SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff*
*FITEQ, INC.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FITEQ, INC., | Case No. ___13-cv-001946-PSG___ |
| Plaintiff, | **ORIGINAL COMPLAINT AND JURY DEMAND** |
| v. | |
| VENTURE CORPORATION, LTD., and CEBELIAN HOLDING PTE, LTD. | |
| Defendants. | |

# I.       __INTRODUCTION.__

1.       Plaintiff FiTeq, Inc. ("FiTeq" or "Plaintiff") hereby files its complaint against defendants Venture Corporation, Ltd. ("Venture Corp.") and Cebelian Holding Pte, Ltd. ("Cebelian") (collectively "Defendants" or "Venture") for breach of contract, damages, and injunctive relief.  For its complaint, Plaintiff alleges, on personal knowledge as to its own acts and on information and belief as to all other matters, as follows:

2.       In 2009, the parties entered into several contracts whereby Venture, a Singapore-based engineering design and electronics manufacturing company, secured exclusivity to engineer and manufacture FiTeq's innovative fraud resistant credit card. As partial consideration for its commitments, Venture received a significant equity position in FiTeq, and took a seat on the FiTeq Board.

3.       Under these contracts, FiTeq was wholly dependent on Venture to perform its obligations fully and in good faith.  FiTeq was precluded from going elsewhere for engineering services, just as it was precluded from going elsewhere for card manufacturing.

4.       Notwithstanding its contractual commitments, and being fully aware of FiTeq's vulnerability, Venture systematically breached its obligations.  It failed to perform its engineering work adequately, just as it failed to manufacture cards properly. It missed deadline after deadline, and falsely reported its alleged progress to FiTeq.

5.       After stringing FiTeq along for over three years, and appreciating that FiTeq was in a precarious position, Venture then demanded that FiTeq substantially renegotiate the underlying agreements.  Specifically, Venture demanded dramatically

better economic terms, including additional financial benefits approaching $30 million. Venture also demanded that FiTeq surrender valuable intellectual property to Venture. Venture finally demanded that FiTeq give Venture "unconditional" manufacturing exclusivity, such that FiTeq would have no recourse regardless of how badly Venture performed or breached. Taken together, these demands essentially reduced to Venture demanding that FiTeq cede the company to Venture. Venture now holds FiTeq hostage to its extortionate demands.

6.      FiTeq files this case to right these profound wrongs.

## THE PARTIES

7.      FiTeq is a venture backed, technology start-up company engaged in developing, building, and selling products designed to combat the most prevalent forms of credit and debit card fraud. With an earlier entity, PrivaSys, FiTeq has been engaged in this development effort for more than a decade, and has spent many tens of millions of dollars on product development and research and development generally. FiTeq is incorporated in the State of Delaware and maintains its principal place of business in this District.

8.      Venture Corp. is a publicly held engineering services and contract electronics manufacturer with its primary place of business in Singapore. Venture holds itself out as a "leading global provider of technology services, products and solutions with established capabilities spanning marketing research, design and development, product and process engineering, design for manufacturability, supply chain management, as well as product refurbishment and technical support across a range of high-mix, high-value and complex products." Venture Corp. is not incorporated in the

State of Delaware, nor is it incorporated in the State of California.

9.      Cebelian is a wholly-owned subsidiary of Venture Corp. with its primary place of business in Singapore.  Cebelian is not incorporated in the State of Delaware, nor is it incorporated in the State of California.

10.     This case arises under an Operating Agreement (the "Agreement") and parallel Common Stock Purchase Agreement ("Purchase Agreement") entered into by the parties in July 2009.  Under the Agreement, Venture secured the right to be the exclusive provider of engineering services to FiTeq.  In addition, Venture secured the right to be the exclusive manufacturer of FiTeq's products.  To secure manufacturing and engineering exclusivity, Venture in turn agreed to meet a rigorous set of engineering and manufacturing milestones with corollary reporting requirements.  Under this Agreement, FiTeq was wholly dependent on Venture to meet its obligations, perform its engineering tasks, report its progress, and manufacture a working, fraud-resistant payment card.

11.     In return for accepting its obligations, Venture received, amongst other things, engineering and manufacturing exclusivity and approximately 15% of the FiTeq common stock.

12.     Venture repeatedly and materially breached its obligations under these agreements.  It consistently missed critical deadlines, failed to report as per contractual requirements, failed to return equipment and materials, submitted false and misleading engineering reports, and failed to deliver the contracted payment card.  Instead, three years into the relationship, Venture suddenly demanded that FiTeq renegotiate the Agreement, and, in this context, demanded a new "up-front" payment of close to $9 million, **plus** an additional $20 million to come over the following several years, based

on a minimum requirement that FiTeq order one million cards per month.  In addition, Venture suddenly demanded that FiTeq surrender FiTeq Intellectual Property ("IP") rights to Venture.  *See* below, ¶ II.H.  In this fashion, Venture demanded to be paid far more than twice for work it had not done once.  Even today, Venture holds FiTeq property hostage to an extortionate financial demand, all as set forth below.

## JURISDICTION AND VENUE

13.     This complaint asserts causes of action for breach of contract under the laws of the State of California pursuant to § 17.2 and § 5.3 of the parties Operating Agreement and Common Stock Purchase Agreement respectively.

14.     This Court has subject matter jurisdiction over this matter by virtue of 28 U.S.C. § 1332.  This action is between a citizen of the State of California, Plaintiff, and citizens of a foreign state, Defendants.  The amount in controversy exceeds $75,000.

15.     This Court has personal jurisdiction over Venture.

16.     Venture has consented to the jurisdiction of the federal courts located in Santa Clara, California.  *See* Operating Agreement at § 17.2; Common Stock Purchase Agreement at § 5.3.

17.     Further, Venture has purposefully availed itself of the protections of the laws of the State of California, *see* Operating Agreement at § 17.2; Common Stock Purchase Agreement at § 5.3, and contracted with Plaintiff who maintains its principal place of business within the Northern District of California.  The agreements at issue were in-part negotiated and drafted in the district, and Defendants participated in numerous meetings relating to the Agreement in the District.  Venture has also shipped materials pursuant to the Agreement into the District, and said materials were received by

Plaintiff in the District.  Defendants also own a significant stake in the Plaintiff, and the Plaintiff has its principal place of business in this District.

18.     Venue is proper in this Court.

19.     Venture has consented to venue in Santa Clara, California.  *See* Operating Agreement at § 17.2; Common Stock Purchase Agreement at § 5.3

20.     Venue is proper in this Court by virtue of 28 U.S.C. § 1391 (b)(1), (c)(2) and (d) in that the Defendants have purposefully availed themselves of this District, such that the Defendants reside here for purposes of 28 U.S.C. § 1391.  Venue is also proper in this Court by virtue of 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the causes of action asserted here occurred in the District.

### INTRADISTRICT ASSIGNMENT

21.     Plaintiff requests assignment to the San Jose division of the Court. Section 17.2 and § 5.3 of the parties' Operating Agreement and Common Stock Purchase Agreement, respectively, require that a party request that any claim arising out of either of those agreements be "subject to the exclusive jurisdiction of the state and federal courts located in Santa Clara, California, and to the extent such courts accept jurisdiction, to submit such matters exclusively to such courts."  The causes of action asserted here arise out of the parties' Operating Agreement and Common Stock Purchase Agreement; hence Plaintiff's request.

## II.     FACTUAL BACKGROUND.

### A.     The Credit Card Fraud Problem.

22.     For the past 40 years, payment cards have been inanimate pieces of plastic.  Each card has a primary account number in embossed characters, information

about the cardholder also embossed, a magnetic stripe ("magstripe") on the back of the card, a printed and visible three or four digit security code and the payment network's hologram and signature panel.

23.     The magstripe contains data that can be read by magstripe readers, the terminals used by merchants at the point of sale ("POS").  When a merchant swipes a card, a magnetic head reads the encoded data and then transmits the data to the issuing bank with an authorization request.  "Track 1" data on the magstripe typically contains the customer's name, account number, expiration date, and a "discretionary data" field to be used by the issuing bank.  "Track 2" data contains the account number, expiration date, and other "discretionary data" fields, all of which must fit within approximately 40 digits of space.  Until recently, the majority of banks used only Track 2 data for their payment card transactions.

24.     A person who obtains the Track 1 and Track 2 account information and the printed security code has all the information that he needs to manufacture a counterfeit card.  An increasing form of fraud consists of collecting valid account numbers, by means of data breach or an illegal swipe known as "skimming," and then using the account numbers and printed security code to manufacture counterfeit cards.  It is estimated that payment card fraud using such techniques costs the issuing banks – and ultimately the cardholders – many billions of dollars a year.

25.     Payment card fraud is being addressed in Europe and in Asia, in part, through the adoption of "smart cards."  A smart card is a payment card equipped with a computer chip, possessing internal data processing functionality.  Smart cards are more difficult to duplicate than conventional cards, and they have intrinsic security aspects.

MasterCard and Visa have advanced smart cards through a joint venture known as EMVCo. ("EMV").

26.     While smart cards offer many benefits, they cannot be read by conventional magstripe POS terminal readers.  Instead, smart cards require new, more sophisticated terminals.  In essence, for a region to enjoy the benefit of full smart card adoption, wholesale replacement of the existing POS magstripe terminals is required.  This "re-terminalization" is expensive but essential to widespread smart card adoption.

27.     MasterCard and Visa accelerated smart card adoption in Europe through what is known as "liability shift."  In the United States, a POS merchant is not liable for loss when a fraudulent card is used in a "card present" transaction, so long as the merchant properly obtains a "personal identification number" ("PIN") or a signature and obtains issuer authorization.  Instead, the issuing bank absorbs that loss.  Conversely, in countries that mandate the issuing banks release smart cards, a POS merchant in Europe bears the fraud loss unless he has invested in a smart card terminal, even if he innocently accepts a fraudulent card.  Shifting the fraud loss to the merchant gives the merchant a strong incentive to invest in new smart card terminals.

28.     MasterCard and Visa have been unable to introduce successfully smart cards in the United States.  In considerable part, this is due to the enormous cost of re-terminalization, estimated to be in the vicinity of $12-13 billion, even excluding more expensive back-end IT changes.  Because MasterCard and Visa have been unable to shift the fraud loss to POS merchants, those merchants lack the economic incentive to invest in new smart card terminals.

29.     Visa and MasterCard previously studied the business case for smart cards and earlier concluded that widespread smart card adoption was not feasible in the United States, given the cost of re-terminalization, merchant resistance, and the expensive changes required in the issuing banks' back-office operations.  Neither Visa nor MasterCard was able to break this technological logjam.  As a result, the American payment card market did not effectively respond to increasing multibillion-dollar skimming fraud through the widespread adoption of smart cards.

**B.     FiTeq Develops An Innovative Solution To Payment Card Fraud.**

30.     FiTeq was founded to develop innovative ways to reduce payment card fraud while working within the existing legacy system of magstripe and EMV readers and transaction networks.  FiTeq understood that smart cards would be adopted slowly if at all in this country, which gave rise to a compelling need to make the legacy system itself more secure.  Prior security approaches, *e.g.*, card holograms or printed security codes, were easily circumvented.  Thus, FiTeq invented a new approach that would allow the card itself to become the center of innovation.  Re-terminalization is unnecessary because data is received from the card in the traditional format.

31.     The FiTeq system creates an authentication code that is unique to each transaction.  The data is transmitted to the magstripe reader by a signal from the card that emulates the magstripe on a traditional card.  Because a counterfeit card lacks the ability to generate this unique signature, or watermark, the issuing bank knows to reject the fraudulent transaction.

32.     The FiTeq method works as follows:

- Each card securely stores a card-specific, cryptographic key.

- Each card contains a "counter" that increments with every use of the card, initialized at zero at the time of card manufacture.

- Each card contains a cryptographic algorithm, to calculate an authentication code.

- The authentication code consists of a combination of *static* information (*i.e.*, unchanging data, such as the account number) and *dynamic* information (*i.e.*, unique, transaction-specific data).

- Both the static information and the dynamic information are processed through an EMV triple-DES (or 3DES) encryption algorithm. The output of this algorithm is reduced to four digits (*e.g.*, 3749). These digits are unique to the specific transaction for the given card.

- The four digits are combined with other data (including the counter) to create a "dynamic authentication code" (or DAC). The DAC is placed in the discretionary data field of Track 1 and/or Track 2. The DAC is then communicated along with the account number, expiration date and a request for authorization to the issuing bank, all through the existing legacy infrastructure.

- The issuing bank has FiTeq software that reproduces the DAC computation on a per-card, per-transaction basis. When the issuing bank receives an authorization request and accompanying DAC, it computes its own DAC for that card using that card's specific cryptographic key and specific counter status. It then compares its issuer-generated DAC to the card-generated DAC, and approves the transaction if the two match.

- FiTeq's technology also works to secure on-line, card not present transactions. The FiTeq display card would display the DAC, and the consumer would have to enter this one time code instead of the conventional static 3 digits on the back of the card.

A counterfeit card is inanimate and does not have the ability to create the unique, transaction-specific DAC. In this way, the FiTeq method detects the use of skimmed, counterfeit cards and denies any transaction attempted, and it does so within the existing magstripe legacy system.

33.     FiTeq's fraud prevention technology is not, however, limited to the magstripe legacy system. FiTeq designed it to be adaptable to a variety of

communications systems and transmission means in addition to the emulated magnetic stripe – including radio frequency (RF), mobile (cellular wireless), near field communication ("NFC") mobile phone/device, and smart-chip compatible systems. These are areas experiencing exponential growth right now; tap and go RF cards (*e.g.*, MasterCard PayPass and Visa PayWave) are becoming increasingly common, and the NFC "digital wallet," *e.g.,* the Google "Wallet," are poised to be a force in the payments industry.  All of these new payment technologies will benefit from FiTeq's novel anti-fraud technology.

34.     FiTeq's technology is designed to bridge the gap between traditional payment cards and fully EMV-compliant smart cards and "digital wallets."  Because it does not require full re-terminalization, FiTeq reasonably believes that its technology will be adopted quickly, populating the United States market with intelligent cards and payment devices.  This would facilitate the ultimate transition to smart cards and "digital wallets."  That is, FiTeq's technology protects sensitive cardholder data in all payment contexts, including NFC, digital wallets, and card not present, on-line transactions. FiTeq's is a fully platform agnostic technology.

35.     Numerous patents and applications cover various aspects of FiTeq's technology and products.  One patent, United States Patent No. 6,805,288 ("288"), was issued on October 19, 2004.  The patent is captioned "Method for Generating Customer Secure Card Numbers Subject to Use Restrictions by an Electronic Card."  This application described significant portions of the technology described above.

36.     FiTeq's innovations are now protected by a substantial patent estate, with numerous additional applications pending.  FiTeq is now the exclusive licensee and controls this patent estate.

**C.      The Critical Importance of Card Certification.**

37.     The major payment processing networks, *e.g.* MasterCard, Visa, American Express, and Discover, have an elaborate certification program for branded payment and debit cards.  While it is possible to release non-certified cards in certain smaller, private markets, wide-scale payment or debit card adoption requires that the card be certified by the principal issuing networks.

38.     The issuing networks publish elaborate certification test requirements. For example, MasterCard's certification tests include the ability to withstand adverse environmental conditions, pass rigorous endurance tests, and satisfy numerous structural integrity tests.  In addition, the card manufacturer's facilities must be audited and certified as secure.

39.     No matter how innovative and desirable a new payment card might be, issuing banks will generally not commit to purchasing or issuing the new product absent certification, which involves a well-defined process.  Certification in the payment business is akin to FDA approval in the drug business: absent such official approval, the product is not marketable.

**D.      The Venture – FiTeq Operating Agreement.**

40.     In July 2009, after months of negotiation and numerous revisions, FiTeq and Venture executed an "Operating Agreement" ("Agreement").  *See* Exhibit 1, attached hereto.  Under this Agreement, Venture secured exclusivity in providing engineering

services to FiTeq, and the right to manufacture FiTeq cards exclusively, all conditioned upon Venture meeting certain contractually set forth engineering and manufacturing production milestones.  This work was all directed by securing card certification, as set forth above.

41.     This Agreement is central to this dispute, and this Complaint summarizes its key provisions below.

### 1.     The Engineering And Production Milestones: The Statement Of Work.

42.     A critical part of the Agreement lies in its meticulously detailed Relevant Regulations in Exhibit C, *i.e.*, certification requirements (*see* below) and Statement Of Work ("SOW") in Exhibit B.  The SOW states the engineering tasks that Venture was obligated to complete under the Agreement.  The Agreement itself states that "[A]ny changes to the SOW must be agreed by both parties in writing."

43.     The SOW set forth a list of detailed and precise engineering targets, *e.g.,* producing a first lab prototype ("LPL") involving "On card new secure and non-secure chip, sensors made on production equipment, BOM ["Bill of Materials"] $4.20 + 10%, NO secure printing."  For each such engineering target, the SOW outlined the requirement itself, the documents that had to be provided to FiTeq upon completion of the engineering milestone, the definition of "engineering success," a target date, and a "no later" than completion date.  Critically, the SOW includes a "Production Pilot" milestone of "no later" than 24 months following the date of the Agreement, or June 2011.  This engineering milestone required that Venture produce a "[s]calable, repeatable manufacturing process on line that scales to >1 million cards per month."  As part of this

milestone, the cards had to be fully functional, with adequate swipe success (work when swiped through debit or credit card readers), and pass industry standard structural, integrity, endurance, and reliability tests all as germane to essential card certification.

44.     This Production Pilot ("PP") milestone was critically important to FiTeq, as was card certification.  Absent Venture meeting this obligation, FiTeq could not release a payment card commercially, a step essential to its business success.  The timing of the PP was also critical: FiTeq had to go into the market, sell conservative and risk averse banks on FiTeq's novel technology, all as backed-up by concrete and real production dates.  Absent a real and hard schedule, FiTeq could not move forward with its business, and hence the detailed "no later than" deadlines in the SOW.

45.     The SOW sets forth numerous intermediate engineering milestones leading to the fully scalable, "no later than" 24 month post-signing Production Pilot. Over three densely detailed pages, the SOW sets forth, in short, a series of progressive manufacturing and documentation milestones, all carefully negotiated and crafted to ensure that the engineering and manufacturing process remained on budget and on time.

46.     The Agreement also explicitly addressed the requirements necessary to secure payment network certification.  Exhibit C to the Agreement set forth the "Relevant Regulations" reflecting, for example, MasterCard certification requirements.  These certification requirements were set forth in considerable detail, and covered "product characteristics and performance to be assessed through testing," and "production and quality and security processes to be assessed through auditing."  Exhibit C also describes the products that FiTeq planned to release for "commercial certification."

47.   The Agreement specifically required that Venture's manufacturing process conform to the processing networks certification requirements:

### Section 4.1.4 Standards and Requirements

(a)   Venture's manufacturing process shall conform to the Certification requirements of American Express, Discover, JCB, MasterCard and Visa Card as the secure Card Provider on behalf of FiTeq with a complete in-line manufacturing process.  FiTeq shall use its best efforts to assist Venture in obtaining the Certification of these Associations.

(b)   Venture's deliverables shall conform to the ISO quality standards.

(c)   Venture's deliverables shall conform to the relevant regulation as measured by ISO, IEC, including but not limited to 7810, 7811, 7816, 10373, etc., as stated in Exhibit C.

(d)   Venture's deliverables shall conform to the logical and physical security standards in operating and product functionality as prescribed in MasterCard's CAST, Visa's Smart Credit and Debit ("VSCD") and American Express EMV standards as specified in Exhibit D.

(e)   Venture shall deliver FiTeq Cards in compliance with the requirements of FiTeq's customers as stated in the Purchase Orders and Certification requirements, or as modified with the agreement of all parties in writing.

(f)   Venture shall remain price competitive in delivering FiTeq Cards.

48.   As part of this Agreement, and during its negotiation and after its execution, FiTeq provided Venture with voluminous confidential technical data and documents.

49.     Throughout the negotiation, and indeed during the full period of the Agreement, Venture held itself out as expert in the requisite areas of expertise.

## 2.     **Venture's Reporting Obligations.**

50.     Under the Agreement, Venture had detailed obligations to report its progress to FiTeq, and to provide FiTeq with documentation relating to Venture's design, engineering, and manufacturing milestones.

51.     There are numerous separate reporting obligations under the Agreement, each with distinct sets of documents: (1) bi-monthly engineering reports; (2) "Design Review" documents; (3) written notice of any anticipated scheduling delay notifications; (4) "Contract Documents" (as described below); (5) "SOW Secured Materials," (6) "Secured Materials, and (7) "Documentation" as described below.

52.     The first such reporting obligation related to Venture's completion of the various milestone tasks set out in the SOW.  On the conclusion of *any* milestone, Venture had the absolute obligation to "prepare, assemble and deliver to FiTeq, in an electronic format approved by FiTeq, the full and complete set of documents listed in the SOW as deliverables."  Agreement at 4.1.1.  These milestone documents are defined in the Agreement as "Contract Documents."  *Id.* at 4.1.1(b).  The Agreement itself underscores that the purpose of this reporting obligation was to ensure that FiTeq had the documentation to permit FiTeq to "effectively and efficiently manufacture, assemble, inspect, test, and modify the FiTeq card."  *Id.*at 4.1.1(b).  Given the importance of this reporting obligation, Venture warranted under the Agreement that the documents so provided would be sufficient to permit FiTeq to recreate Venture's work, *e.g.,* effectively and efficiently, manufacture, assemble, inspect, test and modify the card.

53.     In addition, Venture had the mandatory obligation to save all production versions, including changes made to production versions, related to shipped cards. The Agreement defines "production versions" as including "all technical drawings, documented source code, executable code," and the like. *See* Agreement at 4.1.1(c).

54.     In addition to the engineering milestone reporting and the production reporting, Venture had a mandatory obligation to provide a twice monthly "report from engineering" to FiTeq's head of engineering. *See* § 3.1(a) (hereafter, "engineering reports"). The Agreement specifies that Venture was to utilize its "standard" engineering report, but further specified that if Venture changed that standard, Venture would send a comparable engineering report to FiTeq "at least once each month."

55.     In addition, under the Agreement, Venture had a mandatory obligation to provide to FiTeq any and all materials related to any Venture "Design Reviews."

56.     In addition, Venture had a mandatory obligation to notify FiTeq "in writing at least 90 days prior to a delivery date set forth in the SOW for a Milestone task if Venture reasonably believes that it will not meet the delivery date . . ." (hereafter, "schedule slip notice"). This written notice was required to specify the reason for the extension, and set forth a new targeted date for the milestone task. The rationale for this obligation is clearly stated in the Agreement: enabling FiTeq to "notify its Issuing Banks about the timing, so that the Issuing Banks can plan appropriately for the installation of the FiTeq solution in their business processes." That is, Venture obligated itself to keep FiTeq fully informed and apprised of the schedule, so FiTeq, in turn, could keep its customers equally informed.

57.     As a consequence of the provisions of the Agreement, including the above reporting and engineering milestone obligations, FiTeq agreed to make Venture the sole source for the engineering services and exclusive manufacturer of and for the FiTeq products.

58.     To that end, Section 3.2 of the Agreement states that "Venture will serve as FiTeq's sole source for the engineering services pursuant to the Statement of Work and manufacturing of FiTeq Cards . . . ."  However, this right of exclusivity was explicitly subject to Venture meeting three requirements:  (1) Honoring the terms of the Agreement; (2) Investing $500,000 in cash in FiTeq pursuant to "[a] Common Stock Purchase Agreement"; and (3) Making satisfactory progress on achieving all of the tasks set out in the SOW within the agreed timelines.  *See* Agreement at 3.2(c).  In this fashion, the Agreement explicitly conditions Venture's exclusivity on Venture's complete and timely performance of its obligations under the Agreement.

59.     Under the Agreement, Venture had the obligation to "ensure all documents and drawings that are related to the submissions associated with each Milestone in the SOW" were placed in escrow with Iron Mountain, Inc.  These materials are referenced in the Agreement as "SOW Secured Materials," and the Agreement clarifies that such materials shall include, but not be limited to, all source code, all supporting documentation, including the design materials, all specifications, and all related technological detail.  *See* Agreement at § 4.1.6(a).

60.     The Agreement further specifies that such SOW Secured Materials "shall be released to FiTeq" on any of several events, including if "current investors want to review the assets created by Venture per the SOW;" **or** "upon the occurrence of a new

financing approved by FiTeq's board whereby a due diligence package needs to be

available for review by the new investors . . .." *See* 4.1.6.

### 3.  **Termination Provisions.**

61.     The Agreement has detailed and specific provisions governing termination

for cause.  If a party breached the Agreement, the non-breaching party had the obligation

to issue a written notice to cure.  Pursuant to these terms, FiTeq gave Venture no fewer

than three notices of breach and concomitant requests for cure, beginning in the fall of

2012.  Without exception, Venture failed to cure the various material breaches.  This led

to a final notice of termination, which Venture acknowledged in writing.

62.     At this point, Venture has agreed and concedes that FiTeq terminated the

Agreement, and that the termination provisions are in full force and effect.

63.     Upon termination, Venture had the obligation to deliver to FiTeq "any and

all items furnished by FiTeq and other property of FiTeq then in Venture's possession or

control."

64.     In addition, upon termination, Venture had the obligation to provide to

FiTeq all cards at the agreed to Unit Price, and card manufacturing inventory stock at

cost (where cost is limited to direct costs of manufacturing the inventory; so, for

example, it excludes development costs, licensing expenses, and infrastructure

investment costs, but includes material and labor costs).  As the Agreement puts it:

> [A]ll FiTeq cards which have been manufactured but not
> delivered at the date of termination shall be delivered
> subject to the terms of this Agreement, and all stocks and
> inventory shall be sold to FiTeq at the last agreed Unit Price
> and a price equal to their cost to Venture, respectively.

65.     The Agreement further defines "Unit Price" as the "price per FiTeq Card for which the Card Issuer [*e.g.,* a bank] can order FiTeq Cards to be manufactured under the Agreement . . .."  *See* Agreement, Exhibit 1, Definitions "Unit Price."  This is the card cost to a purchasing bank.  The Agreement also specifically states that Venture must release to FiTeq the secured materials (documents cited above) on Agreement termination.  Venture has breached this obligation, as set out below.

66.     Venture has substantial "stocks and inventory" in Singapore presently, as set forth below.

67.     Further, the Agreement specifies that Venture must release to FiTeq all Secured Materials, which Venture had an obligation to put into escrow in addition to the SOW Secured Materials, upon "a material breach of the Agreement by Venture which has not been cured in accordance with the provisions set out in this Agreement."  *See* Agreement at § 4.1.6(d).  Venture has breached this Agreement, as set out below.  The Secured Materials include, but are not limited to: all source code used in connection with the manufacturing of the FiTeq Cards; all supporting documentation, design materials and specifications for the FiTeq Cards in a form that will allow FiTeq to develop and build the cards on its own; manufacturing specifications; and all related documentation including any updates required to keep such materials current along with results of experiments and all documentation developed by Venture or in its possession pertaining to any Milestone deliverable of the SOW.  *See* Agreement at § 4.1.6(c).

68.     At termination the Agreement also calls for Venture to deliver to FiTeq (in electronic form) "the Documentation for the FiTeq Card."  Agreement at § 12.5(a).  The Documentation includes the descriptions, designs, drawings, schematics, specifications

and other technical documentation set forth in the SOW, in addition to vendor lists and "other documentation provided or to be provided by either party under the Agreement." *See* Agreement at Exhibit 1, Definitions: "Documentation" and "Specifications."

69.     Further, the Agreement obligates Venture to release to FiTeq all SOW Secured Materials upon either of the following two events:

> (1)     current investors want to review the assets created by Venture per the SOW; (2) upon the occurrence of a new financing approved by FiTeq's board whereby a due diligence package needs to be available for review by the new investors.

*See* Agreement at § 4.1.6(b).

70.     In 2012, FiTeq notified Venture in writing that both conditions had occurred: current investors wished to review the assets created by Venture per the SOW, and the FiTeq board had approved a new financing, a rights offering, which required the preparation of a due diligence package including SOW information for investor review. Contrary to the terms of the Agreement, however, and as alleged further below, Venture refused to disclose the materials, but instead initially insisted that existing and prospective FiTeq investors travel from the United States to Singapore to review the SOW documents onsite in Venture's manufacturing facility, and then insisted that investors, including East Coast based investors, travel to a Venture subsidiary's office in Fremont, California.  This stipulation was ex-contractual, unworkable, and, on information and belief, FiTeq alleges that Venture so insisted precisely so as to block access to the SOW Secured Materials.

71.     Under multiple contractual provisions, as set forth above, Venture had and has an absolute obligation to release all materials to FiTeq immediately, just as FiTeq has the right to review such materials immediately.

### 4.     Dispute Resolution Provisions.

72.     The Agreement provides that any party "may seek preliminary or interim injunctive relief from any court having jurisdiction . . . ."  *See* Agreement at § 13.6.  The Agreement further provides that the parties will commit any dispute or claim "arising out of or in connection with the Agreement," or relating to the "performance, breach or termination thereof" to the "exclusive jurisdiction of the state and federal courts located in Santa Clara, California."  *See* Agreement at § 17.2.  The parties also agreed to "waive any challenge to the jurisdiction or venue of" federal or state courts in Santa Clara County, California.  *See id.*  Further, Venture agreed that process may be served upon it or any of its affiliates in any manner authorized by the law of the State of California, and agreed not to contest jurisdiction or contest service of process.  *Id.*

73.     The Common Stock Purchase Agreement, Exhibit 2, attached hereto, has an identical provision.  *See* Purchase Agreement at § 5.3.

74.     The Agreement also has a mandatory fee shifting clause, which provides that any action filed under the Agreement, the prevailing party "will be entitled to recover its costs and expenses (including, without limitation, reasonable attorneys' fees) . . .."  *See* Agreement at § 17.11.

75.     The Purchase Agreement also has a fee shifting provision.  *See* Purchase Agreement at § 5.7.

76.     The Agreement purports to exclude special and consequential damages, but explicitly permits the recovery of direct damages.  Agreement at § 13.4.  It also authorizes injunctive relief.

77.     The Agreement also has a non-waiver clause, as follows:

> The failure of either Party to insist upon or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement, will not be interpreted or construed as a waiver or relinquishment to any extent of such Party's right to assert or rely upon any such provision, right or remedy in that or any other instance; rather, the same will be and remain in full force and effect.

*See* Agreement at § 17.7.

78.      The Common Stock Purchase Agreement also has a parallel non-waiver clause.  *See* Purchase Agreement at § 5.8.

79.     Both the Operating Agreement and Statement of Work (which sets forth the Common Stock Purchase Agreement's "Milestone Event[s]") were exhibits to the Common Stock Purchase Agreement.  The Operating Agreement recites that Venture desired to invest in FiTeq, and expressly states that the Common Stock Purchase Agreement sets out the terms of that investment.  It also states that Venture's right to exclusivity is subject to the $500,000 cash investment under the Common Stock Purchase Agreement.  *See* Agreement at Recital C, § 2, and § 3.2.  Section 3.2 of the Agreement further ties Venture's right of exclusivity to Venture's "satisfactory progress on achieving all the tasks set out in the" Statement of Work.  *See id*. at § 3.2.

**E.      Venture Received Significant Equity In FiTeq And Took A Seat On The FiTeq Board.**

80.     In return for accepting its manufacturing and reporting obligations under

the Agreement, Venture received five things from FiTeq.

81.     First, Venture received a significant early stake in return for its commitment to spool up and manufacture the card. *See* Purchase Agreement at § 1.1, § 1.3 and Exhibit B (the SOW), attached hereto.  As the Purchase Agreement recites, the "consideration for the Milestone Shares shall be the value to the company of the expenditure of time and money by Purchaser [Venture] towards the accomplishment of each milestone even as set forth in Exhibit B…."  That is, Venture was being paid for its development work with the milestone shares, as against Venture being compensated for this work by cash.  In this fashion, under the parties' agreements, Venture received a significant equity stake in return for its commitment to spool up and manufacture the card, all as set forth in the agreements themselves.  As set forth below, Venture's engineering summaries supporting its demands for SOW milestone equity grants did not accurately represent Venture's true progress.

82.     Second, as an equity shareholder, Venture received and took a seat on the FiTeq Board.  From March 2012 through the present, KS Tan served as an active FiTeq Board Member.  Mr. Tan remains on the FiTeq Board at the time of this filing.  As a member of the FiTeq Board, KS Tan had access to sensitive and highly confidential FiTeq information, including financial information.

83.     At the conclusion of the first Board meeting, FiTeq Director William Carson, reviewed for the entire Board the objectives for the next three months.  Specifically, he discussed and reiterated several times before the conclusion of the meeting the absolute requirement that Venture work to achieve certification, which FiTeq Director and Venture Executive, KS Tan, acknowledged.

84.     Third, under the Agreement, and as subject to its compliance with its obligations, Venture became the sole source for "engineering services pursuant to the Statement of Work and related documents."  *See* Agreement at § 3.2.  As a consequence of this exclusivity provision, FiTeq was prohibited from seeking engineering services from another source, absent terminating the Agreement.

85.     Fourth, and as set forth above, Venture received manufacturing exclusivity contingent upon meeting its engineering, manufacturing and reporting obligations, as viewed by FiTeq.  *See* § 3.1.(e).

86.     Fifth, in addition, Venture would be assigned the revenue associated with the Unit Price for cards manufactured and sold, also as set forth above.  Conversely, FiTeq's revenue was based on its licensing fees for the FiTeq solutions.

**F.     <u>Venture Breached Its Obligations To Meet The Engineering Milestones.</u>**

87.      There were five critical engineering milestones set forth by the SOW, Exhibit B to the Agreement, as follows:

1.      Breadboard 1 ("BB1"): complete no later than eight months after signing, or February 2010.

2.      Breadboard 2 ("BB2"): complete no later than twelve months after signing, or June 2010.

3.      Lab Prototype 1 ("LP1"): complete no later than eighteen months after signing or December 2010.

4.      Lab Prototype 2 ("LP2"): complete no later than twenty months after signing or February 2011.

5.      The production pilot: complete no later than 24 months after signing, or June 2011.

88.     These milestones all would result in "certification," as per Exhibit C, by the principal processing networks, MasterCard and Visa.  Absent such certification, FiTeq would not have a broad, commercially viable product, as set forth above.

89.     Each of the above-milestones set forth the precise requirements to be achieved, the documents Venture had to provide to FiTeq upon completion, the metrics against which success would be measured, the initial target date, the "no later than" date, the dollars associated with the work, and the number of FiTeq shares Venture would earn upon successful completion.

90.     Venture systematically breached its obligation to meet these critical benchmarks.

91.     To use the LP2 benchmark as a case in point: by LP2, Venture had to have a functional card that met the following performance metrics:

- Designed to achieve real-world swipe success greater than 95% for "**Transport**" [where the ATM machine ingests the card and then returns it upon transaction completion]; "**Dip**" [gas pump or non-transport ATM] and "**Swipe**" [typical credit card swipe function].

- Conform to 90% of MasterCard's Cast and Visa VSCD standards.

- Conform to least 95% of the ISO [Standards Organization] requirements.

- Present a **mutually** agreed upon engineering plan.

- Present a **mutually** agreed upon objective test plan.

- And provide a Bill of Materials ("BOM") price and production not to exceed $4.20 (plus or minus 25%) per card, corresponding to a device with no more than 45 parts.

- These LP2 engineering milestones were additional to the prior milestones, *e.g.* BBI, BB2, and LP1. Put differently, the LP2 milestone was not satisfied if, by the "no later than" date, aspects of the prior milestones remained unmet. The milestones were, in short, cumulative.

92. By February 2011, Venture was in default on this critical LP2 engineering milestone.

93. Even following the LP2 date, the prototype cards Venture produced were plagued with manufacturing defects. The cards delaminated, were insufficiently flexible, and were incapable of carrying the required hologram and signature panel, all as contrary to the requirements of Exhibit B (SOW) and Exhibit C. Far from achieving a repeatable, scaled production pilot, the Venture cards were profoundly defective, *e.g.*, splitting and peeling apart, exposing the internal electronics.

94. To take a case-in-point, in August of 2011 a major top ten issuing bank under NDA with FiTeq executed a contract with FiTeq to run a pilot with FiTeq cards. Under that Agreement, the issuing bank agreed to purchase a first year commitment of 350,000 cards. The cards would be branded under one of the major payment networks, and serve as a pilot for an anticipated wide-scale FiTeq card rollout.

95. Venture delivered the first 50 cards to FiTeq in October 2011, and a second batch in January 2012, for a total of 2,140 cards. In manufacturing these pilot cards, Venture experienced a manufacturing failure rate in excess of 50%. That is, at least one out of two manufactured cards was fatally defective, with prominent manufacturing defects, such as delamination and cover adhesion problems. More, Venture could not attach the signature panel and hologram, contrary to issuing bank

requirements and the explicit requirements of the Agreement and Exhibit C thereto. FiTeq could not sell cards that its engineering and manufacturing partner, Venture, could not deliver despite a contractual obligation to achieve 95% yield.

96.     Throughout the Agreement, Venture failed to manufacture a finished card to the standards required using a scaled production process that was, as required: (1) reliable; (2) efficient; and (3) with high yield.  More, at all times relevant herein, Venture failed to deliver a repeatable manufacturing process, a scalable manufacturing process, or a manufacturing process that yielded plus 95%, although each of these was a specific contractual requirement.

97.     As a consequence of its inability to reliably repeat the manufacturing process at high yields, Venture was forced to set the price point per card at $8.50, far higher than called for by the Agreement.  That is, given its massive failure rate during the manufacturing process of a finished card, Venture had to nearly double the target unit cost as per the Operating Agreement.

98.     Along the same lines, FiTeq in the period 2011 and forward had concrete "Requests for Proposal" ("RFP's") from other major issuing banks.  FiTeq forwarded these RFP's to Venture, with a request that Venture commit to concrete production dates. Time and again, Venture simply refused to so commit, a failure that precluded FiTeq from closing business with these prospective customers.

99.     The above examples were not anomalous.  Through 2010 and 2011, and in relying on Venture's assurances that it would hit its engineering milestones, FiTeq approached numerous large issuing bank customers, including new economy online payment entities.  These customers, which represent some of the most well-known

financial institutions in the world, were eager to move forward with the FiTeq product.

These would-be customers pressed FiTeq to deliver working test cards.  As set forth

below, and even as it continued to assure FiTeq that Venture was on the cusp of

producing a manufactured card as per the Agreement, Venture failed to produce such a

card.

100.   These actions by Venture were willful, deliberate, and calculated to cause

FiTeq significant damage.  FiTeq's direct damages based on this conduct now

approximate $10 million.

**G.   During The Pendency Of The Agreement, Venture Assured FiTeq That Venture Would Meet Its Engineering Milestones, Representations On Which FiTeq Relied To Its Great Detriment.**

101.   In 2010 and continuing through 2011, Venture consistently assured FiTeq

that Venture would meet its engineering and manufacturing milestones.  FiTeq relied on

these representations in expending significant sums in this District, including acquiring at

great expense a "personalization" facility in the Potrero Hill area of San Francisco.

102.   To illustrate such assurance and reliance, on March 15, 2011, FiTeq's

Joan Ziegler wrote senior Venture employee Thian Nie Khian stating as follows:

> One other point, we plan to send PP cards to Applus for
> final pre-testing of conformance to the ISO tests.  When do
> you anticipate sending these cards for test?  I plan to be in
> Singapore when we receive those results in April so jointly
> Venture and FiTeq can with confidence pull the trigger on
> expenses associated with scale production.  We found a
> great perso [personalization] site in Northern California….
> Achieving on the PP version and shopping feedback from
> Discover cards on the critical drivers to everything we do
> together.  Getting us over the certification finish line is
> what we are after.

103.     Throughout 2011 and 2012, Venture did not warn FiTeq that Venture would not hit its important PP milestone.  To the contrary, Venture consistently and repeatedly gave FiTeq assurance that Venture would ultimately honor its contractual obligations.  It did so in person, in e-mails, and in conference calls.

104.     This e-mail exchange is not anomalous.  Time and again, FiTeq verified with Venture that Venture would be capable of producing the promised card before FiTeq made binding financial and business commitments.  For example, FiTeq prepared a "monthly sales update."  These written updates summarized FiTeq's activities in the marketplace, and FiTeq provided these sales updates to Venture.  The updates were also routinely discussed on conference calls.

105.     Each monthly sales update emphasized the importance of prompt card certification.  For example, in the sales update dated April 27, 2011, FiTeq underscored that "certification lab results" was a "critical path" item to drive sales in the commercial marketplace.

106.     Along the same lines, at Board of Directors meetings attended by Venture's KS Tan, FiTeq executives emphasized the critical importance of card certification.  For example, in a Board of Directors meeting on April 4, 2012, and in a written presentation used at the meeting, FiTeq executives emphasized that "certification with full regression and minimal variances" was an "urgent" item and necessary to complete to market cards.

107.     Venture responded to FiTeq by promising concrete delivery dates.  In reliance on such representations, FiTeq's sales representatives consistently reassured potential FiTeq customers, including some of the most prominent issuing banks in this

country, that FiTeq could and would deliver workable cards on a concrete schedule.
Time and again, given Venture's failure to perform, FiTeq was unable to meet the
commitments it had itself made to these potential customers.  These missed approaches
proved extremely damaging to FiTeq.

108.    To illustrate, and as a representative of the correspondence between FiTeq
and Venture laying out the critical importance of certification, below is a portion of an e-
mail documenting damage to FiTeq:

> Third party Certification data is required by Discover,
> MasterCard and Visa as a condition of doing business with
> their issuing banks.  On June 25[th] Chee Seng Ong and Liu
> Chang met with Eric Foo, FiTeq's Project Head with
> Venture, and me for a detailed discussion on the status of
> certification.  The result of this meeting was a commitment
> by Venture to deliver the third party lab data to FiTeq in
> the first week of August.  FiTeq has been abundantly clear
> how critical this deliverable is to FiTeq's sales effort;
> FiTeq needs that delivery date from Venture to arrange a
> detailed briefing to both our customer banks and their
> networks to drive orders.  As recently as our last telephone
> call, you personally promised to me that Chee Seng Ong
> would deliver these reports from Fime, TruCert, TUV, etc.
> to Eric Foo and to me no later than close of business on
> August 14[th].  My August 13[th] email specifically notified
> you that the detailed third party lab reports are required in
> combination with proof of >95% success among swipe and
> dip readers (the ATM success has been deferred by FiTeq).
>
> Ghai Keen, it is now August 27[th], a full two weeks later
> than you promised to deliver this and still FiTeq is
> not in receipt of the third part lab results, nor an accurate
> date by which Venture will deliver this data.  Venture's
> failure to deliver these detailed reports adversely impacts
> FiTeq's ability to generate revenue, the non-cancellable
> Purchase Orders required by Venture.  It is critical to our
> success that you deliver this data immediately as required
> by the Operating Agreement.
>
> This email notifies you of Section 4.3.4, which clearly
> states the obligations of Venture's obligations in the

event of a delay.

E-mail from Joan Ziegler to Venture Executive Vice President Lee Ghai Keen dated

August 28, 2012.

109.    FiTeq also put Venture on notice that Venture's breaches and failure to

perform was causing FiTeq real and lasting injury.  To quote one such breach and

damages notice:

> I need you and Venture's senior management to appreciate
> the impact these delays cause to FiTeq's operations,
> customer relations and financing efforts.  FiTeq had
> commitments to share certification data with [issuing banks
> and networks] the week of August 6th.  FiTeq already
> missed the deliverable to [networks] and with the news on
> Friday, FiTeq was forced to move the [bank] meeting.  It is
> Venture's obligation to deliver results and inform FiTeq
> in advance if they will be delivered.*** PP was promised
> in May of 2011, then August of 2011, then November of
> 2011, then April of 2012.  Then a slip to June, but a request
> for a grace period through July and then once extra week in
> August.  This is an ongoing slippery slope.  FiTeq has
> managed customers' expectations, but we expect Venture
> to deliver these test results.  If Venture is after non-
> cancellable orders, the single most important duty Venture
> has to the existing agreement is to supply that data to
> FiTeq.  Period.  Full Stop.

E-mail from Joan Ziegler to Lee Ghai Keen, Venture EVP, dated August 12, 2012.

**H.    Instead Of Meeting Its Contractual Obligations, Venture Sought To Renegotiate The Agreement In July 2012 And Demanded Ten Million Dollars In Additional Compensation.**

110.    On July 31, 2012, a full year after failing to hit its critical PP engineering

benchmark, and three years into the relationship, Venture demanded that FiTeq

renegotiate the Agreement.

111.    In writing, Venture demanded that FiTeq agree to pay an incremental nine plus million dollars **and** agree to unconditional exclusivity, **and** cede partial ownership of FiTeq's Intellectual Property to Venture, **and** give Venture exclusive ownership of some IP along with other demands, as follows:

- Pay an "upfront charge" of $3 million in cash **plus** $3.5 million in FiTeq shares (or cash).

- Agree to a new unit charge of $0.292 per card.

- Agree to a Unit Price for a MultiTeq card of $7.56.

- For a display card, agree to an incremental payment of $1 million (Singapore) "payable upon completion of each phase [four phases] over 10 months' development," for total of $4 million (Singapore).

- Agree to a MultiTeq with display Unit Price of $13 for a "committed volume of 2m cards per year."

- Agree to give Venture "**unconditional exclusivity**," as against the carefully negotiated conditional exclusivity set forth in the Operating Agreement (*i.e.*, Venture would have no accountability).

- Agree to share IP with Venture, and agree that Venture would exclusively own particular technology.

- FiTeq would commit to "sale orders of 3m [million] cards per quarter," with "[a]ny shortfall… thrown out" and charged to FiTeq.

- And agree that Venture would have sole manufacturing decision-making authority.

*See* July 31, 2012 "Terms," attached as Exhibit 3.

112.    As proposed, this amendment would have cost FiTeq in excess of $30 million dollars, relative to the deal struck in the Agreement, over the subsequent three years.

113.    In return for this extraordinary new demand, Venture said that it would commit to produce "1 [million] cards per month 9 months from the receipt of upfront charge." A full and complete copy of this renegotiation demand is attached as Exhibit 3.

114.    FiTeq refused to renegotiate the laboriously negotiated and drafted 2009 Operating Agreement, declined to pay Venture far more than twice for work not done once, and rejected Venture's extortionate new demands.

**I.    Venture Breached Its Duty To Report.**

115.    As alleged above, Venture had an absolute obligation to warn FiTeq prior to any schedule slippage on Venture's part.

116.    Venture consistently failed to honor this contractual obligation. To the contrary, and instead of giving FiTeq fair and accurate notice of anticipated schedule delays, Venture assured FiTeq repeatedly that it was making the necessary progress. Such representations were false.

**J.    Venture Breached Its Obligation To Release SOW Secured Materials.**

117.    As alleged above, Venture had an obligation to release SOW Secured Materials upon either a Board approved financing, or if FiTeq investors requested documents to assess the value created by Venture pursuant to the Agreement.

118.    No later than June 2012, FiTeq's Joan Ziegler informed Venture's executive team that the FiTeq Board had approved a fundraising, specifically a rights offering relative to prior investors. In this meeting, and as confirmed in subsequent e-

mails, Ms. Ziegler confirmed the identity of the investors, and asked that Venture comply

by its obligations in providing, amongst other items, the SOW Secured Materials.  As

confirmed in an August 3, 2012 e-mail, Ms. Ziegler specifically called out to Venture's

attention § 4.1.6 of the Operating Agreement, which sets forth the obligation to disclose

upon qualified fundraising or investor asset confirmation.

119.    In early August 2012, Venture refused to provide these materials.  This

prompted another request, again in writing, on August 8, 2012, that Venture release the

documents:

> After a few attempts to request for the document release,
> I'd like to inform you that in our signed operating
> agreement section 4.1.1 Contract Documents, Venture is
> under contractual obligations to release all the latest
> documents as stated below:
>
> Section 4.1.1 The production versions shall at least include
> all technical drawings, documented source code, executable
> code, MPIs, QIIs, LWIs, tooling, testing apparatus, etc.
>
> As we are talking to our current and potential investors
> now (PIs refer to section 4.1.6 – (b), we need your
> immediate attention to release the documents ASAP.  (You
> can send me the latest Gerber files and source code first).

E-mail from FiTeq executive Eric Foo to Ong Chee Seng, Venture Program Manager,

dated August 8, 2012.

120.    Venture continued to refuse to honor its obligations under the Agreement.

Far from making the documents available, Venture instead insisted that these significant

investors travel to Singapore to review the SOW Secured Materials.  As Venture's Lee

Ghai Keen, Executive Vice President, Technology Products & Solutions, put it on

August 13, 2012:

> Joan, I am definitely not in agreement with the many

assertions that you have made, I shall give you a due response, particularly on the project delays, there were many contributing factors that were entirely not within our control.

**As to your request on the release of information to your potential investors, the quickest way is for your investors to come to Venture Singapore, we can make this available for their viewing at the time of your choosing.**

121.  This extra-contractual stipulation that potential investors travel to Singapore was directly equivalent to refusing to release the documents at all.

122.  As a direct consequence of Venture's refusal to honor the terms of the Agreement, FiTeq was compelled to abort this financing.  This consequence caused FiTeq significant damage and loss.

123.  Most recently, on March 14, 2013, FiTeq counsel wrote to Venture counsel, again requesting that Venture release the documents for inspection by accredited investors in San Francisco.  To quote the letter:

> The Operating Agreement provides that SOW "Secured Materials" shall be release to FiTeq if current FiTeq investors want to review the assets created by Venture per the SOW, or if FiTeq has a new board-approved financing underway.
>
> Both events are true, as you know from prior correspondence.
>
> By this letter, and pursuant to Agreement § 4.1.6, we request that Venture make available for the immediate near-term the "secured materials" for review by current and prospective FiTeq investors in San Francisco, California.
>
> Please let me know if your client is willing to abide by these terms.

Letter from Spencer Hosie to David E. Rogers, March 14, 2013.

124.     Venture counsel responded to this letter by e-mail on March 18, 2013, as follows:

> I communicated with Venture.  The Operating Agreement has been terminated for some time, and FiTeq never complied with the escrow requirements, despite Venture's numerous requests that it do so (including executing the Iron Mountain escrow agreement that FiTeq had requested).  So there are no "secured materials" to be released.   Venture would like to negotiate a global settlement with respect to FiTeq paying Venture for the 2,000 cards, equipment Venture purchased and components FiTeq must buy under Section 12.4 of the Operating Agreement.  A spread sheet is reproduced above.  **The release of technical information not already known to FiTeq could be part of that negotiation.**  Also, Venture would like to negotiate a sale of its FiTeq stock back to FiTeq.

E-mail from David Rogers to Spencer Hosie, March 18, 2013 (emphasis added).

### K.     <u>Venture Breached Its Obligation to Release the Secured Materials.</u>

125.     As alleged above, Venture had an obligation to release the Secured materials upon either: (1) the termination of the Agreement, or (2) an uncured material breach of the Agreement by Venture.  *See also* Agreement at § 4.1.6(d)(iii-iv).  As further alleged above, both of these conditions have occurred.

126.     FiTeq has terminated the Agreement in accord with § 12 of the Agreement and Venture has conceded that the Agreement has been terminated.  *See* § II(c)(3) above.

127.     Venture materially breached the Agreement, and continues to be in breach of the Agreement, through, but not limited to, failing to meet the engineering milestones, failing to meet its reporting obligations, and failing to release various materials.  *See* §II(E), (H) and (I) above for examples.

128.    To date, despite acknowledging that termination has occurred, and having been repeatedly notified of its breaches and failure to cure, the Secured Materials have not been released to FiTeq.  Venture has failed to fulfill its obligation to release the Secured Materials.

**L.    Venture Breached Its Obligation to Release the Contract Documents.**

129.    As alleged above, Venture had an obligation to deliver the Contract Documents on completion of milestone events (said events being set forth in the SOW). *See* ¶40 above; *see also* Agreement at § 4.1.1.

130.    Despite having purported to have completed various milestones, for example, the LP2 milestone, *see* § II(E) above, the delivery of certain documents being explicitly set forth as milestone specific deliverables in the SOW, *see* Agreement at Exhibit B; Purchase Agreement at Exhibit B, and Venture having accepted equity in FiTeq for the purported completion of various Milestone Events, *see* Purchase Agreement at § 1.3, Venture to date has failed to provide to FiTeq all documents specified for a given milestone by the SOW and/or has failed to deliver the Contract Documents, and has failed in its obligation to provide these materials.

**M.    Venture Breaches Its Obligation to Release Documentation Upon Termination.**

131.    As alleged above, Venture had an obligation to deliver the Documentation to FiTeq upon termination of the Agreement.  *See* ¶56 above; *see also* Agreement at § 12.5.

132.    FiTeq has terminated the Agreement in accord with § 12 of the Agreement and Venture has conceded that the Agreement has been terminated.  *See* § II(c)(3) above.

133.    To date, despite acknowledging that termination has occurred, the Documentation has not been delivered to FiTeq.  Venture has failed to fulfill its obligation to deliver the Documentation.

**N.    Venture Breached Its Obligation To Sell "Stocks And Inventory" At The "Unit Price" And Instead Held The Inventory Hostage To An Extortionate Financial Demand.**

134.    As alleged above, upon termination, Venture had an obligation to provide to FiTeq all partially assembled cards and related inventory at the agreed upon "Unit Price" and direct cost respectively.

135.    Upon termination, FiTeq repeatedly, and in writing, demanded that Venture honor this obligation.

136.    Venture refused to tender the partially assembled cards at the agreed upon Unit Price and the related inventory at direct cost.  Instead, Venture demanded that FiTeq reimburse Venture for its alleged cost to "tool-up," acquire licenses, and related infrastructure investment costs.  In writing, Venture demanded approximately $1 million from FiTeq as its price to release the partially assembled cards and related componentry.  Explicit in this demand was Venture's request that FiTeq reimburse Venture for set-up and tooling expenditures, notwithstanding that these were costs for which Venture had already been compensated under the Agreement.  This demand exceeded the contractually agreed amount by almost ten-fold.

137.    As of the date of this filing, Venture persists in refusing to deliver the inventory and assembled cards at the agreed upon amount.  FiTeq has repeatedly requested that Venture comply with the Agreement, and Venture refuses to do so.  In addition, Venture refuses to release an authorization letter which would permit FiTeq to

source secure chips to populate its cards, absent FiTeq meeting Venture's illicit and

excessive financial demand.  As Venture put it:

> [Venture] would be happy to authorize FiTeq to buy from
> G&D if the parties can come to an agreement on the
> outstanding issues raised in my previous emails, including
> payment of the $88,000 owed for the 2,000 cards,
> purchasing the equipment and components from Venture
> (see, for example, the attached spread sheet above and
> message below), and purchasing the 66 components from
> Venture that it has on hand.  Venture would also like to
> discuss a possible buy back of the FiTeq stock paid to
> Venture.  Thanks, Dave

E-mail from David Rogers to Spencer Hosie, March 26, 2013.

138.     The referenced "spreadsheet" sets out Venture's demand for a payment of

approximately $1 million as a precondition to release the information it is contractually

obligated to release.  Venture is, in short, holding hostage the information it is

contractually obligated to release in an effort to coerce FiTeq into making a payment

entirely unsupported by the Agreement.

139.     Venture's responses to FiTeq's notices of default reduced to its assertion

that all of Venture's breaches were "technicalities, immaterial, inaccurate, actually

breaches by FiTeq and/or have been waived by FiTeq."

## COUNT I

## BREACH OF CONTRACT
(Operating Agreement)

140.     FiTeq incorporates and re-alleges, as though fully set forth herein, the

allegations contained in paragraphs 1 through 139 above.

141.     FiTeq has performed all the terms and conditions of the Operating

Agreement up until termination of said agreement.

142.   FiTeq has not breached the Operating Agreement.

143.   Venture breached the Operating Agreement by, among other things, not meeting the engineering milestones, failing in its duty to report, failing to release the Design Review materials, failing to release the Contract Documents, failing to release the SOW Secured Materials, failing to release the Secured Materials, failing to release the Documentation, failing to sell stock to FiTeq at the Unit Price, failing to sell inventory to FiTeq at cost, and breaching the covenant of good faith and fair dealing.

144.   As a proximate and foreseeable result of the wrongful conduct described above, FiTeq has been damaged, and will continue to be damaged, until the Defendants are commanded to perform the acts described above.  As of the date of this filing, FiTeq's direct damages alone approximate $10 million.

145.   Venture will continue to not perform the acts described above unless commanded to perform them by this Court.  Plaintiff faces real, substantial and irreparable damage and injury of a continuing nature owing to Venture's breaches of the Operating Agreement for which Plaintiff has no adequate remedy at law.

## COUNT II

### BREACH OF CONTRACT
(Common Stock Purchase Agreement)

146.   FiTeq incorporates and re-alleges, as though fully set forth herein, the allegations contained in paragraphs 1 through 139 above.

147.   FiTeq has performed all the terms and conditions of the Common Stock Purchase Agreement up until termination of the Operating Agreement.

148.   FiTeq has not breached the Common Stock Purchase Agreement.

149.     Venture breached the Common Stock Purchase Agreement by, among other things, not fulfilling elements of the Milestone Events, including but not limited to, failing to provide FiTeq with Design Review documentation, documented source code and documented executable code, and breaching the covenant of good faith and fair dealing.

150.     As a proximate and foreseeable result of the wrongful conduct described above, FiTeq has been damaged, and will continue to be damaged, until the Defendants are commanded to perform the acts described above.  As of the date of this filing, FiTeq's direct damages alone approximate $10 million.

151.     Venture will continue to not perform the acts described above unless commanded to perform them by this Court.  Plaintiff faces real, substantial and irreparable damage and injury of a continuing nature owing to Venture's breaches of the Common Stock Purchase Agreement for which Plaintiff has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for entry of judgment:

A.       that Defendants account for and pay to Plaintiff all damages caused by Defendants' breaches of the herein described agreements in an amount to be proven at trial;

B.       that this Court issue a preliminary and final injunction commanding Venture, its officers, agents, servants, employees and attorneys, and any other person in active concert or participation with them, to perform the acts herein complained of as not performed, and more particularly, that Venture and such other persons be commanded to immediately deliver to FiTeq the Documentation, Contract Documents, SOW Secured

Materials, Secured Materials, Design Review materials, stock and inventory described above at the "Unit Price," as per the Agreement;

   C.   that Plaintiff be granted pre-judgment and post-judgment interest on the damages caused to it by reason of Defendants' breaches of the herein described agreements;

   D.   that this Court require Defendants to file with this Court, within thirty (30) days after entry of final judgment, a written statement under oath setting forth in detail the manner in which Defendants have complied with the injunction;

   E.   that this Court award Plaintiff its costs and disbursements in this civil action, including reasonable attorney's fees, pursuant to contract; and

   F.   that Plaintiff be granted such other and further relief as the Court may deem just and proper under the current circumstances, including the recovery of direct damages.

Dated:  April 29, 2013                    Respectfully submitted,


                                          _/s/ Spencer Hosie_____
                                          SPENCER HOSIE (CA Bar No. 101777)
                                          shosie@hosielaw.com
                                          DIANE S. RICE (CA Bar No. 118303)
                                          drice@hosielaw.com
                                          DARRELL R. ATKINSON (CA Bar No. 280564)
                                          datkinson@hosielaw.com
                                          HOSIE RICE LLP
                                          Transamerica Pyramid, 34th Floor
                                          600 Montgomery Street
                                          San Francisco, CA 94111
                                          (415) 247-6000 Tel.
                                          (415) 247-6001 Fax

                                          Attorneys for Plaintiff
                                          *FITEQ, INC.*

1

**<u>DEMAND FOR JURY TRIAL</u>**

2

      Plaintiff, by its undersigned attorneys, demands a trial by jury on all issues so

3

triable.

4

Dated:  April 29, 2013                    Respectfully submitted,

5

6

     */s/ Spencer Hosie*
SPENCER HOSIE (CA Bar No. 101777)

7

shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)

8

drice@hosielaw.com
DARRELL R. ATKINSON (CA Bar No.

9

280564)
datkinson@hosielaw.com

10

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor

11

600 Montgomery Street
San Francisco, CA 94111

12

(415) 247-6000 Tel.
(415) 247-6001 Fax

13

14

Attorneys for Plaintiff

15

*FITEQ, INC.*

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

EXHIBIT A

OPERATING AGREEMENT

between

FITEQ Inc

and

VENTURE CORPORATION LTD.

Dated as of July      , 2009

**TABLE OF CONTENTS**

SECTION 1    DEFINITIONS ............................................................................................1

SECTION 2    COMMON STOCK PURCHASE AGREEMENT ................................................1

SECTION 3    SERVICES AND RIGHT OF EXCLUSIVITY ......................................................2

SECTION 4    CONTINUING OBLIGATIONS .........................................................................3

    4.1    Obligations of Venture ..........................................................................3

        4.1.1   Contract Documents .............................................................3
        4.1.2   Prototypes ...........................................................................4
        4.1.3   Pre-production Units .............................................................4
        4.1.4   Standards and Requirements ................................................4
        4.1.5   Quality Assurance, Inspection and Testing ............................4
        4.1.6   Secured Location for Documents ..........................................5

    4.2    Obligations of FiTeq .............................................................................6

        4.2.1   Preliminary Documentation ...................................................6
        4.2.2   Customer Information and Strategic Marketing .......................6

    4.3    Mutual Obligations of Venture and FiTeq .................................................7

        4.3.1   Financial Statements ............................................................7
        4.3.2   Change of business notification ............................................7
        4.3.3   Production Management ........................................................7
        4.3.4   Schedule; Delays .................................................................7

SECTION 5    PURCHASE AND SALE OF FITEQ CARDS ......................................................7

    5.1    Master Agreements with Card Issuers .....................................................7
    5.2    Forecasts ............................................................................................8
    5.3    Purchase Order Administration ...............................................................8

        5.3.1   Buyer Purchase Order ..........................................................8
        5.3.2   Acceptance of Purchase Orders ...........................................8
        5.3.3   Rejection of Purchase Orders ...............................................9

    5.4    Modification of Purchase Orders prior to Acceptance of a Purchase Order ........9
    5.5    Modification of Purchase Orders After Acceptance of a Purchase Order...........9

        5.5.1   Modification of Shipment Date ...............................................9

    5.6    Payment .............................................................................................10
    5.7    Shipment and Delivery .........................................................................10
    5.8    FiTeq's customer's incoming inspection .................................................10
    5.9    Cancellation ........................................................................................10

SECTION 6    APPROVED VENDOR LIST .........................................................................10

SECTION 7    WARRANTIES ............................................................................................11

    7.1    Warranty .............................................................................................11

i

## TABLE OF CONTENTS
### (continued)

| | | |
|---|---|---|
| 7.2 | Vendor Warranties | 11 |
| 7.3 | Exclusions and Disclaimers | 12 |
| 7.4 | Remedies for Breach of Warranties | 12 |
| 7.5 | Review of Warranty | 12 |
| 7.6 | FiTeq Warranty | 12 |
| **SECTION 8** | **OWNERSHIP AND PROPRIETARY RIGHTS** | 12 |
| 8.1 | Ownership of Background IPR | 12 |
| 8.2 | Ownership by FiTeq | 12 |
| 8.3 | Pre-Existing Materials; and Third Party Software | 13 |
| 8.4 | Ownership by Venture | 14 |
| 8.5 | Ownership of Joint Intellectual Property | 14 |
| 8.6 | Notice of Potential Intellectual Property Conflict | 14 |
| **SECTION 9** | **PROTECTION OF CONFIDENTIAL INFORMATION** | 15 |
| 9.1 | General | 15 |
| 9.2 | Exceptions | 15 |
| **SECTION 10** | **NOTICE AND CURE** | 15 |
| **SECTION 11** | **ADVISORY SERVICES** | 16 |
| 11.1 | Quarterly Business Review Committee | 16 |
| 11.2 | Management Arbitration Subcommittee | 17 |
| **SECTION 12** | **TERM AND TERMINATION** | 18 |
| 12.1 | Term of Agreement | 18 |
| 12.2 | Termination | 18 |
| 12.3 | Termination for Act of Insolvency | 18 |
| 12.4 | End of the Term | 18 |
| 12.5 | Effects of Termination | 19 |
| **SECTION 13** | **INDEMNIFICATION** | 19 |
| 13.1 | FiTeq's Indemnity for Breach of Intellectual Property Rights | 19 |
| 13.2 | Venture's Indemnity for Breach of Intellectual Property Rights | 20 |
| 13.3 | Product Liability Indemnity | 20 |
| 13.4 | Limitation of Liability | 20 |
| 13.5 | Notice and Cooperation | 20 |
| 13.6 | Injunctive Relief | 21 |
| **SECTION 14** | **CHANGE OF CONTROL** | 21 |
| 14.1 | Change of Control | 21 |
| 14.2 | Special Circumstance | 21 |

69646-0002/LEGAL16496662.2

## TABLE OF CONTENTS
(continued)

SECTION 15   FORCE MAJEURE ............................................................................21

SECTION 16   PERSONALIZATION SERVICES .....................................................22

SECTION 17   MISCELLANEOUS ...........................................................................22

    17.1    Compliance With Laws .....................................................................22
    17.2    Governing Law and Venue ...............................................................22
    17.3    Independent Contractor ....................................................................22
    17.4    Notices ..............................................................................................22
    17.5    Rights and Remedies Cumulative.....................................................23
    17.6    Publicity .............................................................................................23
    17.7    Nonwaiver..........................................................................................23
    17.8    Assignment........................................................................................23
    17.9    No Third Party Beneficiaries .............................................................24
    17.10  Severability .......................................................................................24
    17.11  Attorneys' Fees.................................................................................24
    17.12  Amendments .....................................................................................24
    17.13  Entire Agreement..............................................................................24

69646-0002/LEGAL16496662.2

| List of Exhibits | |
|---|---|
| **Exhibit** | **Description** |
| A | Defined Terms |
| B | Statement of Work |
| C | Relevant Regulation |
| D | Card Issuers' Security Standards |
| E | Preliminary Documentation |

69646-0002/LEGAL16496662.2

# OPERATING AGREEMENT

This Operating Agreement (the "**Agreement**"), dated as of July     , 2009 (the "**Effective Date**"), is made and entered into by and between FiTeq, Inc., a Delaware corporation ("**FiTeq**"), and Venture Corporation Ltd., a Singapore corporation ("**Venture**").

## RECITALS

A.       FiTeq is in the business of designing, developing, marketing and selling authentication and access solutions to financial institutions to reduce fraud and provide production differentiation in the payment industry or the access/authentication industry.

B.       Venture is engaged in the business of providing a seamless manufacturing system, delivering product quality and cost efficiency for a range of high-mix, high-value and complex products on a contract basis and provides total value chain management including Original Design Manufacturing, Electronics Manufacturing Services and E-fulfillment Services.

C.       Venture desires to invest in and be engaged by FiTeq in the engineering and manufacturing of FiTeq Cards in order to enjoy the benefit as a value-added key supplier with sustainable margin and growing market share.

D.       FiTeq desires to engage Venture to enhance its card technology and provide substantial differentiation to Card Issuers.

E.       By entering into a business relationship more particularly described below, Venture desires to allocate its ongoing card manufacturing technology and process engineering resources to enable FiTeq to deliver high value FiTeq Cards to Card Issuers, all subject to and in accordance with the terms and conditions of this Agreement.

## AGREEMENT

The Parties therefore agree as follows:

## Section 1       Definitions

The definitions of certain terms used in this Agreement are set forth in the attached **_Exhibit A_**.

## Section 2       Common Stock Purchase Agreement

The Parties have of even date signed a Common Stock Purchase Agreement which sets out the terms upon which Venture is investing in FiTeq.

**Section 3      Services and Right of Exclusivity**

**3.1**   Venture shall provide the engineering and manufacturing services to FiTeq in accordance with the Statement of Work (the "*SOW*") set out as *Exhibit B* and this Agreement (the "*Services*").  Related to Venture's duties in performing the SOW, Venture and FiTeq have mutual reporting obligations as follows.  The intent of reporting obligations is to: (i) guide FiTeq's sales organization with regard to "time to market"; (ii) ensure Venture is fulfilling its obligations related to the SOW to maintain its exclusive rights provided under the Agreement, and (iii) maintain an open environment of knowledge exchange to expedite SOW completion. Accordingly:

(a)   Venture shall:

   (i)   Provide its standard bi-weekly report from engineering to FiTeq's head of engineering.   If the term of these reports changes internally at Venture, the standard Venture report will be provided to FiTeq at least once each month.

   (ii)   On a periodic basis whenever Venture holds a Design Review of deliverables related to FiTeq's SOW, the materials shall be provided to FiTeq's head of engineering and CEO and both will have the option to participate in these Design Reviews; and

   (iii)   Use reasonable efforts to maintain an ongoing environment of open communication and report success, concerns and issues so there is an expeditious transfer of knowledge from FiTeq.

(b)   FiTeq's head of engineering shall:

   (i)   Review the bi-weekly report and use reasonable efforts to transfer information to Venture's team based on the history of FiTeq's product development; and

   (ii)   Review and prepare for the Design Review and use reasonable efforts to transfer information to Venture's team based on the history of FiTeq's development.

(c)   FiTeq's CEO and Venture's CTO shall perform the following:

   (i)   Venture shall notify FiTeq in writing at least 90 days prior to a delivery date set forth in the SOW for a Milestone task if Venture reasonably believes that it will not meet the delivery date in the SOW, and the written notice shall specify the reasons for such extension and the new targeted delivery date for that Milestone task.  FiTeq shall agree to the new delivery date if the reasons for extension and the new delivery date are reasonable. The purpose of the written notice is to enable FiTeq to notify its Issuing Banks about the timing, so the Issuing Banks can plan appropriately for the installation of the FiTeq solution in their business processes.

   (ii)   On a monthly basis, Venture's CTO and FiTeq's CEO will meet to review expenses incurred by Venture since the inception of the engineering services on each of the Milestones in the SOW.  The review will be to track the allocation of dollars spent on each of the Milestone tasks as set out in the SOW.

2

(d)     Venture and FiTeq shall meet on a regular basis by phone or in person to discuss these documents.  On a monthly basis, FiTeq shall provide a written response approving the Reports and provide approval that the milestone is on track to make the SOW target date or a target date that is agreed upon by parties in writing in accordance with Section 3.2(c).

(e)     If FiTeq deems the engineering services to be proceeding too slowly with regards to the timelines as set out in the SOW, or there are fundamental flaws in the design, FiTeq shall provide a Notice and acceptable Cure recommendation to Venture.  If after two successive unsuccessful Notice and Cure sessions for any Milestone tasks which had been followed by an unsuccessful resolution through the Management Arbitration Subcommittee, FiTeq may give Notice of Termination.

3.2     Venture will serve as FiTeq's sole source for the engineering services pursuant to the Statement of Work and manufacturing of FiTeq Cards (the "*Right of Exclusivity*") subject to:

(a)     the terms of this Agreement;

(b)     Venture's investment of $500,000 in cash in FiTeq pursuant to the Common Stock Purchase Agreement of even date; and

(c)     Venture making satisfactory progress on achieving all the tasks set out in the SOW within the agreed timelines.

## Section 4     Continuing Obligations

### 4.1     Obligations of Venture

#### 4.1.1   Contract Documents

(a)     The SOW in Exhibit B states the engineering tasks.  Any changes to the SOW must be agreed by both parties in writing.  Upon completion of all the tasks set out in the SOW, Venture shall prepare, assemble and deliver to FiTeq, in an electronic format approved by FiTeq, the full and complete set of documents listed in the SOW as deliverables.

(b)     FiTeq shall promptly review such documents and provide to Venture any comments that FiTeq may have (including, without limitation, the identification of any additional documents required and any required revisions to the documents submitted by Venture).  Venture shall promptly revise and resubmit the documents or otherwise respond to FiTeq's comments.  This process shall be repeated until the documents are mutually agreed (collectively "**Contract Documents**").   Venture warrants that the Contract Documents shall be sufficient to permit FiTeq to effectively and efficiently manufacture, assemble, inspect, test and modify the FiTeq Card.

(c)     Venture shall save all production versions, including changes made to production versions, that have been shipped to issuing banks in two locations, i.e., Venture's server, and the Escrow Agent specified in Section 4.1.6 below.  The production versions shall at least include all technical drawings, documented source code, executable code, MPIs, QIIs, LWIs, tooling, testing apparatus, etc.

3

**4.1.2    Prototypes**

(a)    Venture shall design, manufacture, assemble, inspect, test and deliver to FiTeq prototypes of the FiTeq Card in accordance with the requirements set forth in the SOW or otherwise agreed upon by the Parties in writing.

(b)    The prototypes of the FiTeq cards shall be submitted to BRIGHTSIGHT for inspection and testing. Venture shall promptly correct, modify and resubmit the prototypes until the certification of BRIGHTSIGHT is obtained as set out in the SOW.

**4.1.3    Pre-production Units**

(a)    Upon the Parties' agreement on the preliminary Documentation for the FiTeq Card under Section 4.2.1 and the certification by BRIGHTSIGHT of the prototypes under Section 4.1.2, Venture shall manufacture, assemble, inspect, test and deliver to FiTeq pre-production units, in accordance with the preliminary Documentation agreed upon by the Parties under Section 4.2.1 and prototypes under Section 4.1.2.

(b)    The pre-production units shall be submitted to BRIGHTSIGHT for inspection, testing and evaluation. Venture shall promptly correct, modify and resubmit the pre-production units until the certification of BRIGHTSIGHT is obtained as set out in the SOW.

**4.1.4    Standards and Requirements**

(a)    Venture's manufacturing process shall conform to the Certification requirements of American Express, Discover, JCB, MasterCard and Visa Card as the secure Card Provider on behalf of FiTeq with a complete in-line manufacturing process. FiTeq shall use its best efforts to assist Venture in obtaining the Certification of these Associations.

(b)    Venture's deliverables shall conform to the ISO quality standards.

(c)    Venture's deliverables shall conform to the relevant regulation as measured by ISO, IEC, including but not limited to 7810, 7811, 7816, 10373, etc., as stated in Exhibit C.

(d)    Venture's deliverables shall conform to the logical and physical security standards in operation and product functionality as prescribed by Master Card's CAST, Visa's Smart Credit and Debit ("VSCD") and American Express EMV standards as specified in Exhibit D.

(e)    Venture shall deliver FiTeq Cards in compliance with the requirements of FiTeq's customers as stated in the Purchase Orders and Certification requirements, or as modified with the agreement of all parties in writing.

(f)    Venture shall remain price competitive in delivering FiTeq Cards.

**4.1.5    Quality Assurance, Inspection and Testing**

Venture shall source all materials stated in the Bill of Materials through mutually agreed upon suppliers on the Approved Vendor List and manufacture, assemble, inspect, test and package each FiTeq Card prior to shipment in accordance with the Quality Assurance Plan and as otherwise required to ensure compliance with Venture's warranty under Section 7.  In addition,

4

upon FiTeq's request, Venture shall make the FiTeq Cards available for inspection and test by FiTeq or its representative prior to shipment.

### 4.1.6   Secured Location for Documents

(a)   Venture shall ensure all documents and drawings that are related to the submissions associated with each Milestone in the SOW and subsequently accepted by FiTeq up to the release for manufacturing (the "**SOW Secured Materials**") are placed in escrow with Iron Mountain Incorporated. For clarification, the SOW Secured Materials shall include, but not limited to: (i) the source code of all of the software used in connection with the manufacturing of FiTeq Cards, (ii) all supporting documentation, design materials, results of experiments and specifications for the FiTeq Cards that are assets of FiTeq and for which Venture was compensated with Common Stock, (iii) the specifications for each of the Milestones as stated in the SOW, including the manufacturing or assembly processes for the FiTeq Cards, (iv) any and all documentation developed by Venture or in its possession pertaining to any Milestone deliverable of the SOW. Venture agrees to pay fees related to the escrow services until such time when Venture has produced a Production Version card (i.e., more than 100,000 cards) for which FiTeq has generated revenue.

(b)   These SOW Secured Materials shall be released to FiTeq upon the following events:

(i)   current investors want to review the assets created by Venture per the SOW;

(ii)   upon the occurrence of a new financing approved by FiTeq's board whereby a due diligence package needs to be available for review by the new investors; or

(iii)   as required by auditors or any other group to meet any legal requirements.

(c)   Venture shall ensure that: (i) the source code of all of the software used in connection with the manufacturing of FiTeq Cards, (ii) all supporting documentation, design materials and specifications for the FiTeq Cards, in such form that will allow FiTeq to develop and build FiTeq Cards and each component of FiTeq Cards, as the case may be, without the assistance of Venture, (iii) the specifications for the manufacturing or assembly processes for the FiTeq Cards, (iv) any and all updates, modifications, revisions, and enhancements needed to keep current such materials as it is developed by Venture, and (v) any and all documentation developed by Venture or in its possession pertaining to (i) to (iv) of this Section 4.1.6.c (together, the "**Secured Materials**") are placed in escrow with Iron Mountain Incorporated. FiTeq agrees to pay fees related to the escrow services. FiTeq may inspect (but not copy) the Secured Materials to verify that they have been properly deposited in escrow.

(d)   These Secured Materials shall be released to FiTeq under the following conditions:

(i)   in the event of an insolvency proceeding against Venture or an appointment of a receiver or an assignee for the benefit of creditors of Venture;

(ii)   upon the occurrence of a Force Majeure event which would prevent Venture from performing its obligations under this Agreement for a period exceeding 3 months thereby adversely affecting FiTeq's ability to meet its contractual obligations with its Buyers provided that the occurrence of such a Force Majeure

5

Event has been reviewed and confirmed by the Management Arbitration Subcommittee in accordance with Section 11;

(iii) the termination of this Agreement in accordance with Section 12. For the avoidance of doubt, the Secured Materials will not be released to FiTeq if this Agreement has been terminated by Venture due to a material breach by FiTeq which material breach has not been cured in accordance with the provisions set forth in this Agreement; or

(iv) a material breach of the Agreement by Venture which has not been cured in accordance with the provisions set out in this Agreement.

(e) In the event that a Card Issuer, trade association or customer requires certain materials related to FiTeq Cards be placed in escrow, Venture shall cooperate and set up an escrow in accordance with the requirements.

## 4.2 Obligations of FiTeq

### 4.2.1 Preliminary Documentation

FiTeq shall prepare and submit to Venture preliminary Documentation as set forth in **_Exhibit E_** for the FiTeq Card. Venture shall promptly review the preliminary Documentation and provide to FiTeq any comments that Venture may have (including, without limitation, any revisions or additions required to conform the Documentation to Venture's manufacturing and assembly practices and to optimize the Documentation for the efficient, effective and economical manufacture and assembly of FiTeq Cards under this Agreement). FiTeq shall promptly review and respond to Venture's comments. This process shall be repeated until the Parties agree upon the preliminary Documentation for the FiTeq Card.

### 4.2.2 Customer Information and Strategic Marketing

FiTeq shall use reasonable efforts to:

(a) market and promote the sales of the FiTeq cards in connection with the provision of authentication and access solutions;

(b) provide Venture with customer requirements for the FiTeq Cards;

(c) manage customer relationships, sales and purchase order administration;

(d) to the best of FiTeq's knowledge inform Venture of changes in industry rules. For avoidance of doubt, the associations and networks are independent companies and are under no obligation to inform FiTeq of all changes;

(e) gather market intelligence and inform Venture of market changes with respect to new payment platforms, new payment technologies, new technologies that can become part of the EEDA Extensible Electronic Device Architecture; and

(f) report FiTeq's strategy for the trajectory of FiTeq's core technology in order to expand market share and grow new business opportunities with Venture.

6

**4.3     Mutual Obligations of Venture and FiTeq**

**4.3.1   Financial Statements**

(a)     FiTeq shall deliver to Venture its unaudited income statement, statement of cash flows and balance sheet, all prepared in accordance with GAAP, on a quarterly basis within forty-five (45) days after the end of each quarter of each fiscal year of FiTeq.

(b)     Venture shall provide FiTeq with the financial statements of the Venture Group which is released quarterly in accordance with the listing rules of the Stock Exchange of Singapore.

**4.3.2   Change of business notification**

Both Parties shall promptly notify each other of any changes to their Core Businesses. Such notification shall occur in the Quarterly Business Review held in accordance with Section 11.

**4.3.3   Production Management**

Venture and FiTeq shall proactively manage production to specific quarterly objectives to ensure all prices, product performance and quality objectives are met through ongoing improvements in Bill of Materials, automation, tooling, process, etc. as measured by yield and product performance continually increasing and Unit Cost continually decreases.  Venture shall disclose improvement in writing with reasonable details.  Parties may also define key performance indicators to monitor performance.

**4.3.4   Schedule; Delays**

The Parties shall consult, cooperate and use their best efforts to complete the services and other activities described in Sections 4.1 and 4.2 in accordance with the Engineering Milestones Schedule set forth in the SOW.  In the event of any delay, the Party experiencing the delay shall promptly give the other Party written notice of the delay, the reasons for the delay, the anticipated duration of the delay and the actions required to overcome or mitigate the delay.

**Section 5     Purchase and Sale of FiTeq Cards**

**5.1     Master Agreements with Card Issuers**

In FiTeq's Master Agreements with Card Issuers that are members of MasterCard, Visa and American Express, FiTeq shall provide Purchase Orders to Venture for consideration and upon Venture's acceptance of the Purchase Order, assign each Purchase Order to Venture so Venture can finance turnkey manufacturing and be the recipient of a portion of the payment owed pursuant to the Purchase Order that relate to the portion of the payments pertaining to manufacturing of the FiTeq Card (the "***Venture Receivable***") as it becomes due.

For the avoidance of doubt, assignment of Purchase Orders to Venture entitles Venture only to the Venture Receivable as it becomes due and does not give Venture any right to contact the Card issuers directly except where there is a breach of payment obligations.  For avoidance of doubt, to the limited extent there is a breach of payment, Venture may contact FiTeq customers' Accounts Payable Department personnel, and if FiTeq customers' purchasing, marketing or general management are needed in collections discussion, FiTeq shall be notified

7

and shall arrange for and participate in these discussions.

## 5.2    Forecasts

FiTeq shall provide Venture, on an annual and quarterly basis, a rolling three (3) month forecast of FiTeq's best estimate of purchase orders for FiTeq Cards to be delivered by Venture under this Agreement during each of the months covered by the forecast.  FiTeq's forecasts are for capacity planning purposes only and do not constitute a purchase order for any FiTeq Cards, a commitment to order or purchase any FiTeq Cards or any other commitment by FiTeq.

## 5.3    Purchase Order Administration

### 5.3.1  Buyer Purchase Order

Immediately upon receiving a Purchase Order from a Buyer, FiTeq shall forward the Purchase Order to Venture for its acceptance, rejection or modification.  Unless otherwise agreed by the parties, each Purchase Order shall be issued no less than 3 months before the shipment date and shall specify, at a minimum:

(a)    the quantity and Unit Price, Ex Factory of each FiTeq Card ordered;

(b)    the dates upon which the FiTeq Cards are to be shipped by Venture, which unless otherwise agreed, shall be a date three months after the date of Acceptance of the Purchase Order; and

(c)    shipping instructions (including, without limitation, detailed expected schedule and location where the FiTeq Cards should be shipped, specification of any particular carrier, insurance, means of shipment, packaging or labeling required by Buyer). Venture shall accept, reject or modify each Purchase Order submitted by FiTeq within ten (10) Business Days after receipt.

Purchase Order Delivery Dates may be staged for up to twelve (12) months beyond the ninety (90) day shipping window from the acceptance of the Purchase Order if that is consistent with the Purchase Order.

The Purchase Orders may not be cancelled after they have been accepted by Venture.

### 5.3.2  Acceptance of Purchase Orders

(a)    Parties shall strive to have a written policy for any quarterly period that provides a Standard Unit Price and Standard Delivery Date as policy for Sheet Pricing.  Parties shall agree upon Sheet Pricing based on volume and delivery dates on a quarterly basis. The Sheet Pricing shall be at levels which are acceptable to customers of FiTeq.

When establishing Sheet Pricing, Venture and FiTeq shall use reasonable efforts to collaborate and create a product mix that provides a staircase of value for FiTeq's customers, so customers can either choose products that meet universal demand or products with value-enhanced features.   Parties shall use reasonable efforts to incorporate emerging technologies, emerging payment platforms, new firmware for variant product lines to create such a product mix.  The objective of this Sheet Pricing strategy is to maximize both Venture's and FiTeq's margin and maximize market

8

penetration of FiTeq Cards or devices.

(b)      By acceptance of the Purchase Order in writing, Venture is thereby consenting to the Unit Price and the Shipment Date of FiTeq Cards pursuant to the Purchase Order. Such written acceptance can be communicated by email. If Venture does not accept in writing each Purchase Order that is outside standard Sheet Pricing, then it is not accepted.

If both Parties agree upon Sheet Pricing, the acceptance of a Purchase Order is automatic if: (i) the Unit Price in any Purchase Order is equal to or more than the Standard Unit Price; and (ii) the delivery date in any Purchase Order is three months after the date of the Purchase Order acceptance by Venture or is equal to or is more than the Standard Delivery Date.

(c)      Upon acceptance, the Purchase Order shall be binding on Venture, and Venture shall manufacture, assemble, inspect, test, package, sell and deliver FiTeq Cards in accordance with the Purchase Order. In no event shall FiTeq accept a Purchase Order outside Sheet Pricing without Venture's prior acceptance.

### 5.3.3   Rejection of Purchase Orders

Venture may reject a Purchase Order by modification only if:

(a)      the Purchase Order does not comply with this Section 5.3 or any other applicable provision of this Agreement;

(b)      the Unit Price on the Purchase Order is less than the Standard Unit Price; or

(c)      the Delivery Date is shorter than the Standard Delivery Date.

### 5.4     Modification of Purchase Orders prior to Acceptance of a Purchase Order

If Venture rejects a Purchase Order forwarded by FiTeq, Venture shall modify the Purchase Order and provide the following information for FiTeq to communicate to the Buyer at the Card issuer for further negotiation: (i) acceptable Unit Price for the quantity of FiTeq Cards cited in the Purchase Order; (ii) acceptable quantity of FiTeq Cards for the Unit Price cited in the Purchase Order; and (iii) acceptable delivery date for the quantity of FiTeq Cards cited in the Purchase Order.

In the event that Venture and FiTeq have a dispute regarding acceptance of a Purchase Order and cannot resolve it by conventional business process, either Party may issue a written notice to the other and the provisions of Section 10 shall apply.

### 5.5     Modification of Purchase Orders After Acceptance of a Purchase Order

### 5.5.1   Modification of Shipment Date

After Venture accepts a Purchase Order and as soon as Venture determines that it is unable to deliver the FiTeq Cards at the Unit Price within the Shipment Date:

(a)   due to the occurrence of a Force Majeure event, Venture shall give notice to FiTeq immediately and FiTeq shall work with its Buyers to create a mutually acceptable delivery schedule within the 90-day delivery window; or

(b)   due to quality assurance issues or sourcing issues which are beyond Venture's control, FiTeq would work with the Buyer and Venture to schedule mutually acceptable new delivery schedule.

## 5.6   Payment

FiTeq shall assign the Purchase Order to Venture upon written acceptance by Venture.  As part of the legal assignment of the Purchase Order to Venture, Venture shall receive payment directly from the Buyer.  If however FiTeq receives the payment from the Buyer, it will transmit the payment to Venture promptly following receipt of good funds.  FiTeq shall use commercially reasonably efforts to assist in the payment of all Purchase Orders as part of the sales process.

## 5.7   Shipment and Delivery

All FiTeq Cards delivered pursuant to the terms of this Agreement shall be suitably packed for shipment in accordance with the Specifications and marked for shipment by Venture to the shipping destination specified in the applicable purchase order.  If the shipment of FiTeq Cards pursuant to a Purchase Order has left Venture's dock and has been delayed due to causes beyond the reasonable control of Venture, including, but not limited to, acts of God, acts of the public enemy, government acts, fires, floods, epidemics, quarantine restrictions and freight embargoes, Venture shall not be liable for such delay and the purchase order remains in effect

## 5.8   FiTeq's customer's incoming inspection

In the event a Buyer rejects any FiTeq Cards that do not comply with the warranty given by Venture in Section 7, Buyer shall notify FiTeq and FiTeq shall immediately notify Venture, no later than 30 days after delivery to the end users of the FiTeq Cards, of such rejection and cancellation, and any such cancellation shall be without any cost, penalty or liability to FiTeq. Venture shall verify the non-compliance of the affected FiTeq Cards and upon its analysis that the FiTeq Cards do not comply with the Venture warranty as set out in Section 7,  Venture shall promptly, at its own costs, replace the defective FiTeq Cards.  Notwithstanding the above, Venture's inspection right shall conform to the inspection rights that are prescribed in FiTeq's agreement with each Buyer as per the Purchase Order.

## 5.9   Cancellation

If Buyer cancels any purchase order, in whole or in part, at any time, FiTeq shall give immediate notice to Venture, and such cancellation shall be without any cost, penalty or liability to FiTeq, unless such cancellation is due to FiTeq's negligence related to Vault.  FiTeq shall assist Venture to obtain reimbursement from the Buyer for the aggregate Unit Price for the cancelled FiTeq Cards if the cancellation is not due to FiTeq's negligence.

## Section 6   Approved Vendor List

To fulfill the SOW, Venture shall _itself_ provide key engineering services related to automation, tooling, modeling, reliability testing and failure analysis, including but not limited to the completion of the ASIC, porting card firmware from 7816 secure chip to a secure contactless

10

chip.

Venture shall only outsource services under this Agreement to vendors on the Approved Vendor List, which is mutually agreed upon by the Parties. To fulfill the Purchase Order, Venture agrees to source all materials stated in the Bill of Materials through the mutually agreed upon suppliers on the Approved Vendor List without deviation. Mutual agreement is required for any change to the Approved Vendor List and both Parties agree to not unreasonably withhold their consent to any change request.

## Section 7       Warranties

### 7.1      Warranty

Venture warrants that:

(a)      each FiTeq Card shall comply with all applicable Specifications;

(b)      each FiTeq Card shall be new and unused;

(c)      each FiTeq Card shall incorporate only materials that are new and obtained from sources included in the Approved Vendor List;

(d)      Buyers shall acquire good and marketable title to the FiTeq Cards, free and clear of all liens, claims, encumbrances, and other restrictions;

(e)      in performance of the Agreement, Venture shall not infringe or misappropriate any Intellectual Property Rights of any third party;

(f)      Venture warrants that each FiTeq Card shall be free from all defects in material and workmanship (including, but not limited to, cosmetic defects) for :

(i)      24 months after personalization; or

(ii)      26 months ex factory; or

(iii)      2100 swipes,

whichever is earlier;

(g)      Services shall be (i) rendered with promptness and diligence; and (ii) executed in a good, professional and workmanlike manner consistent with best practices in the industry; and

(h)      Venture shall use adequate numbers of qualified individuals with suitable training, education and skill for the performance of the Services.

### 7.2      Vendor Warranties

Upon FiTeq's request, Venture shall pass through warranty coverage which it has received from its vendors for any materials incorporated in any FiTeq Cards to FiTeq, Buyers and/or end users.

## 7.3    Exclusions and Disclaimers

Venture's warranty under this Section 7 does not apply to, and Venture makes no warranty with respect to, any:

(a)     FiTeq proprietary components;

(b)     FiTeq Cards that have been abused, damaged, altered or misused by any person or entity after risks passes to Buyers; or

(c)     prototypes, pre-production models, test units or other similar FiTeq Cards that are specifically manufactured and labeled pursuant to this Agreement for test purposes only.

## 7.4    Remedies for Breach of Warranties

If any FiTeq Card fails to comply with the warranties set forth in Section 7.1, then Venture shall, at FiTeq or its customer's option and Venture's expense, either:

(a)     repair or otherwise correct the noncomplying FiTeq Card;

(b)     accept the noncomplying FiTeq Card in exchange for a new FiTeq Card that does comply; or

(c)     shall credit or refund FiTeq's customer for any and all amounts paid by such customer for the FiTeq Cards.

## 7.5    Review of Warranty

Parties however agree to review the warranty for the FiTeq cards where there are improvements in the technology affecting the battery life of the battery incorporated in the FiTeq cards.

## 7.6    FiTeq Warranty

FiTeq represents and warrants that, to the actual knowledge of FiTeq, FiTeq Background IPR does not violate or infringe any Intellectual Property Right of any third party, and that FiTeq is not aware of any facts upon which such a claim for infringement could be reasonably based.

## Section 8    Ownership and Proprietary Rights

## 8.1    Ownership of Background IPR.

Each Party shall own its own Background IPR, and except as may be specifically set forth in writing, nothing in this Agreement or any SOW shall be deemed to provide one Party with any rights to the other Party's Background IPR.

## 8.2    Ownership by FiTeq.

(a)     As between FiTeq and Venture, FiTeq shall own or have rights to all right, title, and interest in its Background IPR, any derivative works of such Background IPR by either Party as contemplated by this Agreement or a SOW, and all Intellectual Property Rights

12

that are created by either Party in performing this Agreement or SOW and are not related to the manufacturing process ("**FiTeq IPR**"). FiTeq shall have the exclusive right to apply for or register any patents, mask work rights, copyrights, and such other proprietary protections with respect to FiTeq IRP, and Venture agrees to execute any documents or take any other actions as may reasonably be necessary, or as FiTeq may reasonably request, to perfect FiTeq' ownership of any such FiTeq IPR. FiTeq hereby grants Venture a nonexclusive, worldwide, revocable, non-sublicense-able (except as set forth in Section 8.2(b)(ii)), fully paid-up, and royalty free license to make, have made, use, import, copy, modify, offer to sell, sell, lease and otherwise distribute FiTeq's Background IPR, solely to the extent that:

(i)     the license shall be limited to the use of the Background IPR only in connection with Venture's manufacture and distribution of FiTeq Cards under this Agreement;

(ii)    in the event such Background IPR consists of software, the license is limited to use of such Background IPR in a compiled format in conjunction with this Agreement, except that the licenses hereunder shall permit Venture to utilize the Background IPR in an uncompiled format for the limited purpose of embedding part or all of such Background IPR (in compiled format) in FiTeq Cards manufactured by Venture; and

(iii)   any changes made to the FiTeq Background IPR will be reported in the design review document.

(b)     For the avoidance of doubt:

(i)     after completing the Engineering Milestones set forth in the SOW, Venture will have no rights to FiTeq's Background IPR, and FiTeq's Background IPR is owned exclusively by or licensed to FiTeq as part of its core business;

(ii)    the license granted by FiTeq to Venture under this Agreement may only be sublicensed by Venture to its majority-owned and controlled Affiliates, subject to FiTeq's prior written consent, not to be unreasonably withheld; and

(iii)   FiTeq shall be able to claim its Background IPR for a deliverable under a SOW if such deliverable is derived from FiTeq's Background IPR and is different from manufacturing or engineering process.

**8.3     Pre-Existing Materials; and Third Party Software.**

Venture will disclose to FiTeq any tools, works of authorship or other materials proprietary to Venture and/or Venture's licensors or suppliers ("**Preexisting Materials**") and all software owned by third parties ("**Third Party Software**") that Venture intends:

(a)     to use in the development of the prototype or any deliverable; or

(b)     to incorporate into the prototype or any deliverable,

and any such use shall be subject to FiTeq's prior written approval.

13

Subject to the rights of the owners of Third Party Software, Venture hereby grants to FiTeq a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, fully-paid right and license, with right to sublicense through multiple tiers of sublicensees, to use such Preexisting Materials, where it is permitted by the third party licensors in connection with FiTeq's use of the prototype and deliverables. Notwithstanding any other provision of this Agreement, to the extent that Third Party Software is incorporated into a deliverable, FiTeq's rights to use such Third Party Software (including Third Party Software that is incorporated into Background IPR) shall be subject to a license between the owner of such Third Party Software and Venture.  Moreover, the parties acknowledge and understand that certain Preexisting Materials not owned by Venture may have additional restrictions or terms associated with them, of which such terms must be clearly set forth in the Preexisting Materials section of any deliverable. Therefore, execution of the Agreement by officers of the Parties shall constitute acceptance of any such additional terms.

**8.4     Ownership by Venture.**

Venture shall own all right, title, and interest in Venture's Background IPR and any modifications made to such Background IPR by either Party pursuant to this Agreement or a SOW, including any derivatives, improvements or modifications of Venture's Background IPR. For the avoidance of doubt, to the extent Venture claims its Background IPR in connection with a deliverable under a SOW, Venture shall specify such Background IPR in the SOW.

**8.5     Ownership of Joint Intellectual Property.**

Subject to the ownership rights specified in Sections 8.1, 8.2, 8.3 and 8.4, FiTeq and Venture shall be co-owners of any intellectual property that is related to the manufacturing process of the FiTeq Cards ("*JIP*").  The Parties agree to execute any documents or take any other actions as may reasonably be necessary to perfect the Parties' joint ownership of any such JIP.  The Parties further agree that JIP cannot be assigned to or used by any third party without prior written consent by both Parties.  The Parties also agree to engage each other to explore new business opportunities utilizing the JIP with the following limitations:

(a)     participation in the new business opportunity contemplates a revenue share for the use of the respective Party's Background IPR and for the JIP;

(b)     Parties shall agree in writing as to how the new business opportunity should be exploited and the manner in which each Party shall participate. However if one Party does not wish to participate in the new business opportunity, that Party shall not unreasonably withhold its consent to the other Party pursuing the opportunity; and

(c)     the Parties further agree not to compete with each other in business that is related to the JIP or their respective Core Businesses.

**8.6     Notice of Potential Intellectual Property Conflict.**

One Party shall give at least 30-days prior written notice to the other Party in the event that the first Party enters into an agreement with a third party to engage in the manufacturing of a product that may have potential intellectual property conflicts with the other Party's Background IPR.

14

**Section 9     Protection of Confidential Information**

**9.1     General**

In the performance of this Agreement, a Party may disclose to the other Party certain Confidential Information.  In such event, the Recipient will protect such Confidential Information of the Discloser against any unauthorized use or distribution to the same extent that the Recipient protects its own Confidential Information of a similar nature against unauthorized use or distribution (but in no event using less than commercially reasonable efforts to protect the Confidential Information), provided that the Confidential Information of the Discloser is conspicuously marked or otherwise identified as confidential or proprietary upon receipt by the Recipient or the Recipient otherwise knows or has reason to know that the same is Confidential Information of the Discloser.  Without limiting the foregoing:

(a)     the Recipient will Use such Confidential Information solely for the purposes for which it has been disclosed by the Discloser;

(b)     the Recipient will disclose such Confidential Information only to those of its employees, agents, consultants and other representatives who have a need to know the same for the purposes described in (a) above, and who understand and acknowledge their obligation and willingness to preserve and hold such Confidential Information in strict confidence;

(c)     the Recipient will not copy or authorize the copying of any confidential materials, except as required for the purposes described in (a) above or otherwise authorized by the Discloser in writing; and

(d)     any copy of any confidential materials that is made or authorized by the Recipient will contain all copyright, confidentiality or other proprietary notices contained on such document as delivered by the Discloser.

**9.2     Exceptions**

Paragraph 9.1 will not be interpreted or construed to restrict or prohibit any use of any Confidential Information:

(a)     that is reasonably necessary or appropriate in connection with the Recipient's performance of its obligations or exercise of its rights under this Agreement or any other agreement between the Parties;

(b)     required by applicable law (e.g., pursuant to applicable securities laws or legal process), provided that the Recipient uses reasonable efforts to give the Discloser reasonable advance notice thereof and to limit the extent the Confidential Information is disclosed; or

(c)     made with the consent of the Discloser.

**Section 10     Notice and Cure**

In the event that either Venture or FiTeq does not meet any of its obligations as set out in this Agreement, the following mechanism of notice and cure shall apply:

69646-0002/LEGAL16496662.2

(a)     Written notice shall be given by the non-defaulting Party to the defaulting Party in accordance with Section 10(b).

(b)     The written notice shall state:

    (i)      in reasonable detail, the nature of the alleged non-compliance;

    (ii)     a reasonable cure period, which shall not be less than 2 weeks from the date of the notice; and

    (iii)    the course of action reasonably expected to be taken by the defaulting Party to cure the non-compliance.

(c)     Both Parties shall confer either in person or by telephone within five (5) business days after the date of the written notice for purposes of determining the corrective action to be taken by the Parties to cure the non-compliance and the time period by which it should be completed.

(d)     Upon the completion of the agreed course of action:

    (i)      the non-defaulting Party may give an acceptance notice in writing that the cure has been accepted;

    (ii)     both Parties may mutually agree to take such further action as required to refine the course of action necessary to cure the non-compliance; or

    (iii)    the non-compliance has not been remedied or if any of the completion dates in the corrective action plan has been exceeded, then the non-defaulting Party may submit the issue to the Management Arbitration Subcommittee for resolution in accordance with Section 11.2.

(e)     If the Parties are unable to agree on the correction action in Section 10(c), the issue shall be submitted to the Management Arbitration Subcommittee for determination in accordance with Section 11.2.

(f)     Pending resolution of issues raised under this Section, the Parties will continue performance of their respective obligations under this Agreement in good faith, including without limitation, the payment of all undisputed amounts.

## Section 11    Advisory Services

### 11.1   Quarterly Business Review Committee.

The Parties shall form a Quarterly Business Review Committee, which is comprised of key management members of both Venture and FiTeq, to meet on a quarterly basis for the purpose of collaboration to fully exploit the commercialization of FiTeq's solutions.   The Quarterly Business Review Committee shall perform the following functions:

(a)     review market conditions, changing market dynamics and related business or product opportunities;

(b)    review sales report for the quarter period, rolling forecast of sales for the next 12 month period, strategic sales opportunities, etc.;

(c)    review development progress and measure success of development milestones against key metrics, target new product improvements to sustain margin and grow market share;

(d)    review success metrics against actual manufacturing, assess fulfillment of POS, the quality assurance plan, warranty, etc., set targets for upcoming quarters, analyze problems or shortcomings for the past quarter and set up new success metrics;

(e)    identify necessary improvements in core technology to sustain market share;

(f)    identify unique differentiation of card services for Card Issuers to grow market share; and

(g)    audit schedule by FiTeq and its key card issuing association partners.

**11.2   Management Arbitration Subcommittee.**

(a)    The Parties shall form a Management Arbitration Subcommittee comprised of a key senior executive from Venture and from FiTeq as the body for final resolutions of all issues related to this Agreement, including but not limited to this Agreement, the manufacturing services, the engineering services as set out in the SOW, IP Rights and the financial stability of either Party. The Management Arbitration Subcommittee is a business person's forum for resolving disputes between the Parties without formal legal procedures.

The Management Arbitration Subcommittee shall define Notice and Cure Procedures to surface and resolve disputes and issues between the Parties before they damage the relationship intended by this Agreement. The Management Arbitration Subcommittee shall meet on a regular basis, but in no case less than quarterly to resolve all outstanding issues identified in the Notice and Cure Procedures. In the event of multiple Notices without a satisfactory Cure, the Parties shall have the Management Arbitration Subcommittee make the final decision as to acceptable resolution.

The Management Arbitration Subcommittee shall come to an agreement within 60 days. If the Management Arbitration Subcommittee is unable to reach an agreement at the end of 60 days, the Parties may terminate the Agreement in accordance with Section 12.2 and/or bring a claim in accordance with Section 17.2.

(b)    The following principles will set the tone of the relationship of the Parties and describe the basis of each Party's behavior, both Parties shall:

(i)    focus on supporting business needs and outcomes for mutual benefit of the Parties;

(ii)    work collaboratively and co-operatively to resolve any issues arising from the implementation and operation of this Agreement; and

(iii)   contribute towards a long-term relationship and strongly contest any reason for termination.

## Section 12   Term and Termination

### 12.1   Term of Agreement.

The Term of this Agreement will commence as of the Effective Date of this Agreement and will continue unless and until terminated pursuant to Section 12 of this Agreement.

### 12.2   Termination

If either Party breaches the terms of this Agreement and such breach has not been resolved in accordance with the procedures set out in both Sections 10 and 11, then either Party may issue a written notice to the other Party to cure the breach within 30 days of the receipt of the written notice.  If the non-compliance is not remedied within the said 30 days, the non-defaulting Party may terminate the Agreement.

### 12.3   Termination for Act of Insolvency

(a)   If an Act of Insolvency occurs with respect to Venture, then FiTeq may terminate this Agreement by giving written notice of such termination.

(b)   If an Act of Insolvency occurs with respect to FiTeq, Venture may continue to fulfill Purchase Orders and receive the Venture Receivable under the operation of this Agreement. The payments paid by Card Issuers pursuant to the Purchase Orders other than the Venture Receivable shall be held in an escrow account for the benefit of FiTeq.

(c)   Upon termination due to an Act of Insolvency of FiTeq, FiTeq would render such assistance necessary to enable Venture to obtain the necessary licenses directly from PrivaSys to enable Venture to continue to exploit the JIP.

### 12.4   End of the Term

Upon any notice of termination of the Term being given under this Agreement, the following will apply, unless otherwise agreed by the Parties:

(a)   the Parties will cooperate to effect an orderly, efficient, effective and expeditious termination of their respective activities under this Agreement;

(b)   Venture will deliver to FiTeq any and all items furnished by FiTeq and any other property of FiTeq then in Venture's possession or control;

(c)   FiTeq will deliver to Venture any and all items furnished by Venture and any other property of Venture then in FiTeq's possession or control;

(d)   the licenses granted by FiTeq and Venture under Section 8 will terminate;

(e)   the Right of Exclusivity granted by FiTeq to Venture under Section 3 will terminate;

(f)    any outstanding orders accepted by Venture under Section 5 prior to the end of the Term will remain in full force and effect, provided that:

    (i)    if FiTeq terminates the Term pursuant to Section 12.2 or Section 12.3, then FiTeq may cancel any outstanding orders without any cost, penalty or liability to FiTeq; and

    (ii)    if Venture terminates the Term pursuant to Section 12.2 or Section 12.3, then Venture may cancel any outstanding orders without any cost, penalties or liability to Venture;

(g)    the Parties' respective rights and obligations under Sections 3, 4, 5, 7, 8, 9, 12, 13, 14, 15, and 17 will survive the end of the Term in accordance with their respective terms; and

(h)    all FiTeq Cards which have been manufactured but not delivered at the date of termination shall be delivered subject to the terms of this Agreement, and all stocks and inventory shall be sold to FiTeq at the last agreed Unit Price and a price equal to their cost to Venture, respectively.

## 12.5    Effects of Termination

Except where this Agreement has been terminated by Venture due to a material breach by FiTeq which material breach has not been cured in accordance with the provisions set forth in this Agreement, Venture shall upon the termination of this Agreement deliver to FiTeq, in an electronic format approved by FiTeq, a full and complete set of:

(a)    the Documentation for the FiTeq Card;

(b)    a quality assurance plan; and

(c)    a Unit Price inclusive of labor, parts and Venture's price list for the FiTeq Card.

FiTeq shall promptly review such documents and provide to Venture any comments that FiTeq may have (including, without limitation, the identification of any additional documents required and any required revisions to the documents submitted by Venture).

Venture warrants that the Contract Documents shall be sufficient to permit FiTeq to effectively and efficiently manufacture, assemble, inspect, test and modify the FiTeq Card.

## Section 13    Indemnification

### 13.1    FiTeq's Indemnity for Breach of Intellectual Property Rights

FiTeq agrees to defend, indemnify and hold harmless, Venture from and against any loss, cost, liability and expense (including reasonable attorneys' fees and court costs) at its own expense, any claim, suit or legal proceeding ("**Claim**") which may be brought against Venture by a third party alleging infringement by Venture as a result of the use of the FiTeq's Background IPR. Without limitation to such Party's indemnification obligations, FiTeq shall have the right, at its own expense, to procure for Venture the right to continue using the FiTeq's Background IPR so that it becomes non-infringing and in the event that it is unable to do so, the issue shall to the

19

Management Arbitration Subcommittee for resolution in accordance with Section 11.

**13.2    Venture's Indemnity for Breach of Intellectual Property Rights**

Venture agrees to defend, indemnify and hold harmless, FiTeq from and against any loss, cost, liability and expense, arising from any suit or legal proceeding which may be brought against FiTeq by a third party alleging infringement or misappropriation of a third party's intellectual property by Venture's Background IPR or the Services. Without limitation to such Party's indemnification obligations, Venture shall have the right, in the event that the Venture Background IPR renders the FiTeq unable to use the same, at its own expense, to procure for FiTeq the right to continue using the FiTeq Cards replace FiTeq Cards with an equally satisfactory non-infringing product, modify said FiTeq Cards so that it becomes non-infringing and in the event that it is unable to do so, the issue shall to the Management Arbitration Subcommittee for resolution in accordance with Section 11.

Further, Venture shall be responsible for any and all costs of recall of any FiTeq Cards due to any cause described in this Section 13.2.

The foregoing indemnity fully defines Venture's obligation for infringement of intellectual property rights.  Such obligations shall specifically not apply to an infringement claim resulting from additions or changes made by Buyer or any third party.

**13.3    Product Liability Indemnity**

Venture will defend and indemnify FiTeq from and against any and all claims that may arise out of or in connection with any breach of the warranty as set out in Section 7.1 or property damage or bodily injury (including death), if and to the extent the same is attributable to the fault, negligence or strict liability of Venture, or any employee, contractor or supplier of Venture, or any other person acting under the direction or supervision of Venture or its subcontractors or suppliers (other than FiTeq or FiTeq's employees).

**13.4    Limitation of Liability**

Neither Party nor its affiliates shall be liable to the other Party or its affiliates under any legal or equitable theory of liability (including, without limitation, breach of contract, strict liability, negligence, or other tort, or breach of statutory duty), for any special, incidental, indirect, consequential, punitive, or exemplary damages arising out of, related to, or connected with this Agreement in any way (including, without limitation, any damages resulting from lost profits or loss of business), regardless of whether such other Party or its affiliates shall be advised, shall have other reason to know, or in fact shall know of the possibility of the foregoing.

Notwithstanding the above, the foregoing limitations shall not apply to Venture's obligation to indemnify FiTeq from any third-party claims against FiTeq in connection with the manufacture of the FiTeq card by Venture and any services related to personalization or Vault which may be provided by Venture.

**13.5    Notice and Cooperation**

Each Party's indemnification obligations under Section 13 are conditioned expressly upon the indemnified Party (a) giving the other Party written notice of such claim promptly after the Party seeking to enforce such obligations receives notice of the same; (b) cooperating with the other

Party in connection with the defense, settlement and satisfaction of such claim (at the other Party's reasonable expense); and (c) granting the other Party sole control of the defense and settlement of such claim (except that the enforcing Party's prior written approval will be required for any settlement that reasonably can be expected to require an affirmative obligation of or result in any ongoing liability to the enforcing Party).

## 13.6    Injunctive Relief

Notwithstanding the foregoing, any Party may seek preliminary or interim injunctive relief from any court having jurisdiction, whether or not such Party has pursued resolution in accordance with this Section 13.  By seeking or obtaining such remedy, the Party seeking injunctive relief will not waive any of the provisions of this Section 13, and any issues or claims arising in connection with such injunctive relief may, at the election of the Party seeking injunctive relief, be determined in accordance with this Section 13.

## Section 14    Change of Control

## 14.1    Change of Control

In the event that FiTeq is acquired by a third party through merger, consolidation or other corporate reorganization or by way of a sale of substantially all of the assets of FiTeq (the "**Change of Control**"), the surviving party shall assume all of the obligations of FiTeq under this Agreement and agree to comply with the terms set forth in this Agreement.  FiTeq shall give a prior written notice to Venture of the Change of Control.

## 14.2    Special Circumstance

With respect to the warrant associated with completing Certification by December 1, 2010, in the event that a Change of Control occurs to FiTeq prior to VENTURE completing the Certification and assuming that Venture has been performing on a timely basis in accordance with the SOW, FiTeq shall issue a warrant to Venture to purchase the pro rata portion of Common Stock by multiplying 2,500,000 by a fraction, the numerator of which is the number of dates elapsed between the Effective Date and the date of the Chang of Control and the denominator is the number of dates between the Effective Date and December 1, 2010.

For example, assuming the Effective Date is June 1, 2009, the date of the Change of Control is June 1, 2010, then in the event of the Change of Control, FiTeq shall issue to Venture a warrant to purchase 1,665,146 (2,500,000 x (365/548)) shares of common stock.

## Section 15    Force Majeure

Neither Party shall be liable for failure or delay in performance of any of its obligations under this Agreement or for any damages caused thereby, if such failure or delay is caused by, or arises in connection with, any supervening act of God, act of public authority, injunction, war, terrorism, embargo, strike, lock out, failure or delay of supplier or carrier, failure of communication or public utility, casualty, or natural disaster, or any other supervening cause, circumstance or condition, whether similar or dissimilar to the foregoing, that is beyond the reasonable control of the Party, provided that the Party shall have used reasonable commercial efforts to avoid such occurrence and minimize its impact and duration.  To the extent failure or delay in performance is caused by such a cause, circumstance, or condition, such Party shall be excused from its affected performance hereunder so long as such circumstance, condition

21

or event continues to prevent such performance.

## Section 16     Personalization Services

Venture shall have an option to provide personalization services at cost of no more than $1 per FiTeq Card if required by a Card Issuer.  FiTeq shall assist Venture to become a MasterCard or Visa Card secure facility for personalization services.

## Section 17     Miscellaneous

### 17.1     Compliance With Laws

Each Party will comply with all applicable laws, regulations, rules, orders and other requirements, now or hereafter in effect, of governmental authorities having jurisdiction in performing this Agreement.  Without limitation of the foregoing with respect to Venture's making, use, distribution and other dealings with the FiTeq Card, Venture will comply with the U.S. Export Administration Act, regulations of the U.S. Department of Commerce and other export controls of the United States, as applicable.

### 17.2     Governing Law and Venue

This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to conflicts of laws thereof that may direct the application of the laws of another jurisdiction. The Parties agree to (a) request that any dispute or claim arising out of or in connection with this Agreement, or the performance, breach or termination thereof, be subject to the exclusive jurisdiction of the state and federal courts located in Santa Clara, California and (b) to the extent such courts accept jurisdiction, to submit such matters exclusively to such courts. The Parties hereby waive any challenge to the jurisdiction or venue of such courts over these matters. Venture agrees that process may be served upon it or any of its affiliates in any manner authorized by the laws of the State of California and waives and covenants not to assert or plead any objections that they might otherwise have to such jurisdiction and to such process.

### 17.3     Independent Contractor

Each Party is an independent contractor in the performance of this Agreement.  Without limiting the generality of the foregoing, each Party will properly withhold and pay, or ensure that a third party properly withholds and pays for, all federal income, workers' compensation, employer's liability, pension, deferred compensation, welfare, insurance and other employee taxes or benefits payable to or on behalf of any Person engaged by such Party to perform any of its obligations under this Agreement.  Neither Party will have, by virtue of this Agreement, any right, power or authority to enter into any contract or to assume or incur any other commitment or obligation in the name of or on behalf of, to act as the agent or representative of, or to otherwise bind the other Party.  This Agreement will not be interpreted or construed to create or evidence a partnership, joint venture or franchise among the Parties or as imposing any partnership, joint venture or franchise obligation or liability on either Party.

### 17.4     Notices

Any notice or other communication under this Agreement given by a Party to the other Party will be in writing and will be delivered in person or mailed, properly addressed and stamped with the

22

required postage, to the intended recipient at its address specified in this Section 17.4.

    If to Venture:
5006 Ang Mo Kio Avenue 5
#05-01/12 TECHplace II
Singapore 569873
Attn: Chief Financial Officer
Facsimile (65) 6482 0122

    If to FiTeq:
2145 Paradise Drive
Tiburon, CA
Attn: Joan Ziegler
Facsimile 415 267 1888

    With a copy to:
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, CA 94025
Attn: Edward J. Wes
Facsimile: (650) 838-4350

Any Party may from time to time change such address or individual by giving the other Parties notice of such change in accordance with this Section 17.3.

**17.5    Rights and Remedies Cumulative**

Any right or remedy afforded to either Party under any provision of this Agreement on account of any breach or default by the other Party is in addition to, and not in lieu of, any and all other rights and remedies afforded to such Party under any other provision of this Agreement, by law or otherwise on account of such breach or default.

**17.6    Publicity**

Neither Party will issue any press release or similar publicity regarding this Agreement without the prior approval of the other Party.   Venture will not use any trademark of FiTeq as a reference or in any sales, marketing or other promotional material without the prior written consent of FiTeq.

**17.7    Nonwaiver**

The failure of either Party to insist upon or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement, will not be interpreted or construed as a waiver or relinquishment to any extent of such Party's right to assert or rely upon any such provision, right or remedy in that or any other instance; rather, the same will be and remain in full force and effect.

**17.8    Assignment**

Neither Party will assign, by operation of law or otherwise, this Agreement or any of its rights, title or interest under this Agreement (voluntarily, involuntarily, by operation of law or otherwise)

without the prior written consent of the other Party. However, each Party hereby consents to any assignment of the other Party's right, title and interests under this Agreement to a successor by virtue of merger, consolidation or other corporate reorganization or by way of a sale of substantially all of the assets of the assigning Party; provided that, unless otherwise agreed upon, (a) such successor or assign executes a document assuming all of the obligations of the assigning Party under this Agreement and agreeing to comply with the terms set forth in this Agreement, (b) a copy of such document is provided to the non-assigning Party, and (c) any such successor or assign is not a director competitor of FiTeq if Venture is the assigning Party or a director competitor of Venture if FiTeq is the assigning Party. No assignment by either Party, without the consent of the other Party, will relieve or release the Party making the assignment from any of its obligations under this Agreement. Subject to the foregoing, this Agreement will be binding upon, inure to the benefit of and be enforceable by each of the Parties and their respective successors and assigns.

## 17.9   No Third Party Beneficiaries

This Agreement is for the benefit of, and will be enforceable by, the Parties only. This Agreement is not intended to confer any right or benefit on any third party. No action may be commenced or prosecuted against a Party by any third party claiming as a third-party beneficiary of this Agreement or any of the transactions contemplated by this Agreement.

## 17.10   Severability

This Agreement will be enforced to the fullest extent permitted by applicable law. If any provision of this Agreement is held to be invalid or unenforceable to any extent, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the purpose of this Agreement.

## 17.11   Attorneys' Fees

In any action to enforce any right or remedy under this Agreement, to recover any damages or other relief on account of any breach of or default under this Agreement, or to interpret any provision of this Agreement, the prevailing Party will be entitled to recover its costs and expenses (including, without limitation, reasonable attorneys' fees) reasonably incurred in connection with such action or any appeal thereof.

## 17.12   Amendments

No amendment, modification or waiver of any provision of this Agreement will be valid unless set forth in a written instrument signed by the Party to be bound thereby.

## 17.13   Entire Agreement

This Agreement (including, without limitation, **Exhibit A** through **Exhibit E**) sets forth the entire agreement, and supersedes any and all prior proposals, understandings and agreements between the Parties with respect to the subject matter hereof. FiTeq will not be bound by, and specifically objects to, any term, condition, or other provision which is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) that is proffered by Venture in any quotation, invoice, purchase order, receipt, shipping document, acceptance, confirmation, correspondence or otherwise, unless FiTeq

24

specifically agrees to such provision in a written instrument signed by FiTeq.


IN WITNESS WHEREOF, the Parties have entered into and signed this Agreement as of the date first set forth above.


FiTeq:                                          Venture:

**FiTeq, Inc.**                                 **Venture Corporation Ltd.**




By: _____       By: _____
     Joan Ziegler, CEO                         Tan Choon Huat, Executive Director

**Exhibit A**

**Defined Terms**

## Exhibit A

## Defined Terms

Whenever used in this Agreement with the initial letter capitalized, the following terms will have the following specified meanings:

"Act of Insolvency" shall mean the occurrence of any of the following: (a) the filing of a petition by or against a Party to have such a Party adjudged as bankrupt or a petition for reorganization or arrangement of such Party under any Debtor Relief Law (unless, in the case of a petition filed against such Party, the same is dismissed within sixty (60) days after it is filed); (b) the making of any general assignment or general arrangement for the benefit of a Party's creditors under any Debtor Relief Law; (c) the appointment of a trustee or receiver to take possession of all or substantially all of a Party's assets under any Debtor Relief Law (unless such possession is returned to such Party within thirty (30) days after such appointment); (d) the attachment, execution or other judicial seizure of all or substantially all of a Party's assets (unless the same is released within thirty (30) days); or (e) the dissolution or liquidation by or of a Party, or the adoption of any plan of dissolution or liquidation, if such Party does not continue as a viable business in altered form.

"Affiliate" shall mean any person which controls, is controlled by, is under common control with a Party to this Agreement, and for the purpose of this definition the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise, or the ownership either directly or indirectly of 50% or more of the voting securities of such person.

"Approved Vendor List" shall mean a list of supplier or service provider mutually agreed upon by FiTeq and Venture in writing.

"Associations" shall mean the scheme operators under which payments are processed over a payment network.  Associations include American Express, China Union Pay, Discover, JCB, MasterCard, and Visa.

"Background IPR" of a Party shall mean any Intellectual Property Rights of such party, which Intellectual Property Right is described in a SOW or otherwise used in the performance of the Services or in connection with this Agreement and that is conceived, created, or developed prior to, or independent of any work performed under this Agreement or any SOW hereunder, whether or not such Intellectual Property Right is incorporated into a deliverable under the SOW. For greater certainty, Background IPR of a party shall include without limitation all data, including drawings, prints, specifications, reports, designs, plans, documentation, techniques, methodologies, materials, mask works, software code, firmware, design kits, design tools and other information furnished by one party to the other for use in connection with this Agreement and SOWs executed hereunder.

"Bill of Materials" shall mean a list of materials to be used in manufacturing the FiTeq Card that are mutually agreed upon by FiTeq and Venture in writing.

"Brightsight" shall mean the spin-off from TNO, the Netherlands organization for applied scientific research.  Brightsight is a very successful organization, it has some 40 employees,

has an annual turnover over 4 Million Euro, it is one of the largest security evaluation laboratories in the world and it is in possession of all relevant internationally recognized security evaluation accreditations. Brightsight can count some 100 international clients to its customer base, most of which have been clients over a decade.

Address Delftechpark 1
2628 XJ DELFT
The Netherlands
Phone: +31 15 269 2500
Fax: +31 15 269 2555

"Business Days" shall mean Monday through Friday except for federal or state holidays in the United States.

"Buyer" shall mean a Card Issuer who has placed a Purchase Order to FiTeq.

"Cards" shall mean credit cards, charge cards, debit cards, other cards, devices or accounts used to make payments.

"Card Finisher" shall mean a Secure Printer that provides secure card printing and related holograms, logos and secure printing techniques required by any major card association including, but not limited to American Express, China Union Pay, Discover, JCB, MasterCard and Visa.

"Card Issuer" shall mean a bank or other entity that issues FiTeq Cards in connection with an account between itself and the cardholder.

"Certification" shall mean the process by which MasterCard or Visa and other Network Operators warrant the card technology, security used in processing the transaction over the network, manufacturing process, manufacturing location meet with their requirements. These requirements include, but are not limited to Visa Smart Credit and Debit (VSCD), MasterCard CAST, ISO 7810, USO 10373, ISO 7816, etc and are fully specified in Exhibit D "Certified Card Supplier" shall mean a suppler that has obtained a Certification from the applicable Card Association required to manufacture and supplying Cards operating on the Association Network used by a Card Issuer.

"Common Stock" shall mean the common stock of FiTeq, Inc.

"Confidential Information" shall mean any information that is proprietary or confidential or that a Party is obligated to keep confidential (e.g., pursuant to a contractual or other obligation owing to a Third Party). Confidential Information may be of a technical, business or other nature (including, but not limited to, information that relates to a Party's technology, research, development, Cards, customers, employees, contractors, marketing plans, finances, contracts, legal affairs or business affairs). However, Confidential Information does not include any information that: (a) was known to the Recipient prior to receiving the same from the Discloser in connection with this Agreement; (b) is independently developed by the Recipient; (c) is acquired by the Recipient from another source without restriction as to Use or disclosure; or (d) is or becomes part of the public domain through no fault or action of the Recipient.

"Core Business" Core Business in relation to FiTeq shall mean the designing, developing, marketing and selling authentication and access solutions to financial institutions to reduce

fraud and provide production differentiation in the payment industry or the access/authentication industry and in relation to Venture shall mean engaging in the business of providing a seamless manufacturing system, delivering product quality and cost efficiency for a range of high-mix, high-value and complex products on a contract basis and provides total value chain management including Original Design Manufacturing, Electronics Manufacturing Services and E-fulfillment Services.

"Debtor Relief Law" shall mean any bankruptcy, moratorium, insolvency, reorganization, liquidation, conservatorship, or similar law, now or hereafter in effect, for the relief of debtors and that affects the rights of creditors generally.

Discloser" shall mean a Party that discloses Confidential Information to the other Party.

"Documentation" shall mean the Specifications, vendor lists and other documentation provided or to be provided by either party under this Agreement.

"$" shall mean US Dollars unless otherwise specified in the Agreement.

"Engineering Milestones" shall have the meaning set forth in the SOW.

"Engineering Milestones Schedule" shall have the meaning set forth in the SOW.

"FiTeq Card" shall mean Cards that utilize FiTeq's Background IPR.

"Intellectual Property Rights" or "IPR" shall mean all patent rights, copyrights, mask work rights, trade secret rights, trademark rights, sui generis database rights, rights of publicity, rights of privacy, moral rights and all other intellectual and industrial property rights of any kind anywhere in the world.

"Party" shall mean either FiTeq or Venture and "Parties" shall mean FiTeq and Venture collectively.

"Person" shall mean any individual, corporation, limited liability company, partnership, trust, association, governmental authority or other entity.

"Purchase Order" shall mean a committed and non-cancellable purchase order from a Card Issuer and sold by the sales organization of FiTeq or FiTeq's affiliates.

"Quality Assurance Plan" shall mean the quality assurance plan agreed upon by the Parties pursuant to Section 5.5 as the same may be amended from time to time by written agreement of the Parties or otherwise in accordance with this Agreement.

"Recipient" shall mean a Party that receives Confidential Information from the other Party.

"Sheet Pricing" shall mean the Standard Unit Price and Standard Delivery Date mutually agreed to by both Parties and valid for a specified period.

"Specifications" shall mean descriptions, designs, drawings, schematics, specifications and other technical documentation as set forth in Exhibit B, the Statement of Work (SOW).

"Standard Delivery Date" shall mean the number of days following receipt of a Purchase Order

that is mutually agreed upon by the Parties enabling Venture to deliver the card without written acceptance of a Purchase Order and which shall be no earlier than 3 months after the date of the acceptance of the Purchase Order by Venture.

"Standard Unit Price" shall mean the Parties' mutually agreed upon price per FiTeq Card that does not require Venture's written Acceptance of a Purchase Order.

"Statement of Work" or "SOW" shall mean the statement of work attached as <u>Exhibit B</u>, which is incorporated herein by reference.

"Term" shall mean the period of time set forth in Section 12.

"Unit Cost" means Bill of Material and Venture's labor costs.

"Unit Price" shall mean the price per FiTeq Card for which the Card Issuer can order FiTeq Cards to be manufactured under this Agreement, inclusive of costs related to the Bill of Material, Venture's labor and Venture's profit.

EXHIBIT B
Statement of Work

Engineering Milestones Schedule

| Task | Requirement | Documents to Provide Upon Completion | Success as Measure by: | Target (Date from Closing) | No Later Than (from Closing) | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| | | All documents to be stored in both company (Fiteq/Venturi) servers | | | | | | |
| 1 | | Venture will provide an overall project schedule upon sign-off | | | | | | |
| | | Schedule and milestone reviews with the mechanism to track and monitor progress of the whole project | | | | | | |
| **Breadboard 1** | | | | | | | | |
| BB1 | New sensors and interface with the new non-secure Chip | Bi-weekly design review report. | Choose reliable low cost sensor (as SMT P&P component) as approved by Thian, E Foo and J Ziegler | 6 months | 8 months | $ 650,000 | 2.60% | 1,300,000 |
| | Conforms to Functional Specification of 2.2.5.5. Changes approved by FiTeq to highlight sensitive points on certification tasks | Provide feasibility reports with all components spec. Breadboard design and schematic drawing | Choose reliable low cost wound or laminated coil as approved by Thian, E Foo and J Ziegler | | | | | |
| | | | Identify key reliability issues which are to be addressed by the development process as approved by Thian, E Foo and J Ziegler | | | | | |
| | Conform to Design Review Procedures | Engineering Plan | | | | | | |
| | Conform to experimental process procedures, documenting traceability of parts, specific hypothesis, clear measurement of success | | | | | | | |
| | Target design to achieve real world swipe success >95% for 1) transport, 2) Dip and 3) swipe readers | Test Plan | Reports of experiment results | | | | | |
| | 10-20 cards | Functional Spec | | | | | | |
| | Mutually Agreed Upon Engineering Plan | Documented source code & executable code | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Executable code and all engineering drawing release | | | | | | |
| | Conform to document control procedures | | | | | | | |
| 2 | **Breadboard 2:** Tethered card w/emulated secure and non-secure chip, pre-stored DACs (not real-time from secure chip) no perso | | | | | | | |
| BB2 | Emulates functionality of 2.2.5.5 as per its functional spec with mutually agreed upon changes. Pls note dual chip interface | Bi-weekly design review Functional Spec | Barnes equipment results documents 70-80% success rate. This report enables objective data points to be used by Venture to characterize the magnetic stripe data | 9 months | 12 months | $ 750,000 | 3.00% | 1,500,000 |
| | BOM pricing in production not to exceed $4.20 +25%, no more than 46 parts (target 30). FiTeq to get .75 battery | BOM target | Brightsight gets BB2+3-5 cards and measure: 80%+ swipe success and 50%+ for DIP/ATM success | | | | | |
| | Conform to most ISO IEC Requirements for MC/Visa Certification | Design Review documentation with updated schematic drawing | Pre-populated DACs demonstrate dynamic data set is reliably transferred 100% of the time as verified by Brightsight. | | | | | |
| | Conform to Design Review Procedures | Engineering Plan | | | | | | |
| | Target design to achieve real world swipe success >95% for 1) transport, 2) Dip and 3) swipe readers | Test Plan | Secure Chip has been certified by both MC & Visa as verified by Brightsight | | | | | |
| | Mutually Agreed Upon Engineering Plan | Documented source code & executable code | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Reader swipe success raw and summary data | | | | | | |
| | | ISO/IEC test results raw & summary data | | | | | | |
| 3 | **Lab Proto #1:** On card new secure and non-secure chip, sensors made on production equipment, BOM $4.20 + 10%, NO secure printing | | | | | | | |
| LP1 | Total final packaging not to exceed .030 of an inch plus or minus 10% | Bi-weekly design review. | Secure Chip selected has been certified by MC and Visa as verified by Brightsight | 12 months | 18 months | $1,500,000 | 6.00% | 3,000,000 |
| | Made on production equipment with an understanding that process engineering tasks will be improved/refined - needs process development | BOM target. | | | | | | |

| Task | Requirement | Documents to Provide Upon Completion — All documents to be stored in both company (Fixed/Venture) servers | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| | Conforms to most ISO IEC Requirements for MC/Visa Certification | Design Review documentation with updated schematic drawing and PCB layout files. | Chip when assembled on a PCB with components with Polycard or similar front/back is .030 plus or minus 10% as tested by Brightsight | | | | | |
| | | BOM target. | <45 components as tested by EF/JZ/TK | | | | | |
| | Mutually Agreed Upon Engineering Plan | Design Review documentation with updated schematic drawing | 80% of ISO & IEC pass as tested by Brightsight | | | | | |
| | Mutually Agreed Upon Objective Test Plan | | 70% swipe success across DIP, ATM, swipe as tested by Brightsight | | | | | |
| | US$4.20 BOM in production +10% | Documented source code & executable code | | | | | | |
| | <45 components | Reader swipe success raw and summary data | | | | | | |
| | | ISO/IEC test results raw & summary data | | | | | | |
| 4 Lab Proto #2 New secure & non secure with secure front/back, <45 components | | | | 15 months | 20 months | $ 1,000,000 | 4.00% | 2,000,000 |
| LP2 | Emulates functionality of 2.2.5.5 as per its function spec with mutually agreed upon changes. Plus note dual chip interface | Bi-weekly design review c/w report, Functional Spec | Proof of production line equipment and no major issues as per pre-audit Report by Brightsight | | | | | |
| | Mutually Agreed Upon Engineering Plan | BOM target | Prove sample of at least 75 components selected among batch | | | | | |
| | | Design Review documentation | BOM in production target of $4.20+10% or as agreed by Thien, E Foo and J Ziegler. The BOM price shall be no more than $7 | | | | | |
| | Mutually Agreed Upon Objective Test Plan | BOM target. | 80% success across swipe, Dip, ATM as measured by Brightsight | | | | | |
| | Select chip that has been certified by AmEx, Discover, MC and Visa | Design Review documentation with updated schematic drawing and PCB layout files. | Conforms to 95% ISO/IEC as measured by Brightsight | | | | | |
| | Conforms to 90% MC CAST and VSCD standards | Documented source code & executable code | Final 2 dimension of flip chip packaging not to exceed 0.030" assuring positioning on PCB, secure printing on polycarbonate, adhesive and any other requirement in stack up design as measured by Brightsight | | | | | |
| | Conforms to at least 95% ISO/IEC | | | | | | | |
| | Mutually Agreed Upon Engineering Plan | Reader swipe success raw and summary data | Conforms to all aspects of the Visa's printing standards including, but not limited to mice type, hologram, secure sig panel, black light inks as measured by Brightsight | | | | | |
| | Mutually Agreed Upon Objective Test Plan | ISO/IEC test results raw & summary data | | | | | | |
| | | Associated quality documents | | | | | | |
| 5 Production Pilot: Scaleable, repeatable manufacturing process on line that scales to >1 million cards per month | | | | 17 months | 24 months | $ 725,000 | 2.90% | 1,450,000 |
| PP | Process proves repeatable, scaleable to 1,000,000 cards per month | Weekly design review, Functional Spec, First article submission | Prove process works for a batch of no less than 250,000 cards per week resulting in 95% yield on no fewer than 5K cards per week as measured by Brightsight or Truggelmann in audit report | | | | | |
| | Conforms to all document control per #6 | BOM target, Detailed on-line process flow, Process cycle time and all equipment spec. | Batch of at least 750 cards swipe at 95% across swipe, DIP, ATM as measured by Brightsight | | | | | |
| | Process, procedures, staffing conform to CAST and VSCD logical and physical security standards | Design Review documentation | Release conforms to all ISO/IEC/CAST/VSCD standards associated with certification as per audit of samples among 1,000 First Articles as measured by Brightsight or Truggelmann | | | | | |
| | In development process demonstrate clear traceability of parts, WIP and problem resolution | Design Review documentation | Manufacturing process audit passes by Brightsight with only minor recommendations, none that would preclude certification | | | | | |
| | Fully developed quality assurance program in all aspects of sourcing, engineering and manufacturing as per #6 | BOM target. | Line conforms to all logical and security requirement as measured by official MC/Visa security auditor | | | | | |
| | Mutually Agreed Upon Engineering Plan | Reader swipe success raw and summary data | Results are statistically reliably and valid on a sample size of at least 100 repeated at least twice as verified by Brightsight or Truggelmann | | | | | |

| Task | Requirement | Documents to Provide Upon Completion — All documents to be stored in both company (Filed/Venture) servers | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| | Mutually Agreed Upon Objective Test Plan | Reader swipe success raw and summary data | Conforms to all aspects of Visa's printing standards including, but not limited to micro type, hologram, secure sig panel, black light links as measured by Brightsight | | | | | |
| | | ISO/IEC test results raw & summary data | | | | | | |
| | | Associated quality documents | | | | | | |
| | | In line process documentation, test/yield analysis data | | | | | | |
| 6 | Audit ready with document control, tracking processes for all elements of engineering & manufacturing | | | | | | | |
| | *a. Manufacturing Work Instructions (MPIs), Logistical Work Instructions (LWIs) & Quality Inspection Instructions (QIIs) supporting all aspects of the Manufacturing Process* | | | | | | | |
| | *b. Engineering Design Review, Prototype Release, Manufacturing Release,* | | | | | | | |
| | *c. Maintain Release Schedule* | | | | | | | |
| | Conform to Visa Certification & plan for MC, AmEx, Discover certification | All MPIs, QIIs, LWIs | Meets MC/Visa auditor standards and defective product/procedure resolution as measured by Brightsight or Truggelman Associates | 2-6 months | 10 months | $ 50,000 | 0.20% | 100,000 |
| | Mutually Agreed Manufacturing Document Control Procedures | WIP and inline quality/process documentation | Manufacturing process audit passes 80% by Brightsight with only minor recommendations, none that would preclude certification | | | | | |
| | Conform to document conventions: Filename, header, footer, pagination, confidentiality | Document Control Procedures | | | | | | |
| | Conform to prototype release naming conventions | Release Control Procedures | | | | | | |
| | Conforms to Functional Specification of 2.2.5.5. | Traceability Procedures | | | | | | |
| | Conform to Design Review Procedures | Guage testing procedures | | | | | | |
| | Conform to experimental process procedures, documenting traceability of parts, specific hypothesis, gear measurement of success | Security procedures, document control | | | | | | |
| | Measurements of lab and real world usage success conform to >95% reader success for 1) transport, 2) Dip and 3) swipe readers | | | | | | | |
| | Results are statistically reliably and valid on a sample size of at least 100 repeated at least twice | | | | | | | |
| | Mutually Agreed Upon Engineering Plan | | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | | | | | | | |
| 7 | MasterCard Certification | Same as for PP1 | As measured by Brightsight | | | 50,000 | 0.20% | 100,000 |
| 8 | American Express Certification | Same as for PP1 | As measured by Brightsight | | | 50,000 | 0.20% | 100,000 |
| 9 | Discover Certification | Same as for PP1 | As measured by Brightsight | | | 25,000 | 0.10% | 50,000 |
| 10 | All the above mentioned documents must store in both Files and Venture servers as complete customer's package. | | | | | | | |
| Total | | | | | | $ 4,800,000 | 18.70% | 9,600,000 |
| | *All FiTeq/PrivaSys equipments are consigned to Venture and should return back to FiTeq in good working condition when the project is completed.* | | | | | | | |
| | *Start to consider Version 3.0 (track 1 and 2) as the market demands* | | | | | | | |

Confidential

EXHIBIT B
Statement of Work

Engineering Milestones Schedule

| Task | Requirement | Documents to Provide Upon Completion — All documents to be stored in both company (Fileg/Venturg) servers | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| **1** | | | | | | | | |
| | Breadboard 1 | | | | | | | |
| BB1 | New sensors and interface with the new non-secure Chip | Venture will provide an overall project schedule upon sign-off | Choose reliable low cost sensor (as SMT P&P component) as approved by Thian, E Foo and J Ziegler | 6 months | 8 months | $ 650,000 | 2.60% | 1,300,000 |
| | | Schedule and milestone reviews with the mechanism to track and monitor progress of the whole project | | | | | | |
| | | Bi-weekly design review report. | | | | | | |
| | Conforms to Functional Specification of 2.2.5.5. Changes approved by FITeq to highlight sensitive points on certification tasks | Provide feasibility reports with all components spec. Breadboard design and schematic drawing | Choose reliable low cost wound or laminated coil as approved by Thian, E Foo and J Ziegler | | | | | |
| | Conform to Design Review Procedures | Engineering Plan | Identify key reliability issues which are to be addressed by the development process as approved by Thian, E Foo and J Ziegler | | | | | |
| | Conform to experimental process procedures, documenting traceability of parts, specific hypothesis, clear measurement of success | | | | | | | |
| | Conform to document control procedures | | | | | | | |
| | Target design to achieve real world swipe success >95% for 1) transport, 2) Dip and 3) swipe readers | Test Plan | Barnes equipment results documents 70-80% success rate. This report enables objective data points to be used by Venture to characterize the magnetic stripe data | | | | | |
| | 10-20 cards | Reports of experiment results | | | | | | |
| | Mutually Agreed Upon Engineering Plan | Functional Spec | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Documented source code & executable code | | | | | | |
| | | Executable code and all engineering drawing release | | | | | | |
| **2** | Breadboard 2 : Tethered card w/emulated secure and non-secure chip, pre-stored DACs (not real-time from secure chip) no perso | | | | | | | |
| BB2 | Emulates functionality of 2.2.5.5 as per its functional spec with mutually agreed upon changes. Pls note dual chip interface | Bi-weekly design review | Brightsight gets BB2+3-5 cards and measure: 80%+ swipe success and 50%+ for DIP/ATM success | 9 months | 12 months | $ 750,000 | 3.00% | 1,500,000 |
| | | Functional Spec | | | | | | |
| | BOM pricing in production not to exceed $4.20 +25%, no more than 45 parts (target 30). FITeq to get .75 battery | BOM target | Pre-populated DACs demonstrate dynamic data set is reliably transferred 100% of the time as verified by Brightsight. | | | | | |
| | Conforms to most ISO IEC Requirements for MC/Visa Certification | Design Review documentation with updated schematic drawing | | | | | | |
| | Conform to Design Review Procedures | Engineering Plan | Secure Chip has been certified by both MC & Visa as verified by Brightsight | | | | | |
| | Target design to achieve real world swipe success >95% for 1) transport, 2) Dip and 3) swipe readers | Test Plan | | | | | | |
| | Mutually Agreed Upon Engineering Plan | Documented source code & executable code | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Reader swipe success raw and summary data | | | | | | |
| | | ISO/IEC test results raw & summary data | | | | | | |
| **3** | Lab Proto #1 : On card new secure and non-secure chip, sensors made on production equipment, BOM $4.20 + 10%, NO secure printing | | Secure Chip selected has been certified by MC and Visa as verified by Brightsight | | | | | |
| LP1 | Total final packaging not to exceed .030 of an inch plus or minus 10% | Bi-weekly design review. | | 12 months | 18 months | $1,500,000 | 6.00% | 3,000,000 |
| | Made on production equipment with an understanding that process engineering tasks will be improved/refined - needs process development | BOM target. | | | | | | |

| Task | Requirement | Documents to Provide Upon Completion (All documents to be stored in both company (Filed/Venture) servers) | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| | Conforms to meet ISO IEC Requirements for MC/Visa Certification | Design Review documentation with updated schematic drawing and PCB layout files. | Chip when assembled on a PCB with components with Polycard or similar front/back is .030 plus or minus 10% as tested by Brightsight | | | | | |
| | Mutually Agreed Upon Engineering Plan | BOM target | <45 components as tested by EF/JZ/TK | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Design Review documentation with updated schematic drawing | 80% of ISO & IEC pass as tested by Brightsight | | | | | |
| | US$4.20 BOM in production <10% | Documented source code & executable code | 70% swipe success across DIP, ATM, swipe as tested by Brightsight | | | | | |
| | <45 components | Reader swipe success raw and summary data | | | | | | |
| | | ISO/IEC test results raw & summary data | | | | | | |
| 4 | Lab Proto #2 New secure & non secure with secure front/back, <45 components | | | 15 months | 20 months | $1,000,000 | 4.00% | 2,000,000 |
| LP2 | Emulates functionality of 2.2.5.5 as per its functional spec with mutually agreed upon changes. Pls note dual chip interface | Bi-weekly design review c/w report, Functional Spec | Proof of production line equipment and no major issues as per pre-audit Report by Brightsight | | | | | |
| | Mutually Agreed Upon Engineering Plan | BOM target | Prove sample of at least 75 cards selected among batch | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Design Review documentation | BOM in production target of $4.20+10% or as agreed by Than, E Foo and J Ziegler. The BOM price shall be no more than $7 | | | | | |
| | Select chip that has been certified by AmEx, Discover, MC and Visa | BOM target. | 80% success across swipe, Dip, ATM as measured by Brightsight | | | | | |
| | Conforms to 90% MC CAST and VSCD standards | Design Review documentation with updated schematic drawing and PCB layout files. | Conforms to 65% ISO/IEC as measured by Brightsight | | | | | |
| | Conforms to at least 95% ISO/IEC | Documented source code & executable code | Final 3 dimension of flip chip packaging not to exceed 0.030" assuming positioning on PCB, secure printing on polycarbonate, adhesive and any other requirement in stack up design as measured by Brightsight | | | | | |
| | Mutually Agreed Upon Engineering Plan | Reader swipe success raw and summary data | Conforms to all aspects of the Visa's printing standards including, but not limited to mice type, hologram, secure sig panel, black light inks as measured by Brightsight | | | | | |
| | Mutually Agreed Upon Objective Test Plan | ISO/IEC test results raw & summary data | | | | | | |
| | | Associated quality documents | | | | | | |
| 5 | Production Pilot: Scalable, repeatable manufacturing process on line that scales to >1 million cards per month | | | 17 months | 24 months | $ 725,000 | 2.90% | 1,450,000 |
| PP | Process proves repeatable, scalable to 1,000,000 cards per month | Weekly design review, Functional Spec, First article submission | Prove process works for a batch of no less than 250,000 cards per week resulting in 95% yield on no fewer than 5K cards as measured by Brightsight or Truggelmann in audit report | | | | | |
| | Conforms to all document control per #9 | BOM target, Detailed on-line process flow, Process cycle time and all equipment spec. | Batch of at least 750 cards swipe at 95% across swipe, DIP, ATM as measured by Brightsight | | | | | |
| | Process, procedures, staffing conform to CAST and VSCD logical and physical security standards | Design Review documentation | Release conforms to all ISO/IEC/CAST/VSCD standards associated with certification as per audit of samples among 1,000 First Articles as measured by Brightsight or Truggelmann | | | | | |
| | In development process demonstrate clear traceability of parts, WIP and problem resolution | Design Review documentation | Manufacturing process audit passes by Brightsight with only minor recommendations, none that would preclude certification | | | | | |
| | Fully developed quality assurance program in all aspects of sourcing, engineering and manufacturing as per #6 | BOM target. | Line conforms to all logical and security requirement as measured by official MC/Visa security auditor | | | | | |
| | Mutually Agreed Upon Engineering Plan | Reader swipe success raw and summary data | Results are statistically reliably and valid on a sample size of at least 100 repeated at least twice as verified by Brightsight or Truggelmann | | | | | |

| Task | Requirement | Documents to Provide Upon Completion — All documents to be stored in both company (Fiteq/Venture) servers | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| | Mutually Agreed Upon Objective Test Plan | Reader swipe success raw and summary data | Conforms to all aspects of Visa's printing standards including, but not limited to mice type, hologram, secure sig panel, black light inks as measured by Brightsight | | | | | |
| | | ISO/IEC test results raw & summary data | | | | | | |
| | | Associated quality documents | | | | | | |
| | | In line process documentation, test/yield analysis data | | | | | | |
| 6 | Audit ready with document control, tracking processes for all elements of engineering & manufacturing | | | | | | | |
| | a. *Manufacturing Work Instructions (MPIs), Logistical Work Instructions (LWIs) & Quality Inspection Instructions (QIIs) supporting all aspects of the Manufacturing Process* | | | | | | | |
| | b. *Engineering Design Review, Prototype Release, Manufacturing Release.* | | | | | | | |
| | c. *Maintain Release Schedule* | | | | | | | |
| | Conform to Visa Certification & plan for MC, AmEx, Discover certification | All MPIs, QIIs, LWIs | Meets MC/Visa auditor standards and defective product/procedure resolution as measured by Brightsight or Truggelman Associates | 2-6 months | 10 months | $ 50,000 | 0.20% | 100,000 |
| | Mutually Agreed Document Control Procedures | WIP and Inline quality/process documentation | Manufacturing process audit passes 80% by Brightsight with only minor recommendations, none that would preclude certification | | | | | |
| | Conform to document conventions: Filename, header, footer, pagination, confidentiality | Document Control Procedures | | | | | | |
| | Conform to prototype release naming conventions | Release Control Procedures | | | | | | |
| | Conform to Functional Specification of 2.2.5.5. | Traceability Procedures | | | | | | |
| | Conform to Design Review Procedures | Guage testing procedures | | | | | | |
| | Conform to experimental process procedures, documenting traceability of parts, specific hypothesis, clear measurement of success | Security procedures, document control | | | | | | |
| | Measurements of lab and real world usage success conform to >95% reader success for 1) transport, 2) Dip and 3) swipe readers | | | | | | | |
| | Results are statistically reliably and valid on a sample size of at least 100 repeated at least twice | | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | | | | | | | |
| | Mutually Agreed Upon Engineering Plan | | | | | | | |
| 7 | MasterCard Certification | Same as for PP1 | As measured by Brightsight | | | 50,000 | 0.20% | 100,000 |
| 8 | American Express Certification | Same as for PP1 | As measured by Brightsight | | | 50,000 | 0.20% | 100,000 |
| 9 | Discover Certification | Same as for PP1 | As measured by Brightsight | | | 25,000 | 0.10% | 50,000 |
| 10 | All the above mentioned documents must store in both Fiteq and Venture servers as complete customer's package. | | | | | | | |
| Total | | | | | | $ 4,800,000 | 18.70% | 9,600,000 |
| | *All FiTeq/PrivaSys equipments are consigned to Venture and should return back to FiTeq in good working condition when the project is completed.* | | | | | | | |
| | *Start to consider Version 3.0 (track 1 and 2) as the market demands* | | | | | | | |

EXHIBIT B
Statement of Work

Engineering Milestones Schedule

| Task | Requirement | Documents to Provide Upon Completion | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| | | All documents to be stored in both company (Filed/Venture) servers | | | | | | |
| | | Venture will provide an overall project schedule upon sign-off | | | | | | |
| 1 | | Schedule and milestone reviews with the mechanism to track and monitor progress of the whole project | | | | | | |
| | **Breadboard 1** | | | | | | | |
| BB1 | New sensors and interface with the new non-secure Chip | Bi-weekly design review report. | Choose reliable low cost sensor (as SMT P&P component) as approved by Thian, E Foo and J Ziegler | 6 months | 8 months | $ 650,000 | 2.60% | 1,300,000 |
| | Conforms to Functional Specification of 2.2.5.5. Changes approved by FITeq to highlight sensitive points on certification tasks | Provide feasibility reports with all components spec. Breadboard design and schematic drawing | Choose reliable low cost wound or laminated coil as approved by Thian, E Foo and J Ziegler | | | | | |
| | | Engineering Plan | Identify key reliability issues which are to be addressed by the development process as approved by Thian, E Foo and J Ziegler | | | | | |
| | Conform to Design Review Procedures | | | | | | | |
| | Conform to experimental process procedures, documenting traceability of parts, specific hypothesis, clear measurement of success | | | | | | | |
| | Target design to achieve real world swipe success >85% for 1) transport, 2) Dip and 3) swipe readers | Test Plan | | | | | | |
| | 10-20 cards | Reports of experiment results | | | | | | |
| | Mutually Agreed Upon Engineering Plan | Functional Spec | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Documented source code & executable code | | | | | | |
| | | Executable code and all engineering drawing release | | | | | | |
| | Conform to document control procedures | | | | | | | |
| 2 | Breadboard 2: Tethered card w/emulated secure and non-secure chip, pre-stored DACs (not real-time from secure chip) no perso | | | | | | | |
| BB2 | Emulates functionality of 2.2.5.5 as per its functional spec with mutually agreed upon changes. Pls note dual chip interface | Bi-weekly design review / Functional Spec | Barnes equipment results documents 70-80% success rate. This report enables objective data points to be used by Venture to characterize the magnetic stripe data | 9 months | 12 months | $ 750,000 | 3.00% | 1,500,000 |
| | BOM pricing in production not to exceed $4.20 +25%, no more than 45 parts (target 30). FITreq to get .75 battery | BOM target | Brightsight gets BB2+3-5 cards and measure: 80%+ swipe success and 50%+ for DIP/ATM success | | | | | |
| | Conforms to must ISO IEC Requirements for MC/Visa Certification | Design Review documentation with updated schematic drawing | Pre-populated DACs demonstrate dynamic data set is reliably transferred 100% of the time as verified by Brightsight. | | | | | |
| | Conform to Design Review Procedures | Engineering Plan | | | | | | |
| | Target design to achieve real world swipe success >85% for 1) transport, 2) Dip and 3) swipe readers | Test Plan | Secure Chip has been certified by both MC & Visa as verified by Brightsight | | | | | |
| | Mutually Agreed Upon Engineering Plan | Documented source code & executable code | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Reader swipe success raw and summary data | | | | | | |
| | | ISO/IEC test results raw & summary data | | | | | | |
| 3 | Lab Proto #1: On card new secure and non-secure chip, sensors made on production equipment, BOM $4.20 + 10%, NO secure printing | | | | | | | |
| LP1 | Total final packaging not to exceed .030 of an inch plus or minus 10% | Bi-weekly design review. | Secure Chip selected has been certified by MC and Visa as verified by Brightsight | 12 months | 18 months | $ 1,500,000 | 6.00% | 3,000,000 |
| | Made on production equipment with an understanding that process engineering tasks will be improved/refined - needs process development | BOM target | | | | | | |

| Task | Requirement | Documents to Provide Upon Completion — All documents to be stored in both company (Filed/Ventura) servers | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| | Conforms to most ISO IEC Requirements for MC/Visa Certification | Design Review documentation with updated schematic drawing and PCB layout files. | Chip when assembled on a PCB with components with Polycarb or similar front/back is .030 plus or minus 10% as tested by Brightsight | | | | | |
| | Is not a dual chip interface | BOM target | <45 components as tested by EF/JZ/TK | | | | | |
| | Mutually Agreed Upon Engineering Plan | Design Review documentation with updated schematic drawing | 80% of ISO & IEC pass as tested by Brightsight | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Documented source code & executable code | 70% swipe success across DIP, ATM, swipe as tested by Brightsight | | | | | |
| | US$4.20 BOM in production +10% | Reader swipe success raw and summary data | | | | | | |
| | <45 components | ISO/IEC test results raw & summary data | | | | | | |
| 4 | Lab Proto #2 New secure & non secure with secure front/back, <45 components | | | 15 months | 20 months | $ 1,000,000 | 4.00% | 2,000,000 |
| LP2 | Emulates functionality of 2.2.5.5 as per its functional spec with mutually agreed upon changes. | Biweekly design review cw report. Functional Spec | Proof of production line equipment and no major issues as per pre-audit Report by Brightsight | | | | | |
| | Is not a dual chip interface | BOM target | Prove sample of at least 75 cards selected among batch | | | | | |
| | Mutually Agreed Upon Engineering Plan | Design Review documentation | BOM in production target of $4.20+10% or as agreed by Titan, E Foo and L Ziegler. The BOM price shall be no more than $7 | | | | | |
| | Mutually Agreed Upon Objective Test Plan | BOM target. | 90% success across swipe, Dip, ATM as measured by Brightsight | | | | | |
| | Select chip that has been certified by AmEx, Discover, MC and Visa | Design Review documentation with updated schematic drawing and PCB layout files. | Conforms to 95% ISO/IEC as measured by Brightsight | | | | | |
| | Conforms to 90% MC CAST and VSCD standards | Documented source code & executable code | Final z dimension of flip chip packaging not to exceed 0.030" assuming positioning on PCB, secure printing on polycarbonate, adhesive and any other requirement in stack up design as measured by Brightsight | | | | | |
| | Conforms to at least 95% ISO/IEC | Reader swipe success raw and summary data | Conforms to all aspects of the Visa's printing standards including, but not limited to mice type, hologram, secure sig panel, black light inks as measured by Brightsight | | | | | |
| | Mutually Agreed Upon Engineering Plan | ISO/IEC test results raw & summary data | | | | | | |
| 5 | Production Pilot: Scaleable, repeatable manufacturing process on line that scales to >1 million cards per month | Associated quality documents | | 17 months | 24 months | $ 725,000 | 2.80% | 1,450,000 |
| PP | Process proves repeatable, scaleable to 1,000,000 cards per month | Weekly design review. Functional Spec, First article submission | Prove process works for a batch of no less than 250,000 cards per week resulting in 95% yield on no fewer than 5K cards as measured by brightsight or Truggelmann in audit report | | | | | |
| | Conforms to all document control per #6 | BOM target, Detailed on-line process flow, Process cycle time and all equipment spec. | Batch of at least 750 cards swipe at 95% across swipe, DIP, ATM as measured by Brightsight | | | | | |
| | Process, procedures, staffing conform to CAST and VSCD logical and physical security standards | Design Review documentation | Release conforms to all ISO/IEC/CAST/VSCD standards associated with certification as per audit of samples among 1,000 First Articles as measured by Brightsight or Truggelmann | | | | | |
| | In development process demonstrate clear traceability of parts, WIP and problem resolution | Design Review documentation | Manufacturing process audit passes by Brightsight with only minor recommendations, none that would preclude certification | | | | | |
| | Fully developed quality assurance program in all aspects of sourcing, engineering and manufacturing as per #6 | BOM target. | Lins conforms to all logical and security requirement as measured by official MC/Visa security auditor | | | | | |
| | Mutually Agreed Upon Engineering Plan | Reader swipe success raw and summary data | Results are statistically reliably and valid on a sample size of at least 100 repeated at least twice as verified by Brightsight or Truggelmann | | | | | |

Confidential

Optg Agmnt_Exhbit B SOW.xls

| Task | Requirement | Documents to Provide Upon Completion (All documents to be stored in both company (Filed/Venture) servers | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Reader swipe success raw and summary data | Conforms to all aspects of Visa's printing standards including, but not limited to mice type, hologram, secure sig panel, black light inks as measured by Brightsight | | | | | |
| | | ISO/IEC test results raw & summary data | | | | | | |
| | | Associated quality documents | | | | | | |
| | | In line process documentation, test/yield analysis data | | | | | | |
| 6 | Audit ready with document control, tracking processes for all elements of engineering & manufacturing | | | | | | | |
| | *a. Manufacturing Work Instructions (MWIs), Logistical Work Instructions (LWIs) & Quality Inspection Instructions (QIIs) supporting all aspects of the Manufacturing Process* | | | | | | | |
| | *b. Engineering Design Review, Prototype Review, Manufacturing Release,* | | | | | | | |
| | *c. Maintain Release Schedule* | | | | | | | |
| | Conform to Visa Certification & plan for MC, AmEx, Discover certification | All MPIs, QIIs, LWIs | Meets MC/Visa auditor standards and defective product/procedure resolution as measured by Brightsight or Truggleman Associates | 2-6 months | 10 months | $ 50,000 | 0.20% | 100,000 |
| | Mutually Agreed Document Control Procedures | WIP and Inline quality/process documentation | Manufacturing process audit passes 80% by Brightsight with only minor recommendations, none that would preclude certification | | | | | |
| | Conform to document conventions: Filename, header, footer, pagination, confidentiality | Document Control Procedures | | | | | | |
| | Conform to prototype release naming conventions | Release Control Procedures | | | | | | |
| | Conform to Functional Specification of 2.2.5.5. | Traceability Procedures | | | | | | |
| | Conform to Design Review Procedures | Guage testing procedures | | | | | | |
| | Conform to experimental process procedures, documenting traceability of parts, specific hypothesis, clear measurement of success | Security procedures, document control | | | | | | |
| | Measurements of lab and real world usage success conform to >95% reader success for 1) transport, 2) Dip and 3) swipe readers | | | | | | | |
| | Results are statistically reliably and valid on a sample size of at least 100 repeated at least twice | | | | | | | |
| | Mutually Agreed Upon Engineering Plan | | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | | | | | | | |
| 7 | MasterCard Certification | Same as for PP1 | As measured by Brightsight | | | 50,000 | 0.20% | 100,000 |
| 8 | American Express Certification | Same as for PP1 | As measured by Brightsight | | | 50,000 | 0.20% | 100,000 |
| 9 | Discover Certification | Same as for PP1 | As measured by Brightsight | | | 25,000 | 0.10% | 50,000 |
| 10 | All the above mentioned documents must store in both Fileq and Venture servers as complete customer's package | | | | | | | |
| Total | | | | | | $ 4,800,000 | 18.70% | 9,600,000 |
| | *All FITeq/PrivaSys equipments are consigned to Venture and should return back to FITeq in good working condition when the project is completed.* | | | | | | | |
| | *Start to consider Version 3.0 (track 1 and 2) as the market demands* | | | | | | | |

Optg Agmnt_Exhibit B SOW.xls

EXHIBIT B
Statement of Work

Engineering Milestones Schedule

| Task | Requirement | Documents to Provide Upon Completion (All documents to be stored in both company (Filed/Venture) servers) | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| 1 | | Venture will provide an overall project schedule upon sign-off | | | | | | |
| | | Schedule and milestone reviews with the mechanism to track and monitor progress of the whole project | | | | | | |
| **Breadboard 1** | | | | | | | | |
| BB1 | New sensors and interface with the new non-secure Chip | Bi-weekly design review report. | Choose reliable low cost sensor (as SMT P&P component)) as approved by Thian, E Foo and J Ziegler | 6 months | 8 months | $ 650,000 | 2.60% | 1,300,000 |
| | Conform to Functional Specification of 2.2.5.5. Changes approved by FITeq to highlight sensitive points on certification tasks | Provide feasibility reports with all components spec.Breadboard design and schematic drawing | Choose reliable low cost wound or laminated coil as approved by Thian, E Foo and J Ziegler | | | | | |
| | | Engineering Plan | Identify key reliability issues which are to be addressed by the development process as approved by Thian, E Foo and J Ziegler | | | | | |
| | Conform to Design Review Procedures | | | | | | | |
| | Conform to experimental process procedures, documenting traceability of parts, specific hypothesis, clear measurement of success | | | | | | | |
| | Target design to achieve real world swipe success >95% for 1) transport, 2) Dip and 3) swipe readers | Test Plan | | | | | | |
| | 10-20 cards | Reports of experiment results | | | | | | |
| | Mutually Agreed Upon Engineering Plan | Functional Spec | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Documented source code & executable code | | | | | | |
| | | Executable code and all engineering drawing release | | | | | | |
| | Conform to document control procedures | | | | | | | |
| 2 | Breadboard 2. Tethered card w/emulated secure and non-secure chip, pre-stored DACs (not real-time from secure chip) no perso | | | | | | | |
| BB2 | Emulates functionality of 2.2.5.5 as per its functional spec with mutually agreed upon changes. Pls note dual chip interface | Bi-weekly design review Functional Spec | Barnes equipment results documents 70-80% success rate. This report enables objective data points to be used by Venture to characterize the magnetic stripe data | 9 months | 12 months | $ 750,000 | 3.00% | 1,500,000 |
| | BOM pricing in production not to exceed $4.20 +25%, no more than 45 parts (target 30). FITeq to get .75 battery | BOM target | Brightsight gets BB2-3-5 cards and measure: 80%+ swipe success and 50%+ for DIP/ATM success | | | | | |
| | Conforms to most ISO IEC Requirements for MC/Visa Certification | Design Review documentation with updated schematic drawing | Pre-populated DACs demonstrate dynamic data set is reliably transferred 100% of the time as verified by Brightsight. | | | | | |
| | | Engineering Plan | | | | | | |
| | Conform to Design Review Procedures | | | | | | | |
| | Target design to achieve real world swipe success >95% for 1) transport, 2) Dip and 3) swipe readers | Test Plan | Secure Chip has been certified by both MC & Visa as verified by Brightsight | | | | | |
| | Mutually Agreed Upon Engineering Plan | Documented source code & executable code | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Reader swipe success raw and summary data | | | | | | |
| | | ISO/IEC test results raw & summary data | | | | | | |
| 3 | Lab Proto #1:. On card new secure and non-secure chip, sensors made on production equipment, BOM $4.20 + 10%, NO secure printing | | | | | | | |
| LP1 | Total final packaging not to exceed .030 of an inch plus or minus 10% | Bi-weekly design review. | Secure Chip selected has been certified by MC and Visa as verified by Brightsight | 12 months | 18 months | $ 1,500,000 | 6.00% | 3,000,000 |
| | Made on production equipment with an understanding that process engineering tasks will be improved/refined - needs process development | BOM target. | | | | | | |

Confidential

| Task | Requirement | Documents to Provide Upon Completion (All documents to be stored in both company (Filed/Venture) servers) | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| | Conforms to most ISO IEC Requirements for MC/Visa Certification | Design Review documentation with updated schematic drawing and PCB layout files. | Chip when assembled on a PCB with components with Polycarb or similar front/back is .030 plus or minus 10% as tested by Brightsight | | | | | |
| | Mutually Agreed Upon Engineering Plan | BOM target | <45 components as tested by EF/JZ/TK | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Design Review documentation with updated schematic drawing | 80% of ISO & IEC pass as tested by Brightsight | | | | | |
| | | Documented source code & executable code | 70% swipe success across DIP, ATM, swipe as tested by Brightsight | | | | | |
| | US$4.20 BOM in production +10% | Reader swipe success raw and summary data | | | | | | |
| | < 45 components | ISO/IEC test results raw & summary data | | | | | | |
| 4 | Lab Proto #2 New secure & non secure with secure front/back | <45 components | | | | | | |
| LP2 | Emulates functionality of 2.2.5.5 as per its functional spec with mutually agreed upon changes. Pls note dual chip interface | Bi-weekly design review c/w report. Functional Spec. | Proof of production line equipment and no major issues as per pre-audit Report by Brightsight | 15 months | 20 months | $1,000,000 | 4.00% | 2,000,000 |
| | Mutually Agreed Upon Engineering Plan | BOM target | Prove sample of at least 75 cards selected among batch | | | | | |
| | Mutually Agreed Upon Objective Test Plan | Design Review documentation | BOM in production target of $4.20+10% or as agreed by Thian, E Foo and J Ziegler. The BOM price shall be no more than $7 | | | | | |
| | Select chip that has been certified by AmEX, Discover, MC and Visa | BOM target. | 90% success across swipe, Dip, ATM as measured by Brightsight | | | | | |
| | Conforms to 90% MC CAST and VSCD standards | Design Review documentation with updated schematic drawing and PCB layout files. | Conforms to 95% ISO/IEC as measured by Brightsight | | | | | |
| | Conforms to at least 95% ISO/IEC | Documented source code & executable code | Final z dimension of flip chip packaging not to exceed 0.030" assuming positioning on PCB, secure printing on polycarbonate, adhesive and any other requirement in stack up design as measured by Brightsight | | | | | |
| | Mutually Agreed Upon Engineering Plan | Reader swipe success raw and summary data | Conforms to all aspects of the Visa's printing standards including, but not limited to mice type, hologram, secure sig panel, black light inks as measured by Brightsight | | | | | |
| | Mutually Agreed Upon Objective Test Plan | ISO/IEC test results raw & summary data | | | | | | |
| | | Associated quality documents | | | | | | |
| 5 | Production Pilot. Scaleable, repeatable manufacturing process on line that scales to > 1 million cards per month | | | | | | | |
| PP | Process proves repeatable, scaleable to 1,000,000 cards per month | Weekly design review. Functional Spec, First article submission | Prove process works for a batch of no less than 250,000 cards per week resulting in 95% yield on no fewer than 5K cards as measured by Brightsight or Truggelmann in audit report | 17 months | 24 months | $ 725,000 | 2.90% | 1,450,000 |
| | Conforms to all document control per #6 | BOM target, Detailed on-line process flow, Process cycle time and all equipment spec. | Batch of at least 750 cards swipe at 95% across swipe, DIP, ATM as measured by Brightsight | | | | | |
| | Process, procedures, staffing conform to CAST and VSCD logical and physical security standards | Design Review documentation | Release conforms to all ISO/IEC/CAST/VSCD standards associated with certification as per audit of samples among 1,000 First Articles as measured by Brightsight or Truggelmann | | | | | |
| | In development process demonstrate clear traceability of parts, WIP and problem resolution | Design Review documentation | Manufacturing process audit passes by Brightsight with only minor recommendations, none that would preclude certification | | | | | |
| | Fully developed quality assurance program in all aspects of sourcing, engineering and manufacturing as per #6 | BOM target. | Line conforms to all logical and security requirement as measured by official MC/Visa security auditor | | | | | |
| | Mutually Agreed Upon Engineering Plan | Reader swipe success raw and summary data | Results are statistically reliably and valid on a sample size of at least 100 repeated at least twice as verified by Brightsight or Truggelmann | | | | | |

| Task | Requirement | Documents to Provide Upon Completion / All documents to be stored in both company (Fiteq/Venture) servers | Success as Measure by: | Target Date from Closing | No Later Than from Closing | $'s | % of 50,000,000 shares | Shares |
|---|---|---|---|---|---|---|---|---|
| | Mutually Agreed Upon Objective Test Plan | Reader swipe success raw and summary data | Conforms to all aspects of Visa's printing standards including, but not limited to mica type, hologram, secure sig panel, black light inks as measured by Brightsight | | | | | 100,000 |
| | | ISO/IEC test results raw & summary data | | | | | | |
| | | Associated quality documents | | | | | | |
| | | In line process documentation, test/yield analysis data | | | | | | |
| 6 | Audit ready with document control, tracking processes for all elements of engineering & manufacturing | | | | | | | |
| | *a. Manufacturing Work Instructions (MWIs), Logistical Work Instructions (LWIs) & Quality Inspection Instructions (QIIs) supporting all aspects of the Manufacturing Process* | | | | | | | |
| | *b. Engineering Design Review, Prototype Release, Manufacturing Release,* | | | | | | | |
| | *c. Maintain Release Schedule* | | | | | | | |
| | Conform to Visa Certification & plan for MC, AmEx, Discover certification | All MPIs, QIIs, LWIs | Meets MC/Visa auditor standards and defective product/procedure resolution as measured by Brightsight or Truggleman Associates | 2-6 months | 10 months | $ 50,000 | 0.20% | 100,000 |
| | Mutually Agreed Document Control Procedures | WIP and inline quality/process documentation | Manufacturing process audit passes 80% by Brightsight with only minor recommendations, none that would preclude certification | | | | | |
| | Conform to document conventions: Filename, header, footer, pagination, confidentiality | Document Control Procedures | | | | | | |
| | Conform to prototype release naming conventions | Release Control Procedures | | | | | | |
| | Conforms to Functional Specification of 2.2.5.5. | Traceability Procedures | | | | | | |
| | Conform to Design Review Procedures | Guage testing procedures | | | | | | |
| | Conform to experimental process procedures, documenting traceability of parts, specific hypotheses, clear measurement of success | Security procedures, document control | | | | | | |
| | Measurements of lab and real world usage success conform to >65% reader success for 1) transport, 2) Dip and 3) swipe readers | | | | | | | |
| | Results are statistically reliably and valid on a sample size of at least 100 repeated at least twice | | | | | | | |
| | Mutually Agreed Upon Engineering Plan | | | | | | | |
| | Mutually Agreed Upon Objective Test Plan | | | | | | | |
| 7 | MasterCard Certification | Same as for PP1 | As measured by Brightsight | | | 50,000 | 0.20% | 100,000 |
| 8 | American Express Certification | Same as for PP1 | As measured by Brightsight | | | 50,000 | 0.20% | 100,000 |
| 9 | Discover Certification | Same as for PP1 | As measured by Brightsight | | | 25,000 | 0.10% | 50,000 |
| 10 | All the above mentioned documents must store in both Fiteq and Venture servers as complete customer's package. | | | | | | | |
| Total | | | | | | $ 4,800,000 | 18.70% | 9,600,000 |
| | *All FiTeq/PrivaSys equipments are consigned to Venture and should return back to FiTeq in good working condition when the project is completed.* | | | | | | | |
| | Start to consider Version 3.0 (track 1 and 2) as the market demands | | | | | | | |

**EXHIBIT C**
**Relevant Regulations**



*FiTeQ Certification*

*Exhibit C: Relevant Regulation*
*This Exhibit outlines MasterCard Certification of the FiTeq devices to the best of FiTeq's knowledge prior to signing. This documents is substantially complete, but will be updated post-signing to ensure it is current with MasterCard's standards. In addition, Visa, China Union Pay, Discover, JCB and any other Network Operators' Certification policies will be provided post signing.*

*Confidential*        This material may not be duplicated, published, or disclosed, in whole or
                      in part, without the prior written permission of FiTeq.

*Trademarks*          Trademark notices and symbols used in this manual reflect the
                      registration status of MasterCard trademarks in the United States.
                      Please consult with the Global Member Operations Support team or the
                      MasterCard Law Department for the registration status of particular
                      product, program, or service names outside the United States.
                      All third-party product and service names are trademarks or registered
                      trademarks of their respective owners.



## Table of Contents

---

*Table of Contents*

| | | |
|---|---|---|
| 1 | Introduction | 2 |
| 2 | Presuppositions | 3 |
| 3 | Certification Test Requirements | 4 |
| 3.1 | Reliability Requirements | 4 |
| 3.2 | Security testing | 5 |
| 3.3 | Product characteristics | 6 |
| 4 | Manufacturing Requirements | 8 |

# 1 Introduction
*Reliability Requirements*

The agreement with FiTeQ defines the conditions for certification of FiTeQ product per Exhibit C.
The conditions comprise:

- Product characteristics and performance to be assessed through testing
- Production and quality and security processes to be assessed through auditing
- Other conditions to be assessed through witnessing or other appropriate methods

The conditions are grouped into sections. The status of each condition is indicated in the tables below under each section:

## 2 Presuppositions

| Section | Description | | Remarks | Editor |
|---|---|---|---|---|
| A | Product Releases for Commercial Certification | | | |
| | 1 | FiTeQ Release 2.2 (VariSys with DAC) | | |
| | 2 | FiTeQ Release 3.0 (Track 1 and Track 2) | | |
| | 3 | FiTeQ Vault Authorization System (PVAS) | | |
| | 3. a | FiTeQ Release 2.2 Cards will be swiped at various mechant POS terminals. The FiTeQ Vault installed at MC shoul accept the DAC transaction, validate the transaction, log the transaction in PVAS and send back the approval code to the Merchant. | | |
| | 4 | FiTeQ Personalization Module (PPM) | | |
| | 4. a | FiTeQ shall successfully demonstrate successful personalization of 50 FiTeQ cards using PPM and a DataCard to personalize devices and create a data file to enable real-time billing through MasterCard Billing Services. | | |
| B. | Sample Conditions | | | |
| | | Test cards must be mass manufactured at defined manufacturing sites. Samples must be from at least 3 different batches from discrete production runs | | |
| C | Post Certification Requirements | | | |
| | | FiTeQ must present as part of Commercial Certification a plan satisfactory to MasterCard as to how FiTeQ intends to meet the Exhibit E requirements that are post Commercial Certification | | |
| E | Security Improvements | | | |
| | | FiTeQ will implement solutions to security improvements required by MasterCard within 6 month post contract date. | | |

## 3 Certification Test Requirements
## 3.1 Reliability Requirements

| ID | Sub ID | Description | Lab: Result1 | Remarks | Editor |
|----|--------|-------------|--------------|---------|--------|
| 1 | | Reliability tests | | | |
| | A | Card must retain full functionality after exposure to various magnetic and electric fields | | | |
| | | Card must withstand electrostatic discharge according to measurement method defined in IEC 61000-4-2, with a test value of 4 kV through contact, and 8 kV through air | | | |
| | | Card must withstand EM fields according to measurement method defined in IEC 61000-4-3, with a Test value of 10 V/m (remark: the frequencies involved in these tests range from 80 to 1000 MHz) | | | |
| | | Card must withstand the magnetic fields related to the rated power (household electricity) according to measurement method defined in IEC 61000-4-8, with a test value of 30 A/(m^e) | | | |
| | | Card must be able to withstand a permanent magnet with a flux density of 0.05 T being swiped along the coil in any direction, touching the card surface. The swipes shall be executed at a maximum speed of 1 m/s. | | | |
| | B | Card must retain full functionality after exposure to adverse environmental conditions such as extreme humidity, temperatures, and variations in air pressure | | | |
| | b.i | Card Endurance test (fucntional after 22500 insertions) | | | |
| | b.ii | Resistance to oils and fats | | | |
| | b.iii | Resistance to perspiration and saliva (KVK method) | | | |
| | b.iv | Resistance to plasticizer (KVK method) | | | |
| | b.v | Salt mist (10373-1 clause 5.4) | | | |
| | b.vi | Thermal shock (Cartes Bancaire) | | | |
| | b.vii | Three wheels test (10373-3 annex) | | | |
| | b.viii | Vibrations (10373:1993) | | | |
| | c | Buttons and signal devices (e.g., LEDs) present on the card must satisfy common requirements for such devices: LED 1mcd during life, Buttons in accordance with IEC 61020 | | | |
| | D | Bonding strength between card body and chip modules | | | |
| | | Delamination (180 °, ANSI INCITS 322-2002 sec 5.1)) | | | |
| | | Delamination (Cross hatch tape test, ANSI INCITS 322-2002 sec 5.3) | | | |
| 2 | | Battery tests | | | |

| ID | Sub ID | Description | Lab: Result1 | Remarks | Editor |
|----|--------|-------------|--------------|---------|--------|
|    | A | Battery life must be long enough for the card to support up to 2,100 transactions. Battery shelf life as per manufacturer's warranty. The manufacturer currently warrants the battery for two years. | | | |
|    | B | Reliability tested under various conditions that include temperature variations and extremes as specified and warranted by battery manufacturer. | | | |
|    | C | Susceptibility to battery discharge caused by latch-up (Chip should not go into a latch up state because of power glitches of plus or minus .1 volt to either the Vcc, Ground or input PIN) | | | |
|    | D | Toxicity as per the specifications of the manufacturer. The manufacturer warrants that the battery is not toxic. | | | |
| 3 | | Keys | | | |
|   | | Life of 2,100 transactions for indented keys assuming 8 key presses per transaction | | | |
| 4 | | LEDs | | | |
|   | | Life of 2,100 transactions for LEDs | | | |
| 5 | | Read success rate – Terminals | | | |
|   | | 95% successful read of Track 1 (as ready) and/or Track 2 using a FiTeQ Release 3.0 card. Note: After the initial MasterCard Certification Date, for "Novel Readers", those that are not previously tested, FiTeQ will conform to the reader standards within 60 days. | | | |
| 6 | | Read success rate – ATM | | | |
|   | | 95% successful read at ATM machines for a FiTeQ Release 3.0 card. Note after the initial MasterCard Certification for "Novel Readers", those that are not previously tested, FiTeQ will conform to the reader standards within 60 days. | | | |
| 7 | | Card Durability (ANSI) | | | |
|   | | Card must comply with Card Service Life Class 3 and Durability Class 3 in artificial aging testing, which results in a Reliability Index of 9. | | | |

### 3.2  Security testing

| ID | Sub ID | Description | Lab: Result | Remarks | Editor |
|----|--------|-------------|-------------|---------|--------|
| 8 | | Eavesdropping | | | |
|   | | Eavesdropping on the broadcasted magstripe should be no less secure than a magstripe in a reader head. | | | |
| 9 | | PIN | | | |
|   | | Implementation of PIN as per MasterCard PIN Security Requirements where applicable | | | |
| 10 | | CAST | | | |

| ID | Sub ID | Description | Lab: Result | Remarks | Editor |
|----|--------|-------------|-------------|---------|--------|
| | | Successful completion of the CAST security process as per CAST process | | | |
| | | Triple DES keys are protected by a CAST approved secure micro, Philips 6032 | | | |
| | | DAC generation with triple DES encryption is performed by a CAST approved secure micro, Philips 6032 | | | |
| | | FiTeQ masked the Philips 6032 so patches can be made to the firmware at personalization rather than re-masking | | | |
| | | FiTeQ will provide fixes deemed necessary for rollout within 6 months. Fixes will be deposited in Escrow, as required by the Main Agreement. | | | |
| | | An implementation plan will be mutually agreed upon by FiTeQ and MC. | | | |
| | CAST Requirements | | | | |
| | a | Security Chip (unless a CAST approved chip is already used) | | | |
| | a.i | Tamper Resistance Guidelines | | | |
| | a.ii | Hardware Security Tests and Benchmarks | | | |
| | a.iii | Cryptographic Algorithm Implementation Guidelines | | | |
| | a.iv | Hardware Manufacturing Evaluation Guidelines | | | |
| | b | Operating system and underlying platform (unless a CAST approved OS is used) | | | |
| | b.i | Non-Virtual Machine Operating System Guidelines | | | |
| | b.ii | Java Card Implementation Guidelines (Java Card) | | | |
| | b.iii | Global Platform Implementation Guidelines (Java Card) | | | |
| | b.iv | Java Card Applet Security Guidelines (Java Card) | | | |
| | b.v | Code review of firmware | | | |
| | c | On board application | | | |
| | c.i | Smart Card Application Security Guidelines | | | |
| | c.ii | Security Guidelines for Smart Card Loyalty Guidelines | | | |
| | | | | | |
| 11 | | Vault code review | | | |
| | | Successful completion of security review of code of the VAULT software as per the following documents that will include a code review to ensure no trojan horses: | | | |
| | a | Key Management Guidelines | | | |
| | b | Cryptographic Modules Guidelines | | | |
| | c | Corporate Security Guidelines | | | |
| | | | | | |
| 12 | | DAC/VAULT concept security | | | |
| | | DAC /Vault concept shall not contain conceptual security problems | | | |

### 3.3 Product characteristics

| ID | Sub ID | Description | Lab: Result | Remarks | Editor |
|----|--------|-------------|-------------|---------|--------|
| 13 | | Identification cards - Physical Characteristics ISO/IEC 7810 | | | |

| ID | Sub ID | Description | Lab: Result | Remarks | Editor |
|---|---|---|---|---|---|
| | a | Adhesion (7810) | | | |
| | b | Bending Stiffness (7810) | | | |
| | c | Blocking (7810) | | | |
| | d | Card warpage (7810) | | | |
| | e | Flammability (7810) | | | |
| | F | Opacity (7810) | | | |
| | g | Peel strength (7810) | | | |
| | h | Physical dimensions (7810) | | | |
| | I | Resistance to chemicals – 1 minute test (7810) | | | |
| | J | Resistance to chemicals – 24 hours test (7810) | | | |
| | k | Surface distorsions (7810) | | | |
| | l | Temperature and humidity (7810) | | | |
| | m | UV lighting (7810) | | | |
| 14 | | Embossing | | | |
| | a | Identification cards – Recording technique – Embossing ISO/IEC 7811-1 | | | |
| | b | Identification cards – Recording technique – Embossing ISO/IEC 7811-3: Location of embossed characters | | | |
| 15 | | Identification cards – Recording technique – Magnetic stripe ISO/IEC 7811-2 | | | |
| | a | Surface profile | | | |
| | b | Surface roughness | | | |
| | c | Wear from read head | | | |
| | d | Resistance to chemicals | | | |
| | f | Signal amplitude and jitter - Unlike standard mag stripe cards, FiTeQ cards output the same amplitude regardless of the swipe speed. The amplitude of a FiTeQ-enabled card is equivalent to that produced by swiping a standard magnetic stripe card at a specific speed. This "ISO equivalent swipe speed" will be provided prior to certification.  For 2.2, the "ISO amplitude equivalent swipe speed" is 10-20 inches per second. When measuring jitter, the measurement should be made from the center of the FiTeQ card. | | | |
| | i | Height of the magnetic stripe area | | | |
| 16 | | Identification cards – Integrated circuit(s) cards with contacts – Physical characteristics and contacts ISO/IEC 7816-1, -2 | | | |
| | a | X-rays | | | |
| | b | Surface profile of contacts | | | |
| | c | Mechanical strength | | | |
| | d | Electrical resistance of contacts | | | |
| | e | Electromagnetic fields | | | |
| | f | Static electricity | | | |
| | g | Bending properties | | | |
| | h | Torsion properties | | | |
| | i | Location of contacts | | | |
| | j | UV light | | | |
| 17 | | Card Design | | | |

| ID | Sub ID | Description | Lab: Result | Remarks | Editor |
|----|--------|-------------|-------------|---------|--------|
| | | Compliance with all card design specifications as per Card Design Manual | | | |
| 18 | | Capability of platform (chip and OS) to handle an EMV application | | | |
| | a | Available ROM and EEPROM | | | |
| | b | Support of EMV by hardware and OS | | | |
| 19 | | PPM | | | |
| | | PPM is interoperable and can be successfully integrated into existing personalization equipment without a significant reduction in production throughput or security | | | |
| 20 | | Compliance with FiTeQ documentation | | | |
| | | All system components must comply with the functional and technical specifications as delivered by FiTeQ. Conform to all published FiTeQ System descriptions, user guides, specifications and documentation. Compliance to the documentation as delivered by FiTeQ shall be tested by physical deconstruction of card samples and subsequent component verification, by code review of the delivered software, etc. Please note that compliance to the documentation also implies the delivery of a working DAC mechanism. | | | |

## 4   Manufacturing Requirements

| ID | Sub ID | Description | Observation | Remarks | Editor |
|----|--------|-------------|-------------|---------|--------|
| 21 | | Completion of the following for electronic components suppliers and manufacturers | | | |
| | a | Electronic Assembly Manufacturing: Venture & subsidiaries Battery: VARTA, Solicore Secure chip:  Philips or equivalent Non-secure chip:  MicroChip or equivalent Encoder sub-assembly: Celetron or equivalent FiTeQ reserves the right to substitute like suppliers based on price, endurance, performance or quality.  At such time that a substitute supplier of main components is certified by FiTeQ, MasterCard may audit the new supplier and its core capabilities. | | | |
| | b | Purchasing agreements for audit. Venture Celetron Philips MicroChip Solicore VARTA | | | |
| | c | Quality assurance procedures implemented and documented | | | |
| | d | Proof of capability to achieve volumes as per agreement (Similar technology products and appropriate resources such as people, production lines). | | | |

| ID | Sub ID | Description | Observation | Remarks | Editor |
|---|---|---|---|---|---|
| | e | Proof of compliance to export and import regulations<br>Software - ECCN# 5D992 - NLR (No License Required)<br>VAULT releases 2.2, 3.2, 3.6, 3.7<br>Card Firmware releases 2.2, 3.2, 3.4, 3.5, 3.6, 3.7<br>Hardware - ECCN# 5A992 - NLR (No License Required)<br>Card Releases 2.2, 3.2, 3.4, 3.5, 3.6, 3.7<br>These products can be exported to all but the T7 countries (Iran, Iraq, Cuba, Libya, N. Korea, Syria and Sudan). | | | |
| 22 | | Completion of the following for suppliers of card body (physical plastic) and personalization bureaus | | | |
| | a | Proof of dual supply for initial implementation | | | |
| | b | Plan for releasing technology to other card manufacturers | | | |
| | c | Quality assurance procedures implemented and documented (Per FiTeQ Quality Assurance Documents which must be written.) | | | |
| | d | Proof of capability to achieve volumes as per agreement (Audit prior scalability of production.) | | | |
| | e | MasterCard audit of physical site as per MasterCard Physical Security Guidelines (if not already certified) | | | |
| | f | MasterCard audit of logical security as per MasterCard Logical Security Guidelines (if not already certified) (Service bureau and printer are MC certified.) | | | |
| 23 | | The manufacturing process must meet the following requirements | | | |
| | a | All parties involved, including offshore suppliers, must be ISO 9001 compliant (Per FiTeQ Quality Assurance Documents which must be written.) | | | |
| | b | All parties involved must implement a proper QA process (Per FiTeQ Quality Assurance Documents.) | | | |

*This Exhibit outlines Security Certification of the FiTeq devices to the best of FiTeq's knowledge prior to signing. This documents is substantially complete, but will be updated post-signing to ensure it is current with MasterCard's and Visa's standards. In addition, China Union Pay, Discover, JCB and any other Network Operators' Certification policies will be provided post signing.*

**Security Management System Manual**

       The Security manual establishes and states the policies governing FiTeQ's Security Program. These policies define management's arrangements for managing operations and activities in the event of a major business interruption due to natural disaster event or a manmade act. These top-level policies represent the plans or protocols for establishing quality Security procedures.

Approved by:_____ Joan Ziegler, CEO     Date:_____

Approved by:_____ David Patterson, EVP    Date:_____

Approved by:_____ Eric Foo, VP Engineering   Date:_____

This manual is intended for the sole use of FiTeQ, and is provided to customers for informational purposes only.

The contents of this manual may not be reproduced or reprinted in whole or in part without the express written permission of FiTeQ.

Security Management System, Procedures and Forms                    FiTeQ

**Security Management System Manual**

**Table of Contents**

1.0   INTRODUCTION AND PURPOSE OF THE SECURITY PROGRAM 3

2.0   Scope 5

  2.1   RESPONSIBILITY 5

3.0   Management Responsibility 5

  3.1   SECURITY ORGANIZATION 6

3.1.1   Security Department Organization Chart 6

  3.2   Management Commitment 6

  3.3   MANAGEMENT PHILOSOPHY 6

  3.4   Planning 7

  3.5   Responsibility, Authority, and Communication 7

  3.6   Management REPORTING 8

  3.7   Business conduct 8

4.0   Security Planning 9

  4.1   Objectives 9

  4.2   Requirements 9

  4.3   Transactions 10

  4.4   Documentation 11

  4.5   SECURITY 12

4.6 MANAGEMENT REVIEW 12

5.0   Resource Management 13

  5.1   Provision of Resources 13

  5.2   Competence, Awareness, and Training 13

  5.3   Infrastructure 13

6.0   POLICY AND PROCEDURE STATEMENTS 13

  6.1   DEFINITIONS OF STATEMENTS 14

  6.2   ISSUANCE OF STATEMENTS 14

  6.3   DISTRIBUTION OF STATEMENTS 14

  6.4   MAINTAINING THE SECURITY PROGRAM MANUAL 14

  6.5   CANCELLATION AND PURGING 14

  6.6   INDEXING 14

7.0   TYPES OF SECURITY 15

**1.0     INTRODUCTION AND PURPOSE OF THE SECURITY PROGRAM**

The purpose of this section is to define and explain the Purpose of FiTeQ' Security Program. The Security Program is designed to implement policies and procedures that will protect FiTeQ' personnel, material assets and intellectual property.

1.1     The Security Program is designed to

- Establish minimum standards for the installation and operation of all physical security devices in the Card Technology Center
- Establish logical security standards for servers and all access to shared FiTeQ files
- Establish and to implement procedures to both discourage crimes and to assist in the identification of individuals who commit such acts.

1.2     It is the responsibility of FiTeQ' CEO and officers of the company to ensure that the written Security Program for FiTeQ' offices, remote offices and off site employees be developed and implemented. The program will be continually updated to meet FiTeQ' needs with the approval of FiTeQ':

- VP Operations and Finance
- Quality Manager
- VP Issuer Services
- VP Software Development
- Director of HW and Manufacturing Process Development

1.3     The Security Program is designed to reduce risks, both personal and financial, to:

- FiTeQ' Facilities
- FiTeQ proprietary data
- FiTeQ servers
- Assets
- Records

1.4     The purpose for developing and implementing this Security Program is to:

1. Identify and focus upon those activities likely to create an unacceptable risk to FiTeQ. This involves a continuing assessment of FiTeQ's vulnerability regarding activities threatening its:
   - Personnel
   - Customers and other persons
   - Assets and liabilities
   - Equipment and supplies
   - Facilities
   - Policies and procedures
   - Legal obligations
   - Organizational structure

2. Develop and implement a written and strategic Security Program based upon critical and accessory functions.

3. Continually assess the risk of loss to each function and department within FiTeQ.

4.  Continually identify appropriate solutions to reduce any projected loss upon each function and department. This involves the cooperation with, and delegation to, members within each office, function and department.

5.  At least annually reassess the Security Program by conducting a needs assessment review with senior management in all locations. After each re-assessment, the VP Finance & Operations and appropriate company officers within each function and department shall assign the responsibility for the actual implementation of FiTeQ's Security Program. This assignment shall be to those personnel whose individual areas of responsibility are affected.

6.  The VP Finance & Operations will conduct an update survey at least annually to continually evaluate and update the program. The survey may be conducted by a qualified independent firm, offering security consulting services.

The purpose for developing and implementing a security survey is to:

- Identify and prioritize those activities that create a marginally acceptable or unacceptable risk to FiTeQ. This involves a continuing assessment of FiTeQ's vulnerability regarding activities that threaten its:

    o Personnel
    o Intellectual property
    o Material assets

- Continually assess the risk of loss and/or compromise of assets or information

- Identify, on a continuing basis, appropriate solutions to reduce the risk of loss in each area of company operations

- Make recommendations to bring the program up to the current standards and insure that the security program is being implemented by each department

The security survey will evaluate and make recommendations pertaining to:

    o Physical Security
    o Procedural Security
    o Technical Security
    o Information Security

1.5   In conjunction with the stated purpose and objectives, the following guidelines should all be in effect:

1.  Effective security plans should be continually developed and maintained for each department, facility and function. These plans shall be in line with the critical and accessory functions to be fulfilled by that department, facility or function.

2.  Each department, facility and function shall assist in the continual development and implementation of policies and procedures created during this process, and shall be responsible for achieving the necessary results.

3.  All policies and procedures shall be written in a clearly defined and carefully constructed manner, and itemize specific objectives and concepts. The goal is to reduce the risks pertaining to industrial espionage, unauthorized access to offices and facilities, unauthorized access to electronic data and protection of employees and other persons.

4.  All policies and procedures shall be designed according to appropriate corporate, contemporary business, and legal standards. These policies and procedures shall also be fully supportive of other company plans, goals and objectives.

5.  This Security Program shall be used to define and implement reasonable preventive measures for every department, facility or function.

6.  The acquisition of any new or remodeled equipment, devices, systems or procedures shall be subject to examination before purchase. This is to determine the extent of support that such acquisition will provide to this plan. These acquisitions shall support this plan to the fullest extent.

## 2.0   SCOPE

The policies stated in this manual apply to all operations and activities at FiTeQ.  The scope of our Security Policy may be stated as follows:

Identifying Strategic and tactical risks to the business resulting in a tactical policy implemented to safeguard operations at all facilities.

It is the responsibility of all department managers to help define, implement and maintain the procedures required by this manual and to ensure all processes conform to these requirements. If the policy is not enforced by department managers, notice will be given to ensure compliance with in a reasonable amount of time.

It is the responsibility of all employees to follow procedures that implement these policies and to help strive for continuous improvement in all activities and processes of Our Company. FiTeQ employees sign on to this responsibility in a written agreement.

## 2.1   RESPONSIBILITY

The policies stated in this manual apply to all operations and activities at our company.  It is the responsibility of all department managers to help implement and maintain the procedures required by this manual and to ensure all processes conform to these requirements.

It is the responsibility of all employees to follow procedures that implement these policies and to help strive for continuous improvement in all activities and processes of our company.  The goal is to make the Security Management System Manual as clear and useful as possible.  All users are encouraged to contact FiTeQ VP Finance & Operations with any suggestions for revising or improving the Managers Manual.

Managers' personnel administration responsibilities for the units reporting to them typically include:

- Hiring requirements.
- Security Orientation for new employees.
- Periodic re-training for all employees.
- Overseeing compliance with association Requirements while insuring that Federal and State regulations are followed.

Unless the following activities are performed at a higher level in the organization, managers are also responsible to:

- Design and organize the jobs and functions under their control.

- Develop security policies and procedures as needed, within the parameters of association requirements while obeying all State and Federal laws.

- Develop a philosophy and means of communicating with and involving employees in procedures affecting them.

- Resolve employee complaints and grievances, and represent FiTeQ in formal hearings as necessary, often with the assistance of a Company and/or legal representative.

## 3.0   MANAGEMENT RESPONSIBILITY

The Security Planning function is headed by the VP Finance & Operations, who reports to Chief Executive Officer (CEO).

### 3.1   SECURITY ORGANIZATION

The Security Department has two main responsibilities:
- Prevention
- Investigation
- Enforcing company policy through written notice to managers and their subordinates.

### 3.1.1   Security Department Organization Chart

FiTeQ's organizational framework provides the foundation for coordinating and administrating the Security Planning System. Responsibilities specific to certain procedures or tasks are presented in the related procedures.



### 3.2   MANAGEMENT COMMITMENT

Top Management at our company shows its commitment to Security Planning management through the development and implementation of this Security Management System Manual. Additionally, management commitment is demonstrated through the Management Philosophy, the specific objectives that are set and reviewed during Management Review Meetings and by providing the resources required to meet our objectives for continually improving the effectiveness of our operations and the Security Management System.

The management team consisting of the CEO and all department managers is chartered with ensuring our Security Planning System meets employee needs as well as statutory and regulatory requirements.

### 3.3   MANAGEMENT PHILOSOPHY

Our company has established a Security Management System Manual that we feel is appropriate to our organization. Our Management Philosophy is communicated throughout FiTeQ.

Department managers and supervisors are responsible for ensuring all employees understand the Management Philosophy.  To ensure our policy remains appropriate, it is reviewed at least annually at one of our Management Review meetings.

The Management Philosophy:

❖ Managers should act in a manner that is ethical, accountable and responsive.  We are committed to a spirit of cooperation and teamwork.  We strive for excellence in service and approach our activities with a deep sense of purpose and accountability.

❖ Our customers and employees can be assured that they will be treated fairly, with dignity and respect.  We accomplish this by adhering to our Management System and use operational methods as documented in this Security Management System Manual.

❖ We strive to continually improve the effectiveness of our Management System by monitoring our performance against our established objectives and through leadership, which promotes employee involvement.  This concept represents our company's commitment to a quality workforce and the increasing need to better serve our customers, shareholders, and employees through FiTeQ security initiative.

**3.4     PLANNING**

As part of annual strategic planning meetings, our company establishes strategic objectives related to improving security and expenses.  These objectives are supported by specific measures that track performance against those objectives.  Department managers in turn set departmental objectives related to security with specific performance measures and targets that support FiTeQ Corporate objectives.

As situations arise that demand changes to the Security Management System, either to meet objectives or because of changing business conditions, all changes will be reviewed by the management team to ensure the integrity of the Security Planning System is maintained and improved.

**3.5     RESPONSIBILITY, AUTHORITY, AND COMMUNICATION**

Responsibilities and authorities related to security at FiTeQ are defined in each Job Description.

Key duties and responsibilities should be separated among individuals.  Duties and responsibilities shall be assigned systematically to a number of individuals to ensure that effective checks and balances exist with respect to security.

Qualified and continuous supervision with written feedback to staff and managers are provided to ensure that internal security objectives are achieved.  These security standards require supervisors to continuously review and approve the assigned work of their staffs as well as provide the necessary guidance and training to ensure that errors, waste, and wrongful acts are minimized and that specific security standards are followed.

**3.5.1     Management Representative**

The CEO has appointed the VP Finance & Operations as the Management Representative with the accountability and authority to:

● Ensure that processes needed for the Security Planning System are established, implemented and maintained.

● Report to senior management the performance of the Security Planning System and any need for improvement.

● Ensure the promotion and awareness of Security requirements throughout the organization.

● Serve as the liaison with external parties on matters relating to Security Planning.

**3.5.2     Internal communication**

In line with our company's policy of leadership through employee involvement, our company's personnel policies have established open communication throughout the organization.

The effectiveness of our Security Planning System is evident through internal audit results, management reports, and the departmental performance measures. Other than confidential information, company and departmental performance measures are posted on bulletin boards throughout our company. Internal Audit results are shared at departmental meetings as appropriate.

## 3.6 MANAGEMENT REPORTING

The CEO and senior management team shall review FiTeQ's Security Management System, on an annual basis and more frequently if needed, to ensure its continuing suitability, adequacy and effectiveness. This review shall include assessing opportunities for improvement and the need for changes to the Security Management System, including the management philosophy and objectives. The VP Finance & Operations is responsible for maintaining records from management reviews.

### 3.6.1 Review Input

The VP Finance & Operations and department managers should provide the following information for Management Review meetings:

- Results of audits, training and testing.
- A signed individual sheet for each employee indicating that they have read this manual and will comply with all policies in their duties as a FiTeQ employee.
- Employee feedback.
- Process performance.
- Follow-up actions from previous management reviews.
- Changes that could affect the Security Planning operation.
- Recommendations for improvement.

### 3.6.2 Review Output

Records shall include the output from the management review and shall include any decisions and actions related to:

- Improvement of the effectiveness of the Security Management System and its processes.
- Improvement of processes related to Security Management System requirements.
- Resources required to implement the Security Management System .

## 3.7 BUSINESS CONDUCT

Unethical business conduct, actions or even the appearance of unethical behavior is unacceptable under any conditions. The reputation of FiTeQ depends on each employee applying common sense in situations where specific rules of conduct are insufficient to provide clear direction. A strong sense of personal ethics, which should extend beyond compliance with applicable laws, is necessary to guide the behavior of all employees.

### 3.7.1 Ethical Standards

All employees should comply with the ethical standards of FiTeQ as set forth in this manual. If a situation feels awkward, then the employees should ask themselves:

- Is my action legal and ethical?
- Does my action comply with corporate security policy?
- Does my action agree with my personal ethics or behavior?

An employee should be able to answer "yes" to all of these questions before taking action or compromising themselves or FiTeQ in the situation.

All Managers are responsible for the ethical business conduct and behavior of their employees. Managers should consider the appropriate courses of action in terms of both ethical and economic

factors. Each decision should be based on the guidelines provided in this Security Management System manual as well as their own personal beliefs of what's right and wrong.

### 3.7.2 Integrity

Managers and employees are to have personal and professional integrity and are to maintain a level of competence that allows them to accomplish their assigned duties, as well as understand the importance of developing and implementing good internal controls related to the Security Management System

This requires managers and their staff to maintain and demonstrate at all times:

- Personal and professional integrity.
- A level of skill necessary to help ensure effective performance.
- An understanding of internal controls sufficient to effectively discharge their responsibilities.

### 4.0 SECURITY PLANNING

Managers utilize the Security Planning System to identify, train and develop employees to conform to all policies in the Security Management System. The system utilizes standard security processes to achieve the, objectives of FiTeQ.

### 4.1 OBJECTIVES

Our Company shall establish Security objectives that are reviewed on an annual basis. These objectives shall be measurable and consistent with the Security Policy, and reviewed at least annually at Management Security meetings.

As part of annual strategic planning meetings, Our Company establishes strategic objectives for improvement of our Security Policies. These objectives are supported by specific measures that can be defined and documented. Department managers in turn set departmental security related objectives with specific performance measures and targets that support FiTeQ security objectives.

As situations arise that demand changes to the Security Policies, either to meet objectives or because of changing business conditions, all changes will be reviewed by the management team to ensure the integrity of the Security plan is maintained.

### 4.2 REQUIREMENTS

Through this manual and associated procedures and documents, Our Company has established, documented, and implemented a Security Planning program.    The Policy is designed to result in continually examining potential risks to Our Company and adjusting company policies and practices to mitigate risks.

VP Operations is held accountable for implementation of the Security Management System.

Top Management will ensure the availability of resources to support FiTeQ security standards by the operation and monitoring of processes through regular interaction with department managers and through Management Review meetings. Department Managers will monitor, measure and analyze processes and implement any actions necessary to achieve intended results and continual improvement of the security standards.

Any processes that are outsourced that may affect FiTeQ conformity to requirements are controlled. The VP Finance & Operations and appropriate department manager(s) are responsible for defining the methods to control outsourced security processes.

### 4.2.1 Resources

During planning and budgeting processes, and as needed throughout the year, the CEO and VP Finance & Operations determine and ensure that the appropriate resources are available to

implement and maintain the Security policy and procedures and continually improve its effectiveness.

Top management should allocate resources in their department to support the operation and monitoring of security processes through regular interaction with department managers and through review activities at Management Review meetings.

Department Managers and the VP Finance & Operations should monitor, measure and analyze processes and implement any actions necessary to achieve intended results and continual improvement of the security processes.

Any processes that are outsourced that may affect FiTeQ conformity to security requirements are controlled.  The VP Finance & Operations, VP Finance & Operations and appropriate department manager(s) are responsible for defining the methods to control outsourced security processes and procedures.

### 4.2.2   Infrastructure

Our company provides the infrastructure necessary to achieve conformity to Federal and State standards and requirements.  During the annual budgeting and strategic planning processes, buildings, workspace, and associated utilities are evaluated and provided.

When new personnel are added, VP Finance & Operations coordinates activities to ensure that the employee understands the Security management System and how to use appropriate hardware, software, and supporting services used by FiTeQ.

### 4.2.3   Internal Controls

Internal controls, procedures, and practices should be utilized to ensure that:

- All employees are safeguarded against invasion of privacy, physical harm, harassment, and discrimination.
- Programs are efficiently and effectively carried out in accordance with applicable laws and management policy.
- Employee rights are adequately maintained in accordance with applicable laws and regulations.
- Employee's are properly selected, compensated, motivated, and trained to efficiently and effectively carry out their job responsibilities.

### 4.2.4   Audit Findings

Annual Audits within the department are conducted by the VP Finance & Operations. Managers are to promptly evaluate findings and recommendations reported by Security Auditors and then determine proper actions in response to audit findings and recommendations (e.g., develop corrective actions).  Managers should complete, within established time periods, all actions that correct or otherwise resolve the matters brought to management's attention.

The audit resolution process begins when the results of a security audit are reported to management, and is completed only after actions have been taken that correct identified deficiencies, produce improvements, or demonstrate the audit findings and recommendations are either invalid or do not warrant management actions. A security audit may be conducted at the discretion of the VP Finance & Operations and or FiTeQ customers and FiTeQ. The VP of Finance & Operations may re-audit after the implementation of corrective action

### 4.3   TRANSACTIONS

All transactions recorded on a Security Department form should be properly authorized and accurately represent the activity being documented.  The timing of the transaction should be in accordance with company policies defined in this manual.

Security transactions include all activities and events relating to reported suspicious activity or failure to comply with FiTeQ policy.

### 4.3.1   Authorization

Transactions and other significant events are to be authorized and executed only by persons acting within the scope of their authority. It is the principal means of assuring that only valid transactions and other events are entered into the Security system file. Modification or adjustment to previously recorded security documents requires authorization.

### 4.3.2   Timing

All transaction dates recorded in FiTeQ Security program should accurately reflect the date the transaction occurred. Security files should be kept up-to-date and organized for easy retrieval.

### 4.3.3   Accuracy

Transactions should be recorded in the Security System accurately. All transactions should be supported by documentary evidence, which becomes part of the security file. Errors should be reviewed, resolved, and cleared in a timely fashion.

The Security program utilizes standard Company issued security forms and provides control and accountability over these forms.

### 4.4   DOCUMENTATION

This Security Manual and the associated procedures are intended to satisfy the documentation requirements for a Security Planning System. Department managers and supervisors are responsible for identifying any additional documents needed to ensure the effective planning, operation and control of people and security processes.

Procedures may vary in detail based on the size of the department or organization involved and the type of activity performed. Procedure developers shall consider this as well as the complexity of the processes and interactions, and the competence of the personnel involved.

Documents may be any medium including: software programs, electronic text files, or hardcopy documents for example.

### 4.4.1   Managers Manual

This Managers Manual provides the top-level organizational document for the Security Department. The Managers Manual defines the scope, policies and processes of our company's Security system as well as management's responsibility for the system.

### 4.4.2   Forms Development & Control

All Security Management Systems Forms are controlled by VP Finance & Operations. The Forms Control Procedure defines the controls needed to:

- Approve forms for adequacy before issue.
- Review and update as necessary and re-approve forms.
- Ensure that changes and the current revision status of forms are identified.
- Ensure that relevant versions of applicable forms are available at points of use.
- Ensure that forms remain legible and readily identifiable.
- Ensure that forms of external origin are identified and their distribution controlled.
- Prevent the unintended use of obsolete forms, and apply suitable identification to them if they are retained for any purpose.

### 4.4.3   Control of Records

Procedures define appropriate records to be maintained for the effective operation of the Security Management System, including evidence of compliance with applicable laws. Records shall remain legible, readily identifiable and retrievable. The Files and Records Management Procedure defines the controls needed for the identification, storage, protection, retrieval, retention time and disposition of records.

### 4.4.4   Security Transactions Define?

All transactions and other significant events should be clearly documented, properly classified and readily available for examination. Managers are cautioned that personnel notes and other documentation not addressed to an employee do not belong in an employee personnel file.

This standard applies to:

- The entire process or life cycle of a transaction or event and includes the initiation and authorization.
- All aspects of the transaction while in process.
- Its final classification in summary records.

### 4.5   SECURITY

Access to resources and Personnel records should be limited to authorized personnel only. Accountability for the custody and use of resources should be assigned and maintained as well. Restrictions of access to resources shall also depend upon the vulnerability of the resource as well as the perceived risk of loss, both of which shall be periodically assessed.

Periodic comparisons should be made of the resources with the recorded accountability to determine whether the two agree. The frequency of the comparison shall be a function of the vulnerability of the asset.

### 4.5.1   Physical Security

Physical Security measures are implemented to protect the assets and employees from abuse, fraud, theft, or damage. Security procedures for the protection of assets and employees are addressed with FiTeQ's Security Manual. The following items and procedures are part of the security measures taken to ensure the protection and safety of our employees and assets.

- Card access system

- Entry area man traps

- State or federal identification required to enter FiTeQ facility

- Surveillance cameras at all points of entry and throughout various parts of the building

### 4.5.2   Information Security

Information security measures should be adopted to protect FiTeQ's information assets from unauthorized access, abuse, tampering, theft, or use. Information security procedures for the protection and authorized use of computer and network assets are addressed within FiTeQ's Security Manual.

### 4.6 MANAGEMENT REVIEW

The CEO and management team shall review Our Company's Security Management System on a annual basis and more frequently if needed, to ensure its continuing suitability, adequacy and effectiveness. This review shall include assessing opportunities for improvement and the need for changes to the Security Management System.

VP Finance & Operations is responsible for maintaining records from previous management reviews.

**4.6.1   Review Input**

The VP Finance & Operations and other department representatives provide the following information for Management Review meetings:

- Results of security audits.
- Customer input.
- Status of preventive and corrective actions.
- Follow-up actions from previous management reviews.
- Changes that could Improve the Security policy for FiTeQ employees and customers.
- Recommendations for improved Security Practices.

**4.6.3   Review Output**

Records shall include the output from the management review and shall include any decisions and actions related to:

- Improvement of the effectiveness of the Security Policies.
- Resource needs.

**5.0   RESOURCE MANAGEMENT**

**5.1   PROVISION OF RESOURCES**

During planning and budgeting processes and as needed throughout the year, the CEO and management team determine and ensure the appropriate resources are available to implement and maintain the Security program and continually improve its effectiveness.

**5.2   COMPETENCE, AWARENESS, AND TRAINING ( IS THIS SECURITY RELATED) ?**

The minimum competencies required for each position at Our Company are defined in each position's Job Description.  Human Resources and department managers and supervisors are responsible for ensuring job descriptions are current.

Where otherwise qualified personnel require additional training or other action to meet the minimum competency requirements, these needs are identified.  The department provides task-specific training.  General training or education is provided or coordinated by Human Resources. The department or Human Resources evaluate the effectiveness of training or other actions taken as appropriate.

The department generates records of task-specific training.  Human Resources maintain records of all training and education, skills and experience.

Department managers are responsible for ensuring their employees are aware of the relevance and importance of their activities and how they contribute to the achievement of the quality objectives.

**5.3   INFRASTRUCTURE (SAME AS 4.2.2)**

Our Company provides the infrastructure necessary to achieve conformity to Security Policy goals. During the annual budgeting and strategic planning processes, buildings, workspace, and associated utilities are evaluated and provided.  When new personnel are added, Human Resources coordinates activities to ensure appropriate process equipment including hardware and software if required and supporting services such as telephones etc., are available based on information provided on the Personnel Requisition.

**6.0   POLICY AND PROCEDURE STATEMENTS**

This section defines and explains the format and operation of FiTeQ's Security Management System. All statements issued are applicable to all employees and non-employees, such as associates, customers and contractors.

**6.1     DEFINITIONS OF STATEMENTS**

- POLICY STATEMENTS: A policy statement is one describing a policy or program of broad application used throughout FiTeQ as a guiding document until it is withdrawn or modified.

- PROCEDURE STATEMENTS: A procedure statement is one describing the manner in which a policy is to be implemented and may include performance expectations and specific tasks to be performed.

- MEMORANDA: A memorandum is a document describing an informal request or notification not in conflict with existing policies or procedures, unless used as an interim emergency measure.

**6.2     ISSUANCE OF STATEMENTS**

- POLICY STATEMENTS - must have a basis of both legality and authority. There should be a supporting legal provision based on state law, personnel rules and regulations or other lawful enactment. The person issuing the order must be the one to whom appropriate authority has been delegated for its issuance.

- PROCEDURE STATEMENTS - must have a basis of both sound research and applicability. No procedure statement should be issued without reference to or implementation of an accompanying statement of policy.

- No authority is needed for the issuance of MEMORANDA, which shall contain the name of the author, intended recipient and a statement of Purpose. A copy of any memorandum issued by the VP Finance & Operations with regard to the Security Management System shall be kept on file for at least one (1) year, except those that revise or modify an existing policy and/or procedure. These memoranda shall be kept permanently or made an integral part of this manual.

**6.3     DISTRIBUTION OF STATEMENTS**

Copies of this manual have been distributed to each Department Manager and Office Manager and are available for review at FiTeQ.

**6.4     MAINTAINING THE SECURITY PROGRAM MANUAL**

The VP Finance & Operations shall coordinate the reproduction, placement and updating of all copies of FiTeQ's Security Management System manuals, to include:

- Updating of all copies of the manuals when changes or revisions are made to any statement.

- The assignment of section numbers and other appropriate information;

- Conducting at least an annual review of all statements. This shall be conducted in the same month of each year, to determine the needs for cancellations or revisions. After this review is completed a summary will be presented to the SR. Management regarding new, updated or outdated information.

- Furnishing copies of all changes for each location.

**6.5     CANCELLATION AND PURGING**

- POLICY STATEMENTS: Policy statements are not self-canceling, and shall remain in effect until canceled or superseded.

- PROCEDURE STATEMENTS: Procedure statements indicating an indefinite date of effectiveness will be reviewed in the same manner as policy statements.

- MEMORANDA: N/A.

**6.6     INDEXING**

- The Security Program Manual shall contain at least a table of contents and an index or appendix, if appropriate.

Security Management System, Procedures and Forms                    FiTeQ

- Indices will be periodically reviewed and, when sufficient changes have been made, new indices will be prepared and published.

## 7.0 TYPES OF SECURITY

## 7.1 PHYSICAL

This is the component of the Security Program that affords protection of facilities, material assets and records. It also affords protection to people housed in, or visiting the facility. Components of Physical Security relate to three (3) basic elements:

- <u>PERIMETER</u> - refers to the outermost boundary of the property on which the facility is located.
- <u>FACILITY</u> - the building which houses company operations.
- <u>ITEM</u> - refers to protection of a specific object such as records protected in a safe file cabinet.

## 7.2 LOGICAL

This is the component of the Security Program that affords protection of electronic data and records.

## 7.3 CONCENTRIC

This method of Physical Security refers to the method of protection which works in from the perimeter to the facility to a space within the facility; outer protective ring, middle protective ring, and inner protective rings.

### 7.3.1 External barriers

Erect external barriers as appropriate:

- Entry doors will be constructed of metal or metal and glass in main entry ways and equipped with secure access devices.
- Ground floor windows will be alarmed to prevent or discourage unauthorized entry.
- Fences will be utilized at the employee parking/entrance area

### 7.3.2 Internal Barriers.

Erect internal barriers as appropriate:

- Access control at points of entry will be utilized to control entry to FiTeQ facility.
- Entry to restricted areas of the facility will be controlled by an electronic access system.
- All measures taken to restrict entry and access will be accomplished within the prescribed limits of local and national fire codes and other regulations as they apply.
- Perimeter will be protected by signs, fencing and intrusion detection systems including CCTV and/or a Guard Force. The perimeter will be well lit, providing adequate lighting around the entire area including the Stand Off Zone, which is that area between the perimeter and the facility itself.
- Facility refers to the building that houses FiTeQ's operations. The boundary of the building will be protected by access control systems including guards and/or card access system, alarms, intrusion detection systems and CCTV.
- Item protection refers to the safe, secure file cabinets and other issues as follows:

  - Safe will be metal or concrete that prevents unauthorized access.

- Alarms, intrusion detection systems and CCTV will be utilized where applicable..
- Appropriate lighting will be utilized throughout FiTeQ installations. Outdoor lighting shall be high pressure sodium and provide a minimum of one (1) candle foot power at the furthest edge of each light fixture.
- Protection of personnel is also a goal of the Physical Security aspect of the program. Appropriate access control and lighting will serve to protect company personnel, visitors and clients.

Security Management System, Procedures and Forms                           FiTeQ

**Revision History:**

| Revision | Date | Description of changes | Requested By |
|----------|----------|------------------------|--------------|
| 0 | 09/01/03 | Initial Release | |
| | | | |
| | | | |
| | | | |

**EXHIBIT D**
**Card Issuers' Security Standards**

*Exhibit D:  Security*
*This Exhibit outlines Security Certification of the FiTeq devices to the best of*
*FiTeq's knowledge prior to signing.  This documents is substantially complete,*
*but will be updated post-signing to ensure it is current with MasterCard's and*
*Visa's standards.  In addition, China Union Pay, Discover, JCB and any*
*other Network Operators' Certification policies will be provided post signing.*



## VENDOR'S
## PRE-INSPECTION REPORT

If space allowed for answer is insufficient, use continuation sheet and identify answer by using corresponding paragraph numbers.

### I - Name and Background of Vendor

1.  Name of Vendor: _____

    Length of time in Operation: _____

2.  Address: _____

3.  City: _____

4.  State: _____ Zip Code: _____

5.  Telephone No: _____ Fax No: _____

6.  Names of company officers and titles:_____

    _____

    _____

    _____

    _____

    _____

7.  Name of Plant Security Officer: _____

8.  Name of Plant Manager: _____

9.  Attach current audited financial statement ☐

10. List names and addresses of five companies for whom vendor performs services:

(A) _____

(B) _____

(C) _____

(D) _____

(E) _____

## II - Plant (Exterior)

11. Physical description of plant:

A. Type of construction (masonry, wood, windowless, etc.):

_____

_____

B. Is Plant in self-contained building, if so, number of stories:

_____

C. If plant is not in self-contained building, describe location in building and list names and types of business of tenants in building:

_____

_____

_____

_____

_____

_____

_____

_____

_____

12. Describe perimeter security protection of plant (including type and location of any fences, flood lights, closed-circuit television, etc.):

_____

_____

_____

_____

13. List adjacent buildings up to 300 ft. from plant.  Indicate whether connected to plant and list names, addresses, and type of business of tenants in these buildings: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

14. Give general description of area in which plant is located such as industrial, residential, office, etc., and type of people who live and/ or work in areas (such as laborers, office workers, professional, etc.):

_____

_____

_____

_____

15. What is the location of the police station as to:

    A.  Number of miles from plant: _____

    _____

    B.  Police response time in minutes to answer alarms: _____

    _____

    C.  Frequency with which police cars patrol plant area: _____

    _____

16. What is location of fire station as to:

    A.  Number of miles from plan:    Miles = _____

    B.  Response time in number of minutes to answer alarms:

    Minutes = _____

## III Plant (Interior)

17. Describe location and number of employee entrances into plant:

    _____

    _____

    _____

18. What security is provided on the above employee entrances to prevent

    entry of unauthorised persons: _____

    _____

    _____

    _____

    _____

    _____

19. Describe security procedures in handling visitors (including use of registers, identification badges, employee escort, number of visitors permitted in one group, etc.): _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

20. Describe security procedures in handling suppliers, vendors, and repairmen: _____

_____

_____

_____

_____

_____

21. Describe completely all theft and fire alarm systems and any other type of security devices installed inside or outside of the plant:

_____

_____

_____

_____

_____

_____

22. A. How many persons does the company employ in:

    i.   Production:_____

    ii.  In office: _____

    iii. Other: _____

  B. How many hours of the day, and days of the week does plant operate: _____

  C. How many shifts work in production and what are their hours:

_____

23. Does the plant employ a guard force:   yes ☐   no ☐

24. If a guard force is employed:

  A. Are they employed by vendor or are they employees of private guard force: _____

  B. How many guards are employed and what are their working hours:

  C. Are they in uniform: _____

  D. Are they armed:_____

    If so, what type of weapons do they carry: _____

_____

_____

E.  What type, if any, portable radio equipment do they carry and, if carried, with whom are they in radio contact: _____

_____

F.  What are their working hours (hours of day and days of week): _____

G.  Describe their duties: _____

_____

_____

H.  What type of pre-employment background check is made:

_____

_____

_____

25.  Describe in detail audit trail used (accountability) through all processes, until finished cards are shipped out of plant to the customer:

_____

_____

_____

_____

_____

_____

_____

_____

26.  What method is used to count cards:_____

_____

_____

_____

27. Are any areas of plant restricted to designated employees: _____
_____

If answer is yes, list restricted areas and describe methods used to
protect these areas and procedures devised to prevent access by
unauthorised personnel: _____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

28. Describe procedures used to maintain security of Visa proprietary
materials; i.e. security characters/modules, encoding and embossing
equipment IC chip modules, Visa Holograms, photographic negatives,
printing plates and other VISA materials:
_____
_____
_____
_____
_____
_____
_____

29. If applicable, what final disposition is made of photographic negatives and printing plates, after customer's order has been filled: _____

_____

_____

_____

_____

_____

30. Describe procedures used at each step of manufacturing process to handle spoilage and comment on method of accounting for these rejects in audit trail: _____

_____

_____

_____

_____

_____

_____

31. Describe method used in destroying rejected cards:

_____

_____

_____

_____

_____

_____

_____

32. Describe vault or storage area in plant where finished/unfinished card stocks are stored.  This should include location, size, type of construction, locking mechanism, alarm systems, procedures used for checking these items in and out of vault and identify all persons who have combination or key to open vault:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

33. What is done with finished and unfinished cards when plant is not in production:

_____

_____

_____

_____

_____

_____

34. Does plant have auxiliary power source: _____

_____

If answer is yes, describe type, location uses of this power and security

protection provided: _____

_____

_____

_____

_____

35. Are sample cards produced: _____

_____

_____

If answer is yes, what use is made of these samples and what final

disposition is made of them: _____

_____

_____

_____

_____

36. If applicable, what security, if any, would be afforded the special inks

used to print *VISA* card products: _____

_____

_____

_____

_____

_____

_____

37. Are stock piles maintained of printed or partially printed cards anticipating future orders from Issuers:_____

_____

_____

_____

## IV - Personnel

38. Who hires personnel:_____

_____

_____

39. Are police checks made of prospective employees: _____

_____

40. Are credit checks made of prospective employees: _____

_____

41. Describe any other pre-employment investigation made of prospective employees to assure their honesty and integrity: _____

_____

_____

_____

42. Are employees issued identification badges or cards: _____

_____

43. If answer to 42 is yes -

    A. Does it include photo of employee: _____

    B. Are they colour coded to limit access only to designated areas:

_____

_____

C. What security protection is provided for un-issued badges or cards:

_____

_____

_____

D. What is done when employee reports loss or theft of badges or cards:

_____

_____

_____

E. What is done when employee resigns or retires: _____

_____

_____

_____

44. What do production employees do with personal packages and purses upon arriving for work: _____

_____

45. Are production employees required to wear pocketless smocks or coveralls during working hours: _____

46. Are production employees observed by a guard or other designated employee when leaving premises to prevent their removing cards or other pertinent material from the plant: _____

_____

_____

_____

## V - Shipping

47. What method of counting cards is used prior to packaging completed cards for shipment: _____

_____

48. Describe method of packaging cards for shipment including sizes of containers used, number of cards in each container, strength of containers and seals, and whether or not shipping pallets are used:

_____

_____

_____

_____

_____

_____

49. Where are packaged cards awaiting shipment stored prior to their actually leaving plant: _____

_____

_____

_____

50. Describe methods used in shipping cards from plant to customers:

_____

_____

_____

_____

_____

## VI - General

51.  List all types of insurance coverage, such as fire, theft, liability, fidelity, etc., including names and addresses of insurance companies, policy numbers, amounts and types of coverage: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

52.  What security precautions are taken to protect plant physical facilities, equipment and unfinished cards in the event of work stoppages:

_____

_____

_____

_____

_____

_____

**2.2 Software and Specifications**

| Card | | |
|---|---|---|
| | Documents | **Preliminary Documents already turned over to Venture** |
| | | Release 2.2 Card Dual-Chip Protocol v10 02.23.06 ga.doc |
| | | Release 2.2 Card Functional Spec v1.3 05.04.05 lr.doc |
| Custom Tools | | |
| | DAC | |
| | | Release 2.2 DAC Whitepaper v2.2 04.12.05 lr.doc |

# EXHIBIT E
## Preliminary Documents

| MPI # | REV | DESCRIPTION |
|---|---|---|
| MPI-102 | D | BROADCASTER COIL WINDING, PROTOTYPE, PVC CARD |
| MPI-103-2 | B | SMT & STEAMCLEANING |
| MPI-104-2 | C | BROADCASTER ASSEMBLY, PROTOTYPE |
| MPI-105 | | |
| MPI-106-2 | D | ELECTRONIC MODULE ASSEMBLY |
| MPI-107 | | |
| MPI-108 | B | DOME SWITCH ASSEMBLY, PROTOTYPE |
| MPI-109 | E | ELECTRONIC MODULE FINAL ASSEMBLY, PROTOTYPE |
| MPI-110 | B | COVER ASSEMBLY, PROTOTYPE, DOUBLE SIDED ADHESIVE  METHOD |
| MPI-111 | C | COVER ASSEMBLY, PROTOTYPE, UV CURE METHOD |
| MPI-112 | D | CR80 DIE CUT OPERATION, PROTOTYPE |
| MPI-113 | A | CHIP PLATE WINDOW CUTTING, PROTOTYPE |
| MPI-114 | | |
| MPI-115 | A | PROGRAMMING OF VERSION 2.2.5.5 |
| MPI-116 | A | FLEX PRELIMINARY ELECTRICAL TEST, PROTOTYPE |
| MPI-117 | A | FLEX FUNCTIONAL ELECTRICAL TEST VER. 2.X & 3.X, PROTOTYPE |
| MPI-118 | B | FLATNESS & TEMP VERIFICATION, HOT LAMINATING PRESS |
| MPI-119 | A | PREVENTION OF SCRAPS AND CONTAMINENTS |
| MPI-120 | 3.0.4.4 | CARD POTTING PROCESS 3.0.4.4 |
| MPI-121 | 3.0.4.4 | BROADCASTER ASSY INSTALLATION 3.0.4.4 |
| MPI-122 | A | FUNCTIONAL ELECTRICAL TEST AFTER HOT LAMINATION |
| MPI-123 | B | BATTERY ATTACH-PVC CARD |
| MPI-124 | A | ATTACH COVER DOTS-PVC CARD |
| MPI-125 | A | ATTACH TRIP SWITCH ASSEMBLY-PVC CARD |
| MPI-126 | A | 100% VISUAL INSPECTION AND FUNCTIONAL TEST OF TRIP SWITCH |
| MPI-127 | 3.0.4.4 | BROADCASTER CORE PREPARATION 3.0.4.4 |
| MPI-128 | A | AMERICAN ULTRAVIOLET UV CURE CONVEYOR OPERATING INST. |
| MPI-129 | 3.0.4.4 | BROADCASTER COIL WINDING 3.0.4.4 |
| MPI-130 | B | DIE ATTACH, PROTOTYPE |
| MPI-131 | B | WIRE BONDING, PROTOTYPE, MANUAL MACHINE |
| MPI-132 | B | DIE ENCAPSULATION, PROTOTYPE, MANUAL METHOD |
| MPI-133 | C | HOT LAMINATING PRESS INSTRUCTIONS, PROTOTYPE |
| MPI-134 | A | UNIVERSAL LASER SYSTEMS CUTTER OPERATION |
| MPI-135 | A | ~~HOT STAMPING~~ |
| MPI-136 | A | CLEAN ROOM OPERATOR DRESS AND PREP |
| MPI-137 | A | STEAM CLEANER OPERATING INSTRUCTIONS |
| | | |

*Strikethrough indicates not in current use or under construction.

| MPI #. | REV | DESCRIPTION |
|---|---|---|
| MPI-139 | 3.0.4.4 | BATTERY INSTALLATION 3.0.4.4 |
| MPI-140 | A | SMT PARTS INSTALLATION, MANUAL 3.0.4.X |
| MPI-141 | A | STEAM CLEAN 3.0.4.X |
| MPI-142 | A | FR4 CHIP CARRIER WIREBOND AND ENCAPSULATE 3.0.4.X |
| MPI-143 | A | DIE ATTACH, FR4 CHIP CARRIER 3.0.4.X |

**Preliminary Documents**

| LWI # | REV | DESCRIPTION |
|---|---|---|
| LWI-101 | D | RECEIVING |
| LWI-102 | E | PURCHASING |
| LWI-103 | B | HUMAN RESOURCES |
| LWI-104 | B | SHIPPING |
| LWI-105 | C | JOB TRAVELER GENERATION AND COMPLETION |
| LWI-106 | ~~D~~ | ~~SHOP WORK ORDER GENERATION AND COMPLETION~~ |
| LWI-107 | ~~B~~ | ~~WORK ORDER SUMMARY GENERATION AND UPDATE~~ |
| LWI-108 | ~~C~~ | ~~PERSONALIZATION WORK ORDER GENERATION AND COMPLETION~~ |
| LWI-109 | B | CARD PART NUMBER AND REVISION CONVENTION AND IMPLEMENTATION |
| LWI-110 | A | SPECIFICATION AND STANDARDS UPDATE |
| LWI-111 | B | DCO-ECO ORIGINATION |
| LWI-112 | C | SECURITY & CONTROL OF CITI GLOW CARD COVERS, prototype proc. |
| LWI-113 | B | CARDHOLDER DATA DELIVERY AND SECURITY FOR CITI GLOW CARDS |
| LWI-114 | B | PRIVASYS MAJOR SUB-CONTRACTOR CERTIFICATION PROGRAM |
| LWI-115 | A | SECURE CARD COVER PRINTING |
| LWI-116 | A | CARD PERSONALIZING FOR PROTOTYPING |
| LWI-117 | A | CARDHOLDER DATA DELIVERY AND SECURITY FOR PROTOTYPE CARDS |
| LWI-118 | A | HANDLING, PACKAGING, STORAGE AND SHIPPING OF DIE/WAFER |

*Strikethrough indicates not in current use or being upgraded.

**Preliminary Documents**

| QII # | REV | DESCRIPTION |
|-------|-----|-------------|
| QII-101 | C | DIMENSIONAL INSPECTION |
| QII-102 | A | CARD X-Y DIMENSIONAL MASURMENTS USING CARD DIMENSION GAGE |
| QII-103 | B | PLATING REQUIREMENTS |
| QII-104 | B | PRINTED CIRCUIT BOARD INSPECTION REQUIREMENTS |
| QII-105 | D | BROADCASTER COIL INSPECTION |
| QII-106 | B | FLEX CIRCUIT BOARD INSPECTION REQUIREMENTS |
| QII-107 | B | COMPONENT ATTACHMENT TO PCB OR FLEX |
| QII-108 | | |
| QII-109 | A | ESD WORKSTATION TABLE MAT MONITORING |
| QII-110 | | |
| QII-111 | A | VERISYS 2.2.X TEST REPORT |
| QII-112 | A | ESD TRAINING AND CERTIFICATION/RE-CERTIFICATION |
| QII-113 | G | CARD FINAL TEST REPORT |
| QII-114 | D | VERISYS 3.0.X CITI TEST REPORT |
| QII-115 | A | FIRST ARTICLE INSPECTION |
| QII-116 | A | CARD TERMINAL OPERATION, VARIOUS READERS |
| QII-117 | A | PICO SCOPE DATA MEASUREMENT INSTRUCTIONS |
| QII-118 | C | VERSION 2.X DAC PROGRAMMING, SAMPLE DATA USING "CARD TOOL" |
| QII-119 | A | CHIP PLATE CONTACT INSPECTION USING TEMPLATE |
| QII-120 | A | WAVEFORM DATA RETENTION & DISTRIBUTION FOR MC TEST CARDS |
| QII-121 | B | ASSEMBLY KIT VERIFICATION INSPECTION |

*Strikethrough indicates not in current use.

EXHIBIT 2

# COMMON STOCK PURCHASE AGREEMENT

THIS COMMON STOCK PURCHASE AGREEMENT ("**Agreement**") is made as of the day of July, 2009, by and between FiTeq, Inc., a Delaware corporation (the "**Company**") and Venture Corporation Limited, a Singapore corporation ("**Purchaser**"), with reference to the following facts:

A.      The Company designs, develops, markets and sells authentication and access solutions to financial institutions to reduce fraud and provide production differentiation in the payment industry or the access/authentication industry.

B.      The Purchaser is engaged in the business of providing value added engineering services and specialized manufacturing of high-value electronics products on a contract basis.

C.      The Purchaser desires to invest in and be engaged by the Company in the engineering and manufacturing of Company cards in order to enjoy the benefit as a value-added key supplier with sustainable margin and growing market share, and the Company desires to engage the Purchaser to enhance its card technology and provide substantial differentiation to Card Issuers, pursuant to the terms of an Operating Agreement between the Parties dated as of the date hereof in the form of Exhibit A hereto ("**Operating Agreement**").

D.      As a material inducement to entering into the Operating Agreement, the Parties are entering into this Agreement on the terms and conditions stated herein.

Now therefore, for good and valuable consideration, the Parties hereby agree as follows:

1.      Purchase and Sale of Stock and Warrants.

1.1      Sale and Issuance of Common Stock.  Subject to the terms and conditions of this Agreement, Purchaser agrees to purchase at the Closing and the Company agrees to sell and issue to Purchaser at the Closing 1,000,000 shares of Common Stock, $ 0.0001 par value per share (the **"Common Stock"**), at a purchase price of $0.50 per share.  The shares of Common Stock issued to the Purchaser pursuant to this Agreement (including any shares issued at the Initial Closing, any Milestone Shares, and as a result of the exercise of the Warrants, each as defined below) shall be referred to in this Agreement as the "**Shares.**"

1.2      Closing; Delivery.

(a)      The initial purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures concurrently with the execution hereof ("**Initial Closing**").  In the event there is more than one closing, the term "**Closing**" shall apply to each such closing, including Milestone Closings, unless otherwise specified.

(b)      At each Closing, the Company shall deliver to the Purchaser a certificate representing the Shares being purchased by the Purchaser at such Closing against payment of the purchase price therefor by check payable to the Company or by wire transfer to a bank account designated by the Company, except as otherwise set forth in Section 1.3 below.

1.3     Sale of Additional Shares of Stock.

(a)     After the Initial Closing, the Company shall sell, and the Purchaser shall purchase, on the same terms and conditions as those contained in this Agreement and as more specifically set forth in this Section 1.3, up to 9,350,000 additional shares of Common Stock (the "**Milestone Shares**"), after the Board of Directors of the Company (the "**Board**") has confirmed that any or all of the events specified in the Statement of Work (the "**SOW**") attached hereto as Exhibit B have occurred within the  agreed timeframe (individually, a "**Milestone Event**").   The dates of the purchase and sale of the Milestone Shares are referred to in this Agreement as the "**Milestone Closings.**"  Purchaser shall notify the Company in writing 90 days before the expiration of the corresponding timeframe set forth in the SOW for each Milestone Event (each a "**Milestone Delivery Date**") if that Milestone Delivery Date needs to be extended, and the written notice shall specify the reasons for such extension and the new targeted delivery date for that Milestone Event.  The Company shall agree to the new delivery date if the reasons for extension and the new delivery date are reasonable.  If (i) Purchaser gives proper and timely notice in accordance with the above, (ii) the Milestone Event occurs within the timeframe agreed upon by the parties, and (iii) the certifying authority certifies that the Measurements of Success have been met for that Milestone, the Board shall be obligated to approve the issuance of Milestone Shares for that Milestone Event, and if the Board fails to approve the issuance, the Purchaser shall be entitled to make a written demand to the Company, and thereafter the Company shall issue the Milestone Shares for which a certification was required to be issued.

(b)     Upon achieving any Milestone Event, the Purchaser shall be issued that number of shares of Common Stock set forth opposite such Milestone Event on Exhibit B within 30 days of certification of the same.   Satisfaction of a Milestone Event shall be deemed payment in full in the amount and for that number of Milestone Shares set forth opposite such Milestone Event. The consideration for the Milestone Shares shall be the value to the Company of the expenditure of time and money by Purchaser towards the accomplishment of each Milestone Event as set forth in Exhibit B, and the Parties agree that the values set forth on Exhibit B for each Milestone Event represents the true and accurate value to be paid for the Milestone Shares as of the date of this Agreement and that Purchaser is entitled to purchase the Milestone Shares based on those values.

(c)     The Company's obligation to issue Milestone Shares with respect to a particular Milestone Event shall terminate if such Milestone Event is not satisfied prior to the end of the timeframe agreed upon by the parties or prior to the end of the term of the Operating Agreement, whichever comes first.   If a particular Milestone Event is satisfied within the timeframe agreed upon by the parties and prior to the end of the term of the Operating Agreement, the Purchaser's rights hereunder shall survive such termination.

1.4     Issuance of Warrants.

(a)     Upon certification by the Board that any or all of the following events (each, a "**Warrant Event**") have occurred, the Company shall issue warrants in the form of Exhibit C ("**Warrants**"), to purchase an aggregate of up to 10,000,000 shares of Common Stock, in accordance with the following schedule:

| Milestone | Number and Type of Warrants to be Issued |
|---|---|
| Upon achievement of Certification by either MasterCard or Visa Card | A warrant to purchase 5,000,000 Common Shares at $0.50 per share (1-year term) |
| Upon achievement of Certification by either MasterCard or Visa Card by December 1, 2010 | A warrant to purchase 2,500,000 Shares of Common Stock at $0.50 per share (1-year term) |
| Upon achievement of Unit Cost at $5.50 per Card to Card Issuers | A warrant to purchase 500,000 Shares of Common Stock at $0.50 per share (1-year term) |
| Upon achievement of Unit Cost at $4.00 per Card to Card Issuers | A warrant to purchase 1,000,000 Shares of Common Stock at $0.50 per share (1-year term) |
| Upon achievement of Unit Cost at $3.00 per Card to Card Issuers | A warrant to purchase 1,000,000  Shares of Common Stock at $0.50 per share (1-year term) |

(b)      The Company's obligation to issue Warrants shall terminate if the milestones for issuance of the warrants are not satisfied prior to the end of the term of the Operating Agreement or within ten years, whichever comes first.  If the milestones for issuance of the Warrants are satisfied prior to the end of the term of the Operating Agreement, the Purchaser's rights hereunder shall survive such termination.

1.5      Defined Terms Used in this Agreement.  Capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Operating Agreement."**Code**" means the Internal Revenue Code of 1986, as amended.

(a)      "**Code**" means the Internal Revenue Code of 1986, as amended.

(b)      "**Key Employee**" means Joan Ziegler, David Patterson and Eric Foo.

(c)      "**Knowledge,**" including the phrase "**to the Company's knowledge,**" shall mean the actual knowledge, after reasonable investigation, of the Key Employees.

(d)      "**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, or results of operations of the Company.

(e)      "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(f)      "**Shares**" means the shares of Common Stock issued at the Initial Closing and any Milestone Shares or shares issued upon exercise of Warrants.

(g)  **"Transaction Agreements"** means this Agreement, and the Operating Agreement.

2.    Representations and Warranties of the Company.  The Company hereby represents and warrants to Purchaser that, except as set forth on the Disclosure Schedule attached as Exhibit D to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Initial Closing and each subsequent Closing, except as otherwise indicated.   The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections and subsections contained in this Section 2, and the disclosures in any section or subsection of the Disclosure Schedule shall qualify other sections and subsections in this Section 2 only to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other sections and subsections. For purposes of these representations and warranties (other than those in Sections 2.2, 2.3, 2.4, 2.5, and 2.6), the term "the Company" shall include any subsidiaries of the Company, unless otherwise noted herein.

2.1    Organization, Good Standing, Corporate Power and Qualification.    The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted.  The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2    Capitalization.   The authorized capital of the Company consists, immediately prior to the Initial Closing, of:

(a)    50,625,000 shares of common stock, $0.0001 par value per share (the "Common Stock"), 26,500,000 shares of which are issued and outstanding immediately prior to the Initial Closing.  All of the outstanding shares of Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable federal and state securities laws.

(b)    The Company has reserved 3,125,000 shares of Common Stock for issuance to officers, directors, employees and consultants of the Company pursuant to its 2009 Equity Incentive Plan duly adopted by the Board of Directors and approved by the Company stockholders (the "**Stock Plan**"), and all of the shares of Common Stock remain available for issuance to officers, directors, employees and consultants pursuant to the Stock Plan.  The Company has furnished to the Purchaser complete and accurate copies of the Stock Plan and forms of agreements used thereunder.

(c)    Section 2.2(c) of the Disclosure Schedule sets forth the capitalization of the Company immediately following the Initial Closing including the number of shares of the following:

(i)    issued and outstanding Common Stock, including, with respect to restricted Common Stock, vesting schedule and repurchase price;

(ii)    issued stock options, including vesting schedule and exercise price;

(iii)    stock options not yet issued but reserved for issuance; and

(iv)    warrants or stock purchase rights, if any.  Except for (A) the rights provided in this Agreement, and (B) the securities and rights described in Section 2.2(b) of this Agreement and Section 2.2(c) of the Disclosure Schedule, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any shares of Common Stock, or any securities convertible into or exchangeable for shares of Common Stock.

(d)    None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events.  The Company has never adjusted or amended the exercise price of any stock options previously awarded, whether through amendment, cancellation, replacement grant, repricing, or any other means.  The Company has no obligation (contingent or otherwise) to purchase or redeem any of its capital stock.

2.3    Subsidiaries.    The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity.  The Company is not a participant in any joint venture, partnership or similar arrangement.

2.4    Authorization.  All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into the Transaction Agreements, and to issue the Shares at the Closing and the Common Stock issuable upon conversion of the Warrants, has been taken or will be taken prior to the Closing.  All action on the part of the officers of the Company necessary for the execution and delivery of the Transaction Agreements, the performance of all obligations of the Company under the Transaction Agreements to be performed as of the Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing.  The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

2.5    Valid Issuance of Shares.    The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable state and federal securities laws and liens or encumbrances created by or imposed by the Purchaser.  Assuming the accuracy of the representations of the Purchaser in this Agreement and subject to the filings described in Section 2.6 below, the Shares will be issued in compliance with all applicable federal and state securities laws.  The Common Stock issuable upon conversion of the Warrants has been duly reserved for issuance, and upon issuance, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable federal and state securities laws and liens or encumbrances created by

or imposed by the Purchaser.  Based in part upon the representations of the Purchaser in this Agreement, and subject to Section 2.6 below, the Common Stock issuable upon conversion of the Warrants will be issued in compliance with all applicable federal and state securities laws.

2.6     Governmental Consents and Filings.     Assuming the accuracy of the representations made by the Purchaser in this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority in the United States is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings pursuant to the Securities Act and applicable state securities laws, which have been made or will be made in a timely manner.

2.7     Litigation.     There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's knowledge, currently threatened in writing, that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  Neither the Company nor, to the Company's knowledge, any of its officers, directors or Key Employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or Key Employees, such as would affect the Company).

2.8     Intellectual Property.     The Company owns or possesses or believes it can acquire on commercially reasonable terms sufficient legal rights to all Company Intellectual Property without any known conflict with, or infringement of, the rights of others.  To the Company's knowledge, no product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any intellectual property rights of any other party.  Other than with respect to commercially available software products under standard end-user object code license agreements, there are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Company Intellectual Property, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other Person.  The Company has not received any communications alleging that the Company has violated or, by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets, mask works or other proprietary rights or processes of any other Person.  To the Company's knowledge, it will not be necessary to use any inventions of any of its employees or consultants (or Persons it currently intends to hire) made prior to their employment by the Company.  Each employee and consultant has assigned to the Company all intellectual property rights he or she owns that are related to the Company's business as now conducted and as presently proposed to be conducted.  Section 2.8 of the Disclosure Schedule lists all Company Intellectual Property.  For purposes of this Section 2.8, the Company shall be deemed to have knowledge of a patent right if the Company has actual knowledge of the patent right or would be found to be on notice of such patent right as determined by reference to United States patent laws.  For purposes of Section 2.8 only, "Company Intellectual Property" means all patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, trade secrets, licenses, domain names, mask works, information and proprietary rights and processes as are necessary to the conduct of the Company's business as now conducted and as presently proposed to be conducted.

2.9    Compliance with Other Instruments.  The Company is not in violation or default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, or (iv) under any lease, agreement, contract or purchase order to which it is a party or by which it is bound that is required to be listed on the Disclosure Schedule, or, to its knowledge, of any provision of federal or state statute, rule or regulation applicable to the Company, the violation of which would have a Material Adverse Effect.  The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company.

2.10    Agreements; Actions.

(a)    Except for the Transaction Agreements, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (i) the license of any patent, copyright, trademark, trade secret or other proprietary right to or from the Company, (ii) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (iii) indemnification by the Company with respect to infringements of proprietary rights.

(b)    The Company has not (i) incurred any indebtedness for money borrowed, (ii) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (iii) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business..

(c)    The Company is not a guarantor or indemnitor of any indebtedness of any other Person.

2.11    Certain Transactions. Other than (i) standard employee benefits generally made available to all employees, (ii) standard director and officer indemnification agreements approved by the Board of Directors, and (iii) the purchase of shares of the Company's capital stock and the issuance of options to purchase shares of the Company's Common Stock, in each instance, approved in the written minutes of the Board of Directors (previously provided to the Purchaser or their counsel), there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof.

2.12    Rights of Registration and Voting Rights.  The Company is not under any obligation to register under the Securities Act any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities.  To the Company's knowledge, no stockholder of the Company has entered into any agreements with respect to the voting of capital shares of the Company other than with the Purchaser.

2.13    Absence of Liens.  The property and assets that the Company owns are free and clear of all mortgages, deeds of trust, liens, loans and encumbrances, except for statutory liens

for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets. With respect to the property and assets it leases, the Company is in compliance with such leases and, to its knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets.

2.14    Tax Returns and Payments. There are no federal, state, county, local or foreign taxes dues and payable by the Company which has not been timely paid. There are no accrued and unpaid federal, state, county, local or foreign taxes of the Company which are due, whether or not assessed or disputed. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

2.15    Corporate Documents. The Certificate of Incorporation and Bylaws of the Company are in the form provided to the Purchaser.

2.16    Disclosure. The Company has made available to the Purchaser all the information reasonably available to the Company that the Purchaser have requested for deciding whether to acquire the Shares. No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchaser at the Closing contains any untrue statement of a material fact or, to the Company's knowledge, omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

3.    Representations and Warranties of the Purchaser. Purchaser hereby represents and warrants to the Company that:

3.1    Authorization. The Purchaser has full power and authority to enter into the Agreement. The Agreement to which the Purchaser is a party, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

3.2    Purchase Entirely for Own Account. This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Shares to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares. The Purchaser has not been formed for the specific purpose of acquiring the Shares.

3.3     Disclosure of Information.  The Purchaser has had an opportunity to discuss the Company's business, management, and the terms and conditions of the offering of the Shares with the Company's management. The foregoing, however, does not limit or modify the representations and warranties of the Company in Section 2 of this Agreement or the right of the Purchasers to rely thereon.

3.4     Restricted Securities.  The Purchaser understands that the Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein.   The Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.   The Purchaser acknowledges that the Company has no obligation to register or qualify the Shares for resale. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.  The Purchaser understands that this offering is not intended to be part of the public offering, and that the Purchaser will not be able to rely on the protection of Section 11 of the Securities Act.

3.5     No Public Market.  The Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

3.6     Legends.  The Purchaser understands that the Shares and any securities issued in respect of or exchange for the Shares, may bear one or all of the following legends:

(a)     "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(b)     Any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate so legended.

3.7     Accredited Investor.  The Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.8     Foreign Investors.  If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code), the Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to

such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. The Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

3.9     No General Solicitation.  Neither the Purchaser, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Shares.

4.     "Market Stand-off" Agreement.  In connection with the initial underwritten public offering by the Company of its equity securities pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, the Purchaser shall not, without the prior written consent of the Company's managing underwriter, (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (whether such shares or any such securities are then owned by the Purchaser or are thereafter acquired), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise.  Such restriction (the "**Market Stand-Off**") shall be in effect for such period of time following the date of the final prospectus for the offering as may be requested by the Company or such underwriters.  In no event, however, shall such period exceed 180 days unless extended upon the request of the managing underwriter, to the extent required by any NASA rules, for an additional period of up to 15 days.  In the event of the declaration of a stock dividend, a spin-off, a stock split, an adjustment in conversion ratio, a recapitalization or a similar transaction affecting the Company's outstanding securities without receipt of consideration, any new, substituted or additional securities that are by reason of such transaction distributed with respect to any shares of Common Stock subject to the Market Stand-Off, or into which such shares thereby become convertible, shall immediately be subject to the Market Stand-Off.  In order to enforce the Market Stand-Off, the Company may impose stop-transfer instructions with respect to the Shares until the end of the applicable stand-off period.  The Company's underwriters shall be beneficiaries of the agreement set forth in this Section 4.  The Purchaser shall be subject to this Section 4 only if the directors and officers of the Company are subject to similar arrangements.

5.     Miscellaneous.

5.1     Survival of Warranties.  Unless otherwise set forth in this Agreement, the representations and warranties of the Company and the Purchaser contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Purchaser or the Company.

5.2     Successors and Assigns.  The Purchaser may not assign or transfer the Shares or any of the rights, interests or obligations hereunder, by operation of law or otherwise, in whole or in part, without the prior written consent of the Company, which consent shall not be unreasonably withheld.  The terms and conditions of this Agreement shall inure to the benefit of

and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.3     Governing Law and Venue.  This Agreement shall be governed by and construed in accordance with the laws of California, without regard to conflicts of laws thereof that may direct the application of the laws of another jurisdiction. The Parties agree to (i) request that any dispute or claim arising out of or in connection with this Agreement, or the performance, breach or termination thereof, be subject to the exclusive jurisdiction of the state and federal courts located in Santa Clara, California and (ii) to the extent such courts accept jurisdiction, to submit such matters exclusively to such courts. The Parties hereby waive any challenge to the jurisdiction or venue of such courts over these matters. The Purchaser agrees that process may be served upon it or any of its affiliates in any manner authorized by the laws of the State of California and waives and covenants not to assert or plead any objections that they might otherwise have to such jurisdiction and to such process.

5.4     Counterparts; Facsimile.  This Agreement may be executed and delivered by facsimile signature or electronic mail and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.5     Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

5.6     Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or:  (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this Section 5.6.

5.7     Attorneys' Fees.  If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of any of the Transaction Agreements, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

5.8     Amendments and Waivers.  Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and the Purchaser.

5.9     Severability.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

5.10     Delays or Omissions.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-

breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.   All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

    5.11    Entire Agreement.  This Agreement (including the Exhibits hereto) and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

        [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this Common Stock Purchase Agreement as of the date first written above.

**COMPANY:**

FiTeq, Inc., a Delaware corporation

By: _____

Name: Joan Ziegler _____

Title:__ CEO _____

**PURCHASER:**

Venture Corporation Limited, a Singapore corporation

By: _____

Name: Tan Choon Huat _____

Title: __ Executive Director _____

## EXHIBITS

**Exhibit A –**

**OPERATING AGREEMENT**

**Exhibit B –**

**STATEMENT OF WORK**

**Exhibit C –**

**FORM OF WARRANT**

**Exhibit D –**

**DISCLOSURE SCHEDULE**

# EXHIBIT 3

## Joan Ziegler

| | |
|---|---|
| **From:** | Shammy Hong Geok Beng <shammy.hong-gb@venture.com.sg> |
| **Sent:** | Tuesday, July 31, 2012 6:34 PM |
| **To:** | Shammy Hong Geok Beng; Joan Ziegler |
| **Cc:** | Thian Nie Khian |
| **Subject:** | RE: Terms for Exclusive Cap Run |
| **Attachments:** | Exclusive Cap Run Terms  Display Dev Svc (2) (2).docx |

Hi Joan,
Sorry, typo error.  Please refer to this file instead.

Best Regards.
**Shammy Hong**  | Confidential Secretary

Venture Corporation Limited

DID :  6484 8186

🖐 Please consider the environment before printing this e-mail

---

**From:** Shammy Hong Geok Beng
**Sent:** Wednesday, August 01, 2012 9:25 AM
**To:** 'Joan Ziegler'
**Cc:** Thian Nie Khian
**Subject:** Terms for Exclusive Cap Run

Hi Joan,
Mr Thian informed to forward the attached for your reference.

Thanks & best regards.
**Shammy Hong**  | Confidential Secretary



Venture Corporation Limited

Co Registration No.  198402886H  | 5006 Ang Mo Kio Avenue 5  | #05-01/12 TECHplace II  |  Singapore 569873  |
DID +65 6484 8186 | Main +65 6482 1755 | Fax +65 6482 0122 | URL www.venture.com.sg

🖐 Please consider the environment before printing this e-mail

Confidential/Privileged information may be contained in this email. If you are not the intended
recipient, please do not copy, distribute or use it for any purpose, nor disclose its contents to
any other person. Please notify the sender immediately if you receive this in error.



## Terms for Exclusive Capacity Run and Display Development Service by Venture – MultiTeq & MultiTeq with Display

1. **Committed Capacity** – **Production of 1m cards per month 9 months from the receipt of upfront charge.**

   **Upfront Charge**     **– S$3m in cash & S$3.5m in FiTeq Shares or cash**

   **Unit Charge**        **– S$0.292 per card**

   **MultiTeq**

   **Unit Price** – US$7.33 + S$0.292 = **US$7.56**

2. **Display Card – Development Services**

   **Charge**            **– S$1m** in total payable upon completion of each phase over 10 months' development period (4 phases)

   **MultiTeq with Display**

   **Unit Price – US$13**

   for committed volume of 2m cards per year. Any shortfall will be thrown-out and be charged for amount to be determined, which includes but not limited to material holding costs, facility charges etc.

3. **Unconditional exclusivity of manufacturing to Venture**
   with no conditions attached unless expressly agreed.

4. FiTeq will have product **IP rights** and will share IPs with Venture for manufacturing processes developed under SOWs as per the Operating Agreement dated July 2009. For **Display** technologies, Venture will continue to own the IP for field of use outside of payment card. Venture will license rights to FiTeq for all payment cards.

5. FiTeq is to commit sale orders of **3m cards per quarter**, starting from Venture reaching 1m card per month production capacity. Any shortfall will be thrown-out and be charged for amount to be determined, which includes but not limited to material holding costs, facility charges etc.

6. **PO** once placed and accepted by Venture is non-cancellable and the customer is liable for the material cost incurred. Credit terms are to be Ex Factory price (FOB Shipping point) and Net 30 days. Any deviations will require Venture's prior approval.

7. **Sales of Products Agreement** be put in place for the agreed new arrangements.

8. As **turnkey card manufacturing supplier,** all manufacturing and related decisions are solely made by Venture.

## Terms for Exclusive Capacity Run and Display Development Service by Venture – MultiTeq & MultiTeq with Display

1. **Committed Capacity** – **Production of 1m cards per month 9 months from the receipt of upfront charge.**

   **Upfront Charge**      **– S$3m in cash & S$3.5m in FiTeq Shares or cash**

   **Unit Charge**      **– S$0.292 per card**

   **MultiTeq**

   **Unit Price** – US$7.33 + S$0.292 = **US$7.56**

2. **Display Card – Development Services**

   **Charge**      **– S$1m** in total payable upon completion of each phase over 10 months' development period (4 phases)

   **MultiTeq with Display**

   **Unit Price – US$13**

   for committed volume of 2m cards per year. Any shortfall will be true-ups and be charged for amount to be determined, which includes but not limited to material holding costs, facility charges etc.

3. **Unconditional exclusivity of manufacturing to Venture** with no conditions attached unless expressly agreed.

4. FiTeq will have product **IP rights** and will share IPs with Venture for manufacturing processes developed under SOWs as per the Operating Agreement dated July 2009.  For **Display** technologies, Venture will continue to own the IP for field of use outside of payment card.  Venture will license rights to FiTeq for all payment cards.

5. FiTeq is to commit sale orders of **3m cards per quarter**, starting from Venture reaching 1m card per month production capacity.  Any shortfall will be thrown-out and be charged for amount to be determined, which includes but not limited to material holding costs, facility charges etc.

6. **PO** once placed and accepted by Venture is non-cancellable and the customer is liable for the material cost incurred.  Credit terms are to be Ex Factory price (FOB Shipping point) and Net 30 days. Any deviations will require Venture's prior approval.

7. **Sales of Products Agreement** be put in place for the agreed new arrangements.

8. As **turnkey card manufacturing supplier,** all manufacturing and related decisions are solely made by Venture.