SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
GEORGE F. BISHOP (CA Bar No. 89205)
gbishop@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Plaintiff*
*FITEQ, INC.*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| FITEQ, INC., | Case No. 13-cv-1946 EJD |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR FRAUD, FRAUD IN THE INDUCEMENT, BREACH OF CONTRACT, AND JURY DEMAND** |
| v. | |
| VENTURE CORPORATION, LTD., and CEBELIAN HOLDING PTE, LTD. | |
| Defendants. | |

## I.     __INTRODUCTION__.

1.     Plaintiff FiTeq, Inc. ("FiTeq" or "Plaintiff") hereby files its complaint against defendants Venture Corporation, Ltd. ("Venture") and Cebelian Holding Pte, Ltd. ("Cebelian") (collectively "Defendants" or "Venture") for fraud, fraud in the inducement, breach of contract, damages, and injunctive relief.  For its complaint, Plaintiff alleges, as follows:

2.     In 2009, the parties entered into several contracts whereby Venture, a Singapore-based engineering design and electronics manufacturing company, secured exclusivity to engineer and manufacture FiTeq's innovative fraud resistant credit card. As partial consideration for its commitments, Venture received a significant equity position in FiTeq and took a seat on the FiTeq Board.

3.     In inducing FiTeq to enter into these contracts, Venture told FiTeq falsely that it had expertise in designing and manufacturing sophisticated electronics.  Venture told FiTeq that it could design and build the FiTeq card successfully and on budget.  Venture did **not** tell FiTeq that Venture's own engineering manager told Venture's Chief Technology Officer (CTO) that Venture lacked the ability to build the card.  As this engineer put it internally, Venture had "zero clue on how to laminate the cards."  Nor did Venture tell FiTeq the true facts, including that the lead Venture engineer told Venture's CTO, just days before the contract was signed, that Venture could not meet its obligations under the contract.  This was a "know-how gap" problem, the Venture engineer wrote internally, not a problem fixable by buying equipment.

4.     Under these contracts, FiTeq was wholly dependent on Venture to perform its obligations fully and in good faith.  FiTeq was contractually and practically

precluded from going elsewhere for engineering services, just as it was precluded from going elsewhere for card manufacturing.

5.      Notwithstanding its representations to FiTeq, and being fully aware that it could "hold FiTeq hostage," as Venture put it then, Venture misrepresented and concealed the true facts concerning its progress in designing and building the card. Venture falsely reported its progress to FiTeq.  It concealed the facts that it failed to perform its engineering work adequately, and failed to manufacture cards properly. Venture, for example, told FiTeq that the Venture-made cards worked (swiped reliably), were properly manufactured (so that they would not delaminate), and said that it could attach the card holograms and signature panels.  These representations were material, made repeatedly, including in writing, and were relied upon by FiTeq.

6.      They were also false.  The truth, concealed from FiTeq, was that Venture was not progressing as represented with the design and manufacture of the FiTeq card. Venture, for example, could not manufacture a card that did not delaminate; its own internal tests proved that the cards consistently delaminated.  Venture's tests also revealed that it could not attach the signature panels or the required hologram – both consistently failed to adhere properly.  In documents given to FiTeq to secure payment, Venture told FiTeq that the cards would not delaminate and that it could attach the hologram and signature strip accurately.  At exactly the same time, in confidential internal documents, Venture acknowledged that it could not, in fact, do any of these things.

7.      Venture's internal tests also revealed that its card could not be "read" by card readers when swiped normally.  To create the appearance of good "readability,"

SECOND AMENDED COMPLAINT AND JURY DEMAND       2              CASE NO. 13-CV-1946 EJD

Venture trained professional "swipe" engineers in its labs, and taught these swipe engineers to swipe the cards just so – neither too fast nor too slow. Under the Agreement, Venture was to design a card with greater than 95% "real-world swipe success." This was the explicit language in the Agreement. Contrary to Venture's contemporaneous representations that its cards had excellent real-world readability, its cards did **not** work in the real world. Nor did Venture disclose to FiTeq its continuing use of artificial Goldilocks-like swiping protocols underlying its reported "readability" results.

8.      Venture also affirmatively misrepresented to FiTeq Venture's true manufacturing yield (percentage of workable cards post-manufacturing). Venture told FiTeq that it had a yield approximately 80% to 90% and improving, as was required under the agreements. In truth, its yield was significantly less than half that, and degrading, according to its own internal yet concealed test records and documents. In fact, late in the contractual period, Venture's C.E.O. N.L. Wong, wrote several of his lieutenants that Venture hoped to, at some indeterminate point in the future, get to 80% yield, even though Venture had represented to FiTeq more than a year earlier that it had already exceeded 80% yield, and had so represented to receive significant tranches of FiTeq stock.

9.      Venture further misrepresented its ability to scale production. The agreements required that Venture design a consistent, repeatable engineering and manufacturing process capable of scaling to one million cards a month, or 250,000 cards a week. The credit and debit card business is a **volume** business; no one makes money by selling just several thousand cards a month. Venture's internal documents, concealed

from FiTeq, showed that Venture stretch goal was to manufacture 10,000 cards a month, running two 10 hours shifts. This was one-tenth of the contractually required run-rate. Venture affirmatively concealed its true run-rate from FiTeq, until very late in the project.

10.     Throughout the contractual period, Venture covertly maintained a second "shadow" set of documents reflecting its real manufacturing and engineering process, or, more accurately, lack of progress. These "confidential – internal only" Venture documents were prepared for the most senior executives in the company and were discussed in private senior meetings. The monthly in-house meetings were established at the direct request of Venture's CEO, N.L. Wong, and attended by Venture's CTO, N.K. Thian, General Manager of Operations, Dharma Nadarajah, and (occasionally) Venture's CFO Victoria Ko. The minutes of these covert meetings reflect that Venture discussed its true but dismal real progress in the FiTeq project at the highest levels of the company. More, internal Venture documents reveal that Venture carefully managed the information it released to FiTeq, even going so far as sending FiTeq artificially crafted "versions" of its bi-monthly design reviews, as set forth below.

11.     The contrast between the bubbly, optimistic reports Venture gave FiTeq (to get paid under the agreements) and its bleak internal reports is stark. For example, in assuring FiTeq that it had hit its engineering and manufacturing benchmarks justifying over one million additional FiTeq shares, Venture represented in writing that it had accomplished the following specific goals under the agreements:

- **"Readability: 99.1%"**

- **"Delamination: Pass"**

- **Card lamination yield: "80 to 90%"**

- **"SMT [surface mounting technology] process stable: yield from 80% to 93%"**

12.     Within weeks of this report – a report accepted as true and relied upon by FiTeq – Venture's internal executives met to discuss Venture's real findings.  In the group's internal "technology update," the senior executive group -- a group including the Venture CEO N.L. Wong -- recognized that the Venture cards **did not and could not work** as Venture had just represented to FiTeq.  To quote Venture's internal documents, in reality, the Venture cards:

- **"Failed peel test (poor adhesion)"** and

- **"Hologram and signature could not be attached."**

These internal admissions are **directly** contrary to what Venture told FiTeq, repeatedly and in writing.

13.     Indeed, mere weeks after representing its manufacturing progress to FiTeq, the senior executive group discussed the results of an internal confidential test of 198 cards.  **Of the 198 cards made, none worked – Venture's real yield was zero.**  As Venture put it internally, it made and inspected 198 cards, and **"total cards accepted: 0."**  Even later, Venture's true yield rate was sub-25%, and the only thing consistent about Venture's manufacturing process was its abiding inconsistency.

14.     Even as late as 2012, Venture understood that its basic mechanical engineering ("ME") approach for the cards was a "work in progress," as admitted by its senior engineer.  This admission is directly contrary to what Venture told FiTeq beginning in 2010 – that the engineering design was sound and locked down.  Indeed,

1   these representations were essential to Venture getting paid $3.65 million (U.S.) in FiTeq

2   stock for numerous prior benchmarks.

3           15.     Venture's fraud did not stop with simply misrepresenting its

4   manufacturing and engineering progress to its contractual partner, FiTeq.  Before

5   entering into the Agreement, FiTeq secured a $1.9 million grant from the Economic

6   Development Board ("EBD") of Singapore, a governmental agency.  FiTeq told Venture

7   about this grant, in confidence, several months before the parties executed the Operating

8   Agreement.  With that information, however, Venture went to the Singapore EDB, and

9   persuaded the agency to instead give Venture a multimillion grant to fund Venture's

10  work under the FiTeq agreements.

11          16.     Venture told FiTeq that it was seeking a grant wholly unrelated to FiTeq's

12  grant.  This was false -- the Venture EDB grant proposal mimicked in granular detail the

13  basic work Venture was to do under the Agreement for FiTeq.  Unbeknownst to FiTeq,

14  Venture was thus paid twice for its work, once by FiTeq and once by the EDB.  More, to

15  secure the EDB grant, Venture misrepresented the nature of its role in the project to the

16  EDB, *e.g.*, falsely telling the agency that Venture would co-own all the intellectual

17  property ("IP") generated by the project (FiTeq owns the IP).

18          17.     Venture also falsely reported its progress in the FiTeq project to the EDB,

19  all to secure ongoing progress payments from the governmental agency.  For example,

20  Venture told the Agency, as it had told FiTeq, that its cards worked well and reliably, and

21  that it had a robust and repeatable manufacturing process that could scale to more than

22  100,000 cards a month.  These representations were false.

23          18.     Venture also concealed the nature and scope of its work with the EDB

from FiTeq.  Venture's misrepresentations and omissions were designed to, and did, mislead FiTeq as well as the EDB.  They harmed FiTeq by permitting Venture to obtain EDB monies properly due to FiTeq, and permitting Venture to hide from FiTeq revenues that allowed it to improperly inflate claims against FiTeq.

19.     In the spring of 2012, Venture's CEO, N.L. Wong instructed other senior Venture executives to "renegotiate" the FiTeq agreement.  Wong told his executives that Venture needed to own the intellectual property, and that Venture should secure the right to market the FiTeq card as Venture's own product in Asia.  Wong also told his executives to demand that FiTeq significantly recut the parties' agreements, all to move approximately $30 million to Venture's side of the ledger.  Venture tabled this non-negotiable demand in July 2012.  Unbeknownst to FiTeq, senior Venture management also refused to authorize Venture engineers to order requisite parts in direct contravention to Venture's obligations under the parties' agreements.

20.     As part of this process, Venture's CEO N.L. Wong directed his executives to discuss Venture marketing a "Venture" card with a large Singapore bank DBS, a concern with which N.L. Wong had deep personal and professional ties.

21.     All of this was part of a larger plan, concealed from FiTeq, for Venture to put FiTeq out of business and acquire the FiTeq intellectual property and Asia card business for pennies on the dollar.  Venture wanted to own the FiTeq assets.  But it did not want to buy them.  For this reason, it determined to starve FiTeq out, so as to acquire the assets it wanted but was reluctant to pay for.  In addition, Venture sought to, and did, obtain stock in FiTeq by misrepresenting its progress in designing and building the card.  As part of this process, and being fully privy to FiTeq's internal financial condition given

its seat on the FiTeq Board of Directors, Venture also forced FiTeq to cancel a fundraising round in June and July 2012. It did this by refusing to release documents to FiTeq investors, contrary to its obligations under the Agreement, and by tabling its demand for tens of millions of dollars in additional compensation, along with unconstrained manufacturing exclusivity and IP ownership, as set forth in detail below.

22.    FiTeq reasonably relied on Venture's representations. FiTeq has incurred losses of many tens of millions of dollars as a direct consequence of Venture's misrepresentations, and consequential damages of many tens of millions of dollars more. It has had to re-design the card, reconstruct the manufacturing process, and has lost years introducing its innovative card to market. Time and again, FiTeq lost concrete sales with major banks because Venture failed to perform.

23.    Notwithstanding its contractual commitments, and being fully aware of FiTeq's vulnerability, Venture systematically breached its obligations. It failed to perform its engineering work adequately, just as it failed to manufacture cards properly. It missed deadline after deadline, and falsely reported its alleged progress to FiTeq.

24.    FiTeq filed this case to right these profound wrongs.

## THE PARTIES

25.    FiTeq is a venture backed, technology start-up company engaged in developing, building, and selling products designed to combat the most prevalent forms of credit and debit card fraud. With an earlier entity, PrivaSys, FiTeq has been engaged in this development effort for more than a decade, and has spent many tens of millions of dollars on product development and research and development generally. FiTeq is incorporated in the State of Delaware and maintains its principal place of business in this

District.

26.     Venture is a publicly held engineering services and contract electronics manufacturer with its primary place of business in Singapore.  Venture holds itself out as a "leading global provider of technology services, products and solutions with established capabilities spanning marketing research, design and development, product and process engineering, design for manufacturability, supply chain management, as well as product refurbishment and technical support across a range of high-mix, high-value and complex products."  As Venture put it, "our established clusters of excellence provide complementary engineering strength, technology from the design of a basic component to the development of the most intricate product, our engineering expertise is accompanied by an aspiration to accomplish results that constantly surpass expectations."  This is exactly the expertise that Venture promised FiTeq Venture would bring to the FiTeq project.

27.     Cebelian is a wholly-owned subsidiary of Venture with its primary place of business in Singapore.  Cebelian is not incorporated in the State of Delaware, nor is it incorporated in the State of California.  Cebelian is the alter-ego of Venture.  Venture and Cebelian are operated as a single enterprise.  Cebelian was created by Venture and its owners specifically for the purpose of obtaining and holding the FiTeq stock to be provided under the Common Stock Purchase Agreement.  Cebelian and Venture have identical equitable ownership, are controlled by the same directors and officers, use Cebelian as a mere shell, instrumentality and conduit through which Venture carries on its business, and use the same employees and offices in Singapore.

28.     The breach of contract claims here concern the Operating Agreement (the

"Operating Agreement"), a parallel Common Stock Purchase Agreement ("Purchase Agreement") (both entered into by FiTeq and Venture in July 2009), and a Novation and Supplemental Agreement ("Novation Agreement") (entered into by the parties in November 2009).  Under the Operating Agreement, Venture secured the right to be the exclusive provider of engineering services to FiTeq.  In addition, Venture secured the right to be the exclusive manufacturer of FiTeq's products.  To secure manufacturing and engineering exclusivity, Venture in turn agreed to meet a rigorous set of engineering and manufacturing milestones with corollary reporting requirements.  While under the Purchase Agreement and Novation Agreement Cebelian obtained FiTeq stock in exchange for the same engineering and manufacturing milestones.  Under these agreements, FiTeq was wholly dependent on Venture to meet its obligations, perform its engineering tasks, report its progress, and manufacture a working, fraud-resistant payment card.

29.     In return for accepting its obligations, Venture received, amongst other things, engineering and manufacturing exclusivity and approximately 15% of the FiTeq common stock.

## JURISDICTION AND VENUE

30.     This complaint asserts causes of action for breach of contract under the laws of the State of California pursuant to § 17.2 and § 5.3 of the parties Operating Agreement and Common Stock Purchase Agreement respectively, and through operation of §§ 1-2 of the Novation and Supplemental Agreement, which makes the terms of § 5.3 of the Purchase Agreement binding on Cebelian.

31.     This Court has subject matter jurisdiction over this matter by virtue of 28

U.S.C. § 1332.  This action is between a citizen of the State of California, Plaintiff, and

citizens of a foreign state, Defendants.  The amount in controversy exceeds $75,000.  *See*

*also* Venture's Answer to the Original Complaint at ¶14 (Dkt No. 10) (admitting the

allegations of the Original Complaint's ¶14, which described the basis for the Court's

subject matter jurisdiction).

32.     This Court has personal jurisdiction over Venture

33.     Venture has consented to the jurisdiction of the federal courts located in

Santa Clara, California.  *See* Operating Agreement at § 17.2; *see also* Venture's Answer

to the Original Complaint at ¶16.

34.     This Court has personal jurisdiction over Cebelian.

35.     Cebelian has consented to the jurisdiction of the federal courts located in

Santa Clara, California.  *See* Novation Agreement at §§ 1-2 ("CEBELIAN shall perform

the Base Agreements [(the Purchase Agreement and certain side letter agreements")] . . . .

and be bound by the terms and conditions thereof in all respects in relation to the holding

of FiTeq shares . . . . as if CEBELIAN had been a party to the Base Agreements in place

of [Venture] . . . . CEBELIAN agrees to be bound by the terms and conditions of the

Base Agreements in every way as if CEBELIAN had been named in the Base

Agreements as a party thereto in place of [Venture]); Common Stock Purchase

Agreement at § 5.3 ("This Agreement shall be governed by and construed in accordance

with the laws of California . . . . The Purchaser agrees that process may be served upon it

or any of its affiliates in any manner authorized by the laws of the State of California and

waives and covenants not to assert or plead any objections that they might otherwise have to such jurisdiction and to such process").

36.     Further, Defendants have purposefully availed themselves of the protections of the laws of the State of California, *see* Operating Agreement at § 17.2; Common Stock Purchase Agreement at § 5.3; Novation Agreement at §§ 1-2 (making the terms of § 5.3 of the Purchase Agreement binding on Cebelian), and contracted with Plaintiff who maintains its principal place of business within the Northern District of California.  The agreements at issue were in-part negotiated and drafted in the district. Venture participated in numerous meetings relating to the Operating Agreement in the District.  Venture has also shipped materials pursuant to the Operating Agreement into the District, and said materials were received by Plaintiff in the District.  Cebelian owns a significant stake in the Plaintiff, and the Plaintiff has its principal place of business in this District.

37.     Venue is proper in this Court.

38.     Venture has consented to venue in Santa Clara, California.  *See* Operating Agreement at § 17.2; *see also* Venture's Answer to the Original Complaint at ¶16.

39.     Cebelian has consented to venue in Santa Clara, California.  *See* Novation Agreement at §§ 1-2 (making the terms of § 5.3 of the Purchase Agreement binding on Cebelian); Common Stock Purchase Agreement at § 5.3 ("The Parties agree to (i) request that any dispute or claim arising out of or in connection with this Agreement, or the performance, breach or termination thereof, be subject to the exclusive jurisdiction of the state and federal courts located in Santa Clara, California and (ii) to the extent such courts accept jurisdiction, to submit such matters exclusively to such courts").

40.     Venue is also proper in this Court by virtue of 28 U.S.C. § 1391 (b)(1), (c)(2) and (d) in that the Defendants have purposefully availed themselves of this District, such that the Defendants reside here for purposes of 28 U.S.C. § 1391.  Venue is also proper in this Court by virtue of 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the causes of action asserted here occurred in the District.

41.     Venture has California subsidiaries.  Cebelian has California affiliates. FiTeq effected service through service on Defendants through Venture subsidiary, and Cebelian affiliate, VM Services, Inc., within the State of California, pursuant to the terms of the Operating Agreement and Purchase Agreement.

## II.     FACTUAL BACKGROUND.

### A.     The Credit Card Fraud Problem.

42.     For the past 40 years, payment cards have been inanimate pieces of plastic.  Each card has a primary account number in embossed characters, information about the cardholder also embossed, a magnetic stripe ("magstripe") on the back of the card, a printed and visible three or four digit security code and the payment network's hologram and signature panel.

43.     The magstripe contains data that can be read by magstripe readers, the terminals used by merchants at the point of sale ("POS").  When a merchant swipes a card, a magnetic head reads the encoded data and then transmits the data to the issuing bank with an authorization request.  "Track 1" data on the magstripe typically contains the customer's name, account number, expiration date, and a "discretionary data" field to be used by the issuing bank.  "Track 2" data contains the account number, expiration date, and other "discretionary data" fields, all of which must fit within approximately 40

digits of space.  Until recently, the majority of banks used only Track 2 data for their payment card transactions.

44.    A person who obtains the Track 1 and Track 2 account information and the printed security code has all the information that he needs to manufacture a counterfeit card.  An increasing form of fraud consists of collecting valid account numbers, by means of data breach or an illegal swipe known as "skimming," and then using the account numbers and printed security code to manufacture counterfeit cards.  It is estimated that payment card fraud using such techniques costs the issuing banks – and ultimately the cardholders – many billions of dollars a year.  Recent examples include the Target and Niemen Marcus breaches.

45.    Payment card fraud is being addressed in Europe and in Asia, in part, through the adoption of "smart cards."  A smart card is a payment card equipped with a computer chip, possessing internal data processing functionality.  Smart cards are more difficult to duplicate than conventional cards, and they have intrinsic security aspects.  MasterCard and Visa have advanced smart cards through a joint venture known as EMV Co. ("EMV").

46.    While smart cards offer many benefits, they cannot be read by conventional magstripe POS terminal readers, the kind prevalent in this country.  Instead, smart cards require new, more sophisticated terminals.  In essence, for a region to enjoy the benefit of full smart card adoption, wholesale replacement of the existing POS magstripe terminals is required, along with changing the back-end infrastructure including of the issuing banks.  This "re-terminalization" is hugely expensive but essential to widespread smart card adoption.

47.     MasterCard and Visa accelerated smart card adoption in Europe through what is known as "liability shift."  In the United States, a POS merchant is not liable for loss when a fraudulent card is used in a "card present" transaction, so long as the merchant properly obtains a "personal identification number" ("PIN") or a signature and obtains issuer authorization.  Instead, the issuing bank absorbs that loss.  Conversely, in countries that mandate the issuing banks release smart cards, a POS merchant in Europe bears the fraud loss unless it has invested in a smart card terminal, even if he innocently accepts a fraudulent card.  Shifting the fraud loss to the merchant gives the merchant a strong incentive to invest in new smart card terminals.

48.     MasterCard and Visa have been unable to introduce successfully smart cards in the United States.  In considerable part, this is due to the enormous cost of re-terminalization, estimated to be in the vicinity of $12-13 billion, even excluding more expensive back-end IT changes.  Because MasterCard and Visa have been unable to shift the fraud loss to POS merchants, those merchants lack the economic incentive to invest in new smart card terminals.

49.     Visa and MasterCard previously studied the business case for smart cards and earlier concluded that widespread smart card adoption was not feasible in the United States, given the cost of re-terminalization, merchant resistance, and the expensive changes required in the issuing banks' back-office operations.  Neither Visa nor MasterCard was able to break this technological logjam.  As a result, the American payment card market did not effectively respond to increasing multibillion-dollar skimming fraud through the widespread adoption of smart cards.

**B.     <u>FiTeq Develops An Innovative Solution To Payment Card Fraud</u>.**

50.     FiTeq was founded to develop innovative ways to reduce payment card fraud while working within the existing legacy system of magstripe and EMV readers and transaction networks.  FiTeq understood that smart cards would be adopted slowly if at all in this country, which gave rise to a compelling need to make the legacy system itself more secure.  Prior security approaches, *e.g.*, card holograms or printed security codes, were easily circumvented.  Thus, FiTeq invented a new approach that would allow the card itself to become the center of innovation.  Building a new terminal network is unnecessary because data is read from the card in the traditional format.

51.     The FiTeq system creates an authentication code that is unique to each transaction.  The data is transmitted to the magstripe reader by a signal from the card that emulates the magstripe on a traditional card.  That is, a portion of the hitherto static magstripe is generated on-the-fly with the FiTeq card, and "broadcast," *i.e.* communicated, to the terminal reader.  To accomplish this, the FiTeq cards needs sophisticated internal electronics, including an EMV secure chip and battery, to generate and broadcast the dynamic data on swiping, along with internal card software and parallel software that runs at the issuing bank.  This is, along with FiTeq's software, an essential aspect of the FiTeq solution.

52.     Because a counterfeit card lacks the ability to generate this unique signature, or watermark, the issuing bank knows to reject the fraudulent transaction.

53.     The FiTeq method works as follows:

- Each card securely stores a card-specific, cryptographic key.

- Each card contains a "counter" that increments with every use of the card, initialized at zero at the time of card manufacture.

- Each card contains a cryptographic algorithm, to calculate an authentication code.

- The authentication code consists of a combination of *static* information (*i.e.*, unchanging data, such as the account number) and *dynamic* information (*i.e.*, unique, transaction-specific data).

- Both the static information and the dynamic information are processed through an EMV triple-DES (or 3DES) encryption algorithm.  The output of this algorithm is reduced to four digits (*e.g.*, 3749).  These digits are unique to the specific transaction for the given card.

- The four digits are combined with other data (including the counter) to create a "dynamic authentication code" (or DAC).  The DAC is placed in the discretionary data field of Track 1 and/or Track 2.  The DAC is then communicated along with the account number, expiration date and a request for authorization to the issuing bank, all through the existing legacy infrastructure.

- For card present transactions, this means that a portion of the data under traditional card magstripe is rewritten on-the-fly, and "broadcast" to the reader terminal.  (For this reason, Venture internally referred to the FiTeq project as the "Broadcaster card" project).

- The issuing bank has FiTeq software that reproduces the DAC computation on a per-card, per-transaction basis.  When the issuing bank receives an authorization request and accompanying DAC, it computes its own DAC for that card using that card's specific cryptographic key and specific counter status.  It then compares its issuer-generated DAC to the card-generated DAC, and approves the transaction if the two match.

- FiTeq's technology also works to secure on-line, card not present transactions.  The FiTeq display card would display the DAC, and the consumer would have to enter this one time code instead of the conventional static 3 digits on the back of the card.

A counterfeit card is inanimate and does not have the ability to create the unique, transaction-specific DAC.  In this way, the FiTeq method detects the use of skimmed, counterfeit cards and blocks any transaction attempted, and it does so within the existing magstripe legacy system.  For example, the data representing the hundreds of millions of

cards stolen through the recent Target and Neiman Marcus store breaches, could not be used to credit counterfeit cards, a huge disincentive to stealing the card data at all.

54.     FiTeq's fraud prevention technology is not, however, limited to the magstripe legacy system.  FiTeq designed it to be adaptable to a variety of communications systems and transmission means in addition to the emulated magnetic stripe – including radio frequency (RF), mobile (cellular wireless), near field communication ("NFC") mobile phone/device, and smart-chip compatible systems. These are areas experiencing exponential growth right now; tap and go RF cards (*e.g.,* MasterCard PayPass and Visa PayWave) are becoming increasingly common, and the NFC "digital wallet," *e.g.,* the Google "Wallet," are poised to be a force in the payments industry.  All of these new payment technologies will benefit from FiTeq's novel anti-fraud technology.

55.     FiTeq's technology is designed to bridge the gap between traditional payment cards and fully EMV-compliant smart cards and "digital wallets."  Because it does not require full re-terminalization, FiTeq reasonably believes that its technology will be adopted quickly, populating the United States market with intelligent cards and payment devices.  This would facilitate the ultimate transition to smart cards and "digital wallets."  That is, FiTeq's technology protects sensitive cardholder data in all payment contexts, including NFC, digital wallets, and card not present, on-line transactions. FiTeq's is a fully platform agnostic technology.

56.     Numerous patents and applications cover various aspects of FiTeq's technology and products.  One patent, United States Patent No. 6,805,288 ("288"), was issued on October 19, 2004.  The patent is captioned "Method for Generating Customer

Secure Card Numbers Subject to Use Restrictions by an Electronic Card."  This application described significant portions of the technology described above.

57.     FiTeq's innovations are now protected by a substantial patent estate (more than 27 issued patents), with numerous additional applications pending.  FiTeq is now the exclusive licensee and controls this patent estate.  There are no current competitors to FiTeq in the market (with dynamic smartcards functional on the legacy terminal system), but companies are active in this area and FiTeq is in a race to be first to market.

**C.      The Critical Importance of Card Certification.**

58.     The major payment processing networks, *e.g.* MasterCard, Visa, American Express, and Discover, have an elaborate certification program for branded payment and debit cards.  While it is possible to release non-certified cards in certain smaller, private markets, wide-scale payment or debit card adoption requires that the card be certified by the principal issuing networks.

59.     The issuing networks publish certification test requirements.  For example, MasterCard's certification tests include the ability to withstand adverse environmental conditions, pass rigorous endurance tests, and satisfy numerous structural integrity tests.  In addition, the card manufacturer's facilities must be audited and certified as secure.

60.     No matter how innovative and desirable a new payment card might be, issuing banks will generally not commit to purchasing or issuing the new product absent certification from one major payment processing network, which involves a well-defined process.  Banks are very risk adverse, and a new technology must be proven to be

adopted.  Certification in the payment business is akin to FDA approval in the drug

business: absent such official approval, the product is not marketable.

        **D.**      **The Venture – FiTeq Agreements.**

       61.     In July 2009, after months of negotiation and numerous revisions, FiTeq

and Venture executed an "Operating Agreement."  *See* Exhibit 1, attached hereto.  Under

the Operating Agreement, Venture secured exclusivity in providing engineering services

to FiTeq, and the right to manufacture FiTeq cards exclusively, all conditioned upon

Venture meeting certain contractually set forth engineering and manufacturing

production milestones.  In entering into this contract, Venture represented that it had the

requisite design and manufacturing expertise to design and build the card, as set forth

below.  In fact, it had neither, as its own engineers told Venture's CTO.

       62.     As a material inducement to entering into the Operating Agreement FiTeq

and Venture also entered into the Common Stock Purchase Agreement ("Purchase

Agreement") on the same day.  *See* Exhibit 2.  In addition to setting forth an initial

investment in FiTeq by Venture the Purchase Agreement set forth engineering and

manufacturing production milestones for which Venture would receive additional shares

(milestone shares) in FiTeq.

       63.     The Operating Agreement is central to this breach of contract dispute, and

this Complaint summarizes its key provisions below.

        **1.**      **The Engineering And Production Milestones: The Statement Of Work.**

       64.     A critical part of the Operating Agreement lies in its meticulously detailed

Statement Of Work ("SOW") in Exhibit B.  The SOW (or "Exhibit B") states the

engineering tasks that Venture was obligated to complete under the Operating

Agreement.  The SOW is also Exhibit B to the Purchase Agreement and specifies the

events for which additional shares in FiTeq were to be granted.  The Operating

Agreement itself states that "[a]ny changes to the SOW must be agreed by both parties in

writing."

65.     The SOW set forth a list of detailed and precise engineering targets.

There were six critical phases, as follows:

| Phase | SOW | Comments to sign-offs | Shares & Dollar Value |
|-------|-----|----------------------|------------------------|
| **BB1** (Recommend before entering BB2) | "Conforms to Functional Specification of 2.2.5.5; Changes approved by FiTeq to highlight sensitive points of certification tasks; Target design to achieve real-world swipe success > 95% for 1) transport, 2) Dip and 3) swipe readers; 10-20 cards" | "Comments: Action items coordinated with Venture sent by email and coordinate with Angeline on SOW" | 1,300,000 shares as a $650,000 payment |
| **BB2** (Recommend before entering BB3/LP1) | "Tethered card w/ emulated secure and non-secure chip, pre-stored DACs (not real-time from secure chip) no perso; Emulates functionality of 2.2.5.5 as per its functional spec with mutually agreed upon changes.  Pls note dual chip interface; BOM pricing in production not to exceed $4.20 + 25% no more than 45 parts (target 30).  FiTeq to get .75 battery; Conforms to most ISO IEC Requirements for | "Comments: Item for submission: (Brightsight gets BB2 3-5 cards and measure 80% + Swipe success and 50% + for DIP/ATM success) to be transferred to BB# or LP 1 phase.  [Then handwritten]  As is Brightsight verification of DACs being transferred reliably 100% of the time." | 1,500,000 shares as $750,000 payment |

| | | | |
|---|---|---|---|
| | MC/Visa Certification; Target design to achieve real world swipe success > 95% for 1) transport, 2) Dip and 3) swipe readers; 10-20 cards" | | |
| **LP1** (Recommended before entering LP2) | "On card new secure and non-secure chip, sensors made on production equipment, BOM $4.20 + 10%, NO secure printing; Total final packaging not to exceed .030 of an inch plus or minus 10%; Made on production equipment with an understanding that process engineering tasks will be improved/refined - needs process development; US $4.20 BOM in production +10%" | [Same as for 10/1/10 entry for BB2] | 2,550,000 shares as a $1,275,000 payment |
| **LP2** (Recommend before entering PP) | "New secure and non-secure with secure front/back, <45 components; Emulates functionality of 2.2.5.5 as per its functional spec with mutually agreed upon changes.  Pl not dual chip interface. Select chip that has been certified by AmEx, Discover, MC and Visa; Conforms to 90% MC CAST and the VSCD standards; Conforms to at least 95% ISO/IEC." | "Comments: Best efforts to support ATM transport as soon as possible" | 2,000,000 as a $1,000,000 payment |
| **PP** | "Scalable, repeatable manufacturing process online that scales to greater than 1 million cards per month," at 95% yield and with 95% real-world swipe success." | Tested with a real card run of not less than 5,000 cards | |

66.     The SOW was painstakingly negotiated over many months, with the parties exchanging numerous drafts.

67.     For each such engineering target, the SOW outlined the requirement itself, the documents that had to be provided to FiTeq by Venture upon completion of the engineering milestone, the definition of "engineering success," a target date, and a "no later" than completion date.

68.     Critically, the SOW includes a "Production Pilot" milestone of "no later" than 24 months following the date of the Operating Agreement, or June 2011.  This engineering milestone required that Venture produce a **"[s]calable, repeatable manufacturing process on line that scales to >1 million cards per month."**  As part of this milestone, the cards had to be fully functional, with "real world" swipe success (work when swiped through debit or credit card readers), and pass structural, integrity, endurance, and reliability tests all as to essential to card certification.

69.     This Production Pilot ("PP") milestone was critically important to FiTeq, as was card certification.  Absent Venture meeting this obligation, FiTeq could not release a payment card commercially, a step essential to its business success.  Venture was fully aware of the importance of card certification long before it entered the Agreement.  Indeed, its CTO wrote to others at Venture that, absent certification, FiTeq could not sell a single card and "would have no business."  The timing of the PP was also critical: FiTeq had to go into the market, sell conservative and risk adverse banks on FiTeq's novel technology, all as backed-up by concrete and real production dates.  Absent a real and hard schedule, FiTeq could not move forward with its business, and

hence the detailed "no later than" deadlines in the SOW.  This is **why** the Agreement had

the detailed reporting requirements.

70.    The SOW sets forth numerous intermediate engineering milestones

leading to the fully scalable, "no later than" 24 month post-signing Production Pilot.

Over three densely detailed pages, the SOW sets forth, in short, a series of progressive

manufacturing and documentation milestones, all carefully negotiated and crafted over

many months to ensure that the engineering and manufacturing process remained on

budget and on time.

71.    The Operating Agreement also explicitly addressed the requirements

necessary to secure payment network certification.  Exhibit C to the Operating

Agreement set forth the "Relevant Regulations" which specifically states "This Exhibit

outlines MasterCard Certification of the FiTeq devices to the best of FiTeq's knowledge

prior to signing.  This document is substantially complete, but will be updated post-

signing to ensure it is current with MasterCard's standards."  These certification

requirements were set forth in considerable detail, and covered "[p]roduct characteristics

and performance to be assessed through testing," and "[p]roduction and quality and

security processes to be assessed through auditing."  Exhibit C also describes the

products that FiTeq planned to release for "commercial certification."

72.    As part of the Operating Agreement, and during its negotiation and after

its execution, FiTeq provided Venture with voluminous FiTeq confidential technical data

and documents.  Venture conducted numerous "feasibility studies."  Venture reported to

FiTeq in writing numerous times that Venture was fully capable of designing and

manufacturing the card -- that was its contribution to acquire close to 20% of FiTeq's equity **plus** the revenue from selling the cards themselves.

73.     Venture concealed from FiTeq that Venture's own "innovation" lead engineer, the person responsible at Venture for determining the feasibility of the project given Venture's experience and knowledge, told Venture's CTO that Venture could not build the card, as it lacked the necessary experience.  This engineer also informed the CTO, in writing, mere days before the contract was signed, that Venture certainly could not meet the carefully negotiated schedule painstakingly laid out in Exhibit B, the Statement of Work.

74.     Throughout the negotiation, and indeed during the full period of the Operating Agreement, Venture held itself out as expert in the requisite areas of expertise, as set forth above.

### 2.     <u>Venture's Reporting Obligations.</u>

75.     This was to be a transparent process.  Under the Operating Agreement, Venture had detailed obligations to report its progress to FiTeq, and to provide FiTeq with documentation relating to Venture's design, engineering, and manufacturing milestones.  The Purchase Agreement also called for the delivery of documents by Defendants to FiTeq through operation of the SOW's requirements.

76.     There are numerous separate reporting obligations under the Operating Agreement, each with distinct sets of documents: (1) bi-monthly engineering reports; (2) "Design Review" documents; (3) written notice of any anticipated scheduling delay notifications; (4) "Contract Documents" (as described below); (5) "SOW Secured Materials," (6) "Secured Materials, and (7) "Documentation" as described below.  In

addition, Venture was obligated to create a mutually agreed "Bill of Materials," or "BOM."

77.     The first such reporting obligation related to Venture's completion of the various milestone tasks set out in the SOW.  On the conclusion of *any* milestone, Venture had the obligation to "prepare, assemble and deliver to FiTeq, in an electronic format approved by FiTeq, the full and complete set of documents listed in the SOW as deliverables."  Operating Agreement at § 4.1.1.  These milestone documents are defined in the Operating Agreement as "Contract Documents."  *Id.* at 4.1.1(b).  The Operating Agreement itself underscores that the purpose of this reporting obligation was to ensure that FiTeq had the documentation to permit FiTeq to "effectively and efficiently manufacture, assemble, inspect, test, and modify the FiTeq card."  *Id.* at 4.1.1(b).  Given the importance of this reporting obligation, Venture warranted under the Operating Agreement that the documents so provided would be sufficient to permit FiTeq to recreate Venture's work, *e.g.,* effectively and efficiently, manufacture, assemble, inspect, test and modify the card.

78.     In addition, Venture had the obligation to save all production versions, including changes made to production versions, related to shipped cards.  The Operating Agreement defines "production versions" as including "all technical drawings, documented source code, executable code," and the like.  *See* Agreement at § 4.1.1(c).

79.     In addition to the engineering milestone reporting and the production reporting, Venture had a mandatory obligation to provide a twice monthly "report from engineering" to FiTeq's head of engineering.  *See* § 3.1(a) (hereafter, "engineering reports").  The Operating Agreement specifies that Venture was to utilize its "standard"

engineering report, but further specified that if Venture changed that standard, Venture would send a comparable engineering report to FiTeq "at least once each month."

80.     In addition, under the Operating Agreement, Venture had a mandatory obligation to provide to FiTeq any and all materials related to any Venture "Design Reviews."  Venture had the further obligation to provide "Design Review documentation" as a milestone deliverable under the agreements pursuant to the SOW.

81.     In addition, Venture had a mandatory obligation to notify FiTeq "in writing at least 90 days prior to a delivery date set forth in the SOW for a Milestone task if Venture reasonably believes that it will not meet the delivery date  . . ." (hereafter, "schedule slip notice").  Operating Agreement at § 3.1(c)(i).  *See also* Purchase Agreement at § 1.3(a).  This written notice was required to specify the reason for the extension, and set forth a new targeted date for the milestone task.  The rationale for this obligation is clearly stated in the Operating Agreement: enabling FiTeq to "notify its Issuing Banks about the timing, so that the Issuing Banks can plan appropriately for the installation of the FiTeq solution in their business processes."  That is, Venture obligated itself to keep FiTeq fully informed and apprised of the schedule, so FiTeq, in turn, could keep its customers equally informed.

82.     FiTeq agreed to make Venture the sole source for the engineering services and exclusive manufacturer of and for the FiTeq products, subject to Venture meeting its obligations.

83.     To that end, Section 3.2 of the Operating Agreement states that "Venture will serve as FiTeq's sole source for the engineering services pursuant to the Statement of Work and manufacturing of FiTeq Cards . . . ."  However, this right of exclusivity was

explicitly subject to Venture meeting three requirements: (1) Honoring the terms of the Operating Agreement; (2) Investing $500,000 in cash in FiTeq pursuant to "[a] Common Stock Purchase Agreement"; and (3) Making satisfactory progress on achieving all of the tasks set out in the SOW within the agreed timelines. *See* Operating Agreement at § 3.2(c). In this fashion, the Operating Agreement explicitly conditions Venture's exclusivity on Venture's complete and timely performance of its obligations under the Operating Agreement.

84.     Under the Operating Agreement, Venture had the obligation to "ensure all documents and drawings that are related to the submissions associated with each Milestone in the SOW" were placed in escrow with Iron Mountain, Inc. These materials are referenced in the Operating Agreement as "SOW Secured Materials," and the Operating Agreement clarifies that such materials shall include, but not be limited to, all source code, all supporting documentation, including the design materials, all specifications, and all related technological detail. *See* Operating Agreement at § 4.1.6(a).

85.     The Operating Agreement further specifies that such SOW Secured Materials "shall be released to FiTeq" on any of several events, including if "current investors want to review the assets created by Venture per the SOW;" **or** "upon the occurrence of a new financing approved by FiTeq's board whereby a due diligence package needs to be available for review by the new investors . . . ." *See* Operating Agreement at § 4.1.6.

86.     All of these provisions were designed to ensure that FiTeq knew, accurately and in real time, the details of Venture's design and manufacturing process.

**This was the point.**  This knowledge was essential for FiTeq to solicit card orders from major issuing banks, commit to its own "personalization" card production facilities (in San Francisco), and balance its expenditures against its venture capital funding.  Falsity in Venture reporting not only cost FiTeq money, it put the very survival of FiTeq in the balance.

### 3.    Termination Provisions.

87.    The Operating Agreement has detailed and specific provisions governing termination for cause.  If a party breached the Operating Agreement, the non-breaching party had the obligation to issue a written notice to cure.  Pursuant to these terms, FiTeq gave Venture no three notices of breach and concomitant requests for cure, beginning in the fall of 2012.  Without exception, Venture failed to cure the various material breaches.  This led to a final notice of termination, which Venture acknowledged in writing.

### 4.    Dispute Resolution Provisions.

88.    The Operating Agreement provides that any party "may seek preliminary or interim injunctive relief from any court having jurisdiction . . . ."  *See* Operating Agreement at § 13.6.

89.    The Common Stock Purchase Agreement, Exhibit 2, attached hereto, has an identical provision.  *See* Purchase Agreement at § 5.3.

90.    The Operating Agreement also has a fee shifting clause, which provides that any action filed under the Operating Agreement, the prevailing party "will be entitled to recover its costs and expenses (including, without limitation, reasonable attorneys' fees) . . . .."  *See* Operating Agreement at § 17.11.

91.     The Purchase Agreement also has a fee shifting provision.  *See* Purchase Agreement at § 5.7.

92.     The Operating Agreement purports to exclude special and consequential damages, but explicitly permits the recovery of direct damages.  Operating Agreement at § 13.4.  It also authorizes injunctive relief.

93.     The Operating Agreement also has a non-waiver clause, as follows:

> The failure of either Party to insist upon or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement, will not be interpreted or construed as a waiver or relinquishment to any extent of such Party's right to assert or rely upon any such provision, right or remedy in that or any other instance; rather, the same will be and remain in full force and effect.

*See* Operating Agreement at § 17.7.

94.      The Common Stock Purchase Agreement also has a parallel non-waiver clause.  *See* Purchase Agreement at § 5.8.Both the Operating Agreement and Statement of Work (which sets forth the Common Stock Purchase Agreement's "Milestone Event[s]") were exhibits to the Common Stock Purchase Agreement.  The Operating Agreement recites that Venture Corp. desired to invest in FiTeq, and expressly states that the Common Stock Purchase Agreement sets out the terms of that investment.  It also states that Venture Corp.'s right to exclusivity is subject to the $500,000 cash investment under the Common Stock Purchase Agreement.  *See* Operating Agreement at Recital C, § 2, and § 3.2.  *See also* Novation Agreement at § B ("In connection with the Operating Agreement, FiTeq and [Venture Corp.] had on 15 July 2009 entered into a Common Stock Purchase Agreement for the sale and purchase of shares of Common Stock of

FiTeq . . . , pursuant to which [Venture Corp.] purchased 1,000,000 shares of Common Stock of FiTeq . . . . and agrees to purchase additional FiTeq shares through providing engineering and manufacturing services and completing milestone events specified in the SOW of the Operating Agreement"). Section 3.2 of the Operating Agreement further ties Venture Corp.'s right of exclusivity to Venture Corp.'s "satisfactory progress on achieving all the tasks set out in the" Statement of Work. *See id.* at § 3.2.

95. The Novation and Supplemental Agreement ("Novation Agreement") (attached hereto as Exhibit 3) recites that Cebelian agreed to be "bound by the terms and conditions of the [Purchase Agreement] in every way." *See* Novation Agreement at § 2(b). Cebelian was obligated to ensure that milestone events were timely achieved and to provide appropriate notification of any delay. The Novation Agreement further provides that Venture Corp. continue to "provide the engineering and manufacturing services in accordance with the Operating Agreement . . . ."

96. Both Defendants are liable for failings under the agreements.

**E.**    **Venture Received Significant Equity In FiTeq And Took A Seat On The FiTeq Board.**

97. In return for accepting manufacturing and reporting obligations under the agreements, Venture received five things from FiTeq.

98. First, Venture received a significant early stake in return for its commitment to spool up and manufacture the card. *See* Purchase Agreement at § 1.1, § 1.3 and Exhibit B (the SOW), attached hereto. As the Purchase Agreement recites, the "consideration for the Milestone Shares shall be the value to the company of the expenditure of time and money by Purchaser towards the accomplishment of each

milestone even as set forth in Exhibit B….”  That is, Venture was being paid for its development work with the milestone shares, as against Venture being compensated for this work by cash.  In this fashion, under the parties’ agreements, Cebelian ultimately received a significant equity stake in return for Defendants’ commitment to spool up, and Venture Corp.’s commitment to manufacture the card, all as set forth in the agreements themselves.  As set forth below, Venture’s engineering summaries supporting its demands for SOW milestone equity grants did not accurately represent Venture’s true progress.

99.     Second, as an equity shareholder, Venture received and took a seat on the FiTeq Board.  From March 2012 through the present, KS Tan served as an active FiTeq Board Member.  Mr. Tan remains on the FiTeq Board at the time of this filing.  As a member of the FiTeq Board, KS Tan had access to sensitive and highly confidential FiTeq information, including financial information.

100.     At the conclusion of the first Board meeting, FiTeq Director William Carson, reviewed for the entire Board the objectives for the next three months.  Specifically, he discussed and reiterated several times before the conclusion of the meeting the absolute requirement that Venture work to achieve certification, which FiTeq Director and Venture Executive, KS Tan, acknowledged.

101.     Third, under the Operating Agreement, and as subject to its compliance with its obligations, Venture Corp. became the sole source for “engineering services pursuant to the Statement of Work and related documents.”  *See* Operating Agreement at § 3.2.  As a consequence of this exclusivity provision, FiTeq was prohibited from seeking engineering services from another source, absent terminating the Operating Agreement.

102.    Fourth, and as set forth above, Venture Corp. received manufacturing exclusivity contingent upon meeting its engineering, manufacturing and reporting obligations, as viewed by FiTeq.  *See* § 3.1.(e).

103.    Fifth, in addition, Venture Corp. would be assigned the revenue associated with the Unit Price for cards manufactured and sold, also as set forth above.  Conversely, FiTeq's revenue was based on its licensing fees for the FiTeq solutions.

### F.    **The Truth: Venture Misrepresents its Actual Progress.**

104.    Venture consistently misrepresented its actual engineering and manufacturing progress to FiTeq.  It said its design was sound and its manufacturing process workable, as set forth in detail below.  The truth was that Venture's design and manufacturing process were defective, with claimed successes being essentially random -- some cards worked, but most did not.  This was the fundamental truth that Venture concealed.  A "good" card build was followed days later by a bad build.  A manufacturing process that is not consistent is a process that is profoundly dysfunctional.

105.    Venture made these misrepresentations to receive its benchmark progress payments (as set forth above) under the agreement, and to keep FiTeq captive to Venture as part of a larger scheme to secure the FiTeq intellectual property and card rights for Venture's use and exploitation in Asia.

### *Calendar Years 2009 and 2010*

106.     Beginning in late 2009, Venture represented to FiTeq that Venture's basic mechanical engineering design was sound and locked down.  This was false.  Unbeknownst to FiTeq, Venture's basic mechanical engineering ("ME") design remained a "work in progress" through 2012, years later.  Although Venture discussed internally

that its mechanical engineering design remained a "work in progress," it carefully concealed this fact from FiTeq, and indeed represented directly to the contrary.  FiTeq relied on Venture's misrepresentations, and did so reasonably.

107.    Venture secured BB1 phase signoff from FiTeq in November 2009.  In securing this signoff, Venture represented to FiTeq, in writing in November 2009, that it had a swipe success rate of greater than 90%, that it had completed its "basic functional firmware code development," that it had completed successfully its broadcaster coil development, and that it had completed successfully its card system design.  It also represented that it had solved the card warpage problem, and that it had successfully achieved a "warm lamination card manufacturing process."  It also represented that it had embossed the card adequately.  In writing, Venture represented all of the above as "BB1 accomplishments" as of November 2009.  These representations, too, were false.

108.    Venture continued to make representations to the same effect in 2010.  It told FiTeq that Venture's design was sound, and that it had hit the BB2 and LP1 milestones.  It said it had achieved "real world swipe success" of greater than 95%, and otherwise was on track under the Agreement.  These representations were false.

109.    As set forth below, Venture in fact had solved none of these problems.  Its design remained in flux, its cards could not swipe with any consistent success in real world conditions, card warpage remained an enormous problem, and its cards consistently delaminated.  More, its fundamental manufacturing process was inconsistent, not repeatable, and certainly not scalable.  Its engineer was exactly right, Venture did "not have a clue" how to laminate the cards.

### *Calendar Year 2011 and 2012*

110. Venture's misrepresentations continued unabated in 2011.

111. In February 2011, Venture provided FiTeq a presentation deck representing that Venture had satisfied the various LP2 engineering and manufacturing benchmarks (the "LP2 checkpoint review").

112. In this checkpoint review, Venture explicitly and in writing represented to FiTeq that Venture had accomplished the following goals:

- Readability: 99.1%

- Swipe speed sensor reliability: one inch per second to 27 inches per second

- Cards passed all card warpage, card thickness, card length, and card dimension tests

- Cards passed delamination tests

- Card lamination: yield about 80% to 90%

- Peel strength: passed

- SMT line capacity: total throughput "is at a 100K per month based on 20 hours per day."

- Card lamination capacity: "will be able to scale up to 100K per month when we get in the seven day light laminator."

- Magnetic stripe lamination: "successfully demonstrated magnetic stripe can be laminated on…."

- Hot stamping of hologram/signature panel: "successfully demonstrated hologram and signature panel can be hot stamped onto the card…."

- Readability: by LP2, close to 100% across the board.

113. Venture knew these representations were false. Within weeks of its LP2 checkpoint presentation, Venture discussed its real results in internal meetings set at C.E.O.'s Wong's direction. For example, in a presentation to the senior executive group,

which included the CEO and the CTO, on March 31, 2011, Venture's engineers

summarized Venture's actual progress as follows:



Of the total cards built and inspected, 198, not a single card worked.

114. The conclusion in this internal review was "no single card passed all the

inspection criteria --- **yield equals 0%**."  It is impossible to reconcile these terrible

results with Venture's prior representations to FiTeq, representations over 18 months,

that Venture had hit its engineering and manufacturing benchmarks through LP2

115. Nevertheless, on July 21, 2011, Mr. Thian, in direct response to a question

from FiTeq, represented that there was no difficulty in getting cards for certification and

that there was no "production limitation issue" for the cards: "I don't know what Chee

Weng told you to give you the impression that we have difficulty in getting enough cards

for certification or we have prodn limitation"; more, "Chee Weng should not give anyone

reasons/excuses for not able to book orders."  A few days later, on July 27, Mr. Thian

reinforced to FiTeq that, within a very short time he planned a Venture "manufacturing

release meeting" where Venture manufacturing would "sign up and agree that the VariTeq family of products are ready for mass production."

116.    Over the many months that followed, Venture's internal documents reflect Venture's true but dismal progress.  By category:

***Yield***

117.    Venture's manufacturing yields ran from 0 to over 90%, depending on which batch of cards Venture made that day and week.  **The manufacturing process was such that the outcome was essentially random; Venture concealed this central fact from FiTeq.**  A few cards worked accurately, some worked intermittently, but most did not work at all.  This was true early in the project, and it remained true until the time that FiTeq terminated the contract in late 2012.  In 2012, Venture was still struggling with problems it told FiTeq it had overcome in 2010.  A manufacturing process must be consistent to be commercial; Venture's process was never remotely consistent.

***Delamination***

118.    Throughout 2011 and into 2012, Venture could not solve the delamination problem.  Venture could not use "hot" lamination as it lead to air bubbles and damaged the battery.  But cold lamination did not work; the layers did not adhere.  In the summer of 2012, more than a year after the missed Production Pilot deadline, Venture's CTO internally concluded that Venture would have to in-license a different technology entirely, an injection molding technology.  At this point, Venture went to FiTeq and demanded an additional $2 million from FiTeq to pay for this different technology. Given the failure of its lamination process, Venture's earlier repeated representations about the functionality and integrity of its manufacturing process were false.

### *Hologram Signature Panel and Card Requirements*

119.   To be certified by any card issuer or processing network, debit and credit cards must have properly affixed holograms and signature stripes.

120.   Over the years, Venture told FiTeq that it could affix both properly and reliably, as set forth above.

121.   These representations were false.  The truth was that, throughout the period, Venture could do neither.  As Venture recognized in its internal, confidential documents:

- "Peel test (for signature stripe) is not satisfactory."  (June 13, 2011)

- "Passing peel test is still an issue."  (June 10, 2011)

- "Peel test result not faring too well."  (July 8, 2011)

- "Surface unevenness still prevalent."  (July 8, 2011)

### *Manufacturing Processes*

122.   As part of its bargain, Venture agreed to design a manufacturing process that could scale to one million cards a month, as demonstrated by a production run of no fewer than 5,000 additional cards.  That is, Venture had to design a card and develop a manufacturing process that could exceed 1 million cards a month, with a greater than 95% yield, and **prove** its accomplishments with an actual production run of no fewer than 5,000 cards.

123.   Venture represented to FiTeq that it was on track to meet this goal.

124.   The truth was otherwise.  In internal documents, documents withheld from FiTeq, Venture recognized that its manufacturing process would be capped at 10,000 cards a month.  As Venture put it then, 10,000 cards a month was a stretch goal:

"**Resources are available to support up to 10k card/mth output -- it is achievable. ME [mechanical engineering] design needs to be finalized.**"

125. Internal documents also reflect that Venture did not believe it could scale up in less than a year as of March 2012, already almost a year after the PP deadline. This was so given that Venture could not readily automate its lamination process, given the ten layers to be laminated, and inherent asymmetry in the stamping of the cutouts on each laminated panel. There was also significant hand labor involved, given Venture's design, and a hand process could not scale to more than 1 million cards a month. Hand (manual assembly) labor inevitably introduces errors, making it very difficult to create a scalable, repeatable, and consistent manufacturing process.

126. To market its innovative cards to issuing banks and networks, FiTeq needed the ability to produce hundreds of thousands of cards a month, consistently and reliably. At 10,000 cards a month, FiTeq had no business. And Venture knew this.

127. By March 2012, Venture's CTO had concluded that Venture's manufacturing design and process was not workable. In confidential e-mails sent directly to Venture's CEO, the CTO concluded that Venture had to scrap its process and instead spend an additional year developing a new process entirely, an injection molding process. As N.K. Thian, the CTO, summarized it for the CEO Wong then, the injection molding process offered:

- Scalable and shorter process cycle time
- Better manufacturing cost vs lamination process
- More process margin for encapsulating sensitive electronics
  ***
- Better reliability performance
  - **Will pass ISO flexibility test (the current FiTeq card failed flex test, being too stiff)**

- o    Prelim test shows card still functioning after 10K cycles of dynamic bending whereas the current **FiTeq card is OK up to 2K cycles**
- **Better peels strength of overlays to card body**
  - o    >1N/cm² vs 0.35N/cm² for Venture's process
- **Better card thickness control**
  - o    Can meet ISO spec without asking for variance, which is required with the Venture's process
- **Better surface finish, no unevenness**

VEN0023170.  Explicit in this document is Venture's recognition of the numerous

failures of its own process, *e.g.*, not passing tests, warpage, and the like.

128.    Venture concealed these internal conclusions from FiTeq.  To the

contrary, Venture continued to represent that it was making all requisite progress under

the Agreement.  In discussing injection molding specifically, Venture said that it was

willing to consider adopting the technique, but only if FiTeq reimbursed Venture millions

of dollars for changing Venture's approach.  In this way, Venture not only concealed the

truth, but attempted to lever millions of dollars from FiTeq under the pretense that

Venture's manufacturing process worked and that a change to injection molding was at

FiTeq's behest and request.

### *Swipe Success*

129.    From its earliest benchmarks forward, Venture represented to FiTeq that it

had experienced "real world swipe success" of 90+%.  It did so only by having engineers

specifically trained to swipe in a perfectly measured fashion on given machines.  Given

their experience, and the specific engineer to specific reader assignment, these engineers

learned how to swipe in exactly and precisely the best fashion to secure good readability

results.  These in-house tests were the antithesis of the "real world swipe success"

contractually mandated.  Particularly ironic in this is that FiTeq hosted Venture engineers

in FiTeq's office in the San Francisco Bay Area to show them how to implement real-world swipe tests.  Venture did not disclose to FiTeq its continuing use of its artificial swipe protocols, even after being told (and shown) by FiTeq how to swipe properly.

130.    Venture submitted some of its cards to a third party testing lab to measure swipe success independently.  The lab failed the cards across the board.  Venture debated internally what to do with this negative result, and ultimately decided to select 20 particularly compliant readers in the Venture lab, and have the third party testers come to the Venture lab and use that sub-selection of compliant readers.  This, too, was the antithesis of the contractually required "real world swipe success" protocol.  If a credit or debit card only works in one terminal of ten, it is a card doomed to fail.

131.    FiTeq reasonably relied on Venture's representations, just as Venture intended.

G.    **Venture's Plan to Starve FiTeq Out, Take Over the Intellectual Property, and Sell "Venture" Cards.**

132.    No later than early 2012, Venture determined that it would outlast FiTeq, acquire FiTeq's intellectual property, and market the FiTeq cards, now relabeled as "Venture" cards in Asia.

133.    This plan was discussed at the highest levels of Venture's management, and was driven and approved by Venture's CEO, N.L. Wong.  In early March 2012, Wong wrote his three key lieutenants, including the CTO Thian, telling them that he wanted Venture to begin discussing a commercial card relationship with a big Singapore bank, DBS.  As Wong put it then:

> Four of us… should discuss how fast we want to build the DBS relationship?  When do we go talk to MAS (Monetary Authority of Singapore)?...  After clear understanding on

marketing **our cards** in Asia PAC… does it [Operating Agreement] cover any rights or provisions for sale of **our cards** other than through FiTeq?

134.     The cards were not Venture's ("our") cards.  Under the Operating Agreement, FiTeq owned the cards, just as it owned the intellectual property underlying the cards.  Wong, and his senior lieutenants, understood this, and observed in a confidential internal meeting that "all intellectual property belongs to FiTeq as per our existing agreement with FiTeq.  This also applied to ATM card."  The Agreement specifically prohibits Venture from contacting issuing banks directly, absent explicit FiTeq consent.

135.     Realizing that the intellectual property belonged with FiTeq, Wong and Thian determined that Venture would force FiTeq to renegotiate the agreement, and tender the rights to Venture.

136.     This effort came to a head in July 2012, when Venture presented a unilateral renegotiation demand to FiTeq.  In this demand, Venture insisted that it be given permanent exclusivity on the manufacturing process, regardless of its performance, along with co-ownership of all intellectual property rights.  In addition, Venture insisted that FiTeq contribute millions of dollars to Venture's efforts to manufacture the card, even while Venture was insisting that Venture acquire the rights to sell that card in Asia.  Venture refused to perform the Operating Agreement as written, in this and subsequent communications, thus repudiating the Operating Agreement.

137.     Through the spring and summer of 2012, Venture monitored FiTeq's cash position extremely closely.  As of March 2012, Venture had a Venture executive sit on

the FiTeq Board.  Given this Board seat, Venture had – through its FiTeq Board

representative – FiTeq's detailed financial statements.

138.    By June of 2012, Venture understood that FiTeq was in the middle of an

additional fundraising effort.  FiTeq had prepared the equivalent of a private placement

memorandum, and had circulated that placement memorandum to existing and

prospective investors.  At that time, and in July 2012, Venture tabled its new extortionate

demand to renegotiate the Agreement, seized FiTeq's IP, locked up manufacturing

exclusivity regardless of performance, and the like.  These demands equated to Venture

insisting that FiTeq give Venture FiTeq, as an enterprise.

139.    As this demand from FiTeq's exclusive engineering services and

exclusive manufacturing partner was material, it had to be disclosed to the investors, as

Venture was well aware.  If FiTeq agreed to the demand, it would essentially cede its

business to Venture.  Yet, it was "held captive" by Venture, as Venture knew.  In this

way, the Venture demand killed FiTeq's financing.  On information and belief, one

specific objective in Venture's new demand – it knew that if FiTeq could not raise

additional funds, FiTeq might well go out of business, permitting Venture to acquire the

FiTeq assets at pennies on the dollar.  At this time, Venture also wrongfully refused to let

FiTeq investors review Venture's documents, something that investors had an absolute

right to do under the Agreement, as Venture recognized internally in intra-executive

emails.  FiTeq was forced to close a very expensive bridge financing instead of the

conventional financing for stock as FiTeq set out to close in June of 2012.

140.    As part of this coup effort, Venture refused to agree to a per card price of

less than $8.50 (U.S.) per card despite FiTeq bringing deals to the table that well

exceeded 10 million cards each across three well-established customers.  Venture told FiTeq that it would agree to a lower per card price only if FiTeq ceded some of FiTeq's license revenue to Venture.

141.    As part of this plan to take over FiTeq's assets, Wong and his lieutenants determined to continue to cabin carefully the information flow to FiTeq, as had been true for the prior 24 months.  As Thian, the CTO put it then, **"all communication with FiTeq be channeled via Thian [CTO] to ensure sensitive information not be leaked out."** Indeed, Venture's determination to control the information flow went to the point of preparing false records to send to FiTeq.  To quote Thian again:

> This is for internal discussion.  I recommend we resume to send **a version** of the summary of our bi-weekly design reviews. When Joan or Eric is in town we can have them join our meeting.  We have always controlled what we wanted to show and reviewed our engineer's materials.

VEN0022591 (emphasis in original).  Under the Agreement, Venture was obligated to share material information honestly and transparently, not prepare "versions" of the real internal reports for FiTeq consumption.

142.    As part of this plan to starve FiTeq out, senior Venture management refused to authorize Venture expenditures to scale up the FiTeq project.

143.    In part, Venture's plan to take over the FiTeq assets appears to have been driven by Venture's prior representations to the Singapore EDB, specifically, that Venture would at least co-own the intellectual property, and would be directly marketing cards in Asia.

144.    Throughout 2010, 2011 and well into 2012, Venture disguised its real intent and purposes from FiTeq.  Venture continued to maintain that it was making the requisite progress under the Operating Agreement.

**H.    Venture's Fraud Damaged FiTeq Immensely.**

145.    Relying on the carefully negotiated deadlines set forth in Exhibit B, FiTeq repeatedly had major issuing banks ready to execute purchase contracts with FiTeq, conditioned on receiving properly manufactured cards from Venture.

146.    For example, in September 2011, a global top ten card issuer submitted a Request for a Proposal to FiTeq for 28 million cards.  In April 2012, a major Asia Pacific bank card issuer requested a proposal for 11 million cards.  This was followed by a new and separate request from a new card issuer, an internet-based company, for a proposal scaling up to 50 million cards.  This Request for a Proposal was followed by a proposal in August 2012 from a global top ten card issuer, for 600,000 cards (for year one only).

147.    Given Venture's failures, FiTeq was unable to close these Requests for Proposal.  FiTeq could not contract to provide cards it was incapable of providing.  And it was only incapable of providing these cards on the dates above because Venture had so abjectly failed to honor its commitments.

148.    These missed opportunities cost FiTeq tens of millions of dollars in damages.

**I.    Defendants Breached Their Obligations To Meet The Engineering Milestones.**

149.    There were five critical engineering milestones set forth by the SOW, Exhibit B to both the Operating Agreement and the Purchase Agreement, as follows:

1.      Breadboard 1 ("BB1"): complete no later than eight
        months after signing, or February 2010.

2.      Breadboard 2 ("BB2"): complete no later than
        twelve months after signing, or June 2010.

3.      Lab Prototype 1 ("LP1"): complete no later than
        eighteen months after signing or December 2010.

4.      Lab Prototype 2 ("LP2"): complete no later than
        twenty months after signing or February 2011.

5.      The production pilot: complete no later than 24
        months after signing, or June 2011.

150.    These milestones all would result in "certification," as per Exhibit C, by

the principal processing networks, MasterCard and Visa.  Absent such certification,

FiTeq would not have a broad, commercially viable product, as set forth above.

151.    Each of the above-milestones set forth the precise requirements to be

achieved, the documents Defendants had to provide to FiTeq upon completion, the

metrics against which success would be measured, the initial target date, the "no later

than" date, the dollars associated with the work, and the number of FiTeq shares Cebelian

would earn upon successful completion.

152.    Defendants systematically breached their obligations to meet these critical

benchmarks.

153.    To use the LP2 benchmark as a case in point: by LP2, Venture had to have

a functional card that met the following performance metrics:

•       Designed to achieve real-world swipe success greater than 95% for

"**Transport**" [where the ATM machine ingests the card and then returns it upon

transaction completion]; "**Dip**" [gas pump or non-transport ATM] and "**Swipe**" [typical credit card swipe function].

- Conform to 90% of MasterCard's Cast and Visa VSCD standards.

- Conform to least 95% of the ISO [Standards Organization] requirements.

- Present a **mutually** agreed upon engineering plan.

- Present a **mutually** agreed upon objective test plan.

- And provide a Bill of Materials ("BOM") price and production not to exceed $4.20 (plus or minus 25%) per card, corresponding to a device with no more than 45 parts.

- These LP2 engineering milestones were additional to the prior milestones, *e.g.* BBI, BB2, and LP1. Put differently, the LP2 milestone was not satisfied if, by the "no later than" date, aspects of the prior milestones remained unmet. The milestones were, in short, cumulative.

154.    By February 2011, Defendants were in default on this critical LP2 engineering milestone.

155.    Even following the LP2 date, the prototype cards Venture Corp. produced were plagued with manufacturing defects. The cards delaminated, were insufficiently flexible, and were incapable of carrying the required hologram and signature panel, all as contrary to the requirements of the SOW and Exhibit C to the Operating Agreement. Far from achieving a repeatable, scaled production pilot, the Venture Corp. cards were profoundly defective, *e.g.*, splitting and peeling apart, exposing the internal electronics.

156.    To take a case-in-point, in August of 2011 a major top ten issuing bank under NDA with FiTeq executed a contract with FiTeq to run a pilot with FiTeq cards.

Under that agreement, the issuing bank agreed to purchase a first year commitment of 350,000 cards.  The cards would be branded under one of the major payment networks, and serve as a pilot for an anticipated wide-scale FiTeq card rollout.

157.    Venture Corp. delivered the first 50 cards to FiTeq in October 2011, and a second batch in January 2012, for a total of 2,140 cards.  In manufacturing these pilot cards, Venture Corp. experienced a manufacturing failure rate in excess of 50%.  That is, at least one out of two manufactured cards was fatally defective, with prominent manufacturing defects, such as delamination and cover adhesion problems contrary to bank requirements and the explicit requirements of the Agreement and Exhibit C.  FiTeq could not sell cards that its engineering and manufacturing partner, Venture Corp., could not deliver despite a contractual obligation to achieve 95% yield.

158.    Throughout the Operating Agreement, Venture Corp. failed to manufacture a finished card to the standards required using a scaled production process that was, as required: (1) reliable; (2) efficient; and (3) with high yield.  More, at all times relevant herein, Venture Corp. failed to deliver a repeatable manufacturing process, a scalable manufacturing process, or a manufacturing process that yielded plus 95%, although each of these was a specific contractual requirement.

159.    Venture Corp. having failed to meet engineering requirements under the SOW, Cebelian failed to deliver on "Milestone Events" under the Purchase Agreement for which it received shares.

160.    As a consequence of its inability to reliably repeat the manufacturing process at high yields, Venture Corp. was forced to set the price point per card at $8.50, far higher than called for by the Operating Agreement.  That is, given its massive failure

rate during the manufacturing process of a finished card, Venture Corp. had to nearly double the target unit cost as per the Operating Agreement.

161.   Along the same lines, FiTeq in the period 2011 and forward had concrete "Requests for Proposal" ("RFP's") from other major issuing banks.  FiTeq forwarded these RFP's to Venture, with a request that Venture commit to concrete production dates. Time and again, Venture simply refused to so commit, a failure that precluded FiTeq from closing business with these prospective customers.

162.   The above examples were not anomalous.  Through 2010 and 2011, and in relying on Venture's assurances that it would hit its engineering milestones, FiTeq approached numerous large issuing bank customers, including new economy online payment entities.  These customers, which represent some of the most well-known financial institutions in the world, were eager to move forward with the FiTeq product. These would-be customers pressed FiTeq to deliver working test cards which were capable of being certified by the major payment networks.  As set forth below, and even as it continued to assure FiTeq that Venture Corp. was on the cusp of producing a manufactured card as per the Operating Agreement, Venture Corp. failed to produce such a card.

163.   These actions by Venture were willful, deliberate, and calculated to cause FiTeq significant damage.  FiTeq's direct damages based on this conduct now exceed $30 million.

**J.**   **During The Pendency Of The Operating Agreement, Venture Assured FiTeq That Venture Would Meet Its Engineering Milestones, Representations On Which FiTeq Relied To Its Great Detriment.**

164.    In 2010 and continuing through 2011, Venture consistently assured FiTeq that Venture would meet its engineering and manufacturing milestones.  FiTeq relied on these representations in expending significant sums in this District, including acquiring at great expense a "personalization" facility in the Potrero Hill area of San Francisco.

165.    To illustrate such assurance and reliance, on March 15, 2011, FiTeq's Joan Ziegler wrote senior Venture employee Thian Nie Khian stating as follows:

> One other point, we plan to send PP cards to Applus for final pre-testing of conformance to the ISO tests.  When do you anticipate sending these cards for test?  I plan to be in Singapore when we receive those results in April so jointly Venture and FiTeq can with confidence pull the trigger on expenses associated with scale production.  We found a great perso [personalization] site in Northern California....  Achieving on the PP version and shopping feedback from… cards on the critical drivers to everything we do together.  Getting us over the certification finish line is what we are after.

166.    Throughout 2011 and 2012, Venture did not warn FiTeq that Venture would not hit its important PP milestone.  To the contrary, Venture consistently and repeatedly gave FiTeq assurance that Venture would ultimately honor its contractual obligations.  It did so in person, in e-mails, and in conference calls.

167.    This e-mail exchange is not anomalous.  Time and again, FiTeq verified with Venture that Venture would be capable of producing the promised card before FiTeq made binding financial and business commitments.  For example, FiTeq prepared a "monthly sales update."  These written updates summarized FiTeq's activities in the marketplace, and FiTeq provided these sales updates to Venture.  The updates were also routinely discussed on conference calls.

168.     Each monthly sales update emphasized the importance of prompt card certification.  For example, in the sales update dated April 27, 2011, FiTeq underscored that "certification lab results" was a "critical path" item to drive sales in the commercial marketplace.

169.     Along the same lines, at Board of Directors meetings attended by Venture's KS Tan, FiTeq executives emphasized the critical importance of card certification.  For example, in a Board of Directors meeting on April 4, 2012, and in a written presentation used at the meeting, FiTeq executives emphasized that "certification with full regression and minimal variances" was an "urgent" item and necessary to complete to market cards.

170.     Venture responded to FiTeq by promising concrete delivery dates.  In reliance on such representations, FiTeq's sales representatives consistently reassured potential FiTeq customers, including some of the most prominent issuing banks in this country, that FiTeq could and would deliver workable cards on a concrete schedule.  Time and again, given Venture's failure to perform, FiTeq was unable to meet the commitments it had itself made to these potential customers.  These missed approaches proved extremely damaging to FiTeq.

171.     To illustrate, and as a representative of the correspondence between FiTeq and Venture laying out the critical importance of certification, below is a portion of an e-mail documenting damage to FiTeq:

> Third party Certification data is required by Discover, MasterCard and Visa as a condition of doing business with their issuing banks.  On June 25th Chee Seng Ong and Liu Chang met with Eric Foo, FiTeq's Project Head with Venture, and me for a detailed discussion on the status of certification.  The result of this meeting was a commitment

by Venture to deliver the third party lab data to FiTeq in the first week of August.  FiTeq has been abundantly clear how critical this deliverable is to FiTeq's sales effort; FiTeq needs that delivery date from Venture to arrange a detailed briefing to both our customer banks and their networks to drive orders.  As recently as our last telephone call, you personally promised to me that Chee Seng Ong would deliver these reports from Fime, TruCert, TUV, etc. to Eric Foo and to me no later than close of business on August 14th.  My August 13th email specifically notified you that the detailed third party lab reports are required in combination with proof of >95% success among swipe and dip readers (the ATM success has been deferred by FiTeq).

Ghai Keen, it is now August 27th, a full two weeks later than you promised to deliver this data and still FiTeq is not in receipt of the third part lab results, nor an accurate date by which Venture will deliver this data.  Venture's failure to deliver these detailed reports adversely impacts FiTeq's ability to generate revenue, the non-cancellable Purchase Orders required by Venture.  It is critical to our success that you deliver this data immediately as required by the Operating Agreement.

This email notifies you of Section 4.3.4, which clearly states the obligations of Venture's obligations in the event of a delay.

E-mail from Joan Ziegler to Venture Executive Vice President Lee Ghai Keen dated August 28, 2012.

172.    FiTeq also put Venture on notice that Venture's breaches and failure to perform was causing FiTeq real and lasting injury.  To quote one such breach and damages notice:

I need you and Venture's senior management to appreciate the impact these delays cause to FiTeq's operations, customer relations and financing efforts.  FiTeq had commitments to share certification data with [issuing banks and networks] the week of August 6th.  FiTeq already missed the deliverable to [networks] and with the news on Friday, FiTeq was forced to move the [bank] meeting.  It is Venture's obligation to deliver results and inform FiTeq

> in advance if they will be delivered.*** PP was promised in May of 2011, then August of 2011, then November of 2011, then April of 2012.  Then a slip to June, but a request for a grace period through July and then once extra week in August.  This is an ongoing slippery slope.  FiTeq has managed customers' expectations, but we expect Venture to deliver these test results.  If Venture is after non-cancellable orders, the single most important duty Venture has to the existing agreement is to supply that data to FiTeq.  Period.  Full Stop.

E-mail from Joan Ziegler to Lee Ghai Keen, Venture EVP, dated August 12, 2012.

### K.  **Instead Of Meeting Its Contractual Obligations, Venture Corp. Sought To Renegotiate The Agreement In July 2012 And Demanded Ten Million Dollars In Additional Compensation.**

173.  On July 31, 2012, a full year after failing to hit its critical PP engineering benchmark, and three years into the relationship, Venture Corp. demanded that FiTeq renegotiate the Operating Agreement.

174.  In writing, Venture Corp. demanded that FiTeq agree to pay an incremental nine plus million dollars **and** agree to unconditional exclusivity, **and** cede partial ownership of FiTeq's Intellectual Property to Venture Corp., **and** give Venture Corp. exclusive ownership of some IP along with other demands, as follows:

- Pay an "upfront charge" of $3 million in cash **plus** $3.5 million in FiTeq shares (or cash).

- Agree to a new unit charge of $0.292 per card.

- Agree to a Unit Price for a MultiTeq card of $7.56.

- For a display card, agree to an incremental payment of $1 million (Singapore) "payable upon completion of each phase [four phases] over 10 months' development," for total of $4 million (Singapore).

- Agree to a MultiTeq with display Unit Price of $13 for a "committed volume of 2m cards per year."

- Agree to give Venture Corp. "**unconditional exclusivity**," as against the carefully negotiated conditional exclusivity set forth in the Operating Agreement (*i.e.*, Venture would have no accountability).

- Agree to share IP with Venture Corp., and agree that Venture Corp. would exclusively own particular technology.

- FiTeq would commit to "sale orders of 3m [million] cards per quarter," with "[a]ny shortfall… thrown out" and charged to FiTeq.

- And agree that Venture Corp. would have sole manufacturing decision-making authority.

*See* July 31, 2012 "Terms," attached as Exhibit 4.

175.    As proposed, this amendment would have cost FiTeq in excess of $30 million dollars, relative to the deal struck in the Operating Agreement, over the subsequent three years.

176.    In return for this extraordinary new demand, Venture Corp. said that it would commit to produce "1 [million] cards per month 9 months from the receipt of upfront charge." A full and complete copy of this renegotiation demand is attached as Exhibit 4.

177.    FiTeq refused to renegotiate the laboriously negotiated and drafted 2009 Operating Agreement, declined to pay Venture Corp. far more than twice for work not done once, and rejected Venture Corp.'s extortionate new demands

**L.    Defendants Breached Their Duty To Report.**

178.    As alleged above, Venture had an absolute obligation to warn FiTeq prior to any schedule slippage on Venture's part.

179.    Venture Corp. consistently failed to honor this contractual obligation under the Operating Agreement, and Cebelian similarly failed to honor this contractual obligation under the Purchase Agreement.  To the contrary, and instead of giving FiTeq fair and accurate notice of anticipated schedule delays, Venture assured FiTeq repeatedly that it was making the necessary progress.  Such representations were false.

**M.    Venture Breached Its Obligation To Release SOW Secured Materials.**

180.    Venture had an obligation to release SOW Secured Materials upon either a FiTeq Board approved financing, or if FiTeq investors requested documents to assess the value created by Venture pursuant to the Operating Agreement.

181.    No later than June 2012, FiTeq's Joan Ziegler informed Venture's executive team that the FiTeq Board had approved a fundraising, specifically a rights offering relative to prior investors.  In this meeting, and as confirmed in subsequent e-mails, Ms. Ziegler confirmed the identity of the investors, and asked that Venture comply with its obligations in providing, amongst other items, the SOW Secured Materials.  As confirmed in an August 3, 2012 e-mail, Ms. Ziegler specifically called out to Venture's attention § 4.1.6 of the Operating Agreement, which sets forth Venture's obligation to disclose upon qualified fundraising or investor asset confirmation.

182.    Venture refused to provide these materials.  This prompted another request, again in writing, on August 8, 2012, that Venture release the documents:

> After a few attempts to request for the document release,
> I'd like to inform you that in our signed operating
> agreement section 4.1.1 Contract Documents, Venture is

under contractual obligations to release all the latest
documents as stated below:

> Section 4.1.1 The production versions shall at least
> include all technical drawings, documented source
> code, executable code, MPIs, QIIs, LWIs, tooling,
> testing apparatus, etc.

As we are talking to our current and potential investors now
(PIs refer to section 4.1.6 – (b), we need your immediate
attention to release the documents ASAP.  (You can send
me the latest Gerber files and source code first).

E-mail from FiTeq executive Eric Foo to Ong Chee Seng, Venture Program Manager,

dated August 8, 2012.

183.    Venture continued to refuse to honor its obligations under the Operating

Agreement.  Far from making the documents available, Venture instead insisted that

these significant investors travel to Singapore to review the SOW Secured Materials.  As

Venture's Lee Ghai Keen, Executive Vice President, Technology Products & Solutions,

put it to FiTeq's CEO on August 13, 2012:

> Joan, I am definitely not in agreement with the many
> assertions that you have made, I shall give you a due
> response, particularly on the project delays, there were
> many contributing factors that were entirely not within our
> control.
>
> **As to your request on the release of information to your
> potential investors, the quickest way is for your
> investors to come to Venture Singapore, we can make
> this available for their viewing at the time of your
> choosing.**

184.    This extra-contractual stipulation that potential investors travel to

Singapore was directly equivalent to refusing to release the documents at all.  Venture

knew internally that FiTeq's investors had an absolute right to review these documents, and that refusing to provide the documents breached the contract.

185.    As a direct consequence of Venture's refusal to honor the terms of the Operating Agreement, and given Venture's demand that FiTeq renegotiate the Agreement -- a material event -- FiTeq was compelled to abort this financing.  This consequence caused FiTeq significant damage and loss.

### N.    Venture Breached Its Obligation to Release the Secured Materials.

186.    As alleged above, Venture had an obligation to release the Secured materials upon either: (1) the termination of the Operating Agreement, or (2) an uncured material breach of the Operating Agreement by Venture.  *See also* Operating Agreement at § 4.1.6(d)(iii-iv).  As further alleged above, both of these conditions have occurred.

187.    FiTeq has terminated the Operating Agreement in accord with § 12 of the Operating Agreement and Venture has conceded that the Operating Agreement has been terminated.  *See* § II(c)(3) above.

188.    Venture materially breached the Operating Agreement, and continues to be in breach of the Operating Agreement, through, but not limited to, failing to meet the engineering milestones, failing to meet its reporting obligations, and failing to release various materials.  *See* §II(E), (H) and (I) above for examples.

189.    To date, despite acknowledging that termination has occurred, and having been repeatedly notified of its breaches and failure to cure, the Secured Materials have not been released to FiTeq.  Venture has failed to fulfill its obligation to release the Secured Materials.

### O.    Venture Breached Its Obligation to Release the Contract Documents.

190.     As alleged above, Venture had an obligation to deliver the Contract Documents on completion of milestone events (said events being set forth in the SOW). *See* ¶52 above; *see also* Operating Agreement at § 4.1.1.

191.     Despite having purported to have completed various milestones, for example, the LP2 milestone, *see* § II(E) above, Venture to date has failed to provide to FiTeq all documents specified for a given milestone by the SOW, and has failed in its obligation to provide the Contract Documents.

**P.     Defendants Breached Their Obligations to Provide Document Deliverables Under the SOW.**

192.     As alleged above, Venture had an obligation to deliver documents set forth in the SOW as part of the milestone events (said events being set forth in the SOW). *See* ¶¶43 & 91 above.  For example, the LP2 benchmark calls for, among other things, delivery of: "Design Review documentation," "Design Review documentation with updated schematic drawing and PCB layout files," and "Documented source code & executable code."  Given dozens of "builds" over three years, Venture failed to provide the specific schematic and PCB layout files in combination with the documented source code and executable to enable FiTeq to get any engineering benefit from Venture's trial and error.

193.     Despite having purported to have completed various milestones, for example, the LP2 milestone, *see* § II(E) above the delivery of certain documents being explicitly set forth as milestone specific deliverables in the SOW, *see* Operating Agreement at Exhibit B; Purchase Agreement at Exhibit B; and Cebelian having accepted equity in FiTeq for the purported completion of various Milestone Events, *see* Purchase

Agreement at § 1.3; *see generally* Novation Agreement, Venture to date has failed to provide to FiTeq all documents specified for a given milestone by the SOW, and has failed in its obligation to provide these materials.

**Q. Venture Breached Its Obligation to Release Documentation Upon Termination.**

194. As alleged above, Venture had an obligation to deliver the Documentation to FiTeq upon termination of the Operating Agreement. *See* Operating Agreement at § 12.5.

195. FiTeq has terminated the Operating Agreement in accord with § 12 of the Operating Agreement and Venture has conceded that the Operating Agreement has been terminated.

196. To date, despite acknowledging that termination has occurred, the Documentation has not been delivered to FiTeq. Venture has failed to fulfill its obligation to deliver the Documentation.

**R. Venture's Failure and Refusal to Provide Usable Documentation to FiTeq Damaged FiTeq.**

197. In sum, Venture failed and refused to ever provide FiTeq with anything like a complete, usable set of documentation, for any of the contract milestones. The incomplete and inaccurate jumble of documents that Venture provided over times for the purpose of deceiving FiTeq into approving the milestone payments to Venture, is in large part unusable for the purposes of designing and manufacturing the cards that Venture had contracted to design and manufacture. Venture's failure and refusal to provide such a coherent set of design documents has repeatedly prevented FiTeq from replicating the

engineering work Venture was paid to perform, and has further hobbled FiTeq's own subsequent efforts to build its card.

### S. Venture Breached Its Obligation to Sell "Stocks And Inventory" At the "Unit Price" and Direct Cost and Instead Held the Inventory Hostage to an Extortionate Financial Demand.

198. As alleged above, upon termination, Venture had an obligation to provide to FiTeq all partially assembled cards and related inventory at the agreed upon "Unit Price" and direct cost respectively.

199. Upon termination, FiTeq repeatedly, and in writing, demanded that Venture honor this obligation.

200. Venture refused to tender the partially assembled cards at the agreed upon Unit Price and the related inventory at direct cost. Instead, Venture demanded that FiTeq reimburse Venture for its alleged cost to "tool-up," acquire licenses, and related infrastructure investment costs. In writing, Venture demanded approximately $1 million from FiTeq as its price to release the partially assembled cards and related componentry. Explicit in this demand was Venture's request that FiTeq reimburse Venture for set-up and tooling expenditures, notwithstanding that these were costs for which Venture had already been compensated under the agreements. This demand exceeded the contractually agreed amount by almost ten-fold.

201. On information and belief, Venture called at least one key FiTeq supplier and asked that it not work with FiTeq until FiTeq wrote Venture an unwarranted check for close to $1 million to buy Venture's inventory.

### COUNT I

### BREACH OF CONTRACT
(Breach of Operating Agreement by Venture)

202.    FiTeq incorporates and re-alleges, as though fully set forth herein, the allegations contained in paragraphs 1 through 201 above.

203.    FiTeq has performed all the terms and conditions of the Operating Agreement up until termination of said agreement.

204.    FiTeq has not breached the Operating Agreement.

205.    Venture breached the Operating Agreement by, among other things, failing to perform its duties to design and manufacture the FiTeq cards, including not meeting the engineering milestones, not meeting the certification requirements, repudiating the Operating Agreement, failing in its duty to report, failing to release the Design Review materials, failing to release the Contract Documents, failing to release the SOW Secured Materials, failing to release the Secured Materials, failing to release the Documentation, failing to sell stock to FiTeq at the Unit Price, failing to sell inventory to FiTeq at direct cost, and breaching the covenant of good faith and fair dealing.

206.    As a proximate and foreseeable result of the wrongful conduct described above, FiTeq has been damaged, and will continue to be damaged, until Venture is commanded to perform the acts described above.  As of the date of this filing, FiTeq's direct damages alone exceed $10 million, and its total damages are many times that.

207.    Venture will continue to not perform the acts described above unless commanded to perform them by this Court.  Plaintiff faces real, substantial and irreparable damage and injury of a continuing nature owing to Venture's breaches of the Operating Agreement for which Plaintiff has no adequate remedy at law.

## **COUNT II**

## **BREACH OF CONTRACT**

(Breach of Common Stock Purchase Agreement and Novation and Supplemental Agreement by Venture)

208.    FiTeq incorporates and re-alleges, as though fully set forth herein, the allegations contained in paragraphs 1 through 201 above.

209.    FiTeq has performed all the terms and conditions of the Common Stock Purchase Agreement up until termination of the Operating Agreement.

210.    FiTeq has performed all the terms and conditions of the Novation and Supplemental Agreement up until termination of the Operating Agreement.

211.    FiTeq has not breached the Common Stock Purchase Agreement or the Novation and Supplemental Agreement.

212.    Pursuant to § 1 of the Novation and Supplemental Agreement Venture remained obligated to "provide engineering and manufacturing services in accordance with the Operating Agreement."

213.    Venture breached the Common Stock Purchase Agreement and Novation and Supplemental Agreement by not fulfilling engineering and manufacturing service requirements, which included, among other things, not fulfilling elements of the Milestone Events, including but not limited to, failing to provide FiTeq with Design Review documentation, documented source code and documented executable code, failing in its duty to report, and breaching the covenant of good faith and fair dealing.

214.    As a proximate and foreseeable result of the wrongful conduct described above, FiTeq has been damaged, and will continue to be damaged, until Venture is commanded to perform the acts described above.  As of the date of this filing, FiTeq's direct damages alone approximate $30 million.

215.    Venture will continue to not perform the acts described above unless commanded to perform them by this Court.  Plaintiff faces real, substantial and irreparable damage and injury of a continuing nature owing to Venture's breaches of the Common Stock Purchase Agreement and Novation and Supplemental Agreement for which Plaintiff has no adequate remedy at law.

## COUNT III

### BREACH OF CONTRACT

(Breach of Common Stock Purchase Agreement and Novation and Supplemental Agreement by Cebelian)

216.    FiTeq incorporates and re-alleges, as though fully set forth herein, the allegations contained in paragraphs 1 through 201 above.

217.    FiTeq has performed all the terms and conditions of the Common Stock Purchase Agreement up until termination of the Operating Agreement.

218.    FiTeq has performed all the terms and conditions of the Novation and Supplemental Agreement up until termination of the Operating Agreement.

219.    FiTeq has not breached the Common Stock Purchase Agreement or the Novation and Supplemental Agreement.

220.    Pursuant to §§ 1-2 of the Novation and Supplemental Agreement Cebelian agreed to be bound by terms and conditions of the Common Stock Purchase Agreement.

221.    Cebelian breached the Common Stock Purchase Agreement and Novation and Supplemental Agreement by, among other things, not fulfilling elements of the Milestone Events and/or not meeting the engineering milestones, including but not limited to, failing to provide FiTeq with Design Review documentation, documented source code and documented executable code; failing in its duty to report; contesting that

it has obligations pursuant to terms set forth in the Common Stock Purchase Agreement; contesting service; contesting the Court's jurisdiction over it; and breaching the covenant of good faith and fair dealing.

222.    As a proximate and foreseeable result of the wrongful conduct described above, FiTeq has been damaged, and will continue to be damaged, until Cebelian is commanded to perform the acts described above.  As of the date of this filing, FiTeq's direct damages alone approximate $30 million.

223.    Cebelian will continue to not perform the acts described above unless commanded to perform them by this Court.  Plaintiff faces real, substantial and irreparable damage and injury of a continuing nature owing to Cebelian's breaches of the Common Stock Purchase Agreement and Novation and Supplemental Agreement for which Plaintiff has no adequate remedy at law.

## **COUNT IV**

## **FRAUD - IN THE INDUCEMENT**
(Fraud In the Inducement by Venture and Cebelian)

224.    FiTeq incorporates and re-alleges, as though fully set forth herein, the allegations contained in paragraphs 1 through 201 above.

225.    Defendants made false representations to Plaintiff and concealed material facts to persuade Plaintiff to enter into the Operating Agreement, Stock Purchase Agreement, and Novation and Supplemental Agreement.

226.    The false representations made by Defendants include, but are not limited to, Defendants' representations that: they had expertise in designing and manufacturing

sophisticated electronics; they could build the FiTeq card successfully and on a budget; and that they were seeking an EDB grant wholly unrelated to FiTeq's grant.

227. Defendants knew that their representations were false.

228. Defendants actively concealed and/or intentionally prevented Plaintiff from discovering: Defendants' lack of proficiency in the requisite designing and manufacturing tasks; Defendants' internal assessment that Defendants lacked the expertise to successfully deliver the FiTeq card and/or to deliver the FiTeq card on budget; and the nature and scope of Defendants' work with EDB. These facts were not known to Plaintiff.

229. Defendants intentionally failed to disclose to Plaintiff Defendants' lack of proficiency in the requisite designing and manufacturing tasks; Defendants' internal assessment that Defendants lacked the expertise to successfully deliver the FiTeq card and/or to deliver the FiTeq card on budget; and the nature and scope of Defendants' work with EDB. These facts were not known to Plaintiff and could not be discovered by Plaintiff.

230. Defendants knew that their representations were false, intended to deceive Plaintiff through concealment, and intended that Plaintiff rely on the false representations.

231. FiTeq reasonably relied on Defendants' representations and deceptions and would not have entered into the Operating Agreement, Stock Purchase Agreement, and Novation and Supplemental Agreement if it knew of the falsity of the representations or the concealed facts.

232.    FiTeq has been injured, and its reliance on Defendants' representations and deceptions was a substantial factor in causing its injury.

233.    Defendants' wrongful conduct was fraudulent, oppressive and done with malice, such that Plaintiff should be awarded punitive and exemplary damages to deter conduct such as the Defendants.

**COUNT V**

**FRAUD**

(Fraud by Venture and Cebelian)

234.    FiTeq incorporates and re-alleges, as though fully set forth herein, the allegations contained in paragraphs 1 through 201 above.

235.    Defendants made material false representations to Plaintiff and concealed material facts Plaintiff, as alleged above.

236.    Venture misrepresented and concealed the true facts concerning its progress in designing and building the FiTeq cards.  Venture falsely reported its progress to FiTeq.  It concealed the facts that it failed to perform its engineering work adequately, and failed to manufacture cards properly.  The false representations made by Defendants include, but are not limited to, Defendants' representations that: Venture met engineering milestones and certification requirements, the Venture-made cards worked, were properly manufactured, the cards passed delamination requirements and passed peel tests, that holograms and signature panels could be attached to the cards; and that the manufacturing yield for the cards was approximately 80-90% and improving.  Venture misrepresented the "swipe success" of its cards, and its ability to scale production, and

that it had cogent mechanical engineering approach at all.  Venture misrepresented both to FiTeq and the EDB the true facts in connection with its EDB grant.

237.    Defendants knew that their representations were false.

238.    Defendants actively concealed and/or intentionally prevented Plaintiff from discovering that: Defendants could not manufacture cards that did not delaminate; that Defendants could not attach holograms and signature panels to the cards; that the cards could not be read by card readers under real world conditions; that Defendants could not achieve adequate manufacturing yields of cards or scale card production; and that Defendants planned to drive Plaintiff out of business so as to acquire Plaintiff's intellectual property rights in Asia.  These facts were not known to Plaintiff.

239.    Defendants intentionally failed to disclose to Plaintiff that: Defendants could not manufacture cards that did not delaminate; that Defendants could not attach holograms and signature panels to the cards; that the cards could not be read by card readers under real world conditions; that Defendants could not achieve adequate manufacturing yields of cards or scale card production; and that Defendants planned to drive Plaintiff out of business so as to acquire Plaintiff's intellectual property rights in Asia. .  These facts were not known to Plaintiff and could not be discovered by Plaintiff.

240.    Defendants knew that their representations were false, intended to deceive Plaintiff through concealment, and intended that Plaintiff rely on the false representations.

241.    FiTeq reasonably relied on Defendants' representations and deceptions, by, for example, issuing stock to Defendants, continuing its relationship with Defendants, and not seeking engineering and manufacturing services elsewhere.

242.    FiTeq has been injured, and its reliance on Defendants' representations and deceptions was a substantial factor in causing its injury.

243.    Defendants wrongful conduct was fraudulent, oppressive and done with malice, such that Plaintiff should be awarded punitive and exemplary damages to deter conduct such as the Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for entry of judgment:

A.    that Defendants account for and pay to Plaintiff all damages caused by Defendants' breaches of the herein described agreements in an amount to be proven at trial;

B.    that Defendants account for and pay to Plaintiff all damages caused by Defendants' fraudulent inducement of Plaintiff to enter into the agreements described herein in an amount to be proven at trial;

C.    that Defendants account for and pay to Plaintiff all damages caused by Defendants' fraud and deceptions in an amount to be proven at trial;

D.    that this Court issue a preliminary and final injunction commanding Venture, its officers, agents, servants, employees and attorneys, and any other person in active concert or participation with them, to perform the acts herein complained of as not performed, and more particularly, that Venture and such other persons be commanded to immediately deliver to FiTeq the Documentation, Contract Documents, SOW Secured Materials, Secured Materials, Design Review materials, documents to provide as part of Milestone Events, and the stock and inventory described above at direct cost as described above;

E.       that Defendants make restitution of all money and things of value by which they have wrongfully enriched themselves;

F.       that this Court issue a preliminary and final injunction commanding Cebelian, its officers, agents, servants, employees and attorneys, and any other person in active concert or participation with them, to perform the acts herein complained of as not performed, and more particularly, that Cebelian and such other persons be commanded to immediately deliver to FiTeq the documents to provide as part of Milestone Events;

G.       that Plaintiff be granted pre-judgment and post-judgment interest on the damages caused to it by reason of Defendants' breaches of the herein described agreements, fraudulent inducement of Plaintiff to enter into the herein described agreements, and Defendants' fraud and deceptions;

H.       that this Court require Defendants to file with this Court, within thirty (30) days after entry of final judgment, a written statement under oath setting forth in detail the manner in which Defendants have complied with the injunctions;

I.       that the Court award Plaintiff punitive and exemplary damages as allowed by law according to proof;

J.       that this Court award Plaintiff its costs and disbursements in this civil action, including reasonable attorney's fees, pursuant to contract; and

K.       that Plaintiff be granted such other and further relief as the Court may deem just and proper under the current circumstances, including the recovery of direct damages.

Dated:  February 7, 2014                    Respectfully submitted,


                                            _/s/ Spencer Hosie_____

SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
GEORGE F. BISHOP
gbishop@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

Attorneys for Plaintiff
*FITEQ, INC.*

## DEMAND FOR JURY TRIAL

Plaintiff, by its undersigned attorneys, demands a trial by jury on all issues so triable.

Dated:  February 7, 2014                    Respectfully submitted,


_/s/ Spencer Hosie_____
SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
GEORGE F. BISHOP
gbishop@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

Attorneys for Plaintiff
*FITEQ, INC.*