**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| FITEQ INC,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>VENTURE CORPORATION, et al.,<br><br>　　　　　　Defendants. | Case No. 13-cv-01946-BLF<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION**<br><br>[Re: ECF 199] |

Plaintiff FiTeq is a research and development company that has designed a novel "smart" credit card, containing an on-board computer that FiTeq contends could prevent data breaches and the theft of the card user's personal identifying information. In 2009, FiTeq entered into a contract (the "2009 Agreement") with Defendant Venture, an electronic design and manufacturing company, seeking to engineer a mass producible design for this "smart" credit card. Whether that contract binds Venture to obligations to manufacture the credit card is the issue presented by this motion.

FiTeq's card has never been manufactured. Although the parties agree that they entered into a contract, the proper interpretation of the 2009 Agreement forms the linchpin of the parties' present dispute. Plaintiff moves for partial summary adjudication on two issues of contract interpretation: (1) that "under the Operating Agreement and Common Stock Purchase Agreement, and subject to the terms and conditions stated therein, Venture had the obligation to manufacture all cards required by FiTeq's agreements with card issuers," and (2) "those conditions did not require FiTeq to provide any consideration, funding, or financing for Venture's card manufacturing capacity or card production other than as expressly stated in the two contracts." Mot., ECF 199 at 1.

Having reviewed the submissions of the parties, the underlying contract, and the arguments made by counsel, the Court GRANTS Plaintiff's motion, for the reasons set forth herein.

## I. BACKGROUND

### A. Undisputed Facts

A review of the parties' papers shows that the following facts are undisputed.

On July 15, 2009, following lengthy negotiations over a six-month period, the parties entered into an Operating Agreement – the 2009 Agreement. *See id.* Exh. Y. The 2009 Agreement states that it is to be interpreted pursuant to California law. *See* Exh. Y at § 17.2. FiTeq terminated the 2009 Agreement sometime in late 2012 or early 2013. *See* SAC ¶ 117.

The 2009 Agreement's Recitals state that Venture "desires to invest in and be engaged by FiTeq in the engineering and manufacturing of FiTeq Cards," while FiTeq "desires to engage Venture to enhance its card technology." *Id.* at 7. In Section 3, entitled "Services and Right of Exclusivity," the contract states that Venture would "provide [] engineering and manufacturing services to FiTeq," *id.* at 8 (Section 3.1), and that "Venture will serve as FiTeq's sole source for the engineering services pursuant to the Statement of Work and manufacturing of FiTeq Cards," *id.* (Section 3.2). The 2009 Agreement further provides that Venture was obligated to conform its manufacturing process to the certification requirements of major credit card companies, including American Express, Discover, JCB, MasterCard, and Visa, and that FiTeq was required to "use its best efforts to assist Venture" in obtaining these certifications. *See id.* at 10 (Section 4.1.4).

Once the FiTeq Card was certified and available for sale, additional obligations arose. Under the 2009 Agreement, when FiTeq was to have received a purchase order from a third-party buyer, it was obligated to "forward the Purchase Order to Venture for its acceptance, rejection, or modification." *See id.* at 14 (Section 5.3.1). The 2009 Agreement permitted Venture to "reject a Purchase Order by modification only if" certain conditions were met, including if "the Unit Price on the Purchase Order is less than the Standard Unit Price," *id.* at 15 (Section 5.3.3), and was required, upon such a rejection, to provide to FiTeq with information, including an acceptable price, quantity, and delivery date, that FiTeq could then communicate to the buyer for further negotiation. *See id.* (Section 5.4). Upon written acceptance of the Purchase Order, FiTeq would

"assign the Purchase Order to Venture" and Venture would "receive payment directly from the Buyer." *Id.* at 16 (Section 5.6). Section 5.1 states that this assignment was so "Venture can finance turnkey manufacturing and be the recipient of a portion of the payment owed . . . as it becomes due." *See id.* at 15. If FiTeq nonetheless received payment directly from the buyer, FiTeq would promptly transmit the payment to Venture. *See id.* at 16 (Section 5.6).

Section 5.7 of the Agreement sets forth Venture's obligations regarding shipment and delivery of the cards and the liabilities of both parties following the departure of a shipment from Venture's dock. *See id.* ("All FiTeq Cards delivered pursuant to the terms of this Agreement shall be suitably packed for shipment in accordance with the Specifications and marked for shipment by Venture."). Under Section 5.8, FiTeq had certain rights to inspect incoming shipments and reject the cards that were shipped, after which time Venture would "verify the non-compliance of the affected FiTeq cards," and, if it deemed the cards non-complaint, "at its own costs [] replace the defective FiTeq Cards." *Id.*

Section 7 of the Agreement outlined a number of warranties, including that each card "shall comply with all applicable specifications," "shall be new and unused," and that each card is warranted from defects for a time period of "24 months after personalization, or 26 months ex factory, or 2100 swipes, whichever is earlier." *Id.* at 17. Section 13.3 described the manner in which Venture would indemnify FiTeq against any claims by a third-party that arose "out of or in connection with any breach of the warranty as set out in Section 7.1." *See id.* at 26.

Section 10 of the 2009 Agreement sets forth a "notice and cure" procedure that would be invoked if either party failed to meet any of its obligations set forth in the Agreement. *See id.* at 21-22. If either party breached the Agreement and the breach could not be resolved pursuant to the notice and cure procedures, Section 12.2 authorized the non-breaching party to "issue a written notice to the other Party to cure the breach within 30 days of the receipt of the written notice. If the non-compliance is not remedied within the said 30 days, the non-defaulting Party may terminate the agreement." *Id.* at 24.

The parties also, in Section 11.2, formed a Management Arbitration Subcommittee to serve as the "body for final resolutions of issues related to this Agreement, including but not limited to

3

1   this Agreement, the manufacturing services, the engineering services as set out in the SOW," and
2   other matters. *See id.* at 23. This subcommittee would "define Notice and Cure Procedures," and
3   would meet quarterly to resolve any issues between the parties. Were the parties unable to reach
4   an agreement within 60 days, the parties were permitted to terminate the agreement according to
5   Section 12.2 or bring a claim consistent with Section 17.2, which permits a party to bring suit in
6   "state or federal courts located in Santa Clara, California." *Id.* at 28.

7   Finally, the Agreement contained an integration clause at Section 17.13. *See id.* at 30
8   ("This Agreement . . . supersedes any and all prior proposals, understandings and agreements
9   between the Parties with respect to the subject matter hereof.").

10   The parties also entered into a Common Stock Purchase Agreement (hereinafter the
11   "Stock Agreement"), in which Venture purchased $500,000 in FiTeq in exchange for 1 million
12   shares of FiTeq common stock. *See id.* Exh. V at 2 (Section 1.1). This Stock Agreement also
13   contained an integration clause. *See id.* at 13 (Section 5.11).

14   **B.     Plaintiff's Legal Claims Relevant to this Motion**

15   Plaintiff brings suit for, among other claims, breach of contract, alleging that after the
16   parties executed the 2009 Agreement, Venture began work "finish[ing] the card design and
17   creat[ing] a scalable manufacturing process." Mot. at 15. It argues that "within months" Venture
18   began missing deadlines despite "falsely [telling] FiTeq that it had hit every engineering
19   benchmark in the Operating Agreement." *Id.* at 16. Thereafter, in 2012, FiTeq alleges that Venture
20   attempted to renegotiate the 2009 Agreement, demanding "FiTeq pay it millions of dollar up-front
21   to obtain Venture's performance of its contractual manufacturing obligations, including paying to
22   build Venture's card manufacturing factory in Singapore." *Id.* FiTeq then terminated the 2009
23   Agreement, and this action followed. *See id.*

24   **II.    LEGAL STANDARD**

25   Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary
26   judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions
27   on file, together with the affidavits, if any, show that there is no genuine issue as to any material
28   fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v.*

4

*Catrett,* 477 U.S. 317, 322 (1986). "Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried." *State Farm Fire & Cas. Co. v. Geary,* 699 F. Supp. 756, 759 (N.D. Cal. 1987).

The moving party "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.,* 690 F.Supp.2d 1001, 1004 (N.D.Cal.2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). In judging evidence at the summary judgment stage, "the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party." *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.,* 891 F. Supp. 510, 513–14 (N.D. Cal. 1995). For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett,* 567 F.3d 554, 562 (9th Cir. 2009).

### III. DISCUSSION

The limited question before the Court is how to interpret the 2009 Agreement.

Contract interpretation is a question of law to be determined by the Court. *See, e.g.*, *TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, 40 Cal. 4th 19, 27 (2006). California law makes clear that the "fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties." *Id.* The intent of the parties "at the time the contract is formed" governs the Court's interpretation, *see* Cal. Civ. Code §1636, and this intent "is to be inferred, if possible, solely from the written provisions of the contract." Cal. Civ. Code § 1639. "If the contractual language is clear and explicit, it governs." *County of San Diego v. Ace Prop & Cas. Ins. Co.*, 37 Cal. 4th 406, 415 (2005) (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)).

To that end, "language in a contract must be construed in the context of [the] instrument as a whole . . . and cannot be found to be ambiguous in the abstract." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 867 (1993). "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." *Reserve Ins. Co. v.*

*Pisciotta*, 30 Cal. 3d 800, 807 (1982).

### A. The 2009 Agreement is Both a Development and Manufacturing Agreement

Plaintiff seeks partial summary adjudication as to the following issue: "[U]nder the Operating Agreement and Common Stock Purchase Agreement, and subject to the terms and conditions stated therein, Venture had the obligation to manufacture all cards required by FiTeq's agreements with card issuers." *See* Mot. at 1.

Plaintiff argues that the 2009 Agreement, though one integrated contract, includes two "phases": a development phase and a production/manufacturing phase. *See* Hearing Tr. at 5:19-22 (The Court: "Is it fair for me to look at this like the *TK Power* case as a development phase and a production phase contract?" Mr. Hosie: It does, indeed."). Venture contends that the 2009 Agreement is *only* a development contract, because the agreement lacked a significant number of essential commercial manufacturing terms. *See, e.g.*, Opp. at 5-8; *see also* Hearing Tr. at 12:10-13:16. FiTeq argues that the production portion of the 2009 Agreement is a manufacturing requirements contract which is enforceable despite any open terms it may contain. *See* Reply at 1.

Though the parties present the Court with ample parol evidence, both parties agree that the contract is unambiguous and should be interpreted on its face, without a review of parol evidence. *See* Mot. at 19 ("[T]he Operating Agreement and Purchase Agreement are unambiguous."); *see* Opp. at 1 ("Defendants agree with FiTeq, Inc. that the Operating Agreement was carefully negotiated over months, is unambiguous and should be interpreted without resorting to parol evidence."); *see also* Reply at 10.[1] The Court agrees with the parties, and interprets the contract according to its four corners, without regard to parol evidence. *Cf. Bay Cities* at 874.

In support of its motion, FiTeq argues that the 2009 Agreement "is rife with explicit terms discussing Venture's mass production of FiTeq cards," including referring to Venture as the "sole"

---

[1] The parties, however, express substantial disagreement about the parol evidence that was produced. Both parties argue that the parol evidence supports their respective interpretations of the contract, and Defendant further argues that the parol evidence produced by Plaintiff creates a dispute of material fact that precludes summary adjudication. *See* Opp. at 9. To that end, Venture objects to exhibits A-Q, S-U, W-X, and AA-EE to the Hosie Declaration, ECF 199-1, under Federal Rule of Evidence 402. Because the Court construes the contract on its face, Venture's objection is SUSTAINED to the extent the evidence is offered for the purpose of adding to or modifying the terms of the 2009 Agreement. *See Masterson v. Sine*, 68 Cal. 2d 222, 225 (1968).

1  supplier of the cards to FiTeq and stating that Venture would be compensated for production
2  through the assignment of purchase orders by FiTeq to Venture in order to "finance turnkey
3  manufacturing." *See* Mot. at 18-19.

4  Thus, FiTeq contends, the manufacturing and production portions of the 2009 Agreement
5  constitute a requirements contract governed by the California Commercial Code ("CCC"). Under
6  Section 2204 of the CCC, a "contract for sale of goods may be made in any manner sufficient to
7  show agreement," and "[e]ven though one of more terms are left open a contract for sale does not
8  fail for indefiniteness if the parties have intended to make a contract and there is a reasonably
9  certain basis for giving an appropriate remedy." Cal. Comm. Code §§ 2204(1), 2204(3). The CCC
10 expressly recognizes that such contracts may leave open price terms. *See* Cal. Comm. Code. §
11 2305(1) ("The parties if they so intend can conclude a contract for sale even though the price is not
12 settled. In such a case the price is a reasonable price at the time for delivery if . . . [t]he price is left
13 to be agreed by the parties and they fail to agree."). When parties leave open a price term, the
14 party charged with fixing the price has an obligation to fix said price in good faith. *See id.* §
15 2305(2). If, however, the parties "intend not to be bound unless the price be fixed or agreed and it
16 is not fixed or agreed there is no contract." *See id.* § 2305(4).

17 A contract is "void and unenforceable if it is so uncertain and indefinite that the intention
18 of the parties in material particulars cannot be ascertained." *Netbula, LLC v. BindView Dev. Corp.*,
19 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007). This means that the "scope of the duty and limits of
20 acceptable performance must be." *Id.* But even where a contract vests the power to vary price
21 terms with one party, the contract is not rendered illusory so long as "the party's actual exercise of
22 that power is reasonable." *See Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 345, 352 (1985).

23 When a buyer "expressly or implicitly promises he will obtain his goods or services from
24 the [seller] exclusively," a requirements contract is formed. *See, e.g.*, *Harvey v. Fearless Farris*
25 *Wholesale, Inc.*, 589 F.2d 451, 461 (9th Cir. 1979); *see also* Cal. Comm. Code § 2306(2) ("A
26 lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods
27 concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply
28 the goods and by the buyer to use best efforts to promote their sale."). A requirements contract

7

exists "where the seller agrees to supply all of the buyer's requirements." *See Mozaffarian v. Breitling*, 1998 WL 827596, at *8-9 (N.D. Cal. 1998). "Requirements contracts have been enforced by the courts with little difficulty, where the surrounding circumstances indicate the approximate scope of the promise." *Amber Chemical, Inc. v. Reilley Indus., Inc.*, 2007 WL 512410, at *3 (E.D. Cal. Feb. 14, 2007).

Venture responds that the 2009 Agreement was only a development contract, and that any agreement between the parties for Venture to actually manufacture FiTeq cards is illusory because the 2009 Agreement, including the Statement of Work ("SOW"), lacks myriad essential terms, including price, quantities, supplier lists, a quality assurance plan, a bill of materials, a standard delivery date, an engineering and test plan, product specifications, and manufacturing milestones. *See* Opp. at 5-8. Consistent with this argument, Venture contends that the contract is governed by California common law, and not the CCC, because the 2009 Agreement was not a contract for the purchase or sale of goods, since "[o]n its face, the [2009 Agreement] does not obligate FiTeq (or anyone) to ever purchase a single card from Venture." *See* Opp. at 3. It further argues that any manufacturing exclusivity was "contingent" and terminated by FiTeq. *See* Opp. at 8.

Following a review of the governing law and the language of the 2009 Agreement, the Court agrees with FiTeq, for a number of reasons.

First, the 2009 Agreement expressly includes obligations beyond the mere development of a card. It contains a number of terms describing the parties' obligations with regard to manufacturing cards. For example, Section 3.2 of the contract outlines Venture's exclusive right to serve as "FiTeq's sole source for the engineering services pursuant to the Statement of Work and manufacturing of FiTeq Cards," subject to three conditions: (1) the other terms of the 2009 Agreement, (2) Venture's $500,000 investment in FiTeq consistent with the parties' Stock Agreement, and (3) "Venture making satisfactory progress on achieving all the tasks set out in the SOW within the agreed timelines." Exh. Y at 9. The SOW includes within it a requirement that Venture create a "scalable, repeatable manufacturing process on line that scales to >1 million cards per month." *See* Exh. Y. at 39-40 (SOW Milestone 5). The explicit inclusion of this scalable manufacturing process as part of the Statement of Work – which outlined milestones that Venture

8

was required to meet under its obligations of the contract – shows that the contract did not merely cover Venture developing a card, but also obligated Venture to create a manufacturing process to bring that card to market.

This provision thus runs counter to Venture's argument that the parties "contemplated but did not execute a manufacturing agreement," *see* Opp. at 10, because the manufacturing component of the 2009 Agreement was expressly included in the parties' agreed-upon SOW. Venture argues that Milestone 5, the "production pilot" phase, demanded only that it would make 5,000 cards in order to prove that the process was "scalable." *See* Opp. at 7. But this argument is unpersuasive: even if Venture were required only to make 5,000 cards, Milestone 5 demanded that Venture prove a scalable manufacturing process that could produce over a million cards per month. Though Venture would need to test that process in smaller batches of cards to ensure that the process worked, such a test is the necessary first stage of a manufacturing process which was supposed to, according to the plain language of the contract, produce millions of FiTeq cards.[2]

Additionally, the mechanism under which Venture's manufacturing would be financed – the assignment of FiTeq's contracts with third-party card issuers to Venture to "finance turnkey manufacturing" – is set forth in Section 5.1 of the 2009 Agreement. Had the parties only "contemplated" manufacturing, without agreeing that Venture would actually manufacture anything, the parties would not have included such an explicit funding mechanism for this manufacturing in the 2009 Agreement.[3]

California law, which demands that the "whole of a contract is to be taken together,"

---

[2] Venture further argues that a manufacturing process was "impossible" until cards were certified by the major credit card companies. This argument is unpersuasive because the SOW separated the card certification process from the development of a scalable manufacturing process. *See* Exh. Y at 39-40.

[3] Venture's actions following the signing of the 2009 Agreement are also telling. After the contract was signed, Venture worked to secure financing for its Singapore facility through an incentive grant provided by Singapore's Economic Development Board ("EDB"). *See, e.g.*, Hosie Decl. Exhs S, T, EE. Such an attempt to secure substantial financing for the facility which was to manufacture the FiTeq cards shows conduct consistent with the intent to actually manufacture the cards, not just develop them. Under California law, it has long been the case that such post-contract conduct can be reviewed by the Court in determining the contracting parties' intent. *See, e.g.*, *Purdy v. Buffums*, 95 Cal. App. 299, 303 (1928).

"disfavor[s] constructions of contractual provisions that would render other provisions surplasage." *Boghos v. Certain Underwriters at Lloyd's of London*, 30 Cal. 4th 495, 503 (2005); *see also Farmers Ins. Exchange v. Knopp*, 50 Cal. App. 4th 1415, 1421 (1996) ("[C]ontracts . . . are to be construed to avoid rendering terms surplasage."). Were the 2009 Agreement merely for development and not manufacturing, myriad terms in the contract would be rendered surplus, including (1) the purchase order provisions of Section 5.3, (2) the payment provisions of Section 5.6, (3) the shipment and delivery provisions of Section 5.7, (4) the customer inspection provisions of Section 5.8, (5) the warranty provisions of Section 7.1, and (6) the product liability indemnification provision of Section 13.3. Such a construction would run counter to California's clear rule disfavoring interpretations that render *any* provision – let alone so many provisions – surplus, because these sections would be meaningless and have no bearing on the parties' agreement to merely develop a card. *See, e.g.*, *London Market Ins. v. Superior Court*, 146 Cal. App. 4th 648, 669-70 (2007).

Nonetheless, Venture argues that any manufacturing portion of the 2009 Agreement is illusory because the parties failed to come to agreement on certain essential commercial manufacturing terms. *See* Opp. at 5. FiTeq argues in response that the manufacturing portion of the contract is a requirements contract for the sale of goods under the CCC, which can be enforced even though the parties left open certain terms. *See* Mot. at 22. Venture thus contends that if California common law applies, there is no manufacturing contract between the parties. Plaintiff argues instead that, because the CCC applies, at least the manufacturing portion of the 2009 Agreement is a valid and enforceable requirements contract. To resolve this dispute, the Court must first determine to what extent, if any, the CCC applies to the 2009 Agreement.

The CCC applies to "transactions in goods," *see* Cal. Comm. Code § 2102, which includes "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." *Id.* § 2105. The CCC does not, however, apply to transactions involving services. "Complications arise when the transaction involves both goods and services." *TK Power, Inc. v. Textron, Inc.*, 433 F. Supp. 2d 1058, 1061 (N.D. Cal. 2006). In such an instance, application of the CCC turns on the essence of the agreement. The Court must

10

determine the predominant character of the agreement – whether the contract is for the provision of a service with goods incidentally involved, or for the provision of goods with services incidentally involved, and must apply the law that governs that predominant factor. *See, e.g.*, *United States ex. Rel. Bartec Indus., Inc. v. United Pacific Co.*, 976 F.2d 1274, 1277 (9th Cir. 1992). "A number of courts have held that where a transaction involves a mix of 'goods' covered by the UCC and non-goods such as service or real estate, the court may apply non-UCC law to that portion of the contract that does not involve goods." *TK Power* at 1063 (compiling cases).

Here, the Court is faced with interpreting a contract that includes a services portion (the development phase) and a goods portion (the manufacturing and production phase). As such, consistent with the framework outlined in *TK Power*, the 2009 Agreement's "services phase" should be interpreted pursuant to the common law, and its "goods phase" should be interpreted pursuant to the CCC.

Venture argues, however, that because FiTeq "never agreed to buy 'goods' from Venture," the CCC nonetheless does not apply. *See* Opp. at 4. This argument is unpersuasive. Under the 2009 Agreement, FiTeq was to obtain purchase orders for cards and submit them to Venture for approval. If Venture accepted the purchase order, FiTeq would assign the order to Venture so that the third-party's payment could directly finance manufacturing. *See* Section 5.1. But FiTeq was still purchasing goods – the cards – from Venture. The third-party was in turn purchasing the cards from FiTeq. The assignment agreement, as FiTeq argues, "took a step out of this process, but it did nothing to change the fundamental reality: FiTeq would sell the cards that Venture *built for FiTeq*." Reply at 4 (emphasis added). Defendant's reliance on *Borrachia v. Biomet, Inc.* in support of its position is unpersuasive. In that case, the Ninth Circuit determined that the language of "an agency contract for services" between the parties "ma[de] it plain that Biomet's 'devices' were to be sold by Biomet to the hospitals, and that none of the devices were sold to Borrachia." 348 Fed. App'x 269, 271 (9th Cir. 2009). Here, in contrast, Venture was to sell the cards to FiTeq, and FiTeq would then sell the cards to third-party buyers. Though FiTeq would assign the purchase orders to Venture to streamline funding for card production, the fact remains that under the 2009 Agreement FiTeq would purchase the cards from Venture. Thus, the Court applies the CCC to the

11

manufacturing and production portion of the 2009 Agreement.

Additionally, though Venture argues otherwise, the 2009 Agreement is an exclusive requirements contract. Section 3.2 makes this clear, stating that "Venture will serve as FiTeq's *sole source* for the engineering services . . . *and manufacturing* of FiTeq Cards." Hosie Decl. Exh. Y at 9 (emphasis added). The parties even called this a "Right of Exclusivity." *See id.* Venture argues that this exclusivity was "contingent . . . on achieving all the tasks set forth in the SOW," Opp. at 8, and thus that the 2009 Agreement was not actually an exclusive contract. But this argument does not follow because a party cannot obviate its responsibilities under an exclusive contract by failing to make progress consistent with the other terms of the contract. When parties enter into an exclusive requirements contract, Section 2306(2) of the CCC obligates them to undertake best efforts. Venture therefore cannot argue that a failure to complete terms of the SOW renders the contract non-exclusive – instead, such a failure would go to the question of best efforts.

Further, though the parties left terms open in the 2009 Agreement, including price and quantity, such open terms do not render the contract illusory because the parties otherwise evidenced an intent to bind themselves into an exclusive manufacturing relationship. *See* Cal. Comm. Code § 2204(1). This is shown in Section 5.3 of the 2009 Agreement, which outlined the parties' respective obligations with regard to purchase orders. Section 5.3.2, "Acceptance of Purchase Orders," stated that the parties, every quarter, would agree to sheet pricing "acceptable to customers of FiTeq." Exh. Y at 14. Then, when a purchase order was forwarded from FiTeq to Venture, Venture had two options: it could accept the purchase order in writing pursuant to Section 5.3.2(b), "thereby consenting to the Unit Price and the Shipment Date of FiTeq Cards pursuant to the Purchase Order," *id.* at 15,[4] or it could reject the purchase order pursuant to Section 5.3.3. Under Sections 5.3.3 and 5.3.4, however, Venture was required to "modify" any purchase order it rejected by proposing a new acceptable price, a new acceptable quantity, or a new

---

[4] If a purchase order was accepted, Section 5.3.2(c) obligated Venture then to "manufacture, assemble, inspect, test, package, sell, and deliver FiTeq Cards in accordance with the Purchase Order," which provides further support for FiTeq's argument that the parties intended to enter into a manufacturing relationship in addition to their development relationship. *See* Exh. Y at 15.

acceptable delivery date. *See id.* FiTeq would then take these new terms to the third party buyer for further negotiation. Under a plain reading of Section 5.3, therefore, Venture had *no right* to unilaterally reject a purchase order without providing such information. This shows a clear intent by Venture to bind itself to fulfill the orders placed by third parties with FiTeq, and is therefore a manifestation of the parties' respective intent to enter into a binding requirements contract because Venture bound itself to provide FiTeq with all of the cards it required to fulfill orders with third parties. *See Mozaffarian v. Breitling*, 1998 WL 827596, at *8-9 (N.D. Cal. 1998). The parties additionally created a management arbitration subcommittee under Section 11.2 – to resolve disputes between the parties on issues such as manufacturing and engineering the cards – which was expressly designed to "resolve any issues arising from the implementation and operation of this Agreement." *Id.* at 23 (Section 11.2(b)(ii)).

Even though the parties left open their price terms when they signed the 2009 Agreement, they set forth a procedure by which prices would be determined. This agreement is wholly consistent with Section 2305 of the CCC, which permits parties to "conclude a contract for sale even though the price is not settled." Cal. Comm. Code § 2305(1). The CCC does not even require that the contract explicitly recognize that the price term remains open, as Section 2305 continues: "In such a case the price is a reasonable price at the time for delivery," even if "[n]othing is said as to price." *Id.* § 2305(1)(a).

In this case, Venture expressly agreed to be the exclusive manufacturer of FiTeq's cards despite this open price term, and was unable under the terms of the contract to simply refuse to fill an order. If the parties disagreed on price, or quantity, or delivery, Venture was required to propose a modified alternative for FiTeq to take back to the buyer. Even then if the parties were unable to agree a management subcommittee was formed to resolve such disputes. All of these decisions were occurring under the backdrop of the CCC, which implies into a requirements contract where the price remains open the duty to fix prices in good faith. *See* Cal. Comm. Code § 2305(2). The manufacturing portion of the 2009 Agreement is therefore not, contrary to Defendants' argument, void for indefiniteness, but instead is "at least sufficiently defined to provide a rational basis for the assessment of damages in the case of breach." *Netbula* at 1155.

13

As described above, a contract is "void and unenforceable if it is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained." *Id.* The 2009 Agreement, particularly the purchase order parameters set forth in Section 5.3 and the exclusivity provisions set forth in Section 3.2, provides sufficient definiteness. *See also Robinson & Wilson, Inc. v. Stone*, 35 Cal. App. 3d 396, 407 (1973) ("[T]he terms of a contract need not be stated in the minutest detail, [but] it is requisite to enforceability that it must evidence a meeting of the minds upon the essential features of the agreement."). At bottom, the 2009 Agreement carried risks for both parties – FiTeq and Venture were attempting to bring a new, untested product to market. But the 2009 Agreement shows a clear intent by the parties to enter into a contract which included both a development and manufacturing component. The Court, in construing the 2009 Agreement, considers the contract as a whole so as to give effect to the mutual intent of the parties. *See, e.g.*, *Bay Cities* at 874. Under the California Commercial Code, the manufacturing portion of the 2009 Agreement is a valid requirements contract, and the Court therefore GRANTS Plaintiff's motion for partial summary judgment as to its first issue, "under the Operating Agreement and Common Stock Purchase Agreement, and subject to the terms and conditions stated therein, Venture had the obligation to manufacture all cards required by FiTeq's agreements with card issuers."

**B.     The 2009 Agreement Does Not Demand FiTeq Pay Venture Additional Consideration to Finance Venture's Card Manufacturing Capacity**

Plaintiff also seeks partial summary adjudication as to a second issue: FiTeq was not required to, "subject to the terms and conditions stated [in the 2009 Agreement and Stock Agreement,] . . . provide any consideration, funding, or financing for Venture's card manufacturing capacity or card production other than as expressly stated in the two contracts." Mot. at 1. FiTeq contends that Venture demanded millions of dollars in additional investment to finance manufacturing facilities, including a production facility in Singapore, which was not required by the terms of the 2009 Agreement. *See* Mot. at 18. Venture does not substantively oppose this argument, except inasmuch as it disputes FiTeq's interpretation of the 2009 Agreement. *See generally* Opp. at 4-10.

14

The Court agrees with FiTeq. Neither the 2009 Agreement nor the Stock Agreement address FiTeq further funding Venture's card manufacturing capacity, apart from the terms explicitly stated in the contracts, such as Section 3.2's requirement that FiTeq assign its third-party purchase orders to Venture in order to finance manufacturing. As the Court has held above, the 2009 Agreement includes a manufacturing portion which obligated Venture to manufacture cards consistent with the terms of the contract – it was not merely a development contract. Venture points to no language in the contract that would obligate FiTeq to provide any further consideration for manufacturing and production of the cards, and the Court finds that the 2009 Agreement is silent as to any other funding or financing obligations on the part of FiTeq with regard to the Venture's manufacturing of cards pursuant to valid purchase orders.

As such, the Court GRANTS Plaintiff's motion for partial summary adjudication as to its second issue: FiTeq was not required to, "subject to the terms and conditions stated [in the 2009 Agreement and Stock Agreement,] . . . provide any consideration, funding, or financing for Venture's card manufacturing capacity or card production other than as expressly stated in the two contracts."

## IV.   ORDER

For the foregoing reasons, Plaintiff's motion for partial summary adjudication is GRANTED.

**IT IS SO ORDERED.**

Dated: June 30, 2015

_____
BETH LABSON FREEMAN
United States District Judge