1
2
3

# UNITED STATES DISTRICT COURT

4

## NORTHERN DISTRICT OF CALIFORNIA

5

### SAN JOSE DIVISION

6
7   FITEQ INC,

                    Plaintiff,
8
9         v.
10  VENTURE CORPORATION, et al.,

                    Defendants.
11

Case No.  13-cv-01946-BLF

**ORDER GRANTING MOTION TO EXCLUDE TESTIMONY ABOUT FITEQ'S ALLEGED LOST PROFITS AND VALUATION**

[Re:  ECF 305]

12
13        In theory, Plaintiff is on the cusp of developing a payment card that "looks and feels like a

14  traditional credit card, but has embedded electronics and a battery, and generates, with each swipe,

15  a unique [code]" to combat fraud. *See* ECF 220-2, Pl.'s Supplemental Rule 26(a)(1) Damages

16  Disclosure ("Fourth Disclosure") at 24. In reality, the card does not exist. Plaintiff alleges that this

17  failure is Defendants' fault and seeks five types of damages as a result, including up to $78 million

18  in lost profits and $167.5 million in valuation-related damages.

19        Having professed to the Court and Defendants that all damages would be calculated by

20  experts, Plaintiff now offers exclusively lay opinion regarding its lost profits and valuation. As a

21  result, and in light of Plaintiff's lack of a business track record, Defendants move to exclude (1)

22  testimony by Joan Ziegler, Plaintiff's CEO, and Bill Carson, Plaintiff's CFO since October 2014,

23  part-time consultant since October 2012, and board member since 2008, regarding lost profits and

24  valuation damages, (2) the underlying lost profits and valuation models, and (3) documents and

25  other material Plaintiff failed to disclose.

26        For the reasons set forth below, the Court GRANTS Defendants' motion.

27   **I.    BACKGROUND**

28        Lost profit damages are an essential part of this case. In Plaintiff's own words, "[l]ost

United States District Court
Northern District of California

[p]rofits [h]ave [b]een [p]rominent in [t]his [c]ase [f]rom the [o]utset." ECF 215, Pl.'s Status Update at 4. As expected, damages are also a contentious part of this case.

This motion is not the first opportunity that Plaintiff has had to convince the Court and Defendants that its lost profits and valuation-based damages are admissible. Defendants first moved to exclude evidence of Plaintiff's lost profits and valuation damages on December 8, 2014. *See* ECF 165, Dec. 8, 2014 Defs.' Mot. to Exclude ("First Mot."). That time, Defendants argued that Plaintiff had failed to adequately disclose computations of the damages pursuant to Rule 26. *Id.* at 13-16. As detailed below, the Court agreed with Defendants, but allowed Plaintiff to supplement its disclosures rather than exclude proof of damages entirely. *See* ECF 194, Order Denying Defs.' Mot. to Exclude ("First Exclusion Order") at 1, 3. Since that Order, the parties have filed at least seven updates, disputes, and/or clarifications regarding damages.[1]

### A. First Motion to Exclude

Throughout fact discovery, Plaintiff professed that damages would be the subject of expert opinions. At her August 22, 2014 deposition, for example, Ms. Ziegler responded to a question about the nature of damages by testifying, "I rely on outside counsel—and outside counsel uses experts in this area, Econ One, that really do the analysis that really know how to appropriately assess what our damages are." ECF 165-1, Aug. 22, 2014 Ziegler Dep., First. Mot. Exh. 1 at 94-95. However, Plaintiff's damages experts, Jill Kennedy and Jeffrey Leitzinger, relied on Ms. Zeigler and Mr. Carson's $300 million valuation as the basis for maximum damages calculations. ECF 220-2, Fourth Disclosure at 1; *see also* ECF 305-5, Kennedy Dep., Mot. Exh. 7 at 22-23; ECF 306-13, Leitzinger Dep., Mot. Exh. 9 at 120, 122. At his deposition, Mr. Leitzinger testified that he was not asked to value FiTeq and that he has no opinion about the reasonableness of the valuation. Leitzinger Dep. at 120, 122.

This was surprising insofar as Plaintiff had previously made clear that neither Ms. Ziegler

---

[1] *See, e.g.,* Joint Report Regarding a Proposed Re-Opening of Fact Discovery ("Joint Report"), ECF 214; Pl.'s Report on Venture's "Discovery Plan" ("Pl.'s First Report"), ECF 215; Defs.' Report Regarding Discovery and Deadlines, ECF 220; Pl.'s Response to Defs.' Report, ECF 221; Letter from Pl.'s Counsel re Supplemental Discovery, ECF 252; Pl.'s Further Status Report on Discovery and Trial Schedule, ECF 255; and Defs.' Report Regarding Discovery and Scheduling Issues, ECF 256.

nor Mr. Carson had knowledge of the valuation or lost profits estimates. At earlier stages of the litigation, Ms. Ziegler had testified, "We have not done [a] valuation of FiTeq." Ziegler Dep. at 141. Similarly, in its initial Rule 26(a)(1) disclosure at the close of fact discovery on October 17, 2014, Plaintiff had stated, "At present . . . no actual computation of damages exists." ECF 165-1, Initial Disclosure, First Mot. Exh. 5 at 5. And, at his deposition on August 18, 2014, Mr. Carson had testified that the number of cards Plaintiff would have sold had manufacturing succeeded in 2011 was "[p]retty speculative," that Plaintiff had no written damages calculation, and that he "d[id]n't know" the damages number. ECF 165-2, Aug. 18 2014 Carson Dep., First Mot. Exh. 11 at 239, 242-43. In addition, Mr. Carson testified that he did not have a spreadsheet for lost sales and lost revenue and that Plaintiff had "not quantified" lost opportunities. *Id.* at 244-45. He testified that Plaintiff's value was between "$3 and $500 million" but offered no computations to support the claim. *Id.* at 87.

On November 21, 2014—more than a month after the fact discovery cut-off and on the same day as the expert disclosures—Plaintiff also served a supplemental fact discovery disclosure, in which its damages estimate ballooned from $40 million to $77.5–$286.2 million. ECF 165-3, Second Supplemental Disclosure, First Mot. Exh. 16 at 8. No calculations were provided to support these numbers. For the first time, Plaintiff noted that it "expects to present testimony from its officers and employees" on lost profits and valuation. *Id.* at 8-10.

Two weeks later, on December 5, 2014, Plaintiff served a third supplemental fact disclosure that offered the first sign of calculations in the form of three one-page summary charts. ECF 165-3, Third Supplemental Disclosure, First Mot. Exh. 17 at Exhs. A-C. The charts listed revenue and cost projections, each comprised of three individual components, but offered no description of how the numbers were calculated. *Id.*

Reviewing this record on Defendants' First Motion to Exclude, the Court agreed with Defendants that Plaintiff's damages disclosures were inadequate. *See* First Exclusion Order at 1. At the hearing, the Court noted that, in light of Ms. Ziegler and Mr. Carson's deposition testimony, it would be shocking if Plaintiff were able to lay the foundation for these individuals to testify regarding lost profits. *See* ECF 305-6, First Mot. Hearing Transcr., Mot. Exh. 13 at 4.

United States District Court
Northern District of California

However, because of Plaintiff's potential to cure the defect and the unlikelihood of disruption to the trial, the Court gave Plaintiff the opportunity to supplement its computation disclosures. First Exclusion Order at 1, 3. On February 24, 2015, Plaintiff expressed that the Court's finding was "fair[] enough" and agreed that "no party should have to deal with a black box on damages calculations." *See* ECF 215, Pl.'s First Report at 1.

### B.  Supplemental Damages Disclosure

On January 29, 2015, Plaintiff served Defendants with its supplemental damages calculation. *See* ECF 214, Joint Report at 1; *see also* Fourth Disclosure. This document outlined five components of Plaintiff's damages and focused on lost profits and valuation. Defendants then had follow-up depositions with Ms. Ziegler and Mr. Carson on May 21 and 22, 2015 regarding the calculations.[2]

### 1.  Lost Profits

Plaintiff intends to seek $18 to $78 million in lost profits. Mot. at 2. These numbers reflect hypothetical sales of four types of cards and related authenticating software, all still in development, from 2012 to 2014. *Id.* at 2; *see also* Fourth Disclosure at 13. Plaintiff's calculation is based on 1) card sales projections, based on projections Defendants submitted to Singapore's Economic Development Board ("EDB") in order to obtain a multi-million dollar grant, 2) a per-card license rate of $1.25 with an assumed card life of two years and reissue rate of 80 percent, 3) revenue of $1,000,000 per 5 million cards sold for the back-end authenticating mainframe software, and 4) expenses. Fourth Disclosure at 15-18.

Plaintiff claims that, to arrive at these numbers, Mr. Carson and Ms. Ziegler used "the same financial projection model that is utilized by FiTeq for years as a regular part of its business operation to forecast profits." *Id.* at 12. As Mr. Carson explained in his first deposition, the model had not been used to project backwards to calculate lost profits until litigation began. Carson Dep. at 244.

---

[2] The transcripts of the lost profits and valuation depositions combine the testimony of Ms. Ziegler and Mr. Carson and do not identify which individual is speaking. Based on context and the parties' representations at the hearing on this motion, the Court has made its best determination of which witness is speaking in the discussion that follows.

1

### 2. *Valuation*

2        Plaintiff also intends to seek between $18.8 and $167.5 million in valuation-related

3   damages. Mot. at 2-3. The minimum is derived from Plaintiff's "book value" of $0.50, leading to a

4   $31 million valuation, and Defendants do not seek to exclude testimony based on this number. *Id.*

5   at 3. The maximum is based on a $300 million valuation determined by Ms. Ziegler and Mr.

6   Carson, and is challenged in Defendants' motion. *Id.* at 3*; see also* Fourth Disclosure at 28.

7        Ms. Ziegler and Mr. Carson derive this number in two ways: first, qualitatively, through

8   the selling price and valuations of comparable companies, *see* Fourth Disclosure at 28-30, and,

9   second, quantitatively, based on 5 years of Plaintiff's hypothetical lost profits, *see* ECF 306-3,

10  Rule 30(b)(6) Valuation Dep., Mot. Exh. 2 at 133, 144.

11       Defendants now seek to exclude the lost profit and valuation numbers on two grounds:

12  testimony by Ms. Zeigler and Mr. Carson about the numbers would go far beyond admissible

13  Rule 701 lay opinion testimony and the numbers are too speculative as a matter of law.

14  **II.   DISCUSSION**

15       **A.  Rule 701**

16       Plaintiff intends to introduce the lost profits number through the lay opinion testimony of

17  Ms. Ziegler and Mr. Carson, but Defendants argue that such testimony would be impermissible

18  under Rule 701 as it extends beyond their personal knowledge into the realm of expert witness

19  testimony. Mot. at 8-11.

20       Ms. Ziegler has been CEO since FiTeq's founding and she also ran its predecessor,

21  PrivaSys, for close to a decade before. Mr. Carson, on the other hand, joined FiTeq full-time in

22  late 2014, having served as a board member since 2008, and having come on as a part-time

23  consultant in October 2012. Notwithstanding the detail with which Plaintiff describes Mr.

24  Carson's career prior to joining FiTeq, Plaintiff offers neither him nor Ms. Ziegler as an expert.

25       Defendants are correct to draw a line between lay and expert witness testimony. "Lay

26  witness testimony is governed by Rule 701, which limits opinions to those 'rationally based on the

27  perception of the witness.' Rule 702, on the other hand, governs admission of expert opinion

28  testimony concerning 'specialized knowledge.'" *United States v. Figueroa-Lopez*, 125 F.3d 1241,

United States District Court
Northern District of California

United States District Court
Northern District of California

1246 (9th Cir. 1997) (citing Fed. R. Evid. 701). Rule 701 "expressly excludes lay opinion testimony 'based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" *Synthes USA, LLC v. Spinal Kinetics, Inc.*, No. C-09-01201 RMW, 2011 WL 11709387, at *10 (N.D. Cal. Aug. 19, 2011) (citing Fed. R. Evid. 701(c)).

Defendants suggest that models extrapolating profits and valuation for a hypothetical product fall into the expert category. Mot at 8-11. Plaintiff responds that Rule 701 contemplates testimony by business owners and officers regarding lost profits because of their particularized knowledge of the topics. Opp. at 7. The advisory committee notes to the 2000 amendments to Rule 701 provide that "courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." Fed. R. Evid. 701, Advisory Committee's Notes ¶ 4 (2000). Such opinion testimony is admitted "because of the particularized knowledge that the witness has by virtue of his or her position in the business." *Id.* Plaintiff argues that, under this exception, the witnesses—and Ms. Ziegler especially—should be able to testify regarding lost profits and valuation. Opp. at 7.

### 1. *Lost Profits*

Under Plaintiff's business owner exception argument, the components of the lost profits calculation would require Ms. Ziegler and Mr. Carson to have particularized knowledge of: the card sales projections, the assumed per-card license of $1.25, the assumed card life of two years and reissue rate of 80 percent, revenue of $1,000,000 per every 5 million cards sold for the Authenticator and the associated annual 20 percent software maintenance fee, and expenses based on, among other things, research and development, legal fees, and the cost of operations. *See* Fourth Disclosure at 15-18.

Plaintiff points to four cases in which a trial court allowed a lay witness—owner, investor, and/or board member—to testify regarding lost profits and valuation. First, Plaintiff relies on *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993), in which the Third Circuit held that the district court had not abused its discretion in allowing a business owner to offer his opinion regarding future profits based on his experience selling 117 franchise contracts, as well as

United States District Court
Northern District of California

1   projections he had developed with an accounting firm when he had been planning to take the

2   company public. *Id.* at 1174-75. Similarly, in *Lativafter Liquidating Trust v. Clear Channel*

3   *Communications, Inc.*, 345 Fed. App'x. 46 (6th Cir. 2009), the Sixth Circuit determined that the

4   district court had not abused its discretion by allowing an investor and board member to testify

5   under Rule 701 about valuation based on "the revenue [the defendant] had been generating for [the

6   plaintiff]." 345 Fed. App'x at 50. In *Pet Food Express Ltd. v. Royal Canin USA, Inc*., No. C-09-

7   1483-EMC, 2011 WL 6140874, at *11-12 (N.D. Cal. Dec. 8, 2011), the plaintiff's executives were

8   allowed to testify about future projections as Rule 701 witnesses based on their past sales

9   experience at the plaintiff company. Plaintiff also relies on *Robinson v. Watts Detective Agency,*

10  *Inc.*, 685 F.2d 729, 739 (1st Cir. 1982), where the court allowed the company president to testify

11  based on his 30 year history with the company—over which period he had also been the majority

12  or near-majority stockholder—and his "intimate familiarity" with the business.

13       Plaintiff argues that the same result is appropriate here because Plaintiff collaborated with

14  Defendants to develop the sales projections that, it argues, serve as the foundation for the lost

15  profits model. In addition, Plaintiff argues that the numbers are based on Requests for Proposals

16  and contracts. Opp. at 9. Defendants respond that these cases are inapposite because each involved

17  a company with a history of relevant revenue-generating operations and a witness with knowledge

18  of that history. Reply at 1. In addition, Defendants argue that Plaintiff's emphasis on the sales

19  projections Defendants shared with outside funders is misplaced because Plaintiff's lost profits

20  model incorporates other material assumptions and calculations for which Defendants had no

21  input or oversight. *Id.* at 3.

22       The Court agrees with Defendants. Plaintiff has failed to provide any case in which the

23  business owner exception has been applied where the product at issue has never been sold and the

24  business owner has no experience selling similar products. Unlike the business owner in *Lightning*

25  *Lube*, who relied on actual revenue and on numbers he had developed pre-litigation for other

26  purposes, the executives here have no actual contracts to support their estimates and rely on a

27  model they created for litigation. Similarly, in contrast to the investor in *Latifavter* and the

28  executives in *Pet Food Express* and *Robinson*, Plaintiff's executives have neither past revenue nor

1    past sales experience regarding certified cards to which to compare their projections. In other

2    words, because the product has never been sold, whatever business Ms. Ziegler and Mr. Carson

3    may have particularized knowledge of cannot be the business reflected in the lost profits model.

4         Their deposition testimony highlights this knowledge gap. In her second deposition, Ms.

5    Ziegler explains each of the assumptions underlying the model and admits that many come from

6    outside sources. For example, Ms. Ziegler relied upon industry personnel for the 80 percent

7    reissue rate. *See* ECF 306-7, Rule 30(b)(6) Lost Profits Dep., Mot. Exh. 5 at 95. Similarly, the

8    source of the 20 percent Authenticator maintenance fee was a "customer ha[ving] said that the 20

9    percent [fee] is the [fee] that they're accustomed to." *Id.* at 147. While Ms. Ziegler may have

10   contacts in the credit card industry who can help her fill in the assumptions of the lost profits

11   model, these contacts do not amount to "particularized knowledge" that she has "by virtue of her

12   position in the business."

13        The licensing and maintenance fees are similarly beyond Ms. Ziegler's personal

14   experience. While the licensing fee came from RFPs and RFQs, not one of these is an actual,

15   binding contract because "no one would sign a contract without a certified product." *Id.* at 92. And

16   no bank or issuer has ever purchased an Authenticator or related maintenance "[b]ecause we

17   needed the certified card." *Id.* at 173. Thus, the lost profits model relies on hypotheticals that

18   neither Ms. Ziegler nor Mr. Carson experienced.

19        Furthermore, even where Ms. Ziegler and Mr. Carson could have relied on actual numbers

20   based on their experience—particularly for expenses—they chose hypotheticals. By the time they

21   were providing the disclosures and depositions, they could have updated the model to reflect real

22   numbers, such as the legal fees of outside counsel or utility costs. But, as Mr. Carson testified,

23   "[t]o build a model[,] we were not going to go . . . month by month, line by line and put actuals in

24   there." *Id.* at 15. In a similar vein, the growth rates for 2014-2016, which Plaintiff has agreed to

25   exclude because of the inadequate disclosures discussed below, came from public statements by

26   Visa and MasterCard rather than the witnesses' personal experience. Ms. Ziegler testified, "I did

27   not need to use PrivaSys because I had enough public statements [from external companies] to

28   build this." *Id.* at 126. In other words, for most of the numbers and assumptions underlying the lost

United States District Court
Northern District of California

8

profits model, Ms. Ziegler and Mr. Carson simply lack the requisite knowledge; where they could have relied on their particularized knowledge, they chose not to.

Plaintiff's attempt to argue that the model was used in its daily business operations is equally unconvincing. As noted above, "no actual computation of damages exist[ed]" as of October 2014. *See* Initial Disclosure at 5. Similarly, Mr. Carson testified that, as late as August 2014, no written damages calculation existed, the company had no spreadsheet for lost sales and lost revenue, and Plaintiff had not quantified lost opportunities. Carson Dep. at 239, 242-43. At his second deposition, Mr. Carson specifically testified that "obviously [the lost profits model] is not the actual financial model or financial statements." Rule 30(b)(6) Lost Profits Dep. at 45. He reiterated, "This particular [model] is not used by FiTeq." *Id.* at 45-46.

In light of the record before it, the Court finds that an evidentiary hearing with Ms. Ziegler and Mr. Carson is unnecessary to determine this motion. Moreover, neither party requested an evidentiary hearing in their papers. As Defendants noted at the hearing, these witnesses are not being offered as experts. Furthermore, their deposition testimony and Plaintiff's Rule 26(a)(1) disclosures make clear that they did not—and could not—have particularized knowledge of lost profits from their experience leading FiTeq. Accordingly, Defendants' motion to exclude testimony by Ms. Ziegler and Mr. Carson regarding lost profits is GRANTED.

### 2. *Valuation*

Defendants similarly argue that neither Ms. Ziegler nor Mr. Carson is equipped to talk about the purported $300 million valuation pursuant to Rule 701. Plaintiff again responds that the Rule 701 business owner exception allows them to testify about valuation.

As Ms. Ziegler testified in her first deposition, as of August 2014, FiTeq had not been valued. Since then, however, Plaintiff has developed both a qualitative and a quantitative valuation. The Court considers each in turn.

The primary valuation is qualitative. Opp. at 6; *see also* Fourth Disclosure at 28-30. Plaintiff intends to rely on Ms. Ziegler and Mr. Carson to "testify about comparable companies that get bought, sold, and valued based on their technology." Fourth Disclosure at 28. Defendants argue that this is inadmissible under Rule 701 because Ms. Ziegler and Mr. Carson "rely on each

9

United States District Court
Northern District of California

1    other's opinions, and both rely on third-party reports about other companies and other hearsay."

2    Mot. at 9.

3        While these witnesses—and Ms. Ziegler in particular—may have the requisite knowledge

4    from experience in the business to identify comparable competitors, neither is qualified to testify

5    about the valuation of those companies based on their own knowledge. When asked about

6    valuation at her second deposition, Ms. Ziegler consistently deferred to Mr. Carson. *See, e.g.,* Rule

7    30(b)(6) Valuation Dep. at 18 ("So I think I'm relying on the reports that I received from Bill

8    Carson and our discussion related to our current financing"); *id.* at 34 ("Bill Carson, our CFO, is

9    the right person to address that question."). And Mr. Carson relied on third party reports for his

10   numbers—in particular, two publications to which he does not even subscribe, which came to him

11   by way of forwarded emails from Plaintiff's lawyer, and discussions with bankers about

12   comparable deals. *Id.* at 74-76. Mr. Carson testified that he developed new expertise for this

13   particular valuation: "it was not specific about FiTeq, [but] I gathered information on how to use

14   their materials." *Id.* at 75. Such reliance on third party materials, which requires expertise to

15   analyze and digest, is not in the realm of a lay witness. And expertise developed not "by virtue of

16   [the witness'] position in the business" cannot fit within the business owner exception. *See* Fed. R.

17   Evid. 701, Advisory Committee's Notes ¶ 4 (2000). Plaintiff touts Mr. Carson's significant

18   industry experience as a venture capitalist prior to joining FiTeq, *see* Rule 30(b)(6) Valuation Dep.

19   at 49, 62, 73, 76, but such experience, although relevant to qualifying a Rule 702 expert, cannot

20   replace the particularized business knowledge and experience that would be necessary to fall

21   within Rule 701's business owner exception.

22       The Court now turns to Plaintiff's quantitative valuation model—a discounted cash flow

23   model prepared by Mr. Carson "[a]s a check" for the qualitative model. Opp. at 6. For this model,

24   Mr. Carson calculated the present value of the lost profits discussed above, but including the years

25   2015 and 2016. *See* Rule 30(b)(6) Valuation Dep. at 134, 144. Next, Mr. Carson attempted to

26   calculate FiTeq's assumed cash flows for 2017 and beyond based on financial data about other

27   companies that he obtained from Duff & Phelps, Bank of America, and Merrill Lynch. *Id.* at 76-

28   108. Mr. Carson's calculations produce a range of hypothetical valuations from $149 million to

10

1    $2.6 billion. ECF 306-18, Mot. Exh. 11 at Exh. E-1.

2          As Plaintiff conceded at the hearing, this is not appropriate 701 testimony—particularly in

3    light of the fact that Mr. Carson did not even join FiTeq as CFO until October 2014. Mr. Carson

4    may have been able to qualify as an expert—or perhaps not, given his own testimony that he is

5    "not a valuation expert," Rule 30(b)(6) Valuation Dep. at 118—but Plaintiff has not attempted to

6    introduce him as such. Given his lay witness status and limited experience with FiTeq, Mr. Carson

7    cannot testify about a valuation he derived by modeling discounted cash flows. Accordingly,

8    Defendants' motion to exclude testimony by Ms. Ziegler and Mr. Carson regarding valuation is

9    GRANTED.

10          **B.  Speculative Damages**

11          In addition to the Rule 701 challenge, Defendants argue that the lost profits and $300

12    million valuation-related damages are too speculative as a matter of law to be admitted. Mot. at 3-

13    7. Plaintiff responds that it need only establish the lost profits and valuation with reasonable

14    certainty and that, by relying on the sales projections Defendants provided to the EDB, it meets

15    this standard. Opp. at 7-8.

16          Plaintiff is correct that "reasonable certainty only is required, not absolute certainty."

17    *Sargon Enterprises, Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 753 (2012).[3] At the same time,

18    "[b]ecause it is inherently difficult to accurately predict the future or to accurately reconstruct a

19    counterfactual past, it is appropriate that trial courts vigilantly exercise their gatekeeping function

20    when deciding whether to admit testimony that purports to prove such claims." *Id.* at 781. To

21    recover lost profits, a plaintiff must establish both "their occurrence and extent" with reasonable

22    certainty. *Id.* at 773 (quoting *Grupe v. Glick*, 26 Cal. 2d 680, 693 (1945)).

23          When considering lost business profits, California courts "have generally distinguished

24    between established and unestablished businesses." *Id.* at 774. In established business cases, lost

25    profits "are generally recoverable" because "their occurrence and extent may be ascertained with

26

27      ———————————

[3] The parties rely on the "reasonable certainty" standard for both lost profits and valuation, though the cases they cite consider only lost profits. In this case, the valuation relies heavily on the lost profits. The Court assumes, without deciding, that the "reasonably certain" standard applies to both.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   reasonable certainty from the past volume of business and other provable data." *Id.* (quoting

2   *Grupe*, 26 Cal. 2d at 692). For unestablished business, on the other hand, lost profit damages are

3   not recoverable because they are "uncertain, contingent and speculative" unless "their nature and

4   occurrence can be shown by evidence of reasonable reliability." *Id.* (quoting *Grupe*, 26 Cal. 2d at

5   692-93).

6        While both parties rely on *Sargon* for the applicable legal standard, Defendants

7   additionally use it to support their argument that Plaintiff's lost profits and valuation models are

8   too speculative to be admitted. In *Sargon*, the plaintiff developed, received FDA approval for, and

9   patented a new dental implant. *Id.* at 754. The plaintiff then contracted with the defendant to

10  clinically test the product. *Id.* At trial, the plaintiff established that, after initial success in the

11  clinical trials, the defendant failed to present proper reports as required by the parties' contract. *Id.*

12  As a result of this breach, the plaintiff argued, its product failed. The plaintiff sought $200 million

13  to upwards of $1 billion in lost profits.

14       To establish its lost profits, the plaintiff relied on an expert who used a market share

15  analysis. Because the expert determined that the plaintiff would have become a market leader

16  based on his understanding of its innovativeness, he based his estimate on the profits of the

17  industry's leading companies rather than the plaintiff's actual net profits of $101,000. *Id.* at 769.

18  After an evidentiary hearing, the court excluded this testimony as too speculative.

19       On review, the California Supreme Court determined that the trial court "excluded the

20  expert testimony for proper reasons." *Id.* at 778. The court considered the plaintiff an unestablished

21  business because, while the plaintiff had achieved profits in the past, it "had no track record of

22  being a global leader" as the lost profits estimate assumed. *Id.* at 778. And the court agreed that

23  the testimony was too speculative because the expert "did not base his lost profit estimates on a

24  market share [the plaintiff] had ever actually achieved." *Id.* at 778. As a result, his "attempt to

25  predict the future was in no way grounded in the past." *Id.* at 780.

26       In response, Plaintiff relies on *Asahi Kasei Pharma Corporation v. Actelion Ltd.*, 222 Cal.

27  App. 4th 945. In *Asahi*, the plaintiff, a foreign drug manufacturer, contracted with a domestic

28  company to develop and commercialize its drug in North America and Europe. In the midst of this

partnership, another domestic biopharmaceutical company with a competing drug acquired all of the stock of the commercializing company in order to discontinue the drug's development. The plaintiff sued the acquiring company for lost profits.

To show that the fact of lost profits was certain, the plaintiff relied on the reports of seven experts who agreed that its drug would have been approved by U.S. and European regulators on the projected timeline. *Id.* at 970. In addition, the plaintiff presented evidence showing that the defendant acquired the commercializing company specifically because it viewed the plaintiff as a threat. *Id.* at 952. To show the amount of lost profits, the plaintiff hired an economic expert who relied on revenue projections the commercializing company had prepared in order to negotiate its sale price with the defendant. *Id.* at 973. Those projections were based in part on consultation with experts and the use of market surveys. *Id.* And the expert independently verified the market assumptions underlying the projections, while a medical expert supported the market share projections. *Id.* at 974.

Reviewing the trial court's decision to admit these lost profit estimates, the appellate court held that the trial court had not abused its discretion even though the drug had not yet been approved. "There is no rule prohibiting recovery of lost profits damages simply because regulatory approval is a prerequisite to selling a product." *Id.* at 971. The court found the defendants' challenge to the plaintiff's offer of two estimates similarly unavailing because the expert provided "two distinct estimates rather than a range and he specified the different assumptions on which they were based, described the facts he relied on to make the different assumptions, and explained precisely how the two figures were calculated." *Id.* at 974. In addition, the court determined that the case "does not fit neatly into the established business versus new business paradigm" because the commercializing company "had a track record of obtaining FDA approval for and marketing a [similar drug] and had a sales and marketing team already in place." *Id.* at 975. Thus, the court found it was appropriate to look to the company's history as evidence of prior performance.

Having considered both cases, the Court finds that Plaintiff's case here is weaker than the ones presented in both *Asahi* and *Sargon*. Most significantly, in those cases, both plaintiffs relied on experts—in *Asahi*, the plaintiff introduced at least seven medical experts and one economic

expert. Those experts opined that the plaintiff would have succeeded in getting the requisite

regulatory approval; Plaintiff provides no such evidence to support its assumed certification here.

The *Asahi* court relied on the expert testimony to find that the plaintiff had established the fact of

lost profits with reasonable certainty. As a result, the court was then able to consider whether the

amount of lost profits alleged had "some reasonable basis of computation of damages . . . even if

the result reached is an approximation." *Id.* at 972-73 (citing *Sargon*, 55 Cal. 4th at 774-75). In

contrast, here, Plaintiff has failed to offer evidence that could establish the fact of lost profits with

reasonable certainty: unlike the *Asahi* plaintiff, Plaintiff has not offered evidence to show that its

card would get the certification required for profit.

Even if Plaintiff could establish the fact of lost profits, it nevertheless fails to offer

evidence that could meet the reasonable certainty standard for amount. In contrast to *Asahi*, where

the plaintiff identified the commercializing company's "track record of obtaining FDA approval

and marketing [a similar product]," Plaintiff has consistently failed to develop a certified card and

has never brought a similar product to market. Furthermore, the *Asahi* plaintiff relied on numbers

developed by the commercializing company for non-litigation purposes in consultation with

experts.

In contrast, here, Plaintiff relies on a self-created model developed for this case, casting

doubt on its reliability. Plaintiff argues that the lost profit calculations are reasonably certain

because they are derived from a collaborative effort by the parties to project sales and because

Defendants spent money to work with Plaintiff after vetting the underlying projections. Opp. at 8.

But Defendants have the better of this argument. Defendants point to Mr. Carson's deposition

testimony that the number of cards sold by today if Plaintiff had had a working card in 2011 is

"[p]retty speculative." And Defendants argue that the projections were for worldwide sales, not

the U.S. sales for which Plaintiff now claims damages. Mot. at 6.[4] Plaintiff does not challenge

these arguments and the characterizations are supported by Plaintiff's Fourth Disclosure. *See*

---

[4] The parties also consistently dispute who created the sales projections shared with the EDB.
Because Plaintiff relies on so much more than the sales projections, this dispute is irrelevant to the
Court's determination and need not be resolved at this stage.

United States District Court
Northern District of California

1   Fourth Disclosure at 8-9 (identifying other inputs into and assumptions for lost profits

2   calculation).

3          Thus, key elements that supported the admissibility of lost profits in *Asahi* are not present.

4   Rather, the logic of *Sargon*, which upheld the inadmissibility of lost profits evidence, applies—

5   and with even fuller force. Plaintiff's case for lost profit and valuation-based damages is in many

6   ways weaker than that of the plaintiff in *Sargon*. For example, while the *Sargon* plaintiff had a

7   proven product—approved by the FDA and patented—Plaintiff has yet to produce a certified card.

8   Similarly, while the *Sargon* plaintiff had some profits on which to base its claim, Plaintiff offers

9   none. Furthermore, as noted above, while the *Sargon* plaintiff relied on the testimony of an expert

10  who had been qualified to consider market evidence, Plaintiff relies on lay witnesses.

11         *Sargon* is also instructive on Plaintiff's argument that Defendants are seeking a "free pass"

12  because it is their own failure that is blocking Plaintiff from alleging damages with certainty. *See*

13  Opp. at 2. Faced with the identical argument, the California Supreme Court concluded that

14  "[o]ther avenues might exist to show lost profits." In other words, the Court is not penalizing

15  Plaintiff for Defendants' breach; rather, the Court is considering Plaintiff's own choices to bring

16  its damages case on the basis of a hypothetical model, not grounded in any provable data, through

17  lay witnesses. As a result, the Court finds this "free pass" argument unavailing.

18         Accordingly, Defendants' motion to exclude the underlying lost profit and valuation

19  models is GRANTED.

20                          **C.  New Documents**

21         Finally, Defendants argue that Plaintiff produced new documents in violation of the

22  Court's March 12, 2015 Order, which required Plaintiff to give Defendants a list of "previously-

23  produced" documents regarding valuation.[5] Mot. at 11-12; *see also* ECF 233, Order Re

24  Supplemental Discovery; ECF 245, Mot. for Sanctions at 2-3. After Defendants moved to exclude

25  those documents, Plaintiff agreed to withdraw and not rely on them. *See* ECF 305-10, Mot. Exh.

26

27  _____

28  [5] The parties disagree on the amount of new documents. Defendants number them in the
    thousands, while Plaintiff points to 54 pages. The Court need not resolve this dispute as the
    precise number is irrelevant.

United States District Court
Northern District of California

18. But Defendants assert that, at their depositions, Ms. Ziegler and Mr. Carson testified that they relied on those documents in preparing their damages claims. As a result, Defendants now move to exclude testimony based on this new evidence. Mot. at 11.

Plaintiff agrees that its witnesses cannot rely on the new documents at trial. Opp. at 12. Accordingly, the Court GRANTS Defendants' undisputed motion to exclude testimony based on the new evidence. As the Court noted during the hearing, adhering to this order will require vigilance by both parties.

**IT IS SO ORDERED.**

Dated: February 22, 2016

BETH LABSON FREEMAN
United States District Judge