# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

FITEQ INC,

          Plaintiff,

    v.

VENTURE CORPORATION, et al.,

          Defendants.

Case No.  13-cv-01946-BLF

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

[Re:  ECF 313]

Though now almost unbelievable, this case began with a partnership between the parties to build a groundbreaking payment card that would combat fraud. FiTeq and Venture entered into an Operating Agreement ("OA"), pursuant to which each party had responsibilities: FiTeq was to design, develop, market, and sell the card, while Venture was to "seamless[ly] manufactur[e]" it. ECF 199-26, OA Recitals. The agreement was highly sequenced, with ten milestones, each of which had up to nine component parts. *See* ECF 199-26, OA Exh. B.

The joint project ultimately failed, but the parties dispute which—and most importantly whose—action caused the failure. In the motion now before the Court, Defendants identify alleged inactions, failures and misrepresentations by Plaintiff that they deem the breaking point. On that basis, Defendants move for summary judgment in their favor on the following issues related to Plaintiff's claims: 1) that the OA precludes Plaintiff's lost profits and enterprise valuation damages; 2) that the fact and quantum of those damages are speculative as a matter of law, 3) that Plaintiff's fraud claims fail as a matter of law, 4) that FiTeq, not Venture, breached the OA, and 5) that FiTeq cannot enforce the OA against Venture because Venture and FiTeq were mutually, or Venture was unilaterally, mistaken about material facts related to performance under the OA. *See* ECF 313. In addition, Defendants seek summary judgment in their favor as to liability on each of

their counterclaims—three breach of contract claims, a conversion claim, and a breach of the covenant of good faith and fair dealing.[1] For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

## I.      BACKGROUND

The following facts are undisputed. In 2009, FiTeq and Venture entered into an Operating Agreement to develop payment cards (i.e., debit or credit cards). *See* ECF 199-26. FiTeq knew that Venture had no experience developing or selling cards. *See, e.g.,* ECF 313-14, Exh. 44 at 1 (email from FiTeq's Eric Foo to Venture's Chia Kar Lin stating "I know this kind of lamination process development is new to your people"); ECF 313-4, Exh. 12 at 123 (deposition testimony by FiTeq's CEO Joan Ziegler that FiTeq "definitely knew" that lamination was new to Venture). In contrast, Ms. Ziegler had been CEO of PrivaSys, FiTeq's predecessor company. *See, e.g.,* ECF 313-2, Exh. 2, July 16, 2014 Ziegler Dep. at 73-74.

Under the OA, Venture was responsible for providing "engineering and manufacturing services to FiTeq," OA § 3.1, and would "serve as FiTeq's sole source for the engineering services," *id.* § 3.2. Meanwhile, FiTeq had to use best efforts to assist Venture in certifying a card, certifying Venture's facility, and selling and marketing cards. *Id.* § 4.1.4(a). In addition, if there were "fundamental flaws in the design," FiTeq had a duty to provide notice and an acceptable cure recommendation to Venture. *Id.* § 3.1(e). The parties also agreed to "consult, cooperate, and use their best efforts to complete the services." *Id.* § 4.3.4.

Before the cards could be sold, they had to be certified by at least one Payment Network, such as Visa, MasterCard, American Express, or Discover. *See, e.g.,* ECF 313-2, Exh. 4 at 92 (Ms. Ziegler's deposition testimony that "no one would sign a contract without a certified product");

---

[1] The Court notes that Defendants improperly request summary judgment for different issues in their Notice of Motion and in the "Issues Presented" section of their supporting memorandum. *See* ECF 313 at 1. In the Notice, Defendants seek summary judgment in their favor on Plaintiff's claims in their entirety and on each of Venture's counterclaims as to liability. Mot. at 1. In the issues presented, Defendants break their challenges to Plaintiff's claims into component parts but do not mention their counterclaims. *Id.* at 1-2. Because Defendants clearly intend to seek summary judgment on the component parts of Plaintiff's claims and on liability for their counterclaims and because both parties briefed their papers accordingly, the Court construes this motion as one for summary judgment on the component issues of Plaintiff's claims and liability on Defendants' counterclaims.

United States District Court
Northern District of California

1    ECF 313-3, Exh. 5 at 34 (David Patterson's deposition testimony that certification is

2    "imperative").

3          Though the parties dispute the precise requirements for certification, Plaintiff's expert,

4    Brad McGoran, and Defendants' expert, Henry Dreifus, agree that minimum standards for

5    certification exist. *See* ECF 313-6, Exh. 25, Dreifus Rebuttal Report ¶ 21; ECF 313-5, Exh. 23,

6    McGoran Initial Review at 6. Some of these requirements pertain to personalization, though the

7    parties dispute whether or not those requirements can be waived. *Compare* Exh. 25 ¶ 9

8    (personalization occurs "according to the [ISO] standards") *with* Exh. 23 at 8 ("personalization

9    processes . . . can also adversely affect a card's . . . ability to pass the requisite standards"). The

10   parties also dispute whether FiTeq, Venture, or both developed the specifications for the card.

11         A card's manufacturing and personalization facilities must also be certified. In addition,

12   back-end software—such as FiTeq's Authenticator software—is necessary to make the card work.

13   Venture was not responsible for, or involved with, personalization or the software. *See* OA § 16.

14         To develop the FiTeq card, Venture used a lamination manufacturing method. In 2012,

15   while still obligated to work exclusively with Venture, FiTeq began working with Innovatier, now

16   part of FiTeq, to develop the cards. Innovatier uses a non-lamination method called "reaction

17   injection molding" (RIM). *See, e.g.,* Exh. 1 at 98-99.

18         The OA was terminated in January 2013. After the termination, FiTeq represented to

19   Defendants that it could personalize its RIM cards. *See* ECF 313-12, Exhs. 31, 32 (emails from

20   Plaintiff's counsel referencing personalization facility in San Francisco).  Over the course of seven

21   days between November 2014 and February 2015, FiTeq made 194 RIM cards it deemed suitable

22   for testing. *See, e.g.,* Exh. 25 ¶¶ 31-35. The parties dispute the number of certification

23   requirements those cards met. To date, Fiteq's card technology, personalization facility, and

24   software have not been certified.

25         Plaintiff brought three breach of contract claims against Defendants—one against Venture

26   for breach of the OA (Count I) and one against each Defendant for breach of the Common Stock

27   Purchase Agreement and Novation and Supplemental Agreement (Counts II and III). In addition,

28   Plaintiff alleges that both Defendants engaged in fraud in the inducement (Count IV) and fraud

United States District Court
Northern District of California

1    (Count V). *See* ECF 77, Second Amended Complaint (SAC) ¶¶ 202-243.

2            Defendants answered and filed five counterclaims: three for breach of the OA—

3    specifically, failure to pay for sample cards (Counterclaim I), failure to pay for stocks and

4    inventory (Counterclaim II), and generally (Counterclaim IV)—as well as breach of the covenant

5    of good faith and fair dealing (Counterclaim V) and conversion (Counterclaim III). ECF 80,

6    Answer and Counterclaims ¶¶ 77-104. Defendants now seek summary judgment.

7            **II.      LEGAL STANDARD**

8            "A party is entitled to summary judgment if the 'movant shows that there is no genuine

9    dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of*

10   *Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ.

11   P. 56(a)). "Partial summary judgment that falls short of a final determination, even of a single

12   claim, is authorized by Rule 56 in order to limit the issues to be tried." *State Farm Fire & Cas.*

13   *Co. v. Geary*, 699 F.Supp. 756, 759 (N.D. Cal. 1987).

14           "The moving party initially bears the burden of proving the absence of a genuine issue of

15   material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

16   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the non-moving party bears the burden of

17   proof at trial, the moving party need only prove that there is an absence of evidence to support the

18   non-moving party's case." *Id.* "Where the moving party meets that burden, the burden then shifts

19   to the non-moving party to designate specific facts demonstrating the existence of genuine issues

20   for trial." *Id.* "[T]he non-moving party must come forth with evidence from which a jury could

21   reasonably render a verdict in the non-moving party's favor." *Id.*

22           "The court must view the evidence in the light most favorable to the nonmovant and draw

23   all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "'Where

24   the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

25   there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

26   *Corp.*, 475 U.S. 574, 587 (1986)).

27           **III.     DISCUSSION**

28                   **A.  Lost Profits and Valuation Damages**

United States District Court
Northern District of California

4

United States District Court
Northern District of California

Defendants begin by challenging Plaintiff's lost profits and valuation damages on two grounds: first, that such damages are barred by the terms of the OA and, second, that Plaintiff will be unable to bear the burden of proving these damages with reasonable certainty at trial.

### 1. The Operating Agreement

Defendants argue that FiTeq cannot recover lost profits or enterprise valuation damages pursuant to the OA's limitation of damages clause, § 13.4. Mot. at 10. Not surprisingly, the parties dispute not the language of § 13.4, but its effect.

Contract interpretation is a question of law to be determined by the Court. *See, e.g.*, *TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, 40 Cal. 4th 19, 27 (2006). California law makes clear that the "fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties." *Id.* The intent of the parties "at the time the contract is formed" governs the Court's interpretation, *see* Cal. Civ. Code §1636, and this intent "is to be inferred, if possible, solely from the written provisions of the contract." Cal. Civ. Code § 1639.

Thus, the Court begins this inquiry by turning to § 13.4 itself, which provides

> Neither Party nor its affiliates shall be liable to the other Party or its affiliates under any legal or equitable theory of liability (including, without limitation, breach of contract, strict liability, negligence, or other tort, or breach of statutory duty), for any special, incidental, indirect, consequential, punitive, or exemplary damages arising out of, related to, or connected with this Agreement in any way (including, without limitation, any damages resulting from lost profits or loss of business) . . . "

ECF 199-26 at 26.

Defendants argue that, because the OA specifically excludes "damages resulting from lost profits or loss of business," Plaintiff cannot recover lost profits or enterprise valuation damages under the OA. Mot. at 10; *see also* ECF 335, Reply at 7.

Plaintiff disagrees on two grounds. First, Plaintiff argues that "[u]nder long-settled California law, fraud renders a limitation of damages clause unenforceable." Opp. at 17-18. Plaintiff is correct that "[contractual] releases of future liability for fraud and other intentional wrongs are invariably invalidated" under California law, *see Farnham v.Super. Ct.,* 60 Cal. App.

4th 69, 71 (Cal. Ct. 1997); *see also McQuirk v. Donnelley*, 189 F.3d 793, 796 (9th Cir. 1999). However, to the extent that Plaintiff is arguing that the entire clause is invalid because it cannot apply to fraud or other intentional acts, Plaintiff misreads the law.

California Civil Code § 1668 provides, "contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another . . . are against the policy of the law." Thus, §1668 renders the OA's limitation of liability unenforceable to the extent that it would insulate Defendants from liability for fraud or willful injury. *See WeBoost Media S.R.L. v. LookSmart Ltd.*, No. C 13-5304 SC, 2014 WL 2621465, at *9-10 (N.D. Cal. June 12, 2014). Beyond that, the limitation holds. Thus, the Court cannot agree with Plaintiff that the limitation on damages in § 13.4 is invalid on this basis.

Next, Plaintiff contends that the clause excludes only special or indirect damages and that lost profits and enterprise valuation are direct damages, which remain recoverable. Opp. at 18. Plaintiff bases this argument on deposition testimony by Angeline Khoo, who Plaintiff describes as Venture's drafting lawyer. *See* ECF 331-10, Exh. 127 at 218.

Because the Court agrees with Defendants that the contractual language is clear on its face, this argument is irrelevant.[2] "If the contractual language is clear and explicit, it governs." *County of San Diego v. Ace Prop & Cas. Ins. Co.*, 37 Cal. 4th 406, 415 (2005) (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)). Defendants are correct that § 13.4 explicitly bars Plaintiff from recovering lost profits or enterprise valuation damages—that is, "damages resulting from lost profits or loss of business"—on any claim other than fraud or other intentional acts. Therefore, the Court GRANTS Defendants' motion for summary judgment that Plaintiff cannot recover lost profits or enterprise valuation damages for its three breach of contract claims and DENIES Defendants' motion for summary judgment that Plaintiff cannot recover lost profits or enterprise valuation damages for its fraud and fraud in the inducement claims.

---

[2] Furthermore, though Plaintiff correctly quotes Ms. Khoo's deposition testimony that "[d]irect damages would remain recoverable," *see* ECF 331-10, Exh. 127 at 218, Plaintiff does not quote the numerous times that she disclaims knowledge of the relevant law. *See, e.g., id.* at 218 ("I don't know about US law" and "I'm not an expert on exclusion clauses.") Thus, even if the Court were to consider attorney deposition testimony when interpreting a contract, the testimony here would be entirely unpersuasive.

United States District Court
Northern District of California

1    **2. *Speculative as a Matter of Law***

2        Defendants next ask the Court to determine that the fact and quantum of Plaintiff's lost

3    profits and enterprise valuation damages are speculative as a matter of law. ECF 313, Mot. at 1, 2-

4    4, 10-15.[3] Defendants argue that "[l]ost anticipated profits cannot be recovered if it is uncertain

5    whether any profit would have been derived at all from the proposed undertaking." Mot. at 10

6    (quoting *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 883-84 (2002)).

7        In this motion, Defendants do not attack Plaintiff's damages on the basis of the evidence

8    they anticipate Plaintiff will offer. Instead, they present nine factual claims that they argue

9    preclude Plaintiff from offering any evidence that could prove the fact or quantum of its lost

10   profits and valuation damages with reasonable certainty. The Court considers each claim in turn.

11       *i. Specifications*

12       First, Defendants argue that the specifications Plaintiff directed or authorized Defendants

13   to use could not have led to certification of the card, which is a prerequisite for sales. Mot. at 10-

14   11. Specifically, they argue that Plaintiff directed them to develop a card with track 2 data and a

15   swipe speed of only 25 inches per second ("IPS"), instead of the track 1 data and 118 IPS required

16   for certification, and agreed that Defendants could develop a card without ATM functionality, also

17   required for certification. *Id*. at 10-11. Defendants assert that FiTeq could therefore never have

18   sold its cards and "the Court should enter summary judgment that FiTeq's lost profits and

19   enterprise valuation damages are speculative for this reason alone." *Id*. at 11.

20       To prove that a speed of 118 IPS is required for certification, Defendants point to Mr.

21   Dreifus' Rebuttal Report. However, the report states that real-world swipe speeds vary from

22   approximately 4 IPS to 118 IPS and that MasterCard requires a speed within that range as well.

23   *See* Exh. 25 ¶¶ 57-58; *see also* ECF 313-11, Exh. 25-13 at 7-8 (MasterCard requirement of 4 to

24   118 IPS). Because Defendants claim that Plaintiff directed them to build a card with a 25 IPS

25   swipe speed, Defendants have failed to show an absence of evidence to support Plaintiff's

26

27   [3] The Court recently considered the speculative nature of Plaintiff's lost profits and valuation-
     based damages in its Order Granting Motion to Exclude Testimony About FiTeq's Alleged Lost

28   Profits and Valuation ("Exclusion Order"). *See* ECF 350. Pursuant to that Order, the Court has
     already excluded evidence of the bulk of Plaintiff's asserted damages.

1    damages on the basis of deficient swipe speed specifications.

2         Defendants do offer sufficient evidence to meet this burden regarding the necessity of track

3    1 data and ATM functionality for certification, as well as the significance of certification for sales.

4    Defendants offer specifications from Visa, MasterCard, and the International Organization for

5    Standardization ("ISO") that all reference or require track 1 data. *See* ECF 313-7, Exh. 25-1 at

6    3.3.2.1 (Visa Product and Service Rules stating that the "Magnetic Stripe . . . must be encoded on

7    both track 1 and track 2"); ECF 313-11, Exh. 25-7 at 3-4 (ISO standards describing track 1

8    structure and information content); ECF 313-11, Exh. 25-13 at 7-8 (MasterCard requirements

9    listing Track 1 and Track 2). Defendants also provide Mr. Dreifus' Rebuttal Report and Ms.

10   Ziegler's deposition testimony to corroborate this requirement. *See* Exh. 12 at 76:10-15 (Ms.

11   Ziegler's testimony that she remembers MasterCard CSI specifications from 2010 requiring track

12   1 data); Exh. 25 ¶¶ 42-45 (Mr. Dreifus' Rebuttal Report stating that each payment network and the

13   ISO require both track 1 and track 2 encoding on all cards).

14        Similarly, Defendants identify the ATM functionality requirement in Visa and MasterCard

15   certification requirements. *See* Exh. 25-1 at 6.2.3.2 (Visa's requirements for participation in its

16   ATM Network in the U.S. Region); Exh. 25-2 at 3.6 (MasterCard's requirements for ATMs).

17   Defendants again point to Mr. Dreifus's reports to corroborate this reading of the Visa and

18   MasterCard documents. *See* ECF 313-5, Exh. 24 ¶ 39; Exh. 25 ¶ 49.

19        Then, to prove that certification is required for selling cards, Defendants offer opinions and

20   deposition testimony by both parties' experts. *See* Exh. 25 ¶¶ 20-22 (Mr. Dreifus' opinion that

21   "certification is a crucial requirement for payment networks"); Exh. 23 at 6-8 (Mr. McGoran's

22   report stating "certification is of paramount importance" and "[t]esting and certification often

23   comprise the first steps in the acceptance process and are always prerequisites to mass

24   deployment"); ECF 313-2, Exh. 3 (Mr. McGoran's deposition testimony that "I am not familiar

25   with any payment . . . brand that does not require certification") at 32:5-34, 99:3-101:14.

26        This evidence regarding the necessity of track 1 data and ATM functionality for card

27   certification and sales suffices to meet Defendants' burden to show an absence of evidence to

28   support Plaintiff's damages because the parties were working toward deficient specifications.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiff now bears the burden of showing that its lost profits and valuation damages remain a

2    triable issue.

3            Plaintiff does not dispute the general existence and importance of certification

4    requirements, nor that Venture was working, at least for a limited time, toward a card with track 2

5    data and no ATM functionality. However, Plaintiff argues that, when asked by member banks,

6    payment networks will frequently issue "variances"—temporary exceptions from particular card

7    metrics—and that MasterCard issued a variance for the FiTeq card. Opp. at 11.

8            To establish the existence of this practice, Plaintiff offers Mr. Dreifus' deposition

9    testimony. *See* ECF 331-7, Exh. 107 at 126-127 (stating that financial institutions can drive

10   networks to grant variances and that Visa and MasterCard have granted variances in the past). To

11   show that such a variance issued here, Plaintiff offers an email from Joan Acosta, Leader of Fraud

12   Management Solutions at MasterCard Worldwide, to a Venture employee that states, "MasterCard

13   has formally granted a variance to . . . pursue testing of the two-button card with Venture." ECF

14   313-17, Exh. 109.[4] Viewing the evidence in the light most favorable to Plaintiff and drawing all

15   _____

16   [4] Defendants object to this Exhibit and at least 100 others in a dense, essentially indecipherable list
     that spans nearly two pages of its Reply but offers less than 100 words of explanation. ECF 335,

17   Reply at 14-15. Instead, this baffling presentation of evidentiary objections essentially functions as
     a choose-your-own-adventure for the Court, laying out thirteen independent grounds for

18   objections in clusters followed by lists of 50-100 exhibits. The Court has no obligation to "sift
     through the extensive material cited and speculate as to what material is objectionable." *Melendez*

19   *v. Morrow Cty. Sch. Dist.*, Civ. No. 07–875–AC, 2009 WL 4015426, at *9 (D. Or. Nov. 19, 2009).
     Nor is it the Court's role to conjure up persuasive arguments for Defendants.

20   Nevertheless, recognizing the importance of the admissibility of evidence, the Court has reviewed
     Defendants' objections to the exhibits upon which it relied. Even for those exhibits, the Court is

21   often left to guess to which portions of the exhibit the objections pertain. For example, faced with

22   a Rule 403 objection to Exhibit 119, an email exchange about scheduling between FiTeq and
     Venture employees spanning nine emails, the Court is left to wonder which portion Defendants

23   find objectionable—surely not Ms. Ziegler's statements that Mr. Foo was on holiday or that she
     had dinner plans the evening of July 17. ECF 331-9.

24   To the extent that the Court was able to discern Defendants' objections to the exhibits the Court

25   relies upon, it rules as follows: Defendants' blanket Rule 402 objections are OVERRULED. The
     Court will give the evidence the weight it deserves. Defendants' blanket 403 objections are

26   OVERRULED because Defendants have failed to even identify, much less establish, the prejudice
     that could result from considering the evidence. The Court is unable to discern how Rules 601

27   (competency) and 602 (personal knowledge) apply to the exhibits Defendants challenge and
     therefore OVERRULES the objections. The Court OVERRULES Defendants' Rule 701, 702, and

28   703 challenges, finding that the exhibits challenged on this basis and relied upon by the Court do
     not include expert testimony; to the extent that any of the exhibits tend toward expert opinions, the

9

United States District Court
Northern District of California

1   reasonable inferences in Plaintiff's favor, the Court finds that this evidence suffices to create a

2   genuine issue of material fact as to whether or not Plaintiff was directing Defendants to work

3   toward specifications that would necessarily fail. Thus, the Court cannot grant Defendants' request

4   for summary adjudication of Plaintiff's damages on this basis.

5           *ii. Personalization*

6           Defendants next contend that Plaintiff cannot personalize cards and that Plaintiff still has

7   no certified card personalization facility. Mot. at 11. Defendants argue that, since personalization

8   is necessary for certification and a personalization facility is necessary for sales, Plaintiff therefore

9   cannot prove lost profits or valuation damages with reasonable certainty. *Id.* at 11-12.

10          To support their position, Defendants first argue that personalization—the process of

11  adding the cardholder's name, account number, card expiration date, and card verification number

12  to a manufactured card, *see* Exh. 25 ¶ 9—was entirely Fiteq's responsibility. Defendants first point

13  to § 16 of the OA, which provides, "Venture shall have an option to provide personalization

14  services at cost of no more than $1 per FiTeq Card if required by a Card Issuer. FiTeq shall assist

15  Venture to become a MasterCard or Visa Card secure facility for personalization services." ECF

16  199-26. In addition, Defendants offer deposition testimony by Plaintiff's Rule 30(b)(6) witness

17  stating that "we [FiTeq] handle the personalization," ECF 313-2, Exh. 4 at 63, and by Ms. Ziegler

18  that personalization "would go through FiTeq," ECF 313-3, Exh. 6 at 124.

19          Plaintiff disputes that it had sole responsibility for personalization, arguing that §16 gave

20

21  Court finds that they are admissible "because of the particularized knowledge that the witness has
    by virtue of his or her position in the business." *See* Fed. R. Ev. 701 Advisory committee notes.
22  Defendants' Rule 901 objections are OVERRULED in light of Plaintiff's declaration that the
    exhibits are "true and correct" copies. *See* ECF 331. Upon careful consideration, the Court also
23  OVERRULES Defendants' Rule 802 objections. The majority of the exhibits upon which the
    Court relies and that Defendants challenge on this basis are emails from Venture employees and
24  are therefore admissible party-opponent statements. *See, e.g.,* Exhs. 108, 110, 11, 112, 114, 115,
    182. The remaining exhibits challenged on this basis fall within the business records exception or
25  do not constitute hearsay.

26  Finally, the Court OVERRULES Defendants' objections on the basis of Fed. R. Civ. P.
    56(c)(1)(A) and this Court's Standing Orders for failure to cite particular parts of voluminous
27  exhibits. To the extent that the Court relies on any of these exhibits, the Court has clearly gleaned
    the relevant portions. Furthermore, the Court cannot help but note the irony of Defendants
28  presenting this objection at the end of a 2-page onslaught of general evidentiary objections to
    those same full exhibits.

Venture the right to personalize at its election. However, neither party suggests that Venture exercised that right.

Defendants next offer evidence to show that neither Plaintiff nor its predecessor, PrivaSys, has ever personalized cards or certified a personalization facility. Mot. at 11. Specifically, Defendants offer: 1) Ms. Ziegler's deposition testimony that FiTeq does not have a certified personalization facility, ECF 313-3, Exh. 6 at 124; 2) deposition testimony by Innovatier's Rule 30(b)(6) designee that plans to certify Innovatier's facility for personalization were only in development as of September 2014, ECF 313-4, Exh. 10 at 48-49; 3) Mr. Dreifus' report regarding FiTeq's February 2015 attempt to personalize 230 cards, which resulted in only 194 cards after 4.5 hours of a manual process, ECF 313-6, Exh. 25 ¶ 35; 4) test results from FIME, the French testing laboratory with which Mr. Dreifus contracted to test FiTeq's cards, showing that the cards failed personalization requirements, ECF 313-10, Exh. 25-3 at 76-77; and 5) deposition testimony by a PayPal representative stating that PayPal had security concerns about a personalization facility in San Francisco, ECF 313-4, Exh. 9 at 26-27.

Finally, Defendants offer evidence, including Mr. Dreifus' Rebuttal Report, to show that personalization is necessary for certification and sales. *See, e.g.,* Exh. 25 ¶ 9. This evidence suffices to meet Defendants' burden to show a lack of evidence regarding the certainty of Plaintiff's lost profits and valuation damages on the basis of personalization, thereby shifting the burden to Plaintiff to show a triable issue of material fact regarding its ability to personalize, to certify a personalization facility, or to sell cards regardless.

Plaintiff responds that MasterCard certified a PrivaSys manufacturing facility for personalization in 2005 and that FiTeq is currently leasing space and owns an expensive machine for personalization. Opp. at 20-21. To support its first point, Plaintiff provides a letter dated January 14, 2005 from Luis Ferreira, Associate VP and Head of MasterCard International's Global Vendor Certification Program, to Caitlin Kurtz, PrivaSys' Vice President of Operations, advising PrivaSys that "your facility . . . is certified to add electronic components to MasterCard branded products . . . This work could also include partial personalization." ECF 331-10, Exh. 135. For its second point regarding FiTeq's current facility and machinery, Plaintiff provides an affidavit from

United States District Court
Northern District of California

11

1    Ms. Ziegler, stating that FiTeq leases a building in San Francisco, which "will serve as Fiteq's

2    personalization facility" and currently houses a card personalization machine. ECF 332, Ziegler

3    Dec. ¶ 7. In addition, Plaintiff offers Ms. Ziegler's deposition testimony that FiTeq leased a

4    personalization site during the term of the OA. ECF 331-13, Exh. 190 at 124-125. In response to

5    Mr. Dreifus' description of the personalization trial, Ms. Ziegler explains that the machine

6    malfunctioned on the day cards were to be personalized for Defendants. Ziegler Dec ¶ 7.[5] Finally,

7    Plaintiff again disputes Defendants' position that personalization is necessary for certification on

8    the ground that networks can exempt cards from those requirements through variances.

9            Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable

10   inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff is capable of

11   personalizing cards, as required for certification and sales. Thus, the Court cannot grant

12   Defendants' request for summary adjudication of Plaintiff's damages on this basis.

13           *iii. Certification*

14           Third, Defendants argue that Plaintiff's inability to certify or sell a card after nearly 16

15   years of trying, whether as PrivaSys or as FiTeq, working with three different designs teams, and

16   using different manufacturing processes shows that the card's success is necessarily speculative.

17   Mot. at 12.

18           Defendants begin with evidence to show that FiTeq's technology is nearly 16 years old.

19   Defendants point to Plaintiff's allegation in its original Complaint that "[w]ith an earlier entity,

20   PrivaSys, FiTeq has been engaged in this development effort for more than a decade." ECF 1,

21   Compl. at 2. In addition, Defendants offer Ms. Ziegler's deposition testimony describing PrivaSys

22   as a company that emerged in 2000 to develop a battery-powered payment card and secure

23   platform to combat fraud and shut down immediately before FiTeq's formation. ECF 313-2, Exh.

24   2 at 29, 41-43, 47-48; *see also* ECF 313-3, Exh. 5 at 38.

25   _____

26   [5] Defendants object to this statement, arguing that it is inadmissible for lack of foundation and
     constitutes impermissible expert testimony by a lay witness. Defendants make this objection in the
27   Reply Separate Statement of Facts, ECF 336 at 4, in violation of Civil Local Rule 7-3(c) ("Any
     evidentiary and procedural objections . . . must be contained within the reply brief or
28   memorandum."). Accordingly, the Court does not consider it, nor any other objections raised by
     either party in the Separate Statement.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Defendants next offer evidence to support their contention that, after more than three years

2   of development using its current RIM process, the FiTeq card is still not certified. Defendants

3   direct the Court to the reports of their experts, Mr. Dreifus and Darran R. Cairns, regarding

4   FiTeq's inability to make cards during visits specifically arranged by the parties for Defendants to

5   observe the RIM process. *See, e.g.,* ECF 313-5, Exh. 18 ¶¶12-37, 79, 43 ("FiTeq was only able to

6   make 58 cards using a manual process" on the first visit, "was unable to make any cards because it

7   claimed one if [*sic*] its machines was broken" on the second visit, and "was only able to make

8   approximately 210 cards using a different manual process" over the course of 4.5 hours during the

9   last visit, none of which included a hologram or signature panel). Furthermore, Defendants offer

10  test results to show that, when tested by FIME, even those cards lacked or failed the majority of

11  card certification requirements. *See* ECF 313-10, Exh. 25-3 (FIME results listing 193 cards as

12  failing and only 1 as passing).

13  Finally, Defendants argue that, much like the laminated card Venture was developing,

14  Plaintiff's RIM card can never be certified because its specifications lack at least track 1 data and

15  ATM functionality. Defendants offer deposition testimony by Innovatier's Rule 30(b)(6) designee

16  stating that, as of September 2014, they were working towards a card with track 2 data only, *see*

17  ECF 313-4, Exh. 10 at 65, and deposition testimony by Mr. McGoran that in its current state the

18  card cannot be used in an ATM, *see* ECF 313-4, Exh. 13 at 35-36. This evidence regarding

19  Plaintiff's history of card development and the current state of its card suffices to establish a lack

20  of evidence to show Plaintiff's lost profits and valuation damages with reasonable certainty,

21  thereby shifting the burden to Plaintiff to show a genuine dispute of material fact.

22  Plaintiff responds that its RIM card will be certified. To dispute the importance of the RIM

23  card's track 2 data and lack of ATM functionality, Plaintiff again asserts that it can get a variance

24  from payment networks as a temporary step toward certification. To challenge the FIME test

25  results, Plaintiff points to Mr. Dreifus' deposition testimony, in which he states that he directed the

26  lab to change numerous "inconclusive" results to conclusive "fail" results. *See* ECF 331-7, Exh.

27  107 at 54-56 (Mr. Dreifus' deposition testimony that, upon seeing results labeled "inconclusive,"

28  he asked the lab to provide a definitive answer, at which point they responded "we could not

guarantee [the results] as a pass" and so labeled each a "fail"). In addition, Plaintiff argues that the card passed other third-party tests and offers a summary of test results showing the card passing thirteen compatibility requirements. *See* ECF 331-10, Exh. 126 at 2.

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff's RIM card is on track for certification. Thus, the Court cannot grant Defendants' request for summary adjudication of Plaintiff's damages on this basis.

*iv. Commercial Quantities*

Next, Defendants assert that Plaintiff's card cannot be produced in commercial quantities and that Plaintiff therefore cannot prove lost profits or valuation damages with reasonable certainty. Mot. at 12-13. Plaintiff does not dispute its current inability to produce commercial quantities, but provides evidence to show that commercial-scale manufacturing will follow certification. *See* ECF 331-10, Exh. 132 (e-mail from Ms. Ziegler to Mr. Khan stating ". . . 250K/week . . . is an impossible task without certification.").

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff can establish its damages with reasonable certainty even though it currently lacks a commercialization process because that process follows certification. Thus, the Court cannot grant Defendants' request for summary adjudication of Plaintiff's damages on this basis.

*v. Authenticator Software*

As their next ground for granting summary judgment that Plaintiff will be unable to establish lost profit and valuation damages with reasonable certainty, Defendants argue that Plaintiff's Authenticator Software is still not certified, thereby blocking the card from functioning properly and preventing Plaintiff from generating licensing fees or card sales. Mot. at 12. The parties agree that Defendants were not responsible for the Authenticator software and that it remains uncertified.

Defendants also offer evidence to show that certification of software is necessary, a fact Plaintiff disputes. Defendants provide Mr. McGoran's deposition testimony that he "understand[s

United States District Court
Northern District of California

it] to be true" that each payment brand requires that the software be certified, Exh. 3 at 32. He also stated that he is "familiar that . . . certification standards . . . need to be met" but that he would need to be referred to "a specific one" in order to discuss them. ECF 313-4, Exh. 13 at 36-37.

In addition, Defendants offer the portions of Mr. Dreifus' expert reports that state that back-end software must be certified, Exh. 24 ¶ 4, 43; Exh. 25 ¶¶ 95, 97-98. To establish that the software cannot be certified, Defendants offer the deposition testimony of John Weber, who works on the Authenticator. ECF 313-3, Exh. 8 at 24-25. Mr. Weber states that two certification processes are in progress and that FiTeq is focused on Brightsight rather than PCI, the certification Defendants highlight. *Id.* This evidence suffices to shift the burden to Plaintiff to show some evidence of possible software certification.

To show that certification is likely, Plaintiff offers a 2011 audit report from Brightsight finding that "each of the main required properties for security . . . are present in the current system" and concluding that "the source code is well structured and the design aspects reviewed are well documented and the services implemented are regarded sound and state of the art." ECF 331-10, Exh. 134 at 5. In addition, Plaintiff argues that, unlike card certification, software certification is not required. Plaintiff supports this argument with Ms. Ziegler's Declaration. ECF 332 ¶ 9 ("'Certification' is not required for the bank back-end Authenticator software").

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff can establish its lost profits and valuation damages with reasonable certainty notwithstanding its uncertified software, either because such certification is not necessary or because FiTeq is close to Brightsight certification. Thus, the Court cannot grant Defendants' request for summary adjudication of Plaintiff's damages on this basis.

*vi. Manufacturing Facility*

Defendants next contend that Plaintiff still has no certified card manufacturing facility, without which it cannot provide cards and therefore cannot establish lost profits or valuation damages with reasonable certainty. The parties point to the same evidence they relied upon to dispute the personalization facility: Defendants argue that Plaintiff has not and cannot certify a

facility, while Plaintiff responds that MasterCard certified a previous facility and that FiTeq is currently leasing the necessary space. In addition, Plaintiff argues that certifying the manufacturing facility was Venture's obligation and offers an email from Venture's Thian Nie Khian to FiTeq's Eric Foo stating that "Venture is ready for GVCP (MasterCard) site certification" as evidence. *See* ECF 331-9, Exh. 122.

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff can establish its lost profits and valuation damages with reasonable certainty notwithstanding the current state of its manufacturing facility. Thus, the Court cannot grant Defendants' request for summary adjudication of Plaintiff's damages on this basis.

*vii. Customers*

Defendants assert that the companies to which Plaintiff claims it lost sales—Discover, PayPal, Mandiri, Wells Faro, and Citibank, *see* ECF 180-1 at 9-26—would never have purchased Plaintiff's card, thereby preventing Plaintiff from establishing its lost profits and valuation damages with reasonable certainty. Mot. at 13-14. In large part, this argument is based on Defendants' now-well-trodden—and, at this stage, insufficiently supported—positions that FiTeq directed Venture to develop a card that lacked features that each customer required, including track 1 data, ATM functionality, and a sufficiently high swipe speed, and that, because FiTeq lacked certified infrastructure and software, FiTeq could not have sold the cards even if a customer wanted to buy them. Mot. at 13-14. The Court has already determined above that Plaintiff has offered sufficient evidence on each of these points for a reasonable trier of fact to find in Plaintiff's favor regarding the certainty of lost profits and valuation damages.

Defendants also offer one piece of evidence unique to this argument: deposition testimony by Faith Tucker, PayPal's Director of Card Solutions, that PayPal was not interested in the type of card FiTeq offered, ECF 313-4, Exh. 9 at 22-24, 40, 125, 137-138. This evidence would meet Defendants' burden to show a lack of evidence of customer interest if PayPal were Plaintiff's only asserted customer. Because Plaintiff also suggests that at least four other institutions were interested in purchasing the card, however, this evidence fails to meet Defendants' burden to

16

1    establish a lack of evidence regarding realistic customer interest. *See, e.g.,* ECF 331-11, Exh. 136

2    (CitiBank's findings regarding pilot of laminated cards). Thus, the Court cannot grant Defendants'

3    motion for summary adjudication on this basis.

4              *viii. Patents*

5              Defendants next argue that the card they were developing is not patented and that, without

6    a patent, anyone could have made and sold FiTeq's card had it been successful, thereby preventing

7    Plaintiff from establishing its lost profits and valuation damages with reasonable certainty. While

8    the Court could not grant summary judgment regarding the speculative nature of Plaintiff's lost

9    profits and valuation damages on this ground alone given that profit is possible without a patent,

10   the Court nevertheless considers the evidence Defendants offer in order to determine whether,

11   when combined with Defendants' other arguments, this claim suffices.

12             The parties do not dispute that Plaintiff represented to Venture that the technology in the

13   card was patented, but Defendants argue those representations are false, while Plaintiff claims they

14   are true. Defendants offer Ms. Ziegler's deposition testimony as proof. However, in her

15   deposition, Ms. Ziegler states that FiTeq's patent counsel described its patent portfolio to Venture

16   as part of a due diligence call. *See* Exh. 6 at 52-56. This does not meet Defendants' burden to

17   show an absence of facts regarding the card's patented technology. Furthermore, Plaintiff points to

18   evidence showing that Venture reviewed PrivaSys' patents, including an email exchange between

19   Thian Nie Khian and Joan Ziegler, *see* ECF 331-4, Exh. 91.

20             Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable

21   inferences in Plaintiff's favor, a reasonable trier of fact could find that the card includes patented

22   technology. Thus, the Court cannot grant summary judgment on this ground alone, nor does it

23   contribute to the sum of Defendants' arguments.

24             *ix. Plaintiff's Admission*

25             Defendants assert that Plaintiff admits its entire business is highly speculative, thereby

26   preventing it from establishing its lost profits and valuation damages with reasonable certainty.

27   Defendants base this argument on an investor letter FiTeq sent in September 10, 2013 describing

28   investment in FiTeq as "speculative," involving "a high degree of risk," and something that

United States District Court
Northern District of California

17

"should be considered only by sophisticated investors who . . . can afford to sustain a total loss of their investment. ECF 313-12, Exh. 34 at 14-17. Defendants additionally offer deposition testimony by Ms. Ziegler stating that these risk factors were accurate to her knowledge. *See* Exh. 1 at 127-128. This suffices to shift the burden to Plaintiff to establish a triable issue of material fact regarding the certainty of its lost profits and valuation damages.

Plaintiff responds that an investor letter necessarily includes such language. Opp. at 22. Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that Plaintiff can establish its lost profits and valuation damages with reasonable certainty notwithstanding the letter. Thus, the Court cannot grant summary judgment on this ground alone.

*x. Combination of Factors*

Finally, Defendants argue that, while sufficient on their own to show the speculative nature of Plaintiff's lost profits and valuation damages, the weight of these nine claims in combination is "overwhelming." Mot. at 16. However, as the Court described in detail above, Defendant has failed to establish any of the claims above with requisite certainty. Specifically, considering the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could determine that: i) the networks would have accepted Plaintiff's card on the basis of a variance, ii) Plaintiff is capable of personalizing cards, iii) Plaintiff's RIM card is on track for certification, iv) Plaintiff will have a commercialization process after certification, v) Plaintiff's software will be certified or does not need to be, vi) Plaintiff will soon have a manufacturing facility and did not previously as a result of Venture's misconduct, vii) Plaintiff's customers were interested but did not follow through due to Venture's failure, viii) Plaintiff's technology is patented or would have been profitable regardless, and ix) Plaintiff's statements regarding the risks of investment were prudent statements that do not preclude the possibility of profits. As a result, viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, a reasonable trier of fact could find that the combination of these facts, much like each in isolation, does not preclude Plaintiff from establishing its lost profits and valuation damages with reasonable certainty. Accordingly,

United States District Court
Northern District of California

1    the Court DENIES Defendants' motion regarding the speculative nature of the fact and quantum

2    of Plaintiff's valuation and lost profits.

3        **B. Fraud Claims**

4        The Court next considers Defendants' motion for summary judgment in their favor on

5    Plaintiff's fraud claims (Counts IV and V). The Court begins with Defendants' argument

6    regarding the applicable summary judgment standard. Defendants contend that, because they offer

7    evidence showing that the alleged fraud made no economic sense, Plaintiff must provide more

8    persuasive evidence to support its fraud claims than would otherwise be necessary at this stage.

9    Mot. at 17.

10       *1. Plaintiff's Burden*

11       Defendants rely on *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475

12   U.S. 574, 578 (1986) to argue that, where it makes no economic sense for a defendant to engage in

13   misconduct, the plaintiff has a higher burden to provide persuasive evidence at summary

14   judgment. *Id.* at 17. Defendants contend that this higher burden applies here because Plaintiff has

15   no evidence to suggest that Venture had any economic incentive for the alleged fraud. Rather, they

16   argue, Venture spent three years and millions of dollars trying to develop the card in return for

17   FiTeq stock that was valuable only if the card succeeded. Defendants offer deposition testimony

18   by Ju Lin Lim, a damages witness, stating that Venture invoiced nearly SGD $15 million for the

19   FiTeq project, ECF 313-5, Mot. Exh. 17 at 85-92, and a chart titled "FiTeq—Costs Incurred (YTD

20   December 2012)" listing 14,917.9 as the total, ECF 313-16, Mot. Exh. 49.

21       Plaintiff does not disagree with Defendants' reading of *Matsushita*, but argues that the

22   fraud made economic sense for Defendants. Plaintiff suggests that Defendants—based in

23   Singapore and therefore competing with manufacturers in countries with lower costs—saw the

24   project as an opportunity to move up the value chain from manufacturing to intellectual property

25   and design, with effects beyond the project itself. Opp. at 14-15. Plaintiff contends that

26   Defendants planned to "just recut the deal or outsource lamination" if necessary. *Id.* at 15.

27       In support of this theory, Plaintiff provides an email that includes Venture's Proposal for

28   Purchase of equipment, ECF 331-9, Exh. 125. In the Proposal for Purchase, Venture writes that

United States District Court
Northern District of California

19

the importance of the Fiteq project "cannot be over emphasize[d] as it is strategically important to Venture . . . It will be the future platform that Venture can leap forward to reach the higher value add [*sic*]." *Id.* at 3. Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, the Court finds a triable issue of fact regarding Defendants' incentives. Therefore, Plaintiff need not offer more persuasive evidence than is otherwise necessary to oppose summary judgment. With that standard in mind, the Court now turns to Defendants' substantive arguments against Plaintiff's fraud claims.

### 2. Insufficient Damages

The first argument again contends that Plaintiff cannot recover its lost profits and valuation-based damages—because they are too speculative and because the OA precludes such damages—and additionally asserts that those are the only damages Plaintiff alleges for its fraud claims, which therefore fail for lack of the essential damages element. Mot. at 15-16. The Court has already determined that the first prong of this argument fails, having denied Defendants' motion for summary judgment regarding Plaintiff's lost profits and valuation damages above and having found that § 13.4 of the OA is unenforceable to the extent that it would insulate Defendants from liability for fraud. Because the first prong of Defendants' damages-based challenge to Plaintiff's fraud claims fails, the entire argument fails. The Court cannot grant summary judgment regarding Plaintiff's fraud claims on this ground.

### 3. Causation

Defendants next argue that the fraud claims should be determined in their favor because Plaintiff lacks evidence to prove reliance and harm. Mot. at 16-17. "Reliance is 'an essential element of fraud.'" *In re Tobacco II Cases*, 46 Cal. 4th 298, 326, (2009) (internal citation omitted). To prove reliance, a plaintiff must show "that the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct." *Id.* (internal citation omitted). A plaintiff can show such "immediate causation" if "the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct" in the absence of the misrepresentation. *Id.* (internal citation omitted). "[T]he plaintiff need not demonstrate it was the only cause." *Id.*

1  "An action for fraud or deceit also demands proof of damages caused by

2  misrepresentations or concealment of information." *Williams v. Wraxall*, 33 Cal. App. 4th 120,

3  131 (1995) (quoting *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d

4  197, 219  (1983)). "Fraudulent representations which work no damage cannot give rise to an

5  action at law." *Id.* at 132. In this context, "[c]ausation requires proof that the defendant's conduct

6  was a 'substantial factor' in bringing about the harm to the plaintiff." *Id.* at 132 (quoting *Mitchell*

7  *v. Gonzales*, 54 Cal.3d 1041, 1052-1053 (1991)).

8  To determine whether or not Defendants have shown that Plaintiff has no evidence to

9  support its fraud claims, the Court first considers Plaintiff's allegations. In the Second Amended

10  Complaint, Plaintiff alleges that Defendants falsely represented the following: that they had

11  expertise in designing and manufacturing sophisticated electronics; that they could build the FiTeq

12  card successfully and on a budget; that they were seeking an EDB grant wholly unrelated to

13  FiTeq's grant; that they met engineering milestones and certification requirements; that the cards

14  they made worked and were properly manufactured; that the cards passed delamination

15  requirements and peel tests; that holograms and signature panels could be attached to the cards;

16  that the manufacturing yield for the cards was approximately 80-90 percent and improving; and

17  that the cards had "swipe success." SAC ¶¶ 226, 236.

18  Defendants argue that, even if it made these misrepresentations, Plaintiff cannot establish

19  that they immediately or substantially caused Plaintiff's inability to sell cards or to license the

20  Authenticator software. Mot. at 16-17. Instead, Defendants contend, Plaintiff's own failures—

21  specifically, that "card certification was impossible and there was no certified infrastructure to

22  make or use FiTeq cards"—would have led to the harm regardless of Defendants' actions. *Id.*

23  Defendants point generally to the same "undisputed" facts to support this argument as they

24  offered in support of their argument that Plaintiff's damages are too speculative. However, as

25  discussed above, each one presents a triable issue of material fact. Therefore, the Court cannot find

26  that Plaintiff's harm would have occurred regardless of Defendants' actions or representations.

27  Accordingly, Defendants' motion for summary adjudication of Plaintiff's fraud claims in their

28  favor is DENIED.

United States District Court
Northern District of California

### C.  Plaintiff's Breach as Excuse

Defendants next move for summary judgment in their favor on Plaintiff's breach of contract claims, Counts I-III. Mot. at 17. Defendants argue that Plaintiff, rather than Defendants, materially breached the OA, thereby discharging Defendants from their duty to perform. Specifically, Defendants contend that Plaintiff failed to 1) provide specifications that could lead to card certification, 2) develop certified Authenticator software, 3) inform Defendants that lamination was a "fundamentally flawed" process for making the cards, and 4) work exclusively with Defendants to develop the cards while the OA was in force. *See* Mot. at 1-2, 17-21. Defendants argue that the first three of these failures constituted material breach because they frustrated the purpose of the OA, as no card could ever have been certified or sold, and that the fourth is also a material breach because it significantly reduced any gains Defendants could have realized from the project. *Id.* at 19. Defendants additionally argue that this conduct breached the implied covenant of good faith and fair dealing and that Plaintiff should therefore be estopped from asserting breach against them. *Id.* at 20-21.

The Court has addressed the first two points above. Again, the Court finds that Plaintiff has provided sufficient evidence to create a genuine issue for trial on each one: a reasonable trier of fact could find that the parties had variances approving deviations from the certification standards and that Fiteq's software can be certified. Thus, the Court cannot, at this stage, determine that Plaintiff breached the OA, thereby relieving Defendants of their obligations.

Defendants next argue that Plaintiff expressly breached its duty under the OA to provide notice of and an acceptable cure recommendation for any fundamental flaw in the design by failing to inform Defendants that Plaintiff believed lamination was a "fundamentally flawed" approach. Mot. at 18-19. Defendants offer Ms. Ziegler's deposition testimony that "it was very important to . . . get away from the lamination as the sole means of keeping the card together because we always had air bubbles" using that technique at PrivaSys. ECF 313-2, Exh. 2 at 102-103. Defendants additionally point to Ms. Ziegler's deposition testimony that FiTeq turned Privasys' lamination process over to Venture "[w]ith its known design flaws," ECF 313-2, Exh. 1 at 83, and sent a prototype laminator to Venture, ECF 313-2, Exh. 2 at 100-101. Defendants also

1   offer similar deposition testimony by Mr. Foo—that he "transfer[red] whatever know-how in [*sic*]

2   PrivaSys to Venture," including manufacturing process instructions for lamination, and delivered

3   the manual prototype machine to Venture. ECF 313-4, Exh. 11 at 92, 98-99. This evidence

4   suggests that Plaintiff provided Venture with a manufacturing process it knew to be flawed.

5          However, this evidence also shows that Plaintiff communicated these flaws to Venture. For

6   example, Ms. Ziegler testified that FiTeq "went to Venture at the beginning [and] the one thing we

7   really focused on in getting scale manufacturing is [] we can't use that lamination, because it's

8   inherently flawed." ECF 313-2, Exh. 2 at 102-103. Similarly, Mr. Foo testified that "of course,

9   when I transferred those document[s with process instructions] . . . I also let [Venture] know that

10  this is [a] manual process" with a "very long" cycle time. Exh. 11 at 92. Mr. Foo testified that

11  FiTeq did not know which process was best and so "le[ft] it open" to give Venture a chance to

12  improve lamination because  he saw Venture as a "solid engineering company" with "the

13  resources to actually . . . improve [the process]." *Id.* at 93-94. At the same time, he alerted Venture

14  to other production processes, like Innovatier's RIM process, "so at least [Venture] ha[d] an

15  alternative to choose what [it] want[ed]." *Id.* at 92-94. This evidence does not suffice to show that

16  Plaintiff believed the lamination process would necessarily fail. In addition, the evidence suggests

17  that Plaintiff alerted Defendants to the challenges of the manual lamination process early in their

18  collaboration. Thus, the Court finds that Defendants have not met their burden for summary

19  judgment on this basis.

20         Finally, Defendants argue that Plaintiff breached the OA by working with Innovatier to

21  develop the card while contractually obligated to exclusively use Venture, *see* OA § 3.2.

22  Defendants offer a chart titled "FiTeq, Inc., Profit & Loss Detail" to show that FiTeq began

23  making payments to Innovatier in 2012. *See* ECF 313-16, Exh. 56 (showing payments to

24  Innovatier for "Hardware" beginning in February 2012). This evidence suffices to shift the burden

25  to Plaintiff to show a triable issue regarding its breach of § 3.2.

26         Plaintiff does not dispute that it worked with Innovatier as early as 2012, but contends that

27  it did so at Venture's request and that FiTeq's independent work with Innovatier did not begin

28  until October 2014, more than a year after the termination of the OA. Opp. at 11-13, 24. The

United States District Court<br>Northern District of California

United States District Court
Northern District of California

evidence Plaintiff provides to show Venture's desire to work with Innovatier in 2012 includes: 1) an email from Mr. Thian titled "Innovatier—The Path Forward" stating "we want to move forward quickly to validate the Innovatier process[] for capacity expansion instead of buying more and higher capacity lamination equipment," ECF 331-7, Exh. 110 at 2; 2) an email dated February 13, 2012 from Wong Chee Weng, then Director of Venture's R&D Development, to Ms. Ziegler describing his visit to Innovatier and his excitement regarding the injection molding process, ECF 331-8, Exh. 111; 3) a February 6, 2012 email from Mr. Thian proposing that Venture license Innovatier's technology and do the manufacturing itself, ECF 331-8, Exh. 112; 4) a June 2012 email from Innovatier's Lawrence Keim to Venture employees discussing a draft license agreement between Innovatier and Venture, ECF 331-8, Exh. 113; 5) a July 2012 email from Mr. Thian proposing that "[w]e move ahead with Innovatior's [*sic*] process evaluation/adaptation to FiTeq card design," ECF 331-8, Exh. 114; and 6) an email from Mr. Thian to Ms. Ziegler stating that without closure on SOWs between Venture and FiTeq on ATM and display cards, the "Innovatier evaluation/process adaption are on hold" on July 18, 2012, ECF 331-9, Exh. 119. On the basis of this evidence, cast in the light most favorable to Plaintiff, a reasonable trier of fact could conclude that Venture led the charge to involve Innovatier throughout 2012. Thus, the Court cannot find, at this stage, that Plaintiff breached the OA by engaging a third party for engineering. Accordingly, Defendants' motion for summary adjudication of Plaintiff's breach of contract claims on this basis is DENIED.

### D. Mistake as Excuse

Defendants next ask the Court to find that Defendants are excused from performing under the OA because Defendants, or both parties, were "at least mistaken about" 1) card personalization being required to meet card certification requirements; 2) certification of Plaintiff's Authenticator software being required; and 3) the fact that lamination was "inherently flawed." Mot. at 21. Defendants argue that, if both parties were mistaken, Plaintiff cannot enforce the OA against Defendants because Defendants would not have entered into or continued performance under the OA had they known the truth. *Id.* at 22. Alternatively, Defendants argue that if only they were mistaken, Plaintiff still cannot enforce the OA against them because it knew or should have known

1   that Defendants were mistaken and took advantage of that mistake. *Id.* at 22.

2          However, Defendants do not offer any evidence of mistake. Instead, they again ask the

3   Court to consider the evidence offered above to show that Plaintiff provided deficient

4   specifications and that Plaintiff knew the lamination process was inherently flawed—evidence the

5   Court has already found insufficient at this stage and that, furthermore, does not suggest a

6   mistaken belief by either party. Accordingly, Defendants' motion for summary judgment of the

7   breach of contract claims in their favor on the basis of mistake is DENIED.

8          **E. Liability on Counterclaims**

9          Finally, Defendants ask the Court to grant summary judgment in their favor on Plaintiff's

10  liability for their counterclaims based on Plaintiff's failure to 1) assign 50 percent of the

11  manufacturing intellectual property to Defendants, 2) pay for Defendants' stocks and inventory,

12  and 3) pay for the Citibank prototype cards.

13         *1. Assignment of Intellectual Property*

14         Defendants argue that pursuant to § 8.5 of the OA, Plaintiff must assign them 50 percent of

15  intellectual property related to "Venture's lamination process" and "Venture's design of the card's

16  internal coil for SMT application." Mot. at 19. Under § 8.5, "FiTeq and Venture shall be co-

17  owners of any intellectual property that is related to the manufacturing process of the FiTeq

18  Cards." Defendants offer deposition testimony by Ms. Ziegler stating that the coil design is

19  important for card manufacturing, ECF 313-4, Exh. 12 at 143, and deposition testimony by

20  Venture's Chia Kar Lin identifying the lamination process as a manufacturing process, ECF 313-

21  4, Exh. 15 at 19. Finally, Defendants point to ¶ 9 of the declaration by Venture's C.H. Tan to

22  establish that Plaintiff has not assigned this IP to Defendants. ECF 313-12, Exh. 33 ¶ 9. This

23  evidence suffices to shift the burden to Plaintiff.

24         In response, Plaintiff argues that the OA assigns FiTeq 100 percent of IP developed in the

25  design and engineering phase and 50 percent of the IP developed in the manufacturing phase.

26  However, this mischaracterizes the language of the agreement, which, as quoted above, grants co-

27  ownership over IP "related to the manufacturing process," not developed in the manufacturing

28  phase. The only piece of evidence Plaintiff offers for this argument—an October 2011 email from

1    an attorney assisting in the management of Venture's IP portfolio to FiTeq's patent attorney

2    stating that an invention was "solely created by the employees of Venture" but "the parties agree

3    that such invention will be co-owned"—does not support it. ECF 331-4, Exh. 89 at 1.

4    Accordingly, the Court agrees with Defendants' reading of the OA.

5         With regard to classifying the lamination process and internal coil design as "related to the

6    manufacturing process," Plaintiff does not contest the former but identifies the latter as design

7    work. However, Plaintiff offers no evidence to support its position. Similarly, Plaintiff offers

8    argument but no evidence to dispute Defendants' position that it has not assigned them the IP

9    rights. Accordingly, the Court GRANTS Defendants' motion for adjudication that Plaintiff is

10   liable to Defendants for not assigning them co-ownership of IP related to the lamination process

11   and coil design.

12        ### 2. Payment for Stocks and Inventory

13        Defendants argue that the OA requires Plaintiff to purchase Venture's remaining stocks

14   and inventory upon termination of the OA and that Plaintiff has not paid for them. Mot. at 19.

15   Defendants direct the Court to § 12.4(h) of the OA, which provides, "all stocks and inventory shall

16   be sold to FiTeq at the last agreed Unit Price and a price equal to their cost to Venture,

17   respectively." Defendants do not ask the Court to determine the amount FiTeq owes, but only that

18   it is liable to buy back stocks and inventory.

19        Plaintiff does not dispute that it has not paid Defendants for stocks and inventory, *see* ECF

20   85, Pl.'s Answer ¶ 68, but disputes the amount Venture requests. Opp. at 24. Because the amount

21   is not before the Court and Plaintiff has failed to present any other triable issue, the Court

22   GRANTS Defendants' motion for summary adjudication of Plaintiff's liability for payment for

23   stocks and inventory.

24        ### 3. Payment for Prototype Cards

25        Finally, Defendants contend that Plaintiff must pay Venture for approximately 2,000

26   prototype cards Venture made for a Citibank trial and for which Plaintiff received $300,000.

27   Defendants offer Ms. Ziegler's deposition testimony that Venture made about 2,000 prototype

28   cards with a number of rejects, resulting in approximately 1,100 cards for the trial. Exh. 6 132-

United States District Court
Northern District of California

26

1    133. Ms. Ziegler also testified that Citibank paid $300,000 for the cards and for related training

2    services. *Id.* In addition, Ms. Ziegler acknowledged that FiTeq agreed to pay an amount on a per-

3    card basis and that FiTeq has a reserve on its books for the payment *Id.* This evidence suffices to

4    shift the burden to Plaintiff.

5         Plaintiff disputes its liability to pay for the Citibank prototypes. It offers an August 2012

6    email from Mr. Thian stating "[t]he SOW does require Venture to produce 5,000 cards to

7    demonstrate yield of 95% at PP." Given the date of the email, it is unclear whether the

8    requirement applies to the Citibank cards, produced in 2010-2011. Furthermore, the email

9    continues, "[FiTeq] will pick up the tab for the testers." A reasonable trier of fact could not read

10   this email to relieve Plaintiff of its obligation to pay for the prototype cards.

11        Plaintiff additionally argues that it has no obligation to pay for defective cards, and offers a

12   study showing various defects in the cards provided to Citibank, *see* Exh. 132, but does not

13   provide support for its lack of obligation to pay for such cards. Accordingly, Plaintiff has failed to

14   establish a triable issue of material fact and Defendants' motion for summary adjudication in their

15   favor of Plaintiff's liability to pay for the cards developed for the Citibank trial is GRANTED.

16        **IT IS SO ORDERED.**

17

18   Dated:  March 14, 2016

19                                    _Beth Labson Freeman_

20                                    BETH LABSON FREEMAN
                                      United States District Judge

21

22

23

24

25

26

27

28

United States District Court
Northern District of California